# INDIVIDUAL PATIENT'S AUTHORIZATION

**THIS FORM IS TO CONFIRM YOUR AUTHORIZATION TO USE OR DISCLOSE YOUR PROTECTED HEALTH INFORMATION FOR A SPECIAL PURPOSE.**

**PSYCHOTHERAPY NOTES:** ✓ Check here if this authorization is for psychotherapy notes.

*If this authorization is for psychotherapy notes, it may not authorize the use or disclosure of any other type of protected health information.*

### 1. INDIVIDUAL PATIENT (OR PERSONAL REPRESENTATIVE) CONFIRMING THE AUTHORIZATION

I give my authorization to use or disclose my protected health information as described in Section 2 below. I give this authorization voluntarily.

Individual Patient's Name: ROSEMARIE TAIMANGLO

Your Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Your Address: _____

Your Telephone Number: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Your E-Mail Address: _____

Your Patient Account Number: _____

Your Social Security Number: _____

### 2. THE USE AND/OR DISCLOSURE AUTHORIZED

Describe in detail the protected health information you are authorizing to be used and/or disclosed (if this authorization is for psychotherapy notes, no other type of protected health information may be listed here):

< *see above* >

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to use and/or to disclose the protected health information described above.

**Lilli Perez Iyechad, PhD, RPT-S**
**FAMILY PACIFIC**
Reflection Center, Suite 102
222 Chalan Santo Papa, Hagatna 96910
Tel.: (671) 477-5715 ~ Fax: (671) 477-5714

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to receive and use your protected health information.

*prior authorization to release information to Law Office of Phillip Torres & Thomas Roberts*

**EXHIBIT 6**



## INDIVIDUAL PATIENT'S AUTHORIZATION

Describe each purpose for which you are authorizing your protected health information to be used and/or disclosed.

*To verify mental status*

**3. ENDING THIS AUTHORIZATION**

Select one of the following two choices.

☑ This authorization will end on the following date: **07/05/07**

☑ This authorization will end when the following event happens. The event must relate to the individual or the purpose of the authorized use and/or disclosure. Describe the event below:

*Prior authorization given 03/01/07.*

See attached

**4. CHANGING YOUR MIND ABOUT THIS AUTHORIZATION**

I understand that I may revoke this authorization at any time by giving written notice to the Privacy Officer at your office. However, I understand that I may not revoke this authorization for any actions taken before receipt of my written notice to revoke this authorization. In addition, I understand that if I am giving this authorization as a condition of obtaining insurance coverage, and I revoke this authorization, the insurance company has a right to contest my claims under the insurance policy.

**5. SIGNING THIS AUTHORIZATION IS NOT A CONDITION OF TREATMENT**

I understand that under most circumstances a healthcare provider may not condition treatment, payment, enrollment, or eligibility for benefits on my signing this authorization. However, I understand that signing an authorization that permits the use and/or disclosure of my protected health information for research purposes may be a condition of my treatment if I am undergoing research-related treatment. Also, I may be required to sign an authorization if my treatment is provided solely for the purpose of creating protected health information for disclosure to a third party. And under some circumstances, a health plan may condition my enrollment in a health plan or my eligibility for benefits on my providing an authorization permitting the health plan to make enrollment and eligibility determinations.

**6. INDIVIDUAL PATIENT'S SIGNATURE**

I have had the chance to read and think about the content of this authorization form and I agree with all statements made in this authorization. I understand that, by signing this form, I am confirming my authorization for use and/or disclosure of the protected health information described in this form with the people and/or organizations named in this form.

Signature: _____ Date: **07/05/07**

If this authorization form is signed by a personal representative for the individual patient:

Personal Representative's Name: _____

Print name

_____
Signature

Relationship to Individual Patient: _____

**YOU HAVE A RIGHT TO HAVE A COPY OF THIS FORM AFTER YOU SIGN IT.**



# INDIVIDUAL PATIENT'S AUTHORIZATION

**THIS FORM IS TO CONFIRM YOUR AUTHORIZATION TO USE OR DISCLOSE YOUR PROTECTED HEALTH INFORMATION FOR A SPECIAL PURPOSE.**

**PSYCHOTHERAPY NOTES:** ✓ Check here if this authorization is for psychotherapy notes.

*If this authorization is for psychotherapy notes, it may not authorize the use or disclosure of any other type of protected health information.*

**1. INDIVIDUAL PATIENT (OR PERSONAL REPRESENTATIVE) CONFIRMING THE AUTHORIZATION**

I give my authorization to use or disclose my protected health information as described in Section 2 below. I give this authorization voluntarily.

Individual Patient's Name: VIVIENE VILLANUEVA

Your Address: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Your Address: ▇▇▇▇▇▇▇

Your Telephone Number: ▇▇▇▇▇▇▇

Your E-Mail Address: _____

Your Patient Account Number: _____

Your Social Security Number: _____

**2. THE USE AND/OR DISCLOSURE AUTHORIZED**

Describe in detail the protected health information you are authorizing to be used and/or disclosed (if this authorization is for psychotherapy notes, no other type of protected health information may be listed here):

_____

_____

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to use and/or to disclose the protected health information described above.

**Tom V.C. Babauta, MSW, QCSW**
~~FAMILY PACIFIC~~
Reflection Center, Suite 102
~~222 Chalan Santo Papa, Hagatna 96910~~
Tel.: (671) 477-5715 ~ Fax: (671) 477-5714

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to receive and use your protected health information.

PRIOR AUTHORIZATION TO RELEASE INFORMATION TO LAW OFFICES OF PHIL TORRES & THOMAS ROBERTS

## EXHIBIT 7

## INDIVIDUAL PATIENT'S AUTHORIZATION

Describe each purpose for which you are authorizing your protected health information to be used and/or disclosed.

TO VERIFY MENTAL STATUS

---

### 3. ENDING THIS AUTHORIZATION

Select one of the following two choices.

☑ This authorization will end on the following date: __07/25/07__

☑ This authorization will end when the following event happens. The event must relate to the individual or the purpose of the authorized use and/or disclosure. Describe the event below:

---

### 4. CHANGING YOUR MIND ABOUT THIS AUTHORIZATION

I understand that I may revoke this authorization at any time by giving written notice to the Privacy Officer at your office. However, I understand that I may not revoke this authorization for any actions taken before receipt of my written notice to revoke this authorization. In addition, I understand that if I am giving this authorization as a condition of obtaining insurance coverage, and I revoke this authorization, the insurance company has a right to contest my claims under the insurance policy.

### 5. SIGNING THIS AUTHORIZATION IS NOT A CONDITION OF TREATMENT

I understand that under most circumstances a healthcare provider may not condition treatment, payment, enrollment, or eligibility for benefits on my signing this authorization. However, I understand that signing an authorization that permits the use and/or disclosure of my protected health information for research purposes may be a condition of my treatment if I am undergoing research-related treatment. Also, I may be required to sign an authorization if my treatment is provided solely for the purpose of creating protected health information for disclosure to a third party. And under some circumstances, a health plan may condition my enrollment in a health plan or my eligibility for benefits on my providing an authorization permitting the health plan to make enrollment and eligibility determinations.

### 6. INDIVIDUAL PATIENT'S SIGNATURE

I have had the chance to read and think about the content of this authorization form and I agree with all statements made in this authorization. I understand that, by signing this form, I am confirming my authorization for use and/or disclosure of the protected health information described in this form with the people and/or organizations named in this form.

Signature: _____V·Villanueva_____ Date: _7/25/07_

If this authorization form is signed by a personal representative for the individual patient:

Personal Representative's Name: _____

_____
Print name

_____
Signature

Relationship to Individual Patient: _____

**YOU HAVE A RIGHT TO HAVE A COPY OF THIS FORM AFTER YOU SIGN IT.**

# INDIVIDUAL PATIENT'S AUTHORIZATION

**THIS FORM IS TO CONFIRM YOUR AUTHORIZATION TO USE OR DISCLOSE YOUR PROTECTED HEALTH INFORMATION FOR A SPECIAL PURPOSE.**

**PSYCHOTHERAPY NOTES:** __✓ Check here if this authorization is for psychotherapy notes.

*If this authorization is for psychotherapy notes, it may not authorize the use or disclosure of any other type of protected health information.*

## 1. INDIVIDUAL PATIENT (OR PERSONAL REPRESENTATIVE) CONFIRMING THE AUTHORIZATION

I give my authorization to use or disclose my protected health information as described in Section 2 below. I give this authorization voluntarily.

Individual Patient's Name: _Jennifer T. Holbrook_

Your Address: _P.O. BOX EE 315734 Tamuning GU 96931_

Your Address: _____

Your Telephone Number: ████████

Your E-Mail Address: _____

Your Patient Account Number: _____

Your Social Security Number: _____

## 2. THE USE AND/OR DISCLOSURE AUTHORIZED

Describe in detail the protected health information you are authorizing to be used and/or disclosed (if this authorization is for psychotherapy notes, no other type of protected health information may be listed here):

_____

_____

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to use and/or to disclose the protected health information described above.

| Lilli Perez Iyechad, PhD, RPT-S | Tom V.C. Babauta, MSW, QCSW |
|---|---|
| **FAMILY PACIFIC** | **FAMILY PACIFIC** |
| Reflection Center, Suite 102 | Reflection Center, Suite 102 |
| 222 Chalan Santo Papa, Hagatna 96910 | 222 Chalan Santo Papa, Hagatna 96910 |
| Tel.: (671) 477-5715 ~ Fax: (671) 477-5714 | Tel.: (671) 477-5715 ~ Fax: (671) 477-5714 |

Name the people and/or organizations (or the kinds of people and/or organizations) that you are authorizing to receive and use your protected health information.

_Prior authorization to release information to Law office of Phillip Torres & Thomas Roberts only_

_____

**EXHIBIT 8**



## INDIVIDUAL PATIENT'S AUTHORIZATION

Describe each purpose for which you are authorizing your protected health information to be used and/or disclosed.

*to verify mental status*

---

### 3. ENDING THIS AUTHORIZATION

Select one of the following two choices.

☑ This authorization will end on the following date: **7/24/07**

☐ This authorization will end when the following event happens. The event must relate to the individual or the purpose of the authorized use and/or disclosure. Describe the event below:

---

### 4. CHANGING YOUR MIND ABOUT THIS AUTHORIZATION

I understand that I may revoke this authorization at any time by giving written notice to the Privacy Officer at your office. However, I understand that I may not revoke this authorization for any actions taken before receipt of my written notice to revoke this authorization. In addition, I understand that if I am giving this authorization as a condition of obtaining insurance coverage, and I revoke this authorization, the insurance company has a right to contest my claims under the insurance policy.

### 5. SIGNING THIS AUTHORIZATION IS NOT A CONDITION OF TREATMENT

I understand that under most circumstances a healthcare provider may not condition treatment, payment, enrollment, or eligibility for benefits on my signing this authorization. However, I understand that signing an authorization that permits the use and/or disclosure of my protected health information for research purposes may be a condition of my treatment if I am undergoing research-related treatment. Also, I may be required to sign an authorization if my treatment is provided solely for the purpose of creating protected health information for disclosure to a third party. And under some circumstances, a health plan may condition my enrollment in a health plan or my eligibility for benefits on my providing an authorization permitting the health plan to make enrollment and eligibility determinations.

### 6. INDIVIDUAL PATIENT'S SIGNATURE

I have had the chance to read and think about the content of this authorization form and I agree with all statements made in this authorization. I understand that, by signing this form, I am confirming my authorization for use and/or disclosure of the protected health information described in this form with the people and/or organizations named in this form.

Signature: _____

If this authorization form is signed by a personal representative for the individual patient:

Personal Representative's Name: _____

Print name

_____

Signature

Relationship to Individual Patient: _____

**YOU HAVE A RIGHT TO HAVE A COPY OF THIS FORM AFTER YOU SIGN IT.**

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>        Plaintiff,<br><br>        vs.<br><br>LEO PALACE RESORT,<br><br>        Defendant.<br>_____<br>JENNIFER HOLBROOK,<br>VIVIENE VILLANUEVA and<br>ROSEMARIE TAIMANGLO,<br><br>        Plaintiff-Intervenors,<br><br>        vs.<br><br>MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10,<br><br>        Defendants.<br>_____ | CASE NO. 1:06-CV-00028<br><br><br><br>DEPOSITION OF<br>JENNIFER HOLBROOK<br>SATURDAY,<br>MARCH 17, 2007 |

RECEIVED
APR 17 2007
11:33am
DOOLEY ROBERTS & FOWLER LLP

The deposition of **Jennifer Holbrook**, called by the Defendants, pursuant to Notice and pursuant to the Guam Rules of Civil Procedure, taken at the offices of Dooley Roberts & Fowler, LLP, Suite 201, Orlean Pacific Plaza, 865 South Marine Corps Drive, Tamuning, Guam 96913, on Saturday, March 17, 2007, at the hour of 7 o'clock a.m.

That at said time and place, there transpired the following:

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727
Fax: (671) 632-5353
Email: chilangflores@hotmail.com

EXHIBIT 9    COPY

1    Q.    Okay.  Why did you go see Dr. Perez?

2    A.    Because I was stressed.

3    Q.    When did you first see Dr. Perez?

4               MS. MORRISON:  Objection; vague.

5               MR. ROBERTS:  Yeah.

6    Q.    (By Mr. Roberts)  When were you first counseled

7    by Dr. Perez with respect to the incident that occurred

8    at LeoPalace Resort?

9    A.    I don't remember.

10   Q.    Was it before you quit?

11   A.    Yes, it was.

12   Q.    Was it before you complained about sexual

13   harassment?

14   A.    To who?  To who?

15   Q.    Yeah, good question.  Was it before your

16   attorney sent this letter of August 16th?

17   A.    No, it was after.

18   Q.    What was Dr. Perez' advice with respect to your

19   work schedule in this letter?  I mean, didn't Dr. Perez

20   recommend two weeks for you?

21   A.    Yes.

22   Q.    And why didn't you follow your therapist's

23   advice?

24   A.    I couldn't afford it.

25   Q.    How many times were you counseled by Dr. Perez?

1    *A.*    I don't remember.

2    *Q.*    Was it more than one?

3    *A.*    Yes.

4    *Q.*    Was it more than two?

5    *A.*    Yes.

6    *Q.*    More than three?

7    *A.*    Uh, I don't remember.

8    *Q.*    When is the last time you were counseled by Dr.

9    Perez?

10   *A.*    I don't remember.

11              MR. ROBERTS:  I've said this before but

12   I'll reiterate.  I requested Dr. Perez' records in

13   discovery back on January 31st in a request for

14   production of documents, and I sent a HIPPA waiver form,

15   but I have not received these documents yet.  And I have

16   to reserve my right to take your deposition again if my

17   -- the absence of those records here today has

18   prejudiced my ability to take your deposition in any

19   way.

20              Having said --

21              MR. TORRES:  My response.  I have

22   forwarded the HIPPA request and I have requested the

23   records and I have forwarded to you everything I have

24   received from Dr. Perez.  I have yet to receive

25   responses from them.

1        MR. ROBERTS:  I understand.

2    Q.   (By Mr. Roberts)  Did Dr. Perez charge you?

3    A.   A fee?

4    Q.   Yes.

5    A.   Yes.

6    Q.   Do you remember what it cost per session?

7    A.   No.

8    Q.   Did you pay it?

9    A.   Yes.

10   Q.   Did she ever come to a diagnosis of what was

11   bothering you, to your knowledge?

12   A.   Yes.

13   Q.   And what was her diagnosis?

14   A.   Post-traumatic stress.

15   Q.   Post-traumatic stress.  Do you remember those

16   words exactly?

17   A.   I was told that.

18   Q.   Those three words, post-traumatic stress?

19   A.   It was an abbreviation, P -- I don't --

20   Q.   Was it PTSD?

21   A.   Probably.

22   Q.   Post-traumatic stress disorder; have you heard

23   those words?

24   A.   I don't remember.

25   Q.   Do you remember if she used the words acute

1    stress disorder?

2        *A.*     No.

3        *Q.*     Post-traumatic stress are the words you

4    remember, right?

5        *A.*     Yes.

6        *Q.*     The records will say what they say.

7        *A.*     Yes.

8        *Q.*     Why did you stop seeing -- I've asked you this?

9    Why did you stop seeing Dr. Perez?

10       *A.*     I believe our sessions -- we worked on dealing

11   with the issues and she helped me through many sessions,

12   or the sessions that I went through, understand how to

13   cope with this.

14       *Q.*     Did she prescribe any medication?

15       *A.*     No.

16       *Q.*     And did you, as a result of your sessions with

17   Dr. Perez, come to be able to cope with the stress that

18   you were feeling?

19       *A.*     Yes.

20       *Q.*     After you resigned from LeoPalace, did you get

21   another job?

22       *A.*     Yes.

23       *Q.*     When?

24       *A.*     I don't remember.

25       *Q.*     Did you finish your degree first, which you got

1   unfriendly environment.  It's like we couldn't talk to

2   anybody anymore.  It wasn't the same anymore, it was

3   just so unhappy being there from my perspective.

4       Q.    Can I have that exhibit back, please?  Well,

5   you were still able to talk with Mr. Suzuki, right?

6       A.    I did, I spoke to him.  I continued doing my

7   job.  If I had to communicate with my supervisor, he was

8   the one I communicated with.

9       Q.    Yeah, you went to him and said, "Hey, what's up

10  with these hours," right?

11      A.    I asked him about my hours.

12      Q.    And he wasn't rude to you, was he?

13      A.    No, I don't think so.

14      Q.    Can you look at Exhibit 16, I believe -- no,

15  15.  You haven't seen this document, but this was given

16  to me by the EEOC and there's an EEOC Bates stamp that's

17  partially cut off, it's marked as Exhibit 15.  Mr.

18  Griffin reported -- this is a report by Mr. Griffin

19  after his conversation with you on or about April 5th of

20  2005.  Mr. Griffin wrote after Christine Camacho was

21  discharged, you told him that you retained legal counsel

22  and were advised to go see a therapist because of their

23  ordeal with sexual harassment.  Did you tell Mr. Griffin

24  that?

25      A.    I don't remember.

1    Q.    Do you remember, were you advised to go seek a

2    therapist?

3    A.    Does that breach patient --

4    Q.    No, it doesn't breach doctor-patient privilege

5    but it may breach another privilege.

6    A.    I believe -- yes, I believe so, that it was a

7    recommendation to seek -- to see a therapist about our

8    stress.

9    Q.    By whom?

10    A.    By Phil.

11    Q.    I know you've testified today that you were

12    sexually harassed on the workplace.  I want to ask you,

13    do you feel like -- new subject -- do you feel that you

14    were discriminated against in any way by LeoPalace

15    Resort?

16    A.    Explain discrimination.

17    Q.    Do you think you were treated differently --

18    before August 16th, before Phil wrote his letter, your

19    sexual harassment complaint, do you feel like management

20    treated you differently than other employees?

21    A.    Before August 16th, was I treated differently?

22    Q.    Yes.  I'll just ask you a direct question;

23    okay?

24    A.    Okay.

25    Q.    Do you feel like you were treated differently

1  anymore with Mr.Maruyama.  Or that Mr. Suzuki and

2  everybody felt like we were the bad guys and they

3  weren't talking to us anymore.

4                 MR. ROBERTS:  Objection; the witness is

5  speculating as to what other people's feelings were.

6      A.    Okay; sorry.

7                 MR. ROBERTS:  You don't have to say

8  you're sorry.  You can answer the question now that I've

9  objected to it.

10     A.    You know, I -- they didn't -- why?  I felt I

11 was doing my job and I continued going to work during

12 those times even though we were short of staff.  I --

13 yeah, I really believed that everything was going to be

14 better.  I did my job, I provided excellent customer

15 service and yet I got treated a lot differently, like no

16 -- basically, it wasn't the same anymore.

17     Q.    (By Mr. Torres)  When you went to see the

18 psychiatrist, you testified that you went on my

19 recommendation.

20     A.    Yes.

21     Q.    How long have I known you?

22     A.    A few years.

23     Q.    And you came to see me as an attorney?

24     A.    Friend attorney; yes.

25     Q.    So we have both kinds of relationships?

1    **A.**    Yes.

2    **Q.**    And did you -- in your mind, was I making that

3    recommendation to go see a psychiatrist as your friend

4    or as your lawyer?

5    **A.**    A friend.

6    **Q.**    And that psychiatrist recommended that you take

7    two weeks off?

8    **A.**    Yes.

9    **Q.**    And you didn't do that?

10   **A.**    No.

11   **Q.**    Why?

12   **A.**    Because I couldn't afford to take two weeks off

13   and not be paid for it.

14   **Q.**    But everybody has bills; what do you mean you

15   can't afford it?

16   **A.**    I had no other source of income.  I had to take

17   care of myself, my son -- you know, pay for my personal

18   loans at the time.

19   **Q.**    Who's your son; how old is your son?

20   **A.**    He is four years old.

21   **Q.**    You were shown various declarations, Exhibits

22   13, 14, 15 -- or 13 and 14.

23   **A.**    Okay.

24   **Q.**    13 is called a Supplemental Declaration.  Did

25   you know what this was specifically addressing?

## IN THE DISTRICT COURT OF GUAM

U.S. EQUAL EMPLOYMENT ) CASE NO. 1:06-CV-00028
OPPORTUNITY COMMISSION, )
                           )
          Plaintiff, )
                           )
         vs. )
                           )  **◁ COPY**
LEO PALACE RESORT, )
                           )
        Defendant. )
JENNIFER HOLBROOK, )
VIVIENE VILLANUEVA and )
ROSEMARIE TAIMANGLO, )
                           )
      Plaintiff-Intervenors, )
                           )
         vs. )
                           )
MDI GUAM CORPORATION dba LEO )
PALACE RESORT MANENGGON HILLS )
and DOES 1 through 10, )
                           )
      Defendants. )

### _DEPOSITION OF ROSEMARIE TAIMANGLO_

*Taken on Behalf of the Defendant*


         BE IT REMEMBERED That, pursuant to

the Guam Rules of Civil Procedure, the deposition of

Rosemarie Taimanglo was taken before Veronica F. Reilly,

Certified Shorthand Reporter, on Tuesday, the 20th day of

March 2007, at 9:00 a.m. in the Law Offices of Dooley Roberts

& Fowler, 865 South Marine Corps Drive, Suite 201, Orlean

Pacific Plaza, Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

**DISK ENCLOSED**

Case 1:06-cv-00028     Document 39-2     Filed 08/06/2007     Page 16 of 33

1   Actually, August 19 I guess it was?

2       A.    (No response.)

3               MR. ROBERTS:  This will be 15.

4                       (Exhibit 15 marked.)

5   BY MR. ROBERTS: (Continuing)

6       Q.    This is a letter that your lawyer delivered to Leo

7   Palace and it appears to be regarding you from your

8   counselor, Lilli Perez Iyechad.  Did you ever see this

9   letter?

10      A.    Yes.

11      Q.    Did you take two weeks off?

12      A.    Yes.

13      Q.    And that's what Lilli recommended you do?

14      A.    Yes.

15      Q.    When did you come back to work?

16      A.    September 2.

17      Q.    And did you work a regular schedule between

18  September 2nd and the end of October when you left the

19  company?

20      A.    Yes, I work the morning shift; yes.

21      Q.    On a regular basis?

22      A.    Yes.

23      Q.    Can you remember any incidents or conversations

24  specifically related to Mr. Mariyama that happened between

25  September 4 when you came back to work and the end of August,

1  before you wrote your October 11th resignation letter?

2     A.   Yes.

3     Q.   How long before October 11, if you can recall?

4     A.   I think after I accepted the job off at Wells Fargo.

5  I don't know how many days after.  I know it's just days but

6  I don't remember the date.

7     Q.   Are you saying like a few days before October 11th,

8  you had accepted the job with Wells Fargo?

9     A.   Yes.

10    Q.   When did you decide to leave your job at Leo Palace?

11    A.   Ending of -- maybe -- when I decided, I decided

12 maybe ending of September.

13    Q.   Did Lilli Perez ever tell you, you ought to get out

14 of that company?

15    A.   I'm sorry?

16    Q.   You know who Dr. Lilli Perez is, right?

17    A.   Yes.

18    Q.   We'll talk about her in a minute.  Did she ever tell

19 you, you ought to leave Leo Palace?

20    A.   I don't remember.

21    Q.   Why did you go see Lilli Perez for treatment?

22    A.   Jennifer actually told me that I should go see

23 Dr. Lilli and also Jennifer had spoke to Mr. Suzuki about it

24 to -- if we can have the same day off so she can take me to a

25 therapist and Mr. Suzuki agreed because I was always crying

1   at work, so I went to see Dr. Lilli.

2       Q.   When you say, I was always crying at work, are you

3   talking about the few-day period between the time that

4   Mariyama-san got your sexual harassment complaint and when

5   you started taking time off, your two weeks off earlier?

6       A.   (No response.)

7       Q.   Just to get the dates right, Jennifer Holbrook

8   testified that the letter, Phil Torres's letter, is dated the

9   16th, but Mariyama and her first talked about it, she said he

10  raised his voice to her the next day on August 17th.  Do you

11  recall that?

12      A.   I don't remember the date.

13      Q.   Okay.  And then I've got a letter here, Exhibit 15,

14  from Lilli Perez to Mr. Suzuki dated August 19 recommending

15  that you be given a two-week leave of absence starting August

16  19.  Do you see that?

17      A.   Yes.

18      Q.   So when you just said I was always crying at the

19  office, are you talking about generally the time period

20  August 17 and 18 before you took your two weeks off?

21      A.   Before.

22      Q.   When did Jennifer tell you you should go see

23  Dr. Perez?

24      A.   Before the 19th.  It's probably between this date

25  and that date.

1     Q.    Okay.  That's what I'm asking?

2     A.    On August 16 --

3     Q.    Between the 16th and the 19th?

4     A.    Yes, sir.

5     Q.    Is probably when Jennifer said you ought to go see

6   Lilli Perez Iyechad?

7     A.    Yes.

8     Q.    Did you see Dr. - am I pronouncing that right -

9   Iyechad?

10     A.    I don't know how to pronounce her name.

11     Q.    You call her Dr. Lilli I'll bet, right?

12     A.    Yeah.

13     Q.    All right.  Let's call her Dr. Lilli then.  When's

14   the first time you saw Dr. Lilli?

15     A.    August 19.

16     Q.    And did you undergo any kind of counseling or

17   therapy that day with Dr. Lilli?

18     A.    She -- yes, she tried to talk to me about what

19   happened to me, but in that session, I was crying again.

20     Q.    Well, let me ask to get you away from that, Rose.

21   How many times did you see Dr. Lilli?

22     A.    Twice.

23     Q.    And that would have been both times in August of

24   2004?

25     A.    Once in August 2004.

1      Q.   And when was the next time you saw her?

2      A.   Last week.

3      Q.   Why did you go see her last week?

4      A.   Because with my attorneys interviewing me, I was

5   still crying after more than two years after what has

6   happened to me.

7      Q.   Have you ever cried on the job at Alupang Beach

8   Tower?

9      A.   Not at work, sir.

10     Q.   Was Dr. Lilli able to make any sort of -- did she

11  tell you what was wrong with you on the first meeting in

12  August of 2004?

13     A.   No.  She only called my doctor to prescribe me a

14  medicine.

15     Q.   Do you remember the name of the medicine?

16     A.   It's spelled.

17     Q.   Does it have two X's in it?

18     A.   Yes.

19     Q.   It's Xanax, right?

20     A.   Yes.

21     Q.   That's an anti -- - Dr. Roberts speaking here - it's

22  an anxiety pill?

23     A.   I don't know.

24     Q.   Did you fill the prescription?

25     A.   I'm sorry?

1    Q.   Did you go to a pharmacy and fill the prescription?

2    A.   (No response.)

3    Q.   Did you get the pills?

4    A.   Yes.

5    Q.   And did it help?

6    A.   Yes, it did.

7    Q.   Are you still taking Xanax today?

8    A.   No, sir.

9    Q.   By the way, today as we speak, are you on any

10 medication?

11    A.   My high blood pill.

12    Q.   Anything else?

13    A.   Medication? Birth control, sir.

14    Q.   I was going to say -- Sorry.

15    A.   That's medication, right?

16    Q.   I was going to ask you, are you on any medication

17 that could interfere with your ability to remember things

18 that happened two and a half years ago. And your answer

19 would be no, right?

20    A.   I'm sorry?

21    Q.   You're not taking any medication as we talk today

22 that would interfere with your ability to remember or testify

23 truthfully, right?

24    A.   No, sir.

25    Q.   How many pills were in your first prescription, if

1   you can remember, or if it's easier for you, how many weeks

2   or months did you take Xanax?

3      A.    I stopped in November that same year, 2004. I

4   didn't take it everyday, only when I felt like I'm emotional,

5   depressed.

6      Q.    After November of 2004, forgetting about last week's

7   appointment with Dr. Lilli, after November of 2004, did you

8   ever see any other counselor or health care specialist as a

9   result of what happened at Leo Palace?

10      A.    You mean therapist?

11      Q.    Therapist, for example. Other than the first visit

12   with Lilli Perez, did you ever see a therapist again?

13      A.    Until this day?

14      Q.    Until last week.

15      A.    Last week, no, sir.

16      Q.    And have you ever seen any physician for any

17   medical condition that happened to you as a result of what

18   happened at Leo Palace, other than Dr. Lilli?

19      A.    I've gone to the doctor for -- I've been sick.

20      Q.    But that's not because of Leo Palace, right?

21      A.    No. I had colds.

22      Q.    You had the sniffles, the flu?

23      A.    (Witness nodded head.)

24      Q.    You were emotionally upset over what happened to you

25   at Leo Palace, right?

1     A.    Stressed.  Emotionally stressed; yes.

2     Q.    And then so you went to see Dr. Lilli on one time?

3     A.    In August.

4     Q.    And did you ever see any other counselor or doctor

5  because you were stressed?

6     A.    No.

7     Q.    And did you ever see any other doctor or health

8  care professional, I already asked this, for anything wrong

9  with your body, physically wrong with your body as a result

10 of what happened at Leo Palace?

11    A.    No.

12    Q.    Did Dr. Lilli say anything to you about your

13 condition in this first meeting with her?

14    A.    I don't remember what she said to me.

15    Q.    Let me ask you just a preliminary question.  Did you

16 take any Xanax at any time during December of 2004 while you

17 were working at Wells Fargo?

18    A.    No.

19    Q.    After you left your Wells Fargo job and before you

20 took your job with Alupang Beach Tower, were you willing to

21 come back to work at Leo Palace?

22    A.    There was a time that I wanted to work for Leo

23 Palace, yes.

24    Q.    Thank you.  Jennifer Holbrook testified that Leo

25 Palace reduced her hours in retaliation for her complaint

1    Q.    And you took that to mean that you needed to go to

2    Mr. Suzuki in the future before you could go to Human

3    Resources?

4    A.    Yes, and that's what I did also on June 2004.

5    Q.    Okay.  Earlier, Mr. Roberts also asked you about

6    whether sexually harassing physical incidents occurred with

7    Christina everyday and you responded no, but did you

8    experience other, like verbal, sexually harassing comments or

9    vulgar language from Christina everyday?

10   A.    Yes, that was daily.

11   Q.    And what sort of things did you experience daily?

12   A.    She would say -- ask us about if we like to be eaten

13   or she'll discuss her sexual things that she does with her

14   girlfriend.

15   Q.    Anything else that you can remember?

16   A.    She would talk to Jennifer about sexual things and

17   Jennifer just ignores her or walks away.

18   Q.    Are you still under the care of Dr. Lilli?

19   A.    Yes.  I have an appointment tomorrow.

20            MS. MORRISON:  I don't have any further

21   questions.

22            MR. TORRES:  I have no questions.

23                    REDIRECT EXAMINATION

24   BY MR. ROBERTS:

25   Q.    Are you saying that Christine Camacho, every single

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>LEO PALACE RESORT,<br><br>        Defendant.<br>JENNIFER HOLBROOK,<br>VIVIENE VILLANUEVA and<br>ROSEMARIE TAIMANGLO,<br><br>    Plaintiff-Intervenors,<br><br>    vs.<br><br>MDI GUAM CORPORATION dba LEO<br>PALACE RESORT MANENGGON HILLS<br>and DOES 1 through 10,<br><br>    Defendants. | CASE NO. 1:06-CV-00028 |

**◻ COPY**

APR 25 2007
DOOLEY ROBERTS & FOWLER LLP

## *DEPOSITION OF VIVIENE VILLANUEVA*

*Taken on Behalf of the Defendant*

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of Viviene Villanueva was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Wednesday, the 21st day of March 2007, at 1:30 p.m. in the Law Offices of Dooley Roberts & Fowler, 865 South Marine Corps Drive, Suite 201, Orlean Pacific Plaza, Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica_reilly@hotmail.com

**DISK ENCLOSED**

1  Q. Do you want to come with us?

2  A. Yes. And I wanted to inform them of what happened.

3  Q. And you said, yeah, I'll go?

4  A. Yes. But I was already there.

5  Q. Say that again?

6  A. I left early because I got scared, then I went

7 straight to her.

8  Q. To Rose's house?

9  A. Yes.

10  Q. And then you left with Rose to go see Phil?

11  A. Yes.

12  Q. When's the next time you went back to work after

13 August 13th?

14  A. I'm not sure.

15  Q. At some point, did you see a counselor who

16 recommended two weeks off?

17  A. Yes.

18  Q. This will be Exhibit 9.

19       (Exhibit 9 marked.)

20 BY MR. ROBERTS: (Continuing)

21  Q. Do you know who Tom Babauta is?

22  A. Yes. He was the therapist I saw but he's not a

23 doctor. He's a --

24  Q. Counselor?

25  A. Counselor.

1    Q.    When did you first see Mr. Babauta?

2    A.    August 19.

3    Q.    And he recommended two weeks off for you, right?

4    A.    Correct.

5    Q.    Did you take two weeks off?

6    A.    Yes, I did.

7    Q.    How many times did you see Mr. Babauta for

8    treatment?

9    A.    Twice.

10   Q.    Did he ever tell you what he thought was wrong with

11   you?

12   A.    All I could remember that he's saying that I had

13   anxiety and stress.

14   Q.    Is Mr. Babauta able to prescribe medicine, to the

15   best your knowledge?

16   A.    I don't know.

17   Q.    Did he send you to another doctor?

18   A.    No.

19   Q.    Did he prescribe any medication for you?

20   A.    No, he did not.

21   Q.    Did any other doctor prescribe medication for you?

22   A.    No.

23   Q.    Did you ever see Dr. Libao?

24   A.    Who?

25   Q.    Okay.  So you never had any prescription medication

1  choice?

2  ~  A.    Well, I thought -- I mean, I had a choice and I

3  didn't want but it was like making a hard decision.

4      Q.    And you chose to quit?

5      A.    I chose to quit.

6      Q.    And was that a voluntary decision?

7      A.    Yes.

8      Q.    You thought about it and you made a voluntary

9  decision to resign your job at Leo Palace; is that correct?

10     A.    Yes.

11     Q.    What were the reasons you decided to go see a

12 counselor?

13     A.    Right after Christina was harassing -- at least on

14 the 11th and specially on the day that she was fired, I felt

15 that some day that she was going to retaliate because of us.

16 And so everyday that I go to work and which is mostly morning

17 shift, and me, I'm the person that would go to work even like

18 more than thirty minutes even though it's closed.  And

19 everyday, when I'll drive, I will be like looking around, is

20 she there, is she anywhere near me, is she around or is

21 anyone in particular, like because she had friends, you know,

22 someone that I don't know, so I have to be watchful.

23     Q.    Do you think Leo Palace should have -- Let me ask it

24 this way:  What do you think Leo Palace should have done, if

25 anything, after it fired Christine Camacho?

1    Q.    Do you know what Palacios did that day with respect

2    to Christine Camacho?

3    A.    I think they investigated.

4    Q.    Do you think they escorted her physically off the

5    Leo Palace premises?

6    A.    I don't know.

7    Q.    You don't know?

8    A.    I don't know.

9    Q.    Did you ever see Christine Camacho on Leo Palace

10   premises after that day?

11   A.    After that day?  No.

12   Q.    What feelings or emotions or other -- feelings or

13   emotions were you experiencing when you decided to go see a

14   counselor?

15   A.    I was having stress, headaches, I couldn't go to

16   sleep, and when I go to sleep, I wake up early morning and

17   cannot go back to sleep again and just cannot think anymore,

18   like cannot concentrate on my work job.

19   Q.    So you saw Tom Babauta how many times?

20   A.    Two times.

21   Q.    Once on August 19, 2004, the first day?

22   A.    Yes.

23   Q.    You had an appointment for September 30 of 2004,

24   too, but you cancelled it, right?

25   A.    Yes, due to car problems.

March 21, 2007 - Viviene Villanueva

1    Q.    Due to car problems?

2    A.    Yes, my car overheating.

3    Q.    And then you had another session on October 5 of

4    2004?

5    A.    Yes, that was the second one.

6    Q.    Have you ever seen Mr. Babauta again for treatment?

7    A.    No.

8    Q.    Have you ever seen any other counselor for treatment

9    after that October 5, 2004?

10   A.    I'm not sure if -- I'm sorry?

11   Q.    Yeah, is October 5, 2004 the last time you sought

12   counseling --

13   A.    Yes.

14   Q.    -- in connection with the Leo Palace incidents?

15   A.    Yes.

16   Q.    Did it help?  The counseling?

17   A.    Yes.

18   Q.    Did your headaches go away?

19   A.    (Witness nodded head.)  A little bit.

20   Q.    After your counseling, did your sleeping patterns

21   improve?

22   A.    It mellowed down.

23   Q.    Did your stress level get better?

24   A.    It improved a little bit, slowly but it didn't

25   actually like over the night; like slowly, gradually.

1    Q.    I understand that you were probably stressed about

2  these depositions that were coming up, right?

3    A.    Yes.

4    Q.    Before you were told about these depositions, how

5  were you doing in terms of your emotional condition as a

6  result of these incidents at Leo Palace?

7    A.    I was doing okay.  I mean, I moved on.

8    Q.    Answer this question if you can.  At what point or

9  at some point after your Leo Palace job, did you feel like

10  I'm over it?

11    A.    No, I still had.

12    Q.    What?

13    A.    I was still bothered.

14    Q.    In what way?

15    A.    Knowing that Christina is still there and if she was

16  going to strike out of the blue.

17    Q.    Well, today, are you over it?

18    A.    I'm over it.

19    Q.    How long do you think you suffered stress as a

20  result of the incidents at Leo Palace?

21    A.    After I resigned?

22    Q.    Yeah, for how many weeks or months did you continue

23  to suffer from stress or anxiety or sleeplessness or any of

24  these symptoms you talked about?

25    A.    I was slowly getting better after three months -

1  about, I'm not sure - and then just slowly.

2     Q.   You said I was slowly getting better after about

3  three months?

4     A.   After about three months, I noticed that I was like

5  healing and not think about what just had happened in the

6  past but there were still some but not that much.

7     Q.   Did you ever miss any time at work with your ·

8  Marriott job because of what happened at Leo Palace?

9     A.   Yes, while I was sick.

10    Q.   No, because of what happened?

11    A.   Oh, I'm sorry.  Leo Palace?

12    Q.   Yeah, because of what you went through at Leo

13  Palace, did you ever miss any time at work at the Marriott?

14    A.   Not in regard to Leo Palace.  I was just sick.  You

15  know, cough, colds.

16    Q.   By the time you started working at Marriott, were

17  you over most of your problems from the Leo Palace?

18    A.   From when I started?

19    Q.   (Nodded head.)

20    A.   Not really.  I mean --

21    Q.   How about a month or two into your job at the

22  Marriott, were you over most your problems from Leo Palace?

23    A.   I would say about three months that I had started to

24  not think about it anymore.

25           MR. ROBERTS:  That's all I have.  Thank you for