Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant LeoPalace Resort



**FILED**
DISTRICT COURT OF GUAM

AUG 2 8 2007 

JEANNE G. QUINATA
**Clerk of Court**

IN THE DISTRICT COURT
OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | CASE NO. 1:06-CV-00028 |
| Plaintiff, | |
| vs. | |
| LEO PALACE RESORT, | |
| Defendant. | **SUPPLEMENTAL DECLARATION OF TIM ROBERTS** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, | |
| Plaintiff-Intervenors, | |
| vs. | |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | |
| Defendants. | |

I, **Tim Roberts**, declare under penalty of perjury as follows:

1.     I am the attorney for Defendant LeoPalace Resort. I have personal knowledge of the matters stated herein, and if called, I could and would testify truthfully thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the transcript of Dr. Lilli Perez-Iyechad's deposition, which took place on July 30, 2007, with exhibits omitted.

ORIGINAL

4.    Attached hereto as Exhibit 2 is a true and correct copy of the transcript of the Tom Babauta deposition, which took place on July 30, 2007, with exhibits omitted.

Under penalty of perjury I declare that the foregoing is true and correct.

Executed this 28th day of August, 2007 in Tamuning, Guam.

**TIM ROBERTS**

F:\Documents\TLR (07-04)\M108\M108-330\M108-330.Mtn to Compel-Reply-TR Supplemental Dec

IN THE DISTRICT COURT OF GUAM

U.S. EQUAL EMPLOYMENT     )   CASE NO. 1:06-CV-00028
OPPORTUNITY COMMISSION,     )
    )
             Plaintiff,    )
    )
          vs.         )
    )
LEO PALACE RESORT,     )
    )
         Defendant.   )
    )
JENNIFER HOLBROOK,     )
VIVIENE VILLANUEVA and   )
ROSEMARIE TAIMANGLO,    )
    )
    Plaintiff-Intervenors,)
    )
         vs.         )
    )
MDI GUAM CORPORATION dba LEO )
PALACE RESORT MANENGGON HILLS )
and DOES 1 through 10,    )
    )
    Defendants.      )

**ORIGINAL**

### *DEPOSITION OF DR. LILLI PEREZ-IYECHAD*

*Taken on Behalf of the Defendant*

BE IT REMEMBERED That, pursuant to

the Guam Rules of Civil Procedure, the deposition of

Dr. Lilli Perez-Iyechad was taken before Veronica F. Reilly,

Certified Shorthand Reporter, on Monday, the 30th day of July

2007, at 1:38 p.m. in the Law Offices of Dooley Roberts &

Fowler, 865 South Marine Corps Drive, Suite 201, Orlean

Pacific Plaza, Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email: veronica.reilly@hotmail.com

EXHIBIT 1

Case 1:06-cv-00028   Document 83   Filed 09/28/2007   Page 3 of 75

APPEARANCES

Appearing on behalf of the Plaintiff-Intervenors:

                TEKER TORRES & TEKER
                Suite 2A
                130 Aspinall Avenue
                Hagatna, Guam 96910
                By:  Mr. Phillip Torres, Esq.
                Phone:  671.477.9891

Appearing on behalf of the Defendant:

                DOOLEY ROBERTS & FOWLER
                Suite 201, Orlean Pacific Plaza
                865 S. Marine Drive
                Tamuning, Guam 96913
                By:  Mr. Tim Roberts, Esq.
                Phone:  671.646.1222

Appearing on behalf of the Plaintiff:

                U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                333 S. Las Vegas Boulevard
                Suite 300
                Las Vegas, Nevada 89101
                By:  Ms. Angela D. Morrison, Esq.
                Phone:  702.388.5072

I N D E X

EXAMINATION

Direct    Cross

Mr. Roberts:                    4

Ms. Morrison:              (None)

Mr. Torres:                (None)


EXHIBITS

Page

Exhibit 1: First Request for Production
of Documents                                    6

Exhibit 2: Authorization for the Release of
Records                                        29

Exhibit 3: Subpoena                             7

Exhibit 4: Subpoena                            15

Exhibit 5: July 26, 2007 letter                17

Exhibit 6: March 21, 2007 letter               37

1          DR. LILLI PEREZ-IYECHAD,

2   called as a witness on behalf of the defendant, having first

3   been duly sworn, was examined and testified as follows:

4

5                    DIRECT EXAMINATION

6   BY MR. ROBERTS:

7       Q.   This is the time and place set for the deposition of

8   Dr. Lilli Perez-Iyechad.  Am I pronouncing it correctly?

9       A.   Yes.

10      Q.   And so have you ever had your deposition before?

11      A.   Yes.

12      Q.   In civil cases like this one where somebody is suing

13  somebody else?

14      A.   I believe it was, yes.

15      Q.   And when I say deposition, I mean a deposition like

16  sitting in this room rather than going to court?

17      A.   I think it might have even been this very room.

18      Q.   Did I take your deposition?

19      A.   We used your office because it was a law firm from

20  Saipan.

21      Q.   Could have been.  Have you ever testified at a

22  trial?

23      A.   Civil case?

24      Q.   Yeah, in court?

25      A.   No.

1    Q.    Have you ever been retained as an expert witness

2    before?

3    A.    In a deposition?

4    Q.    For any purpose in a civil case?

5    A.    Yes, the case that was here.

6    Q.    Were you our expert?  My firm's expert?

7    A.    I think they're an affiliate of yours or the

8    gentleman was a friend of yours.  He's based out of Saipan.

9    Q.    How long was this?

10    A.    About a year and three months ago.

11    Q.    Do you remember what the case was about?

12    A.    Yes.  There was an auto accident in Saipan and a

13    little girl was involved and they were bringing her to Guam

14    for play therapy, PTSD, where I was working with her on post

15    traumatic stress disorder.  A five, six-year-old little girl.

16    Doesn't ring any bells?

17    Q.    Doesn't ring a bell.

18    A.    I don't know that you stayed through the whole

19    thing, but you were here initially because I think we used

20    this very office.

21    Q.    Me personally?

22    A.    Because the guy was a friend of yours.  It looked

23    like he was a friend of yours.

24    Q.    The Saipan lawyer?

25    A.    Yes.

1    Q.    Okay.  I'll figure it out later.  Let me show you

2    what we've marked as Deposition Exhibit 1 and what this is,

3    is documents that are exchanged between lawyers.  Lilli, I

4    just want to ask you, this exhibit consists of a request for

5    documents that we gave to Phil Torres as your patients'

6    lawyer and Phil's response to us as his clients' attorney.

7    Have you ever seen these documents before?

8        A.    No.

9        Q.    Has Phil Torres ever requested certain documents

10   from you before as the attorney for your patients, Rose

11   Taimanglo, Jennifer Holbrook and Viviene Villanueva?

12       A.    Yeah, he had requested at one point in time for a

13   copy of their record and I was sharing with him that because

14   of HIPPA, that that's not something that is common practice.

15   and I shared with him that common practice is a treatment

16   summary and so he was okay with that and then he had asked me

17   to prepare the treatment summary.

18       Q.    Can you look at I guess it's the fourth page under

19   the documents requested section?

20       A.    Right here.

21       Q.    Do you see number one, where it asks for all

22   documents generated by any health care provider, etc., etc.?

23       A.    Uh-huh.

24       Q.    Do you see the second sentence where it says Leo

25   Palace will agree to any reasonable confidentiality agreement

1    with respect to the production of these documents?

2    ⌐  A.    Yes, I see it.

3         Q.    Okay.  Has anybody ever told you that Leo Palace was

4    agreeable to any sort of confidentiality provision with

5    respect to the medical records of your patients?

6         A.    No.  It was never a question that I asked.

7              MR. ROBERTS:  Okay.  Let's go off the record for

8    one second.

9                        (Off the record.)

10                       (Back on the record.)

11   BY MR. ROBERTS:  (Continuing)

12        Q.    This will be Deposition Exhibit 3 and this is --

13   Well, what is this?

14        A.    Are we finished with this one, number one?

15        Q.    Just keep it handy.  Have you ever seen Deposition

16   Exhibit 3 before?

17        A.    Yes.

18        Q.    What day did you receive it?

19        A.    I signed on the 3rd, I guess.

20        Q.    Is that your signature on the upper left-hand

21   portion of the first page of this document?

22        A.    Uh-huh, right under my name.

23        Q.    And what did this subpoena command you to do?

24        A.    It asked for the records whatsoever.  I think I got

25   it on -- that week, I had called.  I think you were off

1  island.  I spoke with Carmen.

2  ⁓  Q.   I'll get to that, Doctor.  What did this particular

3  document ask you to do?

4    A.   It commanded for all record whatsoever related to

5  Jennifer, Rose and/or Viviene.

6    Q.   What day was the scheduled date for you to show up

7  and produce these documents?

8    A.   The 10th of July.

9    Q.   Was that a bad day for you?

10   A.   Yes.  In fact, when I got this, I had called your

11 office and spoke with Carmen and she said don't worry about

12 it.  I told her I was scheduled to leave on July 8 and I

13 think you were off island and our paths were going to cross.

14 So she told me she would convey that message to you and I

15 gave her the date that I was returning.

16   Q.   What happened in terms of scheduling as a result of

17 that conversation with my secretary?

18   A.   Basically, she said, don't worry about it, I'll let

19 him know, enjoy your vacation.

20   Q.   We postponed the deposition, right?

21   A.   I --

22   Q.   Right?

23   A.   Well, yes.  That's my assumption, because she said

24 don't worry about it.  I said please don't tell me I have to

25 cancel my family vacation.

1     Q.   Did you actually go off island?

2     A.   Yes.

3     Q.   Where did you go?

4     A.   Palau.

5     Q.   For how long?

6     A.   A week.

7     Q.   Your married name, that's a Palauan name, right?

8     A.   Yeah.

9     Q.   Your husband is Palauan?

10     A.   Yes.

11     Q.   Did you tell my secretary that you weren't going to

12 produce the request of medical records?

13     A.   No, I didn't.

14     Q.   Did you intend to produce the medical records at the

15 time you spoke with her?

16     A.   At that point in time, I think very interestingly, I

17 had an appointment with one of the women listed on this form,

18 and at that point in time, I asked her were you aware of this

19 and she said, no, I was not aware that they were requesting

20 for the record. And at that point in time, I clarified with

21 her what was being requested.

22     Q.   Let me interrupt you. All three of your patients

23 had previously signed waivers and consent to release of

24 information under the federal HIPPA Act, right?

25     A.   Correct. Yes, they did.

1    Q.    And they did that back in March, I believe?

2    A.    You know, I know they did it earlier.  I'm sorry, I

3    don't have that record.  I'm going to assume it's about

4    March, because when I did the treatment summary, it's dated

5    March 21st, so it must have been before March 21st.

6    Q.    As of March 21, you had your clients sign HIPPA

7    forms, right?

8    A.    No, those were not my HIPPA forms that they signed.

9    Q.    Well, your clients had signed HIPPA release --

10   consent to release of medical information for you to release

11   their medical records to me; correct?

12   A.    Well, it did indicate your firm's name and all three

13   of them had signed it; correct.

14   Q.    And that form authorized them to release their

15   medical records to me -- authorized you to release their

16   medical records to me?

17   A.    Correct.

18   Q.    And Phil Torres had been calling you about the same

19   time trying to obtain these records; correct?

20   A.    Well, I don't know if it's exactly the same time but

21   he had been asking and I shared with him that it is not

22   standard practice and I explained to him why it wasn't

23   standard practice, that psychotherapy notes are different

24   from other kinds of medical records.  For example, if a

25   doctor takes an x-ray of a broken bone, any other doctor can

1  look at the very same x-ray and see the break.  It's crystal

2  clear.

3            Psychotherapy notes are written for the

4  psychotherapist.  And so there's too much room for

5  misinterpretation if someone else picks up our notes and

6  reads through it and that's why I'm sharing with Mr. Torres

7  that it is not standard practice to release psychotherapy

8  notes but the treatment summary is standard practice.

9       Q.   The HIPPA release that you were given, were you

10  given that by Phil Torres?

11       A.   Yes.

12       Q.   Did it have any exception for what standard practice

13  is in your industry or just give us all the records?

14       A.   It said all of the above;  yes.  There were several

15  different categories and the last box was the one that was

16  ticked off and it said all of the above.

17       Q.   And so you decided, rather than complying with what

18  the subpoena said, to only give what you considered to be

19  standard practice in your industry?

20       A.   I did not make that decision on my own.  I did it

21  after consulting with my client.  I shared with her, are you

22  aware of this consent for disclosure and she said, yes.  I

23  said, do you understand when you check off all of the above,

24  that it means everything in your file.  I said are you sure

25  that you want to do that and that's when -- The person I

1   continue to work with is Rose.  I had worked with Jennifer
2   initially and I've not worked with Viviene.  So Rose was the
3   individual that I was speaking with.

4       Q.   When did this conversation take place?

5       A.   March.  I'm guessing it's March because it was
6   before I did the treatment summary and she said, I do not
7   want my records released.  And so I said, okay, are you
8   comfortable with the treatment summary.  And I said, I will
9   read it, I will share it with you before I send it out so
10  that there isn't anything in there that you're not
11  comfortable with and, in fact, I did that.  And then she
12  said, okay, I'm comfortable with this.

13      Q.   So the summary that I received of Rose's course of
14  medical treatment, that was pre-approved by Rose for you to
15  send it to me?

16      A.   Correct.

17      Q.   And she previously told you, I do not want my
18  medical records produced?

19      A.   Yes.

20      Q.   Did she tell you that orally?

21      A.   Yes, she did.

22      Q.   Going back to what you said before, when you asked
23  my secretary for a postponement of the first scheduled
24  deposition, that was in July, right?

25      A.   Actually, I didn't ask her for a postponement.

1    Q.    You said you're going off island, what can I do?

2    A.    Yes.

3    Q.    And she said don't worry about it?

4    A.    Right.

5    Q.    And you're saying that you knew since March that

6    Rose was going to revoke her HIPPA authorization?

7    A.    Well, she didn't revoke it.  She just said she

8    didn't want her whole records released.  She said it was okay

9    to send out the treatment summary.

10    Q.    And, again, if you did not intend to turn over any

11   medical records to me in July, why did you ask for a

12   postponement of the scheduled deposition at which you were

13   supposed to turn over these documents?

14    A.    Can you say that again?  There were too many like

15   adjectives in there.

16    Q.    You asked for a postponement of the deposition in

17   July, right?

18    A.    I did not ask for it.  I just let her know about my

19   schedule and then she said, don't worry about it.  Because if

20   I had no choice, of course I wouldn't go.

21    Q.    Wouldn't go where?

22    A.    On the trip.  If I had no choice.  But when she said

23   don't worry about it, because -- I guess because of the

24   circumstances, you weren't here and I was planning to leave,

25   that she felt that we would be able to work through something

1   and I said I'm only going to be gone for a week. So I didn't
2   say, can I have a postponement. I said, Carmen, we have a
3   problem here. I'm planning to leave. And I said, can I talk
4   to Tim. She said you weren't available. And I said, well,
5   I'm needing to leave. What do I do with this? And she said,
6   don't worry about it, go ahead and go and when you get back,
7   we'll take care of it.

8       Q.   But at that point when you had this conversation
9   with my secretary, you had mentally formed -- you had decided
10  not to turn over medical records?

11      A.   No.  At that point, after I spoke to her and she
12  said don't worry about it, I called Phil and I said, did you
13  know about this, because Rose did not know about it. And he
14  was saying, no, he was not aware. And I said well, let me --
15  he asked me to fax it to him and so I did, this Exhibit 3 is
16  what I faxed to him.

17      Q.   That's the first deposition, right?

18      A.   Yes.  And I just assumed that everything was okay at
19  that point in time, because he didn't know it was clear to me
20  about her position and I was just happy I was going on
21  vacation.  I needed a little break.

22      Q.   So, again, when you had this conversation with my
23  secretary in July about scheduling, you had already decided
24  you were not going to turn over your client's medical
25  records?

1     A.   She had decided.

2     Q.   She decided?

3     A.   In March.

4     Q.   She decided?

5     A.   Yes.

6     Q.   And she being Rose, right?

7     A.   Yes.

8     Q.   Let's look at Exhibit 4.  This is the second

9    subpoena duces tecum that I served on your office.  Let me

10   ask you, have you ever seen this before?

11    A.   Yes, I have.

12    Q.   And what is it?

13    A.   It's almost a carbon copy of the initial subpoena,

14   Exhibit 3, except that you are -- there's an additional

15   category where you're requesting for me to appear.

16    Q.   Yeah, and unfortunately, the law office of Teker

17   Torres & Teker has stamped right over one of the dates.  But

18   is it fair to say this requires you to produce documents on

19   July 24th at 10 a.m. and then to show up and testify on July

20   30th at 1:30?

21    A.   It is fair to say that, yes.

22    Q.   Okay.  And is that your initial on the upper left

23   corner of this document?

24    A.   Yes, it is.

25    Q.   Did you comply with the subpoena and bring documents

1    to my office on July 24th?

2    —   A.   No, I did not.

3        Q.   And why didn't you do that?

4        A.   Because there was a written request to revoke the

5    consent for disclosure.

6        Q.   When had your clients execute this written

7    revocation of their prior consents?

8        A.   They were on three different dates.  Rose was the

9    first one because she was the person I was with in July

10   before I left.  It must have been July 6.  So she signed it

11   and then Jennifer was the second person to sign it.  I don't

12   know the date that she came in because I was not there when

13   she came in and I think Viviene was the last person to sign

14   it.  She actually came in I know on the 24th.

15        But prior to them actually coming in and signing, I

16   spoke with Jennifer.  Jennifer was the only other one I

17   worked with.  I had never worked with Viviene before.  And I

18   asked her again, I needed to clarify, are you sure that

19   you're okay with me bringing your record up and she said, no,

20   I'm not, I understand it was only for the treatment summary.

21   And I said, well, the subpoena I have says all record

22   whatsoever which means it's all inclusive.  And she said, are

23   you sure that's what it says?  And I said I'm positive that's

24   what it says.  And I was not able to be there.

25        She was going to come in the morning and I said I

1  will leave the document with Sabrina. Sabrina Lloyd is our

2  office manager. I said I will leave it with Sabrina Lloyd so

3  that you can review it and if you're okay with it, you don't

4  need to sign the revocation. If you're not okay with it and

5  you don't want your records released, I said you can tell me,

6  but I'm asking that you put it in writing. And so she

7  verbally told me no on the phone before she came in to revoke

8  it.

9      Q.   Let me show you what we'll mark as Exhibit 5.

10 Before we leave that, so it was Jennifer that told you to not

11 produce her medical records?

12     A.   On the phone, before she signed, as well -- I mean,

13 she did it after Rose.

14     Q.   It wasn't your idea?

15     A.   No, I just asked her. Because I'm supposed to ask

16 -- I'm supposed to clarify as a clinician about the extent of

17 the information that is released and she said, no, that's not

18 what I was told. She clarified, what I was told is the only

19 information was going to be the treatment summary.

20     Q.   My question is this though, Doctor, it was

21 Jennifer's idea to tell you not to produce her medical

22 records, it wasn't your idea?

23     A.   I did not ask her not to produce it. That's

24 correct.

25     Q.   And the same thing with Viviene, it was Viviene's

1  idea that you --

2  —  A.   I did not communicate with Viviene.

3     Q.   That would be Tom, right?  Tom Babauta?

4     A.   (No response.)

5     Q.   I'll ask Tom when it's time for his depo.

6     A.   Okay.

7     Q.   This is Exhibit 5.  Do you recognize this document?

8     A.   Yes, I do.

9     Q.   What is this document?

10    A.   This is a written document that I forwarded to

11  Attorney Torres indicating the revocation I had of consent of

12  disclosure and attached to it is a copy of the individual

13  patient's authorization.

14    Q.   We'll get to that in a minute.  You've identified

15  it.  That's good enough for me for now.  You faxed this to

16  me, it appears, on July 26 starting at 4:51 p.m.  If you can

17  turn it upside down and look at the fax transmission data?

18    A.   Okay.

19    Q.   You see that?

20    A.   Uh-huh.

21    Q.   Does that look like your office fax number to the

22  right of that?

23    A.   It's our old fax number.  I guess we haven't changed

24  it on the machine.  It's supposed to be 477.5714.

25    Q.   Who's Ron that appears between --

1     A.    He was our old office manager.  This is a our fax
2     number from Pia Marine.

3          Q.    Okay.  Look at the individual patient's
4     authorization section, specifically Rose's, and that's page 5
5     of this document?

6          A.    Okay.

7          Q.    What's the purpose of this form?

8          A.    This is a form that we ordered from Medical Arts
9     Press for the office and it allows for the authorization to
10    release protective health information.  We order these forms
11    so that we could be HIPPA compliant.  So that's what these
12    forms are.  But it also indicates a couple of things all the
13    way through the back.

14         Q.    Sure, but the primary purpose of this is to enable
15    your patients to legally consent under the HIPPA statute for
16    you to release their medical record?

17         A.    Correct.

18         Q.    And on the second page of this form?

19         A.    Page 6?

20         Q.    On the first page of this document, Doctor, it
21    appears that Rose has authorized release of her psychotherapy
22    notes, right, on the first page?

23         A.    Uh-huh.

24         Q.    She's checked Release Psychotherapy Notes, right?

25         A.    Correct.

1    Q.    And on the bottom, she's named the people who are

2    allowed to get copies of these medical records and Phil

3    Torres is one of them and I'm one of them, right?

4        A.    Correct.

5        Q.    On the second page, when did she sign this document

6    authorizing the release of these records to me?

7        A.    It would be on that document that --

8        Q.    It's on the lower right of page 6 of this fax?

9        A.    This is the new date. The original date is the one

10   that is from Tim's office. Tim's office or -- yeah, March.

11       Q.    What date did she sign this document, page 6 of

12   Exhibit 5?

13       A.    July 5, 2007.

14       Q.    And what date does this document terminate your

15   authority to give me records on?

16       A.    July 5, 2007.

17       Q.    So Rose authorized the release of medical records to

18   me from you and terminated it as of the same day, July 5,

19   2007?

20       A.    She authorized it in March and terminated it in

21   July. She makes a note right here, prior authorization given

22   March 1, 2007.

23       Q.    Look at the first page. Doesn't the first page of

24   this document authorize her release of psychotherapy notes?

25       A.    It's the same form that we use, but yes, she did

1    give you authorization -- she gave me authorization on March

2    1, 2007 and she revoked it on July 5, 2007.

3        Q.   Can you take a look at Exhibit 3 again?

4        A.   (Witness complied.)  Okay.

5        Q.   And that's the subpoena that was served on you two

6    days before Rose signed her document revoking her permission,

7    right?

8        A.   Correct.

9        Q.   I served you the subpoena on July 3 and then Rose

10   comes in on July 5 and terminates your ability to give me the

11   medical records?

12       A.   It just happened that we had an appointment

13   scheduled that day.

14       Q.   Which day?

15       A.   The 5th, the day that she signed the revocation.

16                        (Mr. Torres walked out.)

17       Q.   That's the day you showed her my subpoena, right?

18       A.   Yeah, I said, are you aware that this is -- and I

19   showed it to her as I had explained to you earlier, and she

20   said, no, I was not aware and she said, I don't know that my

21   attorney is even aware and I said well, first of all, I need

22   to take care of my dates, because I was supposed to leave on

23   Sunday, which is why I called your office first.

24                        (Mr. Torres entered room.)

25       Q.   Take a look at the second page of Exhibit 5, I

*July 30, 2007 - Rose Lilli Perez Tyecha*

1   believe it is.

2   _ A.    Okay.

3       Q.    Is that fair to say that's a nasty letter I sent to

4   you on July 25?

5       A.    Uh-huh.

6       Q.    You called me when you got that letter, didn't you?

7       A.    Well, I actually went out to get the telephone and I

8   saw it in the fax machine and then I read it, because Sabrina

9   was doing errands.  So when I read it, I was like, what, how

10  come this is still happening?  Because I thought the two of

11  you attorneys would be communicating with each other and that

12  I shouldn't have to do that.  And so I was kind of a little

13  -- I was a little angry, like don't do this to me.  I'm not

14  an attorney.  You two attorneys are supposed to deal with

15  this stuff, but I called because I wanted to make sure that I

16  was clear.

17      Q.    And in that conversation, you told me, didn't you,

18  that your clients, your patients, had instructed you to not

19  turn over their medical records to me?

20      A.    No, they instructed me to keep the medical record,

21  not, not to give it to you.  They said they don't want it

22  released.

23      Q.    Don't release our medical records to Tim Roberts?

24      A.    They just said they don't want it released.

25      Q.    And you also told me that the reason they didn't

1  want it released was because there was sensitive information
2  in their files?

3      A.    Well, that's part of it and they just felt like some
4  of it had nothing to do with the case.  They felt like it was
5  private and they felt that they -- the question was, I
6  thought the treatment summary was good enough or sufficient.

7      Q.    And you told me that when you called me, right?

8      A.    Yes.

9      Q.    And you told me that the sensitive information
10 involved stress and emotional distress they were experiencing
11 in their lives that they felt was unrelated to Leo Palace?

12     A.    I said it was personal information that they felt
13 was unrelated to Leo Palace, yes.

14     Q.    You don't remember saying that one or more of them
15 was having emotional distress that was unrelated to Leo
16 Palace?

17     A.    If I said that, I was probably talking about Rose
18 because she was really distressed that things had gotten this
19 far.

20     Q.    No, but you told me that one or more of the clients
21 was experiencing distress in their lives that was not related
22 to Leo Palace.  Don't you recall that?

23     A.    If I said it, it was probably in relation to Rose
24 because she was feeling distressed about this situation.  I'm
25 only seeing Rose.

1    Q.   And it wasn't also Jennifer because she was

2    experiencing emotional distress related to UOG?

3    A.   At the time, but not -- I mean, I mentioned that in

4    my treatment summary that at the time that the sexual abuse

5    or sexual harassment was ongoing, that was a problem, but not

6    current.  I haven't seen her for years.

7    Q.   And then in the same conversation, you told me that

8    the claimants had revoked their HIPPA consents, right?

9    A.   I told you that, yes, they were revoked and I was

10   surprised that you did not know about it.

11   Q.   And is it fair to say at some point, it was right

12   around then, I said let's stop talking, I'll talk with

13   Mr. Torres about it?

14   A.   Yes, you did and I said thank you, because I had a

15   client waiting in the room and I just took a few minutes to

16   call you to respond to this.

17   Q.   Okay.  Take a look at Exhibit 4 again, please, which

18   is the second subpoena.

19   A.   Okay.

20   Q.   And, again, what date were you required to turn over

21   the medical records for that second subpoena?

22   A.   That would be the date that's under the Received

23   stamp, the 24th.

24   Q.   And can you now take a look at Exhibit 5 and find

25   Jennifer Holbrook's individual patient authorization?

1       A.    Okay.

2   ─   Q.    It's the last two pages.  No, excuse me, I made a

3   mistake.  Can you find Viviene Villanueva's patient

4   authorization and revocation?

5       A.    Yes.

6       Q.    What date did Viviene revoke your authority to turn

7   medical records over to me?

8       A.    The 25th.

9       Q.    That's the day after the deposition, isn't it?

10      A.    Correct.  It was the 25th in the morning.  I believe

11  she had called the day before, if not a couple days before.

12  She was not able to come into the office but she had

13  expressed this to Sabrina.

14      Q.    On the 24th, the day of the deposition --

15      A.    Yes.

16      Q.    What day did you get to the office that day?

17      A.    I don't even recall what day that was.

18      Q.    What time do you usually get to the office?

19      A.    In the afternoon, like about one.

20      Q.    Can you look at Jennifer Holbrook's authorization.

21  That's the last two pages.

22      A.    (Witness complied.)

23      Q.    And do you see what date she executed her written

24  revocation of her consent?

25      A.    24th.

1    Q.   It's the same day as the deposition, isn't it?

2    _   A.   Correct.

3    Q.   It's probably true she executed this after ten a.m.

4    on the 24th?

5    A.   I would say, yes, it's probably true.  I would also

6    say that my phone conversation with her was, I'm going to

7    guess it was about Friday and she told me that she wanted to

8    see the request for documents because she did not believe me

9    when I was telling her that -- I said you're okay with the

10   release of all your information and she said, no, I'm not

11   okay, I was told it was just the treatment summary.

12       So I honored her verbal request to suspend the

13   release of her record and I said, I still think it would be a

14   good idea for you to come in and sign the document.  I was

15   not there when she came in to sign it, but I did leave it

16   with Sabrina.  So I honored her verbal request prior to her

17   written authorization.

18   Q.   To not release her medical records to me?

19   A.   Correct.

20   Q.   The same as you did for the other two patients?

21   A.   No, with Rose, she was there with me and with

22   Viviene --

23   Q.   Well, okay, you honored Rose's written revocation

24   and decided to not comply with the subpoena; correct?

25   A.   That's correct.

1    Q.    And for Jennifer and Viviene, you honored their oral
2    request and decided not to obey the subpoena?

3    A.    I honored -- well, I didn't speak -- I myself did
4    not speak with Viviene because I had never worked with her.
5    What I understand is that she had spoken directly to Sabrina
6    and that she was wanting to come in and sign the form but
7    because we weren't there in the morning, she was having
8    difficulty coming into the office, so I honored what I was
9    told, because she was acting through my agent, who was my
10   office manager, not to release the files.

11   Q.    Let me ask you kind of a general question:   The
12   claimants on their HIPPA consents that they signed back in
13   March, they authorized the release of everything in their
14   files, right?

15   A.    Correct.

16   Q.    And now, here we are in July and they're saying, oh,
17   we don't want our medical records released, right?

18   A.    Well, they were saying that I believe in March
19   because I did the treatment summary as opposed to providing
20   the entire documentation over.   So it wasn't something new.
21   I think, and this is my opinion, that the records were not
22   going to be requested any further because you had the
23   treatment summary and I believe, again, this is my opinion,
24   that that's what the women thought, because they were of the
25   impression that all that was going be released was the

1  treatment summary of which they had a chance to review and

2  concurred with the release of that information.

3      Q.   And then they authorized you to release that to me?

4      A.   Yes.

5      Q.   Did they sign, to the best of your recollection, the

6  HIPPA consents before or after the date of your treatment

7  summaries?

8      A.   Before, because it was the request for the

9  information that prompted the generation of the treatment

10  summary.

11          MR. ROBERTS:   Let's take a break and I'll check

12  for those HIPPA waivers, okay.

13                     (Recess taken.)

14                     (Back on the record.)

15  BY MR. ROBERTS: (Continuing)

16      Q.   Doctor, just a few minutes ago, certain documents

17  were faxed to my office by your office and these appear to be

18  the HIPPA forms, the signed HIPPA consents, that we've been

19  talking about in this deposition by Ms. Holbrook, Villanueva

20  and Taimanglo?

21      A.   (Witness nodded head.)

22      Q.   Can you identify those documents for me?

23      A.   Yes, I'm holding in my hand three authorizations for

24  the release of record from the three women dated March 2 and

25  1, '07.

1    Q.   Who signed on the 1st and who signed on the 2nd?

2    A.   Jennifer signed it on the 1st.

3    Q.   And the other two on the 2nd?

4    A.   Yes.

5    Q.   And then they gave these documents to you?

6    A.   No.

7    Q.   How did these documents get in your file, if you

8    know?

9    A.   I think I got them from Phil's office.

10   Q.   Okay.  We'll make Phil's letter a part of this.

11   A.   Exhibit 6?

12   Q.   Exhibit 2.  And can you look at that part of Phil's

13   letter where he asked you to produce certain identified

14   documents?

15   A.   I am enclosing a copy of -- Please furnish me with a

16   copy of all notes, documents, reports, summaries,

17   examinations and findings; yes.

18   Q.   Okay.  And he was requesting that pursuant to the

19   HIPPA forms enclosed with his letter?

20   A.   Correct.

21   Q.   All right.  That will be Exhibit 2 to the

22   deposition.  Dr. Perez-Iyechad, as we sit here today, are you

23   willing to testify about your patients' mental condition?

24   A.   Today?

25   Q.   Yeah.

1     A.    If we do it in like ten minutes.

2  _  Q.    Are you willing to testify about emotional distress

3  that they may have been suffering that was not related to Leo

4  Palace, if any?

5     A.    The individual that I am currently working with did

6  not have any emotional distress not related to Leo Palace.

7     Q.    And that's Rose?

8     A.    That's correct.

9     Q.    And you're no longer working with Jennifer anymore?

10    A.    I've not worked with her since two years ago.

11    Q.    And Viviene?

12    A.    I've never worked with her.

13    Q.    When you see a patient in general, do you take

14 notes?

15    A.    Yes, in general.

16    Q.    And what notes do you take?

17    A:    Well, the date, the time, who's present, the

18 presenting concerns, the referring physician, the purpose of

19 the session, the consultation.

20    Q.    As you go through your first session when you're

21 chatting with your patient, do you take notes about what you

22 and her are talking about?

23    A.    Sometimes.  It depends on the nature of the

24 consultation.  Different consultations require a different

25 kind of format.  If someone is in crisis management, of

1  course it's different from someone who's come in because

2  they're trying to figure something out but there's no hurry.

3      Q.   If somebody is seeking treatment for a specific

4  concern that they have, say they're emotional well being,

5  you talk to them about that, right?

6      A.   Yes.

7      Q.   Do they lay on a couch like they do in the movies in

8  your office?

9      A.   I don't have a couch long enough to lay on, although

10  some people have tried to lay on it.

11      Q.   So you sit and chat and talk to your patients?

12      A.   Yes.  I have a recliner.

13      Q.   And they tell you what's wrong with them, what

14  they're feeling?

15      A.   Sometimes I ask them to say what brought them to

16  treatment, unless it's already clear on the referral.

17      Q.   And then you take notes about what they tell you,

18  right?

19      A.   Yes.  Well, I take notes about my impressions.

20      Q.   Exactly.  And your impressions are based on what

21  they tell you?

22      A.   And what I know.

23      Q.   And what you see?

24      A.   Yes.

25      Q.   And observe?

1     A.    Yes.

2  ⌐  Q.    And perceive?

3     A.    (Witness nodded head.)

4     Q.    Your impressions of this patient?

5     A.    Correct.

6     Q.    Don't you put specific quotes in your reports?  Like

7  some psychotherapist notes I've seen, they'll have quote,

8  feels threatened, end quote, things like that?

9     A.    Yes, yes, I do.

10    Q.    How long does the average session last?

11    A.    By law, it's forty-five minutes but usually, it

12 could go from forty-five minutes to sixty minutes.  If

13 they're family sessions, they can go longer, almost two

14 hours.

15    Q.    How about in the case of your initial, in fact,

16 maybe your only consultation with Rose Taimanglo.  No, your

17 initial consultation with Rose Taimanglo back in August of

18 2004?

19    A.    Yeah.

20    Q.    Do you remember how long that lasted?

21    A.    Might have been an hour, hour and twenty minutes.

22 Sometimes if I have the flexibility, I will go over if I have

23 the flexibility.  If I don't, then I just have them come back

24 a little bit more frequently.

25    Q.    Do you ever make a diagnosis at the end of the first

1  session or during the first session?

2  ⸺ A.   Yes.

3  Q.   How often does that happen?

4  A.   Depends on the case.  Some of them are really clear

5  sexual abuse, domestic violence, occupational problems.

6  Q.   You have described yourself in one of the documents

7  I've seen as a behavioral health clinician?

8  A.   Provider.

9  Q.   Behavior health provider or clinician provider?

10  A.   That's kind of redundant so --

11  Q.   Can I say therapist?

12  A.   Yes.

13  Q.   Is that fine with you?

14  A.   Yes.

15  Q.   I know you're a Ph.D.

16  A.   Yes.

17  Q.   For example, Tom Babuta is a therapist, but it's

18  okay if I call you a therapist?

19  A.   Uh-huh.  That's our license.  It's individual,

20  marriage and family therapy.

21  Q.   In the world of therapists, you deal a lot with what

22  you call disorders, right?

23  A.   Yeah, behavioral health concerns.

24  Q.   What's the DSM4TR?

25  A.   The Diagnostic and Statistical Manual, Version 4,

1   Text Revised.  It's a diagnostic manual that's used in --

2   it's actually our bible in term of classifications for

3   different situations that individuals might present.

4       Q.    Like lots of disorders, right?

5       A.    Yeah.

6       Q.    And it has the DSM and it has the specific

7   diagnostic criteria for each particular disorder?

8       A.    Correct.  It doesn't just have disorders.

9       Q.    I know.  I know.

10      A.    Okay.

11      Q.    So would your notes, your therapy notes, contain

12  references to things the patient told you that relate to the

13  diagnostic criteria in the DSM4?

14      A.    Would they?

15      Q.    Yeah.

16      A.    Or are you asking me?

17      Q.    -I mean, you're trying to figure out what particular

18  -- you're trying to figure out does this person have a

19  disorder, right?  That's one of the things you're trying to

20  figure out?

21      A.    Yeah.  Well, I'm not trying to figure out does this

22  person have a disorder.  I'm trying to figure out what is the

23  presenting problem first and then work backwards from there.

24  It might be a disorder, but it doesn't necessarily have to be

25  a disorder.

1    Q.    In order for a person to be diagnosed as having a

2    disorder, he or she has to meet or have certain distinct

3    diagnostic criteria; correct?

4    A.    Correct.

5    Q.    And so would you try normally to have your notes

6    reflect or contain information that would be related to those

7    diagnostic criteria?

8    A.    Yes.

9    Q.    Do your notes help you make a diagnoses?

10   A.    No, they don't help me make a diagnoses.  I do that.

11   I use the notes for me to go back and work with the

12   individual, but the manual is what I use and my experience to

13   make a diagnoses.

14   Q.    Well if it takes several sessions to make the

15   diagnosis, would you use your prior notes and your subsequent

16   notes to help you arrive at a correct diagnosis?

17   A.    Most of the time, it doesn't take that long.

18   Usually, by the first session, I can figure it out; yeah.

19   Q.    If you suspect a particular disorder, do you ask

20   questions of your patients designed to test your working

21   hypothesis?

22   A.    Of course.

23   Q.    And if a patient does not have all the diagnostic

24   criteria listed by the DSM4 for a particular disorder, that

25   person does not have that disorder, right?

1    A.    Well, for some disorders, there are different levels
2    that it can present, like for example --

3         Q.    Like acute or chronic?

4         A.    Yeah, or like depression.  You can have major
5    depressive order but then you can - and there are certain
6    symptoms with that - but then if you have some of the
7    symptoms, maybe not as pronounced, maybe not for the same
8    duration of time, someone might give the diagnoses of like
9    systemic disorder, which is like low-grade depression, and
10   you monitor that over time.  And if after so many sessions or
11   so many months with the individual and you have a better
12   sense of their behavior, it could be changed to major
13   depressive disorder.

14        Q.    Right.  And so to take, for example, a disorder
15   called generalized anxiety disorder and then if it gets a
16   little worse, you have a few more criteria, then you have
17   acute stress disorder, right?

18        A.    No, acute stress disorder is more lightweight than
19   generalized anxiety disorder.

20        Q.    So for acute stress disorder, the patient has to
21   display -- have certain distinct diagnostic criteria or you
22   can't diagnose that person with that disorder, right?

23        A.    It would be inappropriate.

24        Q.    You diagnosed Rose Taimanglo as having post
25   traumatic stress disorder, right?

1     A.    Yes, and occupational problem.

2  ⌐  Q.    And you diagnosed her as having that on August 19,

3  2004?

4     A.    Yes.

5     Q.    And you diagnosed Jennifer Holbrook as having post

6  traumatic stress disorder on August 19, too?

7     A.    Correct, or about that time.

8     Q.    You never worked with Jennifer again after that?

9     A.    No, I saw her several times, but after that year, I

10 closed her case and then I think she wanted to come back in

11 but I was going off island or something happened and I wasn't

12 able to take her case. And so my colleague, Tom Babauta,

13 started to see her and sometimes we do that when we go on

14 leave.

15    Q.    But you didn't diagnose Viviene as having post

16 traumatic stress disorder, right?

17    A.    Correct.

18    Q.    This is Exhibit 6. Do you recognize the reports or

19 the summaries rather that are attached to these documents?

20    A.    Yes, I do.

21    Q.    Could you look at the summary for Rose Taimanglo?

22    A.    I'm looking, yup.

23    Q.    Can you show me where in this treatment summary you

24 discuss the required diagnostic criteria for a diagnosis of

25 post traumatic stress disorder?

1     A.    Where I discussed it with her?

2     Q.    Do you set out in this document any details with

3  respect to the diagnostic criteria that you found in

4  diagnosing Rose as having post traumatic stress disorder?

5     A.    No.

6     Q.    They're not in here, are they?

7     A.    No.

8     Q.    Can you turn to Jennifer, the last report?

9     A.    Okay.

10    Q.    Can you show me where in your treatment summary for

11 Jennifer you discuss the required diagnostic criteria for

12 diagnosis of post traumatic stress disorder?

13    A.    No.  I didn't include them in either.  We typically

14 don't include that in treatment summaries.

15         MR. ROBERTS:  Okay.  At this point, I can't take

16 this witness's deposition without her treatment notes, so it

17 is my opinion, so I'm going to adjourn the deposition, file

18 an appropriate motion with the court in seeking whatever

19 relief I deem I'm entitled to by reason of the fact that I've

20 not yet been provided with the medical record relating to

21 your treatment of these three girls despite repeated requests

22 since January of this year.

23         THE WITNESS:  May I share a few words or am I

24 not --

25         MR. ROBERTS:  No.  I'm sorry, Doctor.  No.

1        THE WITNESS:  I can't?

2        MR. ROBERTS:  Not yet.  You can only answer

3 questions that I ask you.

4        THE WITNESS:  You want to ask me if there's

5 anything I want to share?

6        MR. TORRES:  We'll reserve.

7        MS. MORRISON:  Yes, we'll reserve, too.

8

9        (Deposition concluded at 2:43 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF WITNESS

I, DR. LILLI PEREZ-IYECHAD, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 39; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

<u>DR. LILLI PEREZ-IYECHAD</u>

# REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that DR. LILLI PEREZ-IYECHAD personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 39, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 6th day of August 2007.

_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) | CASE NO. 1:06-CV-00028 |
| Plaintiff, ) | |
| vs. ) | |
| LEO PALACE RESORT, ) | 📄 **COPY** |
| Defendant. ) | |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, ) | |
| Plaintiff-Intervenors, ) | |
| vs. ) | |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, ) | |
| Defendants. ) | |

### *DEPOSITION OF TOM BABAUTA*

*Taken on Behalf of the Defendant.*


BE IT REMEMBERED That, pursuant to

the Guam Rules of Civil Procedure, the deposition of

Tom Babauta was taken before Veronica F. Reilly, Certified

Shorthand Reporter, on Monday, the 30th day of July 2007, at

3:30 p.m. in the Law Offices of Dooley Roberts & Fowler, 865

South Marine Corps Drive, Suite 201, Orlean Pacific Plaza,

Tamuning, Guam.

APPEARANCES

Appearing on behalf of the Plaintiff-Intervenors:

    TEKER TORRES & TEKER
    Suite 2A
    130 Aspinall Avenue
    Hagatna, Guam 96910
    By: Mr. Philip Torres, Esq.
    Phone: 671.477.9891

Appearing on behalf of the Defendant:

    DOOLEY ROBERTS & FOWLER
    Suite 201, Orlean Pacific Plaza
    865 S. Marine Drive
    Tamuning, Guam 96913
    By: Mr. Tim Roberts, Esq.
    Phone: 671.646.1222

Appearing on behalf of the Plaintiff:

    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    333 S. Las Vegas Boulevard
    Suite 300
    Las Vegas, Nevada 89101
    By: Ms. Angela D. Morrison, Esq.
    Phone: 702.388.5072

# I N D E X

## EXAMINATION

|  | Direct | Cross | Redirect |
|---|---|---|---|
| Mr. Roberts: | 4 | | 27 |
| Ms. Morrison: | | (None) | |
| Mr. Torres: | | 26 | |

## EXHIBITS

| | Page |
|---|---|
| Exhibit 1: First Request for Production of Documents | 6 |
| Exhibit 2: Authorization for the Release of Records | 6 |
| Exhibit 3: Subpoena | 10 |
| Exhibit 4: Subpoena | 11 |
| Exhibit 5: July 26, 2007 letter | 13 |
| Exhibit 6: March 21, 2007 letter | n/a |

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email: veronica.reilly@hotmail.com

Case 1:06-cv-00028   Document 58   Filed 08/28/2007   Page 46 of 75

1                          TOM BABAUTA,

2    called as a witness on behalf of the defendant, having first

3    been duly sworn, was examined and testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. ROBERTS:

7        Q.    Tom, I'm Tim Roberts.   I represent Leo Palace and I

8    was the one that served you with the subpoena, a couple

9    different subpoenas now.   Have you ever had your deposition

10   taken before?

11       A.    No, sir.

12       Q.    Have you ever testified in court?

13       A.    Yes.

14       Q.    That was at a trial?

15       A.    A couple different hearings.

16       Q.    Hearings?

17       A.    Yeah.

18       Q.    Okay.   Well, you're sworn to tell the truth today.

19   I did have the opportunity to take Dr. Perez-Iyechad's

20   deposition before you.   I think I understand a little bit

21   more about the background of these deposition subpoenas and

22   the HIPPA forms, but I'll go through it -- so I think I'll go

23   through it quicker with you.

24       A.    Okay.

25       Q.    If I start to talk too fast, stop me.   I'll slow

1  down.  If I ask a bad question, tell me.  I'll ask it a
2  different way.

3      A.    Okay.

4      Q.    Having said all that, I'm going to announce that I'm
5  doing the deposition somewhat under protest.  I don't have
6  medical records that I believe I'm entitled to and the main
7  purpose of this deposition is to find out what I can about
8  why I don't have those medical records and I'm going to
9  reserve my right to at least attempt to reschedule your
10 deposition in the future if after filing a motion with the
11 court, I obtain the relief that I'll be looking for.  But I'm
12 saying that for the record.  You don't have to respond to it
13 one way or the other.

14     A.    Sure.

15     Q.    You know Rose Taimanglo and Viviene Villanueva and
16 Jennifer Holbrook?

17     A.    I know Viviene Villanueva and Jennifer Holbrook.

18     Q.    How many times have you counseled Viviene?

19     A.    I met with her on two occasions, two sessions.

20     Q.    And Jennifer more, right?

21     A.    Jennifer, I believe it was sixteen.

22     Q.    When was the first time, if you recall, that you saw
23 Jennifer?

24     A.    I met with Jennifer for the first time on April 8,
25 2006.

1    Q.    When was the last time that you met with Jennifer?

2  — A.    January 26, 2007.

3    Q.    And have you seen her since then?

4    A.    (No response.)

5    Q.    Oh, you said that was the last time you saw her.

6    A.    Yeah.  No, no, sir.

7    Q.    We'll mark this Exhibit 1 to the deposition.  It's a

8    document I served on Phil Torres as the attorneys for the

9    three claimants.  Have you ever seen this document before?

10   A.    No, sir.

11   Q.    Exhibit 2 will be federal HIPPA waiver forms that

12   were originally signed by Ms. Holbrook, Taimanglo and

13   Villanueva, which I'll call the claimants in this deposition,

14   and they were originally signed by them back in March of this

15   year.  This will be Exhibit 2 to both depositions of

16   Dr. Perez Iyechad and -- How do you go by?  Counselor Tom?

17   Counselor Babauta?

18   A.    No, just Tom is fine.

19   Q.    Okay.  This is Exhibit 2.  That's a cover letter

20   from Attorney Phil Torres and three executed HIPPA forms.

21   Have you ever seen a letter for the HIPPA forms?

22   A.    I think I've seen the letter.

23   Q.    And the HIPPA form?

24   A.    If they were attached, at this point, I remember

25   reading the letter which prompted me to prepare a treatment

1 | summary.

2 | ~ Q. All right. Did anyone ever ask you to produce any

3 | documents other than a treatment summary?

4 | A. No, sir. When I received this initial, what you

5 | call it, the request for information, standard operating

6 | procedure for myself is to just prepare a treatment summary.

7 | My notes are difficult to decipher and some things are

8 | written just for myself.

9 | And so even when clients want to review their notes,

10 | I have -- instead of a copy of their notes, they sit with me

11 | and I go over the different kind of things that I put in the

12 | notes. That way, there's no misinterpretation, I can put it

13 | in context as to what was going on at the time and what are

14 | the little notes that I have just towards myself and those

15 | kinds of things.

16 | So that's why when anyone ever requests any

17 | information like this, I just extract for the treatment

18 | summary and so I know that it was requested and it took me a

19 | little bit of time and then that's when I prepared the

20 | treatment summary. So no other information was requested of

21 | me.

22 | Q. Did you ever speak with Phil Torres?

23 | A. Not myself. No, sir.

24 | Q. Are you aware that Lilli may have spoken with Phil?

25 | A. I believe maybe Lilli might have.

1    Q.    Okay.  And did you speak with Lilli about these

2  HIPPA waivers?

3    A.    Recently, she's been doing some research, but not at

4  the time, yeah.

5    Q.    Back then I mean, did she ever come to you and talk

6  to you about these specific HIPPA forms?

7    A.    No.  I have a clinical supervisor who's the same

8  supervisor for Dr. Lilli, so I go over situations like this

9  with him.  So this is something that we've come up with over

10  time, over the last ten years.

11    Q.    Who's the clinical supervisor?

12    A.    Dr. Kirk Bellis.

13    Q.    Is Kirk in charge of the Family Pacific?

14    A.    No.  I have a contract with HIPPA to -- even though

15  I'm licensed already and I don't need any further

16  consultation or supervision, I make it a point just for me to

17  improve myself that I meet with him every two to three weeks

18  and we go over cases just so that I'm on top of my game.

19    Q.    Okay.  I'd like to point your attention to Exhibit

20  2.  Each of the claimants has checked all of the above for

21  what documents they were asking you to disclose to me, right?

22  I'm Tim Roberts?

23    A.    Right.

24    Q.    See they checked all of the above on each of the

25  HIPPA waivers?

1    A.    Uh-huh.

2    Q.    You see what the first one is, any and all medical

3    and/or dental records including any and all reports and

4    handwritten notes.  Did you see that when you got this HIPPA

5    form?

6    A.    No.

7    Q.    Did you read it?

8    A.    No.  Like I said, even when the clients ask me for

9    copies of their own personal records, I didn't make that

10   available to them because of the misinterpretation that may

11   occur.  So it's not standard practice for me to just give

12   records, just because it may be misunderstood or

13   misrepresented.  So I typically would come up with a

14   treatment summary, just standard.

15   Q.    Well, I can understand a patient might misunderstand

16   notations.  Do you have the same concern with legal

17   professionals, such as me, that I would misinterpret or

18   misuse private information?

19   A.    I think anybody, I mean, not just attorneys.  Even

20   if it was another therapist that was reviewing the

21   information, because they're not really understanding what's

22   going on at the moment and what I'm thinking and what I'm

23   processing, so that's kind of my concern.

24        So even before I got the subpoena from you, even

25   when I guess Jennifer had requested for her information, that

1   she wanted to review her notes, I explained to her that I
2   would just need to sit with you if that's something you want
3   and it's not standard for me to give it out. So I did
4   prepare a treatment summary.
5       Q.   All right. Let me show you what we'll mark as
6   Exhibit 3 and this is the same as Exhibit 3 used in the
7   earlier deposition except it's addressed to Tom Babauta. Do
8   you remember getting this subpoena?
9       A.   Yes, sir, I do.
10      Q.   And what day did this subpoena require you to do
11  something?
12      A.   July 10 at 2 o'clock.
13      Q.   The subpoena asked you to produce certain documents
14  on July 10 at 2 o'clock at my office, right?
15      A.   Yes.
16      Q.   And that deposition didn't go forward, right?
17-     A.   No, sir.
18      Q.   And do you know why?
19      A.   Because I didn't attend. I didn't show up.
20      Q.   Did you speak with anybody about your decision not
21  to show up?
22      A.   Dr. Lilli was going off island and she shared with
23  me she was going to be doing some research and review and
24  then I consulted with Dr. Bellis and he advised me at this
25  point, maybe we should just hold off because we did provide

1   the treatment summary, so I was going to consult with her

2   when she returned from her trip.

3       Q.   Why didn't you call me?

4       A.   Sorry.

5       Q.   Okay.  And then exhibit --

6       A.   To be fair, I didn't call Mr. Torres either, so...

7       Q.   It's all right.  Exhibit 4 is a second subpoena I

8   served on you, I believe.  Right?

9       A.   Yes.

10      Q.   And what day did I serve it on you?

11      A.   I'm not sure, sir.

12      Q.   What day did it require you to bring documents to my

13  office?

14      A.   Today at 3:30.

15      Q.   Let's take a look at it again.  You see there's two

16  checks, you're commanded to show up on July 30, 3:30?

17      A.   Yes.

18      Q.   That's the first check?

19      A.   Yes.

20      Q.   And the second check, doesn't it tell you to bring

21  documents on July 24 at 10 a.m., all medical and other

22  records whatsoever related to Jennifer Holbrook and/or Rose

23  and/or Viviene.  Did you read that part of it?

24      A.   No, I think I got stuck with the July 30 date there,

25  but I did bring treatment summaries, but that's all I

1   brought.

2       Q.   Okay.  But you didn't bring any other documents

3   other than a treatment summary?

4       A.   Yes.

5       Q.   To today?  You don't have your patient notes?

6       A.   No, sir.

7       Q.   Chart entries?

8       A.   (Witness shook head.)

9       Q.   Have you ever spoken to Viviene or Jennifer about

10  these subpoenas duces tecum?

11      A.   No, sir.

12      Q.   Did Viviene or Jennifer ever tell you they did not

13  want you to produce any records to me in response to these,

14  either the HIPPA forms or the subpoenas duces tecum?

15      A.   My secretary did contact them, letting them know

16  that the records were subpoenaed and they'd come in and they

17  had revoked - I don't have the form in front of me, maybe

18  Dr. Lilli might have brought it for you - but they had

19  revoked consent.  I didn't speak to them personally and they

20  didn't meet with me.  They just came in and filled out some

21  forms.

22      Q.   They met with you and filled out some forms?

23      A.   No, I said they did not meet with me.  I haven't

24  even seen them since --

25      Q.   All right.  Let me show you what we've marked as

1   Exhibit 5 to Lilli's deposition and we'll mark it as 5 as

2   well to yours.  Is that your signature on that letter?

3       A.   Yes, sir.

4       Q.   Who actually drafted that letter?

5       A.   Dr. Lilli.

6       Q.   What is it?

7       A.   (No response.)

8       Q.   It's a letter.  What's it say?

9       A.   (No response.)

10      Q.   Let me withdraw that question.  Did you ever have

11  anything to do with this letter other than signing it?

12      A.   When we received the initial request, or subpoena,

13  Dr. Lilli and I had a little discussion about, you know, with

14  the HIPPA regulations and with all of the confidentiality and

15  things like that, we're real hesitant to -- you know, we're

16  just really cautious to when it comes to records and client

17  care.  So we discussed what we were looking at and what are

18  the ramifications.  So she was doing most of the research

19  since she's the researcher among the two of us.  So she was

20  the one who did the research and then she drafted this and so

21  I signed off on it after we discussed it and we agreed that

22  that's what we were going to do.

23      Q.   So Lilli put this document together, right?

24      A.   Yes, sir.

25      Q.   Did you ever see the letter I wrote to both of you

1  on July 25th, which is page 2 of Lilli's letter?

2  ~  A.  No.

3     Q.  And the third page of Lilli's letter is a copy of

4  the subpoena, right?

5     A.  Right.

6     Q.  And then the fifth through the eleventh page of this

7  document are documents called Individual Patients

8  Authorization.  Are these the forms you were talking about?

9     A.  Yes.

10    Q.  Were you present when any of these claimants signed

11 any of these forms?

12    A.  No, sir.  But I was told that they did.

13    Q.  When you are counseling a patient, say on a first

14 meeting, do you take notes?

15    A.  Typically, yes.

16    Q.  And do you have any specific kind of name for these

17 notes, like chart entries or something like that?  ⸱⸱

18    A.  I have a couple different forms that I use, like one

19 -- it all depends on who I'm doing the evaluation for, if

20 it's court ordered as opposed to if it's just someone coming

21 in for their own self-enrichment and then -- So sometimes I'm

22 reviewing mental status or I have a checklist for that in

23 some cases.  Some cases, it's just standard, you know, I have

24 a little legal pad that I write some things down, like

25 basically, psychosocial history.  I just try to gather as

1   much information as possible for a session and figure out
2   where we're going to go from there.

3      Q.   For example, if someone comes in and said I'm having
4   major stress at the job, I'm having problems and I'm having
5   emotional stress and I'd like to see a counselor?

6      A.   Right.

7      Q.   Would you take notes at that kind of first meeting?
8      A.   Typically, yes.

9      Q.   Which one of your office forms would you use?
10     A.   On the first meeting, on something like that,
11  typically, I wouldn't. I'd just use -- well, we have a bunch
12  of different forms - maybe I should have brought some - but
13  we have a checklist as to what are some of the concerns that
14  bring you to see us. We have -- For those who come early
15  enough, we have psychosocial history checklist and where they
16  can come in or share what exactly about like their past is
17  troublesome. And then also, you know, just information about
18  their past, about the family origin, how many brothers and
19  sisters, any medical illnesses in their past, just general
20  information to help us kind of formulate some better
21  understanding. But typically, on a first encounter or
22  initial evaluation, I would just start taking notes based on
23  the information given.

24     Q.   And these notes, do they contain quotes from what
25  the patient said to you?

1     A.   It all depends on the situation.  Sometimes it

2  contains quotes, sometimes it's formulations.

3     Q.   Your mental impression?

4     A.   My mental impression.

5     Q.   And is it sometimes the case that you have a

6  relatively immediate working hypothesis of what this person's

7  problem might be?

8     A.   By the end of the first section, I definitely have a

9  better understanding, unless it was like a personality

10  disorder, then it would take a few sessions to a few years.

11  But typically, I would get a working diagnosis.  It's

12  required actually if we're going to be billing the

13  insurances, that we have some kind of information to go on,

14  something to bill them about.

15     Q.   Let me ask you this, it might speed things up a

16  little bit:  It was Dr. Perez that diagnosed Jennifer as

17  having post traumatic stress disorder?

18     A.   Yes.

19     Q.   Was that your diagnosis or Dr. Perez?

20     A.   It was Dr. Perez's and that's why in my treatment

21  summary, I have her diagnosis is PTSD by history.

22     Q.   So when she came to see you -- I'll get there in a

23  minute.  When she came to see you, what did she present with,

24  as you guys like to say?

25     A.   That was -- she came in, she was having some

1   difficulty with -- she felt like there were a lot of things
2   in her environment and her life that were unstable and she --
3   from professional kind of decisions to personal decisions and
4   she felt just really confused, depressed and anxious.

5       Q.   How long had it been since Jennifer had been treated
6   by Dr. Perez before she first saw you on, I guess, April 8,
7   2006?

8       A.   I'm not sure.  Dr. Perez has her own records.  Even
9   though we share the same office, we don't share the same
10  medical record.  So I mean, that's how confidential things
11  are.  So even if Jennifer wanted me to get information from
12  Dr. Perez, she would have to have me -- a release of
13  information.

14      So when Jennifer requested to work with me just as
15  kind of a little bit of a change, I'm not exactly sure when
16  the last time she saw Dr. Perez was, but I started working
17  with her on April 8 and I haven't seen Perez's -- or
18  Dr. Iyechad's treatment summary.  So I don't know when her --
19  the last time she saw her.

20      Q.   I do have her treatment summary.  It's attached to
21  Exhibit 5.  And the second page, she wrote, she was seen for
22  five sessions between the months of August 2004 and April
23  2005.

24      A.   Okay.  So I saw her a year later.

25      Q.   And what was the source of all her confusion and

1   other symptoms that she presented with when she first came to
2   see you in April of 2006?

3      A.   Well, she felt like after the incident up at Leo
4   Palace and after everything kind of crumbling around her,
5   that that was the starting point. So again, I didn't start
6   working with her until April 2006. But that's her
7   perception, that at that point, things just started to kind
8   of deteriorate in different areas of her life and she was
9   just having trouble with anxiety and depression and second
10  guessing her decisions. So many times she would make a
11  decision and then -- on a major life event and then feel like
12  no, I made the wrong choice. So she was flip-flopping back
13  and forth and that was the reason she decided to come in and
14  see me.

15     Q.   Was she having relationship problems?

16     A.   Yes, sir.

17     Q.   With whom?

18     A.   With -- I don't have his name here, but she has -- I
19  don't know she's still with the gentleman but I believe his
20  name is...Eddie Pelkey.

21     Q.   She mentioned his name in her deposition. It's
22  Eddie Pelkey. And do you remember what her problem was with
23  Eddie Pelkey when you were seeing her?

24     A.   Basically -- Let me just make sure that's in the
25  scope here, because -- (Witness read document.)

1    Q.   It's not mentioned in your summary report, just in

2    case that helps you any.

3    A.   Yeah, I'm just kind of concerned because she did

4    revoke regarding her other areas and she wanted it to be

5    specific to the case.

6    Q.   I know, I'll be fair.  I need to get you on the

7    record saying I will or I won't answer those questions.

8    A.   For the record, I won't answer the questions related

9    to the relationship issues other than pointing to the fact

10   that she believed that a lot of the relationship issues

11   stemmed from the stress that she had undergone.

12   Q.   Okay.  Your testimony is you're only willing to

13   testify about the matters discussed in your treatment summary

14   dated March 19?

15   A.   Yes.

16   Q.   And that's because you have an understanding that

17   Ms. Holbrook has not authorized you to talk about anything

18   else that might be going on in her life, right?

19   A.   Yes.

20   Q.   Did you get that through Lilli Perez?

21   A.   Yes.

22   Q.   But you didn't speak with Ms. Holbrook herself?

23   A.   No, sir.

24   Q.   In general, when you are taking notes in sessions

25   with a client, these notes, do they help you make a diagnosis

1    on some occasions?

2    --   A.   Yes, if there's some confusion as to subtle nuances.

3    You know, sometimes one thing may look like one thing and

4    then -- and presents as one thing, but it may be something

5    else.

6        Q.   Yeah, I'm pretty familiar, for a layman, with the

7    DSM4TR which is different than the DSM4 which is different

8    than the DSM3?

9        A.   Right.

10       Q.   That's a book that contains the diagnostic criteria

11   for a variety of different things that could go on with

12   somebody, right?

13       A.   Right.

14       Q.   And a large body of that book is concerned with

15   disorders, right?

16       A.   Yes.

17       Q.   And post traumatic stress disorder is as the name

18   says, a disorder.  Right?

19       A.   Yes.

20       Q.   And is it true that sometimes you could be one

21   diagnostic criteria short of a disorder so that it actually

22   becomes some other kind of disorder?

23       A.   Yes.

24       Q.   And so if you're seeing somebody for a great many

25   different sessions, is it often necessary to go back over

1   your notes to, for lack of a better term, count up the

2   diagnostic criteria and analyze it and see which disorder

3   this might fit, which disorder this might not fit?

4       A.   Yes.  Sometimes if we're not really clear about a

5   disorder, initially, we'll have what we call provisional

6   diagnosis or a working disorder or working diagnosis.  And at

7   that point, that's when we're not clear.  But sometimes even

8   if we are dead-on and we're saying hey, this is exactly what

9   it is, down the road, we may add something to it or maybe

10  even change the diagnosis.  So there's a lot of cases also,

11  like when I'm working with a kid, it may be, may look like

12  and may present as ADHD, but in reality, it's depression or

13  it may be bipolar disorder.

14      Q.   You haven't diagnosed Jennifer with having any

15  particular disorder, right?

16      A.   No, I just worked off the working diagnosis from

17  Dr. Lilli.

18      Q.   So since you weren't the one that actually diagnosed

19  her as having PTSD, if I asked you where in your report can I

20  count the diagnostic criteria that add up to a diagnosis of

21  PTSD, it wouldn't be in there, right?

22      A.   No, it would defer to Dr. Lilli's.

23      Q.   You last saw Jennifer on January 26 of 2007?

24      A.   Yes, sir.

25      Q.   It's at least six months ago, right?

1     A.    Six.

2  _  Q.    How was she doing emotionally as of January of 2007?

3     A.    She was still having some difficulty with decision

4  making.   I think the thing with Jennifer was we were seeing

5  ups and downs.  So she would make progress and then she would

6  second guess herself and feel like she was backsliding, but

7  we got to a point where she was confident enough and

8  comfortable enough with that situation.

9     Q.    All right.  I am listening to you while I'm reading.

10          MR. ROBERTS:  We don't have this exhibit.  Can I

11  go off the record for a second?

12                        (Off the record.)

13                        (Back on the record.)

14  BY MR. ROBERTS:  (Continuing)

15     Q.    Starting on the first page of Dr. Perez's March 21,

16  2007 summary, do you see the word "apparently" down at the

17  bottom?

18     A.    Yes.

19     Q.    And then Dr. Perez wrote, "In addition to assisting

20  Ms. Holbrook with the trauma experienced in the sexual

21  harassment, I, meaning Lilli, also provided certain other

22  things"?

23     A.    Uh-huh.

24     Q.    Do you know anything about the first other thing

25  that's mentioned there?  She apparently had some problem with

1   her academic performance while in her senior year at the
2   University of Guam?

3       A.   No.

4       Q.   I forgot what my question even was.  I guess it was,
5   did you personally ever counsel her about academic
6   performance?

7       A.   No.  By the time I worked with her, she had already
8   graduated.

9       Q.   And then on the second page of Dr. Iyechad's report,
10  Dr. Iyechad writes that she saw her for five sessions between
11  August of 2004 and April of 2005?

12      A.   Yes.

13      Q.   And then Dr. Iyechad Perez wrote that she graduated.
14  Do you know what Dr. Perez-Iyechad is referring to when she
15  writes "While Ms. Holbrook has survived the initial negative
16  impact of the sexual harassment, she continued to have the
17  victim mentality as evidenced in her·expressed concern
18  associated with furthering her education in a system that
19  discriminates."

20              MS. MORRISON:  Objection; calls for speculation.
21  BY MR. ROBERTS: (Continuing)

22      Q.   Have you ever discussed that particular observation
23  made by Dr. Perez with her, with Dr. Perez?

24      A.   No.  I actually didn't get authorization from
25  Jennifer to get any of the information from her prior

1   treatment.  She wanted -- Jennifer wanted a fresh start, just

2   the fresh perspective and not to be tainted with any

3   information from Dr. Lilli.  So she just kind of wanted,

4   again, in line with her trying to move forward because she

5   felt really stuck in her life, she was trying to step

6   forward.

7        Q.   So you've never discussed this particular

8   information with Dr. Perez?

9        A.   No.

10       Q.   Or with Ms. Holbrook?

11       A.   No.  I could speculate if you want, but she said no.

12       Q.   If you call it speculation, no, I don't want you to

13  speculate, but what were you going to say?

14       A.   Is that okay?  (Witness looked at Ms. Morrison)

15  Just when people are victimized, they tend to have

16  hypersensitivity to things in their environment and their

17  surroundings.  So something that may be -- not even be

18  thought twice by somebody else who hadn't been victimized,

19  because of the hypersensitivity, it's heightened.

20            And so now, like as an example, if you and I are

21  joking around and playing and we're teasing each other,

22  somebody who's been traumatized, the teasing may invoke what

23  we call a tune-in kind of a behavior or a thought where it's

24  almost like reliving or almost like initiates a flashback of

25  another time when they were having a traumatic event

1    happening or somebody else was teasing them.  So when people

2    get into this kind of like victim role, they tend to just be

3    hypersensitive and just things that may not affect your

4    typical person, may affect them --

5        Q.   Tom, are you giving me your actual opinion or are

6    you in fact speculating?

7        A.   Well, no, that's what we call tune-in behavior,

8    that's in reality.

9        Q.   But in Jennifer's particular case?

10       A.   Oh, no, I was just saying when you talk about

11   victimization, so I don't -- I thought you wanted to just

12   know about the concept of --

13       Q.   No, I wanted you to talk -- if I could determine

14   whether it was speculation or whether it was something you

15   actually knew.

16       A.   Oh, okay.

17       Q.   Now that I think you're speculating --

18       A.   Right.

19       Q.   -- or just testifying in general, I move to strike

20   the answer as being speculation.

21       A.   Oh.

22            MR. ROBERTS:  With that, I have no further

23   questions.  I continue to have a disagreement with the

24   counselors and the doctor, but we're not the arbiters of what

25   the law is in here.  It's up to the courts.  So I'll go to

1   the courts and ask for whatever relief I think I'm entitled

2   to and we'll see what happens.

3               THE WITNESS:   Okay.

4               MR. ROBERTS:   I appreciate you showing up today.

5               THE WITNESS:   Sorry I couldn't provide any more

6   information.   I just hate to lose my license or get into some

7   other issue for that.   But if the court says I have to, I

8   have to.

9               MR. TORRES:   I have some questions.

10              THE WITNESS:   Sure.

11                         CROSS-EXAMINATION

12  BY MR. TORRES:

13      Q.   Since you were asked about post traumatic stress

14  disorder and that was according to this report from

15  Dr. Lilli, how long does it take to get over post traumatic

16  stress disorder?

17      A.   " How long does it take?   A lifetime."

18      Q.   You were also asked about secondary diagnosis here

19  which was, I guess maybe it was occupational problem.   It's

20  pretty broad.   Do you know what she's talking about when --

21      A.   In terms of a diagnosis for occupational problem,

22  that's under the V Code.   Basically, any and all difficulties

23  that you may be experiencing at work, whether it's with a

24  co-worker or having difficulty performing your duties, if

25  it's creating some difficulty for you, then it could be -- at

1   the work setting, then it could be considered occupational

2   problem.

3       Q.   You also said that someone can have a

4   hypersensitivity based on being a victim?

5       A.   (Witness nodded head.)

6       Q.   And their reaction might not be the reaction that

7   any of us in this room would have but it's very much a real

8   reaction for them?

9       A.   Right.

10      Q.   And is it also a reasonable reaction for them?

11      A.   For somebody who's been traumatized, yes.

12      Q.   So while we have what's called a reasonable man

13  standard, so somebody who's a victim and acting out in what

14  might otherwise be perceived as hypersensitive would actually

15  be a reasonable reaction for their situation.  Do you agree?

16      A.   Sure.

17           **MR. TORRES:**  I have nothing further.

18           **MR. ROBERTS:**  Well, since it wasn't Tom that

19  actually made the diagnosis of PTSD, I wasn't going to ask

20  him about it, but he did, so now I have a few questions.

21                   REDIRECT EXAMINATION

22  BY MR. ROBERTS:

23      Q.   Do you have any particular expertise in diagnosing

24  post traumatic stress disorder?

25      A.   I have training from the Veterans Administration on

1    treatment and diagnosis of PTSD.

2    ⌐   Q.    When you were treating Jennifer, did you ever notice

3    that she had recurrent intrusive distressing recollections of

4    an event including images, thoughts of protection?

5        A.    (No response.)

6        Q.    Did she display, while you were meeting with her,

7    each and every required diagnostic criteria for a diagnosis

8    of post traumatic stress disorder?

9        A.    I'm just taking a minute here because there's quite

10   a few things on the diagnostic criteria.

11       Q.    Let's do it this way, Tom.  I withdraw that.  There

12   are quite a bit.

13       A.    Right.

14       Q.    And I wouldn't expect you to spit them out or

15   remember like that.  Did she display efforts to avoid

16   thoughts, feelings or conversations associated with the

17   events at Leo Palace?

18       A.    Yes.

19       Q.    And would your notes reflect that?

20       A.    They may but I will say that about 90% of what I

21   worked on with her was more after-effects of what happened

22   and not specifically about -- the discussion wasn't each and

23   every time about what happened at Leo Palace.  It was more

24   about kind of like spill off of what happened, more about how

25   it kind of translated into day-to-day difficulties that she

1   was experiencing.

2   _   Q.   Isn't it true that that more than thirty of the

3   diagnostic criteria for PTSD are shared in common with other

4   disorders?

5       A.   Yes.

6       Q.   Would you agree that PTSD is, in general,

7   overdiagnosed?

8       A.   That's tough to say.  I don't give that diagnosis

9   lightly, so --

10      Q.   Would you agree that PTSD is a poorly-defined

11  diagnostic category compared with the other disorders?

12           MR. TORRES:  I'll object on the basis of

13  foundation to render an opinion in that regard.

14  BY MR. ROBERTS: (Continuing)

15      Q.   You can go ahead and answer.  He's just preserving

16  the record.

17      A.   Oh, okay.  Yes.

18      Q.   And have you ever read any scholarly material

19  indicating the prevalence of PTSD is less frequent than most

20  clinicians assume?

21      A.   Yes.

22      Q.   When I asked you earlier when I asked about one

23  particular diagnostic criteria, you said yes and then I said,

24  would your notes reflect that and you said they might and

25  then you explained that 90% percent of what you were doing

1   was -- things that were happening currently in her life,
2   right?

3       A.   Right.

4       Q.   Did you ever make any effort to clinically determine
5   whether she was still suffering from post traumatic stress
6   disorder during the time you were treating her?

7       A.   No, it wasn't something that -- there were other
8   things that popped up.  But it wasn't something where I said
9   let me reevaluate what exactly -- if your initial diagnosis
10  was still current.  So I operated off of that.

11      Q.   So you yourself didn't make any independent effort
12  to clinically diagnose PTSD while you were treating her?

13      A.   No.

14                  MR. ROBERTS:  I have no further questions.

15                              [Whereupon the deposition was

16                               concluded at 4:12 p.m.]

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF WITNESS

I, TOM BABAUTA, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 30; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

_____
TOM BABAUTA

# REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that TOM BABAUTA personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 30, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 31st day of July 2007.

_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter