Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant LeoPalace Resort



FILED
DISTRICT COURT OF GUAM
SEP 10 2007
JEANNE G. QUINATA
Clerk of Court

IN THE DISTRICT COURT
OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>　　　　Plaintiff,<br>vs.<br><br>LEO PALACE RESORT,<br><br>　　　　Defendant.<br><br>JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO,<br><br>　　　　Plaintiff-Intervenors,<br>vs.<br><br>MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10,<br><br>　　　　Defendants. | CASE NO. 1:06-CV-00028<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I.  **INTRODUCTION**

In late June or early July of 2004, Plaintiff-Intervenor Rose Taimanglo complained to Leopalace management that another employee, Christine Camacho, was making sexual remarks and conducting herself in an inappropriate manner on the job. Ms. Taimanglo was also Ms. Camacho's immediate supervisor. Leopalace investigated and then terminated Ms. Camacho on

ORIGINAL

August 13, 2007. Those facts serve as the basis for the negligence allegations in the complaints filed by Plaintiff-Intervenors and the Equal Employment Opportunity Commission ("EEOC") in this case. Both complaints allege that Leopalace did not respond promptly enough to Ms. Camacho's behavior. They allege that Plaintiff-Intervenors suffered damages during the approximately forty-five (45) day period between Ms. Taimanglo's initial complaint and Ms. Camacho's termination. This motion does not concern those allegations. Rather, the motion concerns Plaintiff-Intervenors' allegations about what happened after Leopalace terminated Ms. Camacho, and after Leopalace received a letter from Plaintiff-Intervenors' attorney demanding $330,000.00 in damages four (4) days after that, August 17, 2004. Plaintiff-Intervenors say that Leopalace "retaliated" against them for complaining about the previous harassment. They say they were forced to endure a "hostile work environment". They say they were "constructively discharged". They seek compensatory and punitive damages based on these allegations. As the court will see, however, under the relevant case law Leopalace's conduct after it terminated Ms. Camacho is not actionable as a matter of law. Leopalace accordingly seeks partial summary judgment that it has no legal liability to Plaintiff-Intervenors or to the EEOC for anything that happened after it terminated Ms. Camacho.

## II. UNDISPUTED FACTS

On the morning of Tuesday, August 17, 2004, four (4) days after terminating Ms. Camacho, Leopalace management received a letter dated August 16, 2006 from the law firm of Teker, Torres and Teker, PC, representing the Plaintiff-Intervenors in this case. Exhibit 7, Deposition of Plaintiff-Intervenor Jennifer Holbrook ("Holbrook Depo."), p. 80:15-25; p. 81:1; p. 82:4-19. The letter accused Leopalace of allowing Plaintiff-Intervenors to be sexually harassed in the workplace by Ms. Camacho. *Id.* The letter demanded that Leopalace pay a

collective $330,000.00 in damages to the Plaintiff-Intervenors. *Id.* In the letter, Plaintiff-Intervenors' attorney stated that he had discussed the case with the Equal Employment Opportunity Commission ("EEOC"), but that he "had not filed a formal complaint, as yet." *Id.*

After August 17, 2004, Plaintiff-Intervenor Rose Taimanglo continued to work at Leopalace for over two months, through October 23, 2004, giving her two week notice on October 11, 2004. Exhibit 4, Taimanglo Depo., p. 16:18-25; p. 17:1-14. Plaintiff-Intervenor Vivienne Villanueva also continued to work at Leopalace for over two months, through October 29, 2004, giving her two week notice on October 15, 2004, four days after Ms. Taimanglo gave her notice. Exhibit 12, Villanueva Depo., p. 54:8-25; p. 55:1-3. Plaintiff-Intervenor Holbrook resigned on August 28, 2004. Exhibit 11, Holbrook Depo., p. 91:10-19.

Eventually, Plaintiff-Intervenors did file claims with the EEOC. Each of them claimed that they were subjected to a "hostile working environment" after they complained about sexual harassment, that management "retaliated" against them after they filed their complaints, and that they were each "constructively discharged" from their employment by Leopalace as a result of their complaints. The EEOC thereafter conducted an investigation into each of the Plaintiff-Intervenors' claims. Ultimately, the EEOC found "no cause" to believe that Plaintiff-Intervenors Rose Taimanglo or Vivienne Villanueva had been constructively discharged. Roberts Dec., Exhibits 1 and 2. Only Jennifer Holbrook was found to have "cause" to pursue a constructive termination claim. *Id.*, Exhibit 3. The EEOC did not, however, determine that constructive discharge had actually taken place, merely that Ms. Holbrook could pursue the claim. *Id.*

This lawsuit was filed subsequent to the EEOC's investigation. At their deposition, Plaintiff-Intervenors generally testified that they were "treated differently" by Leopalace

3

management and co-workers after their attorney's August 16, 2007 demand letter was sent.[1] Leopalace's general manager at the time, Yutaka Maruyama, testified at his deposition that he was simply afraid to talk to the claimants after receiving their attorney's demand letter. Deposition of Yutaka Maruyama ("Maruyama Depo."), p. 129:25; p. 130:1-5 ("knowing that they're suing the company and I feel that the general manager ... I'm part of the responsibility, I was afraid to talk to them because they might take my expression against me or something like that, so honestly I was afraid to talk to them"). There is no evidence to dispute Mr. Maruyama's testimony.

Leopalace asks for partial summary judgment on Plaintiff-Intervenors' ability to recover on any basis for anything Leopalace allegedly did or failed to do after it terminated Ms. Camacho on August 13, 2004. As a matter of law, Plaintiffs were not "constructively discharged" from their employment. Instead, they just quit, in order to obtain higher paying jobs. Moreover, as a matter of law, nothing that Leopalace did or failed to do after August 13, 2004 constituted "retaliation" or a "hostile work environment" under the relevant case law.

Each Plaintiff-Intervenors' claim will be discussed separately.

A. **Rose Taimanglo.**

Christina Camacho was terminated by Leopalace on August 13, 2004. Two months later, on October 11, 2004, Rose Taimanglo submitted her letter of resignation. Her last day on the job was October 23, 2004. Taimanglo Depo., p. 16:18-25; p. 17:1-14; p. 25:1; p. 26:1-22. Before

---

[1] Any such alleged "different" treatment by co-workers, is, of course, irrelevant to this case, since management can only act through high level managers, not co-workers. This motion, therefore, focuses solely on the alleged conduct of Leopalace management.

giving notice, Ms. Taimanglo already had a job lined up with Wells Fargo Bank.  Taimanglo Depo., p. 117:11-25; 118:1-9.

Ms. Taimanglo was given several opportunities at her deposition to testify about just how bad it was working for Leopalace after August 16, 2007, which is when her attorney sent his letter threatening to sue Leopalace for $330,000.00.  Asked an open-ended question, Ms. Taimanglo positively gushed about how much she loved working at Leopalace -- even during Leopalace's alleged "hostility" and "retaliation" between August 17, 2004 and October 23, 2004:

> Q. When's the first time in your ten year time that you worked for Leo Palace that you started not to like your job?
> A. It's not like I don't like the job.  It's not that.
>
> * * *
>
> Q.  Before June of 2004, and that's about a ten-year period of you working at Leo Palace, did you like your job before 2004?
> A. I love my job at Leo Palace.
> Q. Go ahead.
> A. I always loved working at Leo Palace, even till the last day.
> Q. When you say the last day, you mean the day - -
> A. Even the day, my last day to work there.  I still love - - I loved working there.

Taimanglo Depo., p. 27:6-6-8; p. 28:13-22.

Even after Ms. Taimanglo resigned from Leopalace, and after she filed her claims with the EEOC, and after she sued Leopalace, she still wanted her old job back.  Taimanglo Depo., p. 124:19-23.

After Ms. Taimanglo complained about sexual harassment, and after her attorney's demand letter, Leopalace did not reduce Ms. Taimanglo's hours, Ms. Taimanglo did not lose any wages. *Id.*, p. 125:12-25; 126:1-9, p. 126:10-19. Instead, "Mr. Maruyama, Mr. Suzuki and Mr.

5

Iijima" merely treated her "differently". Taimanglo Depo., p. 107:17-25. Actually, though, Ms. Taimanglo admitted that Mr. Maruyama was only "mean" to her one time after she complained about sexual harassment. Taimanglo Depo., p. 114:21-25. This involved an incident wherein Mr. Maruyama had come by the front desk to pick up his messages from Ms. Taimanglo. As Ms. Taimanglo handed Mr. Maruyama his messages, Mr. Maruyama asked her whether there was a "sexual harassment report" in the day's messages. Taimanglo Depo., p. 108:9-14. Ms. Taimanglo thought he was being "sarcastic" when he said this. *Id.* On the other hand, Ms. Taimanglo does not blame Mr. Maruyama for being "upset" that she filed a sexual harassment claim. Taimanglo Depo., p. 109:4-8. Ms. Taimanglo explained that Mr. Maruyama was "a good guy". Taimanglo Depo., p. 110:15-18.

Other than the Maruyama incident described above, Ms. Taimanglo could not say that management was "mean" to her at any time after she threatened to sue Leopalace. All management did was treat her "differently". *Id.*, p. 107:17-21. That is, Mr. Maruyama did not "greet me like he used to" when he came in to pick up his messages. *Id.*, p. 108:1-4. He didn't say "good morning" to her any more. *Id.*, p. 108:4. Sometimes he wouldn't "look" at Ms. Taimanglo like he did before. *Id.*, p. 108:6-8. On another occasion, Ms. Taimanglo had a conversation with Mr. Iijima, another manager, after which she went to another room and cried – but not because Mr. Iijima was mean to her. Taimanglo Depo., p. 109:20-25; 110:1-6. The next day, Mr. Maruyama visited Ms. Taimanglo to find out why she was crying. Taimanglo Depo., p. 110:10-18; 109:12-19. Although Mr. Maruyama commented that he "didn't know local girls cried", Ms. Taimanglo did not know whether he intended that as a mean remark. *Id.*, p. 109:12-19.

6

As for Mr. Iijima, after Ms. Taimanglo's attorney threatened suit, she met with Mr. Iijima because he wanted to talk with her privately. During their conversation, Mr. Iijima "apologized" to Ms. Taimanglo for their previous conversation in which resulted in Ms. Taimanglo's crying. Taimanglo Depo., p. 111:21-25, 112:1-6. Mr. Iijima was being nice to Ms. Taimanglo during this conversation. *Id.*, p. 112:11-13. In fact, Mr. Iijima told Ms. Taimanglo that she ought to report the previous harassment to the police for her own protection from the alleged harasser, Christina Camacho. *Id.*, 112:12-24. Mr. Iijima "wasn't mean" to Ms. Taimanglo after she filed her harassment complaint. Taimanglo Depo., p. 114:15-17.

Asked directly whether Mr. Suzuki was mean to her after her harassment complaint, Ms. Taimanglo answered "No. They just hardly speak to me" (Taimanglo Depo., p. 114:18-20), that is, Mr. Suzuki treated her "differently" (Taimanglo Depo., p. 107:17-23).

Ms. Taimanglo was making $11.50 per hour at Leopalace before she quit. Taimanglo Depo., p. 14:7-15. The Wells Fargo job paid more. Taimanglo Depo., p. 15:21-25, 16:1-5.

### B. Vivienne Villanueva.

Ms. Villanueva never thought about quitting her job at Leopalace until <u>after</u> Rose Taimanglo told her that she was quitting. Villanueva Depo., p. 57:23-25. Presumably, this would have been after Ms. Taimanglo submitted her two week notice, on October 11, 2004, almost two months after Ms. Villanueva filed her harassment claims. When Ms. Taimanglo told Ms. Villanueva that she was quitting, Ms. Villanueva "felt like quitting, too. And even though it was hard for me to quit, it was something that I had to decide." Villanueva Depo., p. 56:21-25; 57:1. More specifically:

7

Q. And you decided to quit your job at Leo Palace because Rose was quitting?

A. After she told me that she was going to quit. I felt like I wanted to quit, too, because I didn't want to carry the burden of what Rose and Jennifer had gone through.

Q. Why did you quit your job at Leo Palace?

A. Why I did quit my job?

Q. (Nodded head.)

A. Because I didn't want management to be - - to turn - - because I've seen what Rose and Jen had gone through with Mr. Mariyama and the stuff that he said. When Rose said she was going to quit, I didn't want to carry that burden.

Q. What burden?

A. That they had gone through, that they were stressed. And, you know, even though I didn't want to leave Leo Palace, it was a hard decision.

Q. It was a hard decision to leave Leo Palace?

A. Yes.

Q. Did anyone at Leo Palace force you to quit your job?

A. No.

Q. Did you feel forced to quit your job or was it just a hard decision?

A. I didn't want to quit, but at that point, I felt like it.

Q. You decided to quit?

A. I decided to quit.

Q. And that's because Rose had quit?

A. Yes.

   Ms. Morrison: Objection; mischaracterizes her testimony.

BY MR. ROBERTS: (Continuing)

Q. Why did you think that you would have to carry any sort of burden after Rose - - Let me withdraw the question. Jennifer had quit a while before this, right?

A. Yes.

Q. At least a month before this, right?

A. Maybe two months. She left sometime in August.

Q. Yeah. And so you would have been working with Rose for those two months after Jennifer quit, right?

A. Yes.

8

> Q. And why did you think you'd have to carry some sort of a burden when Rose quit?
>
> A. Because of the lawsuit.
>
> * * *
>
> Q. When Rose told you she was quitting, did you understand you had a choice that you could quit or not quit?
>
> A. Yes, I had a choice.
>
> Q. And what choice did you make?
>
> A. At first, I didn't want to, because front desk - - being a front desk clerk, I took up tourism and it's like work-related, like what I studied and that's what I'm doing now, you know. With tourists and it was something that I enjoyed doing and learning, specially I was getting more knowledge on Japanese, you know, language. And I didn't want to leave, specially because of the distance between my house to Leo Palace, it's very near. So but overall, I just had no choice.
>
> Q. Well, wait a minute. First you said you had a choice?
>
> A. Well, I thought - - I mean, I had a choice and I didn't want but it was like making a hard decision.
>
> Q. And you chose to quit?
>
> A. I chose to quit.
>
> Q. And was that a voluntary decision?
>
> A. Yes.
>
> Q. you thought about it and you made a voluntary decision to resign your job at Leo Palace; is that correct?
>
> A. Yes.

Villanueva Depo., p. 67:24 through p. 69:16; p.71:12 through p. 72:10.


Ms. Villanueva did not say that any Leopalace manger was mean to her after her lawyer sent his August 16, 2004 letter. All she could say is that managers treated her differently. She said management "gave us the silent treatment. I wouldn't say mean because they never talked to us anymore." Villanueva Depo., p. 62:13-14. Well, that is not strictly accurate. Even after she threatened to sue, Ms. Villanueva still spoke with Mr. Suzuki and Mr. Iijima about "work related" matters. Villanueva Depo., p. 62:23-25, 61:1-4. As for Mr. Maruyama, the resort's GM

9

who had just been hired on July 1, 2004, he did not say "good morning" anymore or greet the front desk clerks in the same "happy way." Villanueva Depo., p. 58:11-17. This was, of course, after Ms. Villanueva accused Leopalace of allowing her to be sexually harassed on the job, and after she threatened to file a lawsuit for $330,000, and after she warned that she was considering filing a discrimination claim with the EEOC. That being said, Ms. Villanueva does not blame Mr. Maruyama for being "upset" about her sexual harassment claim. Villanueva Depo., p. 58:25; 59:1-5. Mr. Maruyama and Ms. Villanueva were never really "on friendly terms". She was "never close to him." Villanueva Depo., p. 60:6-9.

As for Mr. Suzuki, before the threat of a lawsuit began looming over everyone's heads, he would sometimes join the front desk staff for "pot luck" breakfasts in the morning. Villanueva Depo., p. 60:10-13. After her attorney's demand letter, however, it was "like (he) didn't want to be part of it any more" (Villanueva Depo., p. 60:15-19), that is, "he wouldn't talk to us anymore like before". Villanueva Depo., p. 59:11-14. Asked about other managers, Ms. Villanueva mentioned May Paulino, the Human Resources Manager. "(T)here's one time that Ms. May Paulino was at the front desk and she said something like, 'Madam, the duplex can now use the hotel swimming pool." Villanueva Depo., p. 60:20-25; 61:1. This resulted in a conversation wherein Ms. Villanueva asked Ms. Paulino how or where she was supposed to obtain the proper forms for the duplex gusts, to which Ms. Paulino responded "I will give it to them." Villanueva Depo., p. 60:11-18. Ms. Villanueva "felt" that Paulino's comments were made in a "sarcastic" way. *Id.*, p. 60:24 through p. 62:1-4.

Asked directly whether Leopalace "retaliated" against Ms. Villanueva in any "financial way" after her attorney's demand letter, Ms. Villanueva explained that on August 13, 2004, after being interviewed by May Paulino and reporting Christina Camacho's sexual harassment, she

10

decided to go home early at 1:45 p.m. Villanueva Depo., p. 64:12-22. As a result, she did not get paid for the hours of work she missed. Villanueva Depo., p. 64:24-25; 65:1-6. In Ms. Villanueva's estimation, this was the only time that Leopalace retaliated against her for complaining about sexual harassment. Villanueva Depo., p. 66:2-7.

Ms. Villanueva's resignation letter is dated October 15, 2004, and made effective October 29, 2004. Villanueva Depo., Exhibit 12, p. 54:8-25; p. 55:1-3; p. 56:21-23. She started her new job at the Guam Marriott almost immediately, on November 7, 2004. Villanueva Depo., p. 56:15-17. The Marriot job paid more money. Villanueva Depo., p. 67:15-23.

### C. Jennifer Holbrook.

Ms. Holbrook was attending UOG while she worked at Leopalace. Holbrook Depo., p. 11:3-17. After quitting her job at Leopalace on August 28, 2004 (Exhibit 11, Holbrook Depo., p. 91:10-19) she graduated in December of 2004 with a degree in Consumer Family Science Nutrition. *Id.* Ms. Holbrook then applied for and received employment with the Guam Public School System ("GPSS") as a "Program Coordinator for the Food and Nutrition Services". Holbrook Depo., p. 99:6-8. Ms. Holbrook did not consider being a front desk clerk for a hotel at $8.50 an hour to be her career goal (*Id.*, p. 99:21-23); instead, she had gone to college in the first place to get a degree and a better job. Holbrook Depo., p. 99:16-20.

Apparently, it was Ms. Holbrook who delivered Plaintiff-Intervenors' attorney's August 16, 2007 demand letter to Leopalace. According to her, on the morning of Tuesday, August 17, 2004 -- which, remember, was four (4) days <u>after</u> Leopalace had fired the alleged harasser -- Ms. Holbrook bundled her attorney's letter together with Mr. Maruyama's other mail, which he picked up every morning from the front desk. Holbrook Depo., p. 82:5-19. Thereafter,

11

according to Ms. Holbrook, Mr. Maruyama "raised his voice" to her, although he did not "shout" at her:

> A: And that was on a Tuesday, August 17, when he got that letter in the morning.
>
> Q. And you were at work that day?
>
> A. Yes. Tuesday morning. He came, gave him the letter - - gave him his mail. I guess he opened it and Rose and I were working that morning, he walked by and stormed straight towards me in the front desk, and he said, "Why are you doing this?" He had his voice raised and he was up in my face asking me why am I suing him.
>
> Q. Was he behind the front desk?
>
> A. Behind the front desk.
>
> Q. Where you were?
>
> A. Yes.
>
> Q. And he said, "Why are you doing this"?
>
> A. And I said, "I am not doing this to you." He said, "But I am the company. I am LeoPalace." And I responded to him, "I'm doing this because HR didn't do anything about it." And he said, "I can't trust you anymore." He kept on staring at me, I can feel anger coming off of his voice. I started to tremble inside, I felt butterflies inside and I started feeling scared. And then he stormed out of the front desk ... .

Holbrook Depo., p. 82:18 through p. 83:16.

> Q. When you say Mr. Maruyama stormed away, what do you mean stormed?
>
> A. He pushed the door open hard and then he pushed the other door open, and he walked this way back to his office and in a few minutes he walked back the other way, across the lobby, walled out the front door, and he just kept on pacing back and forth that day and just not talking to us, and just pushing - - I remember, the reason why I'm saying storm is because I remember him pushing the door really hard to get out of it.
>
> Q. Okay. When you say he raised his - - did you say he raised - - he didn't shout - - did he raise his voice or shout?
>
> A. He raised his voice.
>
> Q. He wasn't shouting, right?
>
> A. No, he raised his voice.

Holbrook Depo., p. 84:11-25; p. 85:1

12

At her deposition, Ms. Holbrook was asked to "describe how working at Leopalace after the sexual harassment complaint was different than working at Leopalace before the sexual harassment complaint was filed." Ms. Holbrook responded: "It was not comfortable anymore." Holbrook Depo., p. 86:17-22. It should be noted that Ms. Holbrook worked a grand total of eight (8) days after her attorney's litigation threat before resigning on August 28, 2004. Holbrook Depo., p. 129:4-9. Mr. Maruyama did not speak to Ms. Holbrook during those eight (8) days. Holbrook Depo., p. 86:8-13. Having said that, Ms. Holbrook was not surprised that Mr. Maruyama was upset that she had filed a sexual harassment complaint against him. Holbrook Depo., p. 90:23-25; 91:1-3. That Mr. Maruyama would be upset about such a complaint was "understandable" to Ms. Holbrook. *Id.*, p. 91:4-7.

Mr. Suzuki was never rude to Ms. Holbrook. He never treated her or acted toward her in a hostile manner. Holbrook Depo., p. 127:3-5; p. 130:4-13; p. 141:10-16; p. 114:7-21.

Ms. Holbrook could not make up her mind on how she was treated by managers other than Mr. Maruyama and Mr. Suzuki during the eight (8) days she worked before quitting. According to her, they would either "turn away" when she looked at them, or alternatively, they would "stare" at her in a "hostile" manner. Holbrook Depo., p. 125:14-21. Sometimes, according to Ms. Holbrook, Mr. Saito, another manager, would walk by her "with a stare". Holbrook Depo., p. 126:2-6.

Aside from Ms. Holbrook not being "comfortable" working at Leopalace any more, and aside from the fact that Mr. Maruyama "raised his voice" on a single occasion and did not speak with her for eight (8) days, Ms. Holbrook complained that her "hours got cut" by Leopalace in retaliation for her attorney's letter. Holbrook Depo., p. 88:4. Referring to a handwritten statement she had delivered to the EEOC, Ms. Holbrook testified at her deposition that "I went

13

into work one Saturday morning and found that my hours had been cut and instead of being off at 2:45 p.m., I was to be off at 1:30 p.m. - - I quickly realized that management reducing my work hours was retaliatory against me." Holbrook Depo., p. 88:20-25; 89:1. Ms. Holbrook was making $8.50 an hour at the time. Holbrook Depo., p. 89:5-7. Thereafter, the following exchange took place at Ms. Holbrook's deposition:

> Q: Do you really think – what was your pay at the time, $8.50 an hour?
> A: Yes.
> Q: And at $8.50 an hour, and hour and 15 minutes is about 10 bucks, isn't it?
> A: (Witness nodded head to signify affirmative.)
> Q: You have to say yes.
> A: Yes.
> Q. Do you really think management retaliated against you by reducing your pay by $10.00 because you filed a sexual harassment complaint?
> A. Yes.
> Q. $10.00?
> A. I believe so. We were short five staff, why would they cut my hours when we were short of five individuals. I felt that they were cutting my hours.

Holbrook Depo., p. 89:5-20.

Asked directly why she quit her job at Leopalace, Ms. Holbrook responded:

> Q. How much longer after August 17th did you work for LeoPalace?
> A. I believe a week.
> Q. Is that why you quit, because your hours were reduced?
> A. I quit because I was tired of dealing with all the stress I was getting from LeoPalace. I was tired of not being spoken to by Mr. Maruyama. I was tired of feeling uncomfortable.

14

Although Ms. Holbrook wanted to argue about it, eventually she admitted that one of the reasons she quit was to take care of her mother who had been diagnosed with cancer. Holbrook Depo., p. 91:10 - 93:19.

Significantly, no matter how she was treated, Ms. Holbrook "continued doing my job." Holbrook Depo., p. 130:6-7. In other words, nothing that Leopalace did or did not do changed the "terms or conditions" of her employment.

Ms. Holbrook was earning $8.50 per hour at Leopalace. Holbrook Depo., p. 99:21-23. In May of 2005, Ms. Holbrook accepted her Program Coordinator job with the Guam Public School System at an hourly rate of $12.75 an hour. Holbrook Depo., p. 21:1-22. That job is what she went to UOG to train for. Holbrook Depo., p. 122:3-5.

III.  **LAW AND ARGUMENT**

A.  **Plaintiffs have not established that there was a hostile work environment after the alleged harasser was fired.**

As shown above, after Plaintiff-Intervenors' demand letter of August 16, 2004, the only alleged harm suffered by Plaintiff-Intervenors was that management treated them "differently" and didn't talk to them as much after their attorney threatened a lawsuit. Also, Mr. Maruyama allegedly "raised his voice" to Ms. Holbrook on a single occasion. And, of course, there is Ms. Holbrook's belief that Leopalace reduced her work schedule by 1.25 hours. This is not enough to establish a hostile work environment at any time after August 16, 2004. Plaintiff EEOC and Plaintiff-Intervenors' hostile work environment claims must therefore be judicially limited to the period of alleged harassment by Ms. Camacho before she was fired.

15

"In order for a plaintiff to have an actionable hostile work environment claim under title VII, the work environment must be both objectively and subjectively hostile." West v. Maxon Corp., 2001 U.S. Dist. LEXIS 22228, *13-*14 (S.D. Ind. 2001). The question is whether the allegedly improper conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). To establish an objectively hostile work environment, a plaintiff must establish that the alleged harassment was serious and tangible enough to alter the plaintiff's compensation, terms, conditions or privileges of employment. Grady v. Cracker Barrel Old Country Store, 2007 U.S. Dist. LEXIS 47673, *20 (M.D. Penn.)

"Cold shoulder" treatment does not support a hostile work environment claim. West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *24. General antipathy and mere snubbing by supervisors is not actionable under Title VIII. *Id.* at *24-*25. Thus the Third Circuit Court of Appeals affirmed summary judgment in favor of an employer on a hostile work environment claim in Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876, 2004 U.S. App. LEXIS 4711 (3rd Cir.), even though the employee alleged that she felt isolated and received "cold shoulder" treatment from some of her supervisors.

There is understandably a dearth of authority on the issue of whether or not a single reduction in an employee's time of 1.25 hours constitutes a "hostile work environment". In Baucom v. Holiday Cos., 428 F. 3d 764, 765 (8th Cir. 2005), it was noted that the trial court had granted summary judgment on a hostile work environment claim notwithstanding a slight reduction in the plaintiff's hours, although this was not an issue on appeal. As a general rule, isolated instances of non-severe misconduct will not support a claim of a hostile work environment. *See* West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *15. As noted below, a one-time reduction of an

employee's overtime of 1.5 hours has been described as "relatively trivial", and the contention that such a reduction might support a retaliation claim has been described as "absurd". Valenti v. City of Chicago, 2004 U.S. Dist. LEXIS 2779, *23 (N.D. Ill.). The same result should be reached in this case.

**B. Plaintiffs-Intervenors have no cause of action for constructive discharge.**

Two Plaintiff-Intervenors voluntarily resigned from Leopalace more than two months after Ms. Camacho was terminated, and one Plaintiff-Intervenor quit her job two weeks after Ms. Camacho was terminated. Therefore, it would be disingenuous for Plaintiff-Intervenors and Plaintiff EEOC to claim constructive discharge based on Ms. Camacho's conduct. Instead, both Plaintiff-Intervenors and Plaintiff EEOC must attempt to base a claim for constructive discharge on the actions of the Leopalace management after Ms. Camacho's termination. The record in this case reveals no grounds for such a claim.

In a case involving a claim of constructive discharge, "[t]he inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004). "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." Brooks v. City of San Mateo, 229 F. 3d 917, 930 (9th Cir. 2000). "[A] plaintiff who claims constructive discharge must, to survive summary judgment, show more than 'ordinary' discrimination. Absent 'extraordinary conditions', an employee is expected to remain employed while seeking redress." Roeder v. Hendricks Community Hospital, 2001 U.S. Dist. LEXIS 24619, *29 (S.D. Ind.). Given this high standard, it is not surprising that claims of "cold shoulder"

17

treatment similar to those advanced by the plaintiffs here are completely inadequate to sustain a claim of constructive discharge. *See* Huskey v. City of San Jose, 204 F. 3d 893, 901 (9th Cir. 2000); Roeder, *supra*, 2001 U.S. Dist. LEXIS 24619 at *33.

Leopalace has found no precedent in which a plaintiff has contended constructive discharge based on having her hours cut a single time by an hour-and-a-quarter, although, as noted below, it has found precedent holding that a similar reduction will not sustain a retaliation claim. However, courts have regularly held there has been no constructive discharge when employers' actions have had much more serious economic consequences. *See, e.g.,* Rabinovitz v. Pena, 89 F. 3d 482, 488-899 (7th Cir. 1996) (lower performance rating may have resulted in loss of $600 bonus); Harrison v. Chicago Tribune Co., 992 F. 2d 697, 705 (7th Cir. 1993) (assignment to undesirable sales territories).

### C. **Plaintiffs have no cause of action for retaliation.**

Plaintiff-Intervenors' claims for retaliation rest on the allegations that, after Leopalace received a letter from Plaintiff-Intervenors' counsel threatening to report Leopalace to the EEOC unless it paid them $330,000.00, Leopalace management gave them the "cold shoulder" and did not talk to them as much. In addition, Ms. Holbrook contends that Mr. Maruyama raised his voice to her one time, and her work schedule was cut back by 1.25 hours. This is simply not sufficient to sustain a claim for retaliation.

In order to establish retaliation, the Plaintiff-Intervenors must demonstrate some adverse employment action. Valenti, *supra*, 2004 U.S. Dist. LEXIS 2779 at *21. "An adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Id.* Not everything that makes an employee unhappy is an actionable adverse action. *Id.* "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces

18

an injury or harm." Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2414 (2006). The challenged action must be "materially adverse", as "it is important to separate significant from trivial harms." *Id.* at 2415.

The alleged "cold shoulder" that Plaintiff-Intervenors received after threatening to sue their employer is not the sort of significant harm that constitutes actionable retaliation. Title VII does not set forth a general code of civility for the American workplace. Burlington Northern, *supra*, 126 S. Ct. at 2415. Title VII prohibits employer actions that are likely to deter victims of discrimination from complaining to the EEOC. *Id.* "And normal petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* (citing to EEOC Manual). A "cold shoulder" from management is not an adverse employment action because it is not a materially adverse change in the terms and conditions of employment. West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *22.

Similarly, the allegation that Leopalace reduced Ms. Holbrook's hours by 1.25 hours is not an adverse action sufficient to establish retaliation. In Valenti, the court unequivocally stated, "It is absurd to think that a plainly trivial reduction in overtime of 1.5 hours can support a claim for retaliation." Valenti, *supra*, 2004 U.S. Dist. LEXIS at *23. Similarly, in Baucom v. Holiday Cos., 428 F. 3d 764, 765 (8th Cir. 2005), the court found that a "slight reduction in hours" combined with other minor slights failed to amount to adverse employment actions that could sustain a retaliation claim.

### III.  CONCLUSION

Leopalace management may or may not have been rude to Plaintiff-Intervenors after being accused of various misdeeds and after being told it was going to be sued. It is more likely that

Plaintiff-Intervenors were overly sensitive to management's words and actions. And, quite frankly, if management did give Plaintiff-Intervenors the "cold shoulder" after receiving their attorney's demand letter, then that is just human nature – as each of the Plaintiff-Intervenors seemed to concede at their depositions, when they said they were not surprised that management was upset about their harassment claims. Either way, Leopalace's conduct after it fired Ms. Camacho is not actionable as a matter of law.

This is, and always has been, a negligence case. The issue is whether Leopalace acted promptly enough when informed of Ms. Camacho's conduct in late June or early July of 2004. If not, the issue is what amount of damages will fairly compensate the Plaintiff-Intervenors. This case is not a retaliation case, or a hostile work environment case, or a constructive discharge case. The court should so rule, and thereby streamline the trial by eliminating extraneous, irrelevant and prejudicial evidence. Partial summary judgment should be granted.

Dated this 10th day of September, 2007.

DOOLEY ROBERTS & FOWLER LLP

By _____
**TIM ROBERTS**
Attorneys for Defendant

20

Case 1:06-cv-00028   Document 58   Filed 09/10/2007   Page 20 of 20