Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant LeoPalace Resort


FILED
DISTRICT COURT OF GUAM

SEP 1 0 2007 nbr

JEANNE G. QUINATA
Clerk of Court

## IN THE DISTRICT COURT
## OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | CASE NO. 1:06-CV-00028 |
| Plaintiff, | |
| vs. | |
| LEO PALACE RESORT, | |
| Defendant. | **FILING OF TRANSCRIPT OF DEPOSITION OF JENNIFER HOLBROOK IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, | |
| Plaintiff-Intervenors, | |
| vs. | |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | |
| Defendants. | |

Defendant Leopalace Resort hereby files with the court a copy of the transcript of the deposition of Jennifer Holbrook in support of its motion for partial summary judgment

DOOLEY ROBERTS & FOWLER LLP

Date: __September 10, 2007__     By: _____

**TIM ROBERTS**
Attorneys for Defendant

F:\Documents\11.R (07.04)\M108\M108-330\Pleadings\M108-330.PSJM-Filing of Deposition Transcript.doc

ORIGINAL

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) | CASE NO. 1:06-CV-00028 |
| Plaintiff, ) | |
| vs. ) | |
| LEO PALACE RESORT, ) | DEPOSITION OF JENNIFER HOLBROOK SATURDAY, MARCH 17, 2007 |
| Defendant. ) | |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, ) | |
| Plaintiff-Intervenors, ) | |
| vs. ) | |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, ) | |
| Defendants. ) | |

RECEIVED

APR 17 2007
11:32am

DOOLEY ROBERTS & FOWLER LLP

The deposition of **Jennifer Holbrook**, called by the Defendants, pursuant to Notice and pursuant to the Guam Rules of Civil Procedure, taken at the offices of Dooley Roberts & Fowler, LLP, Suite 201, Orlean Pacific Plaza, 865 South Marine Corps Drive, Tamuning, Guam 96913, on Saturday, March 17, 2007, at the hour of 7 o'clock a.m.

That at said time and place, there transpired the following:

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727
Fax: (671) 632-5353
Email: chilangflores@hotmail.com

COPY

```
 1                    A P P E A R A N C E S :

 2

 3   For Plaintiff       Angela D. Morrison
                         U.S. EQUAL EMPLOYMENT OPPORTUNITY
 4                       COMMISSION
                         333 S. Las Vegas Boulevard, Suite 300
 5                       Las Vegas, Nevada 89101

 6

 7   For Plaintiff-
       Intervenors       Phillip Torres, Esq.
                         TEKER TORRES & TEKER, P.C.
 8                       130 Aspinall Avenue, Suite 2A
                         Hagatna, Guam 96910
 9

10   For Defendant
       LeoPalace         Tim Roberts, Esq.
11                       DOOLEY ROBERTS & FOWLER, LLP
                         Suite 201, Orlean Pacific Plaza
12                       865 South Marine Corps Drive
                         Tamuning, Guam 96913
13

14   Also Present:       Michiro Niikura, Director, LeoPalace
                           Administration
15                       May Paulino, HR Manager, LeoPalace
                         Viviene Villanueva, Plaintiff-Intervenor
16

17

18

19

20

21

22

23

24

25
```

I N D E X

E X A M I N A T I O N

Direct    Cross    Redirect    Recross

By Mr. Roberts        7                      148

By Mr. Torres                      134

By Ms. Morrison                  (None)


E X H I B I T S

Defendants:                                        Page Marked:

Exhibit 1 - Defendant Palace Resort's
            First Request for Production
            Of Documents (5 pages)                      6

Exhibit 2 - Authorization for the Release
            Of Records (3 pages)                        6

Exhibit 3 - New Employee Orientation (2 pages)      15

Exhibit 4 - LeoPalace Employee Handbook (17 pages)  20

Exhibit 5 - Transcript of August 11, 2004
            Meeting between May Paulino and
            Jennifer Holbrook (1 page)                 71

Exhibit 6 - Handwritten Note dated 8/11/04
            To Christina (1 page)                      76

Exhibit 7 - Letter dated August 16, 2004 to May
            Paulino from Phillip Torres (6 pages)      80

Exhibit 8 - Front Office Work Schedule
            For PP July 25 - Aug 7, '04 (3 pages)      93

Exhibit 9 - Front Office Work Schedule
            For PP June 27 - July 10, '04 (1 page)     95

Exhibit 10- Punch Detail Report (6 pages)             105

Exhibit 11- Jennifer Holbrook's Letter of
            Resignation (1 page)                       91

Jennifer Holbrook: Saturday, March 17, 2007

1 | Defendants:                                    Page Marked:

2

3 | Exhibit 12- Letter to May Paulino from
            Phillip Torres dated Aug 19, 04
4 |          (1 page)                                    114

5 | Exhibit 13- Supplemental Declaration (3 pages)  88

6 | Exhibit 14- Statement (2 pages)                   123

7 | Exhibit 15- Memo dated April 5, 2005 to
            File from Raymond J. Griffin, Jr.
8 |          Investigator (2 pages)                    124

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          TAMUNING, GUAM:   SATURDAY, MARCH 17, 2007

2

3               MR. ROBERTS:  This is the time and place

4    set for the deposition of Jennifer Holbrook in District

5    Court of Guam, Civil Case 06-00028.  I'm Tim Roberts,

6    I'm counsel for LeoPalace Resort; to my left is May

7    Paulino, HR Manager; and to her left is Mr. Niikura,

8    Director of Administration for LeoPalace Resort, I

9    believe.  Angela Morrison, an attorney with the EEOC is

10   here with us, as is Phil Torres, counsel for the

11   Intervenors in the case.  And finally, the witness is

12   obviously here, Jennifer Holbrook.  It is approximately

13   7:00 in the morning, it's a Saturday, I have no idea

14   what date it is, but let's start the deposition.  Oh,

15   and I'm sorry, Viviene Villanueva is here also, she's

16   one of the intervenors.

17               MS. MORRISON:  And if I may, before we

18   start, the EEOC just wants to state on the record that

19   we adopt any of Mr. Torres' form objections as to the

20   questions as our own.

21               MR. ROBERTS:  And so my understanding is

22   that if Mr. Torres makes an objection as to the form of

23   the question, you'll be deemed to have joined in the

24   objection.

25               MS. MORRISON:  Yes.

1    MR. ROBERTS:  And I have no problem with

2  that.

3    MS. MORRISON:  Thank you.

4    MR. ROBERTS:  A couple of things,

5  preliminarily.  Back on January 31st, I served a Request

6  for Production of Documents on the Intervenors.  I just

7  got the response at 5:00 p.m. last night, it being again

8  7:00 a.m. I have skimmed the request, but I have not had

9  a chance to -- or I have skimmed the response, I haven't

10  had a chance to really digest it.  To the extent that I

11  may be prejudiced today in my ability to take the

12  witness' deposition, I'm just going to formally reserve

13  my right to request to take your deposition again in the

14  future if the judge thinks I'm entitled to.  And we'll

15  mark that Request for Production as Exhibit No. 1 and

16  also a HIPPA authorization I sent to Mr. Torres several

17  weeks ago is going to be Exhibit 2, just for

18  identification purposes.

19    Can you swear the witness in?

20    (Witness sworn)

21    (Exhibit 1 marked: Request

22    for Production of Documents.)

23    (Exhibit 2 marked: HIPPA form.)

24

25

|   |   |
|---|---|
| 1 | TAMUNING, GUAM:   SATURDAY, MARCH 17, 2007 |
| 2 | |
| 3 | JENNIFER HOLBROOK, |
| 4 | called by Defendant LeoPalace Resort to give her |
| 5 | deposition at this time, being first duly sworn, was |
| 6 | examined and testified on her oath, as follows: |
| 7 | DIRECT EXAMINATION |
| 8 | BY MR. ROBERTS: |
| 9 |     Q.    Ms. Holbrook, you were present at yesterday's |
| 10 | deposition I believe, right? |
| 11 |     A.    Yes. |
| 12 |     Q.    Did you hear all of the instructions that Greg |
| 13 | McClinton gave to yesterday's deponent, which was Yutaka |
| 14 | Maruyama? |
| 15 |     A.    No, I came in -- |
| 16 |     Q.    A little late? |
| 17 |     A.    -- a little late. |
| 18 |     Q.    All right.  So here's the instructions for the |
| 19 | deposition.  We can't talk over each other because the |
| 20 | court reporter is typing everything that you say and I |
| 21 | say into eventually will be a transcript, a written |
| 22 | record of what you said here today.  You'll have a |
| 23 | chance -- and if we talk over each other, it makes for a |
| 24 | messy deposition.  So I'd ask you to wait until I'm done |
| 25 | asking the question before you give your answer, and |

1    I'll try to give you the same courtesy.  I'll try to

2    wait until you're done answering the question before I

3    start my new question.  Okay?

4        A.    Okay.

5        Q.    There you go.  That's the second rule, you have

6    to speak up and say yes or no, you can't -- in normal

7    conversation, people nod their head yes and shake their

8    head no and everybody knows what everybody's meaning,

9    but we can't do that in a deposition.  Also in normal

10   conversation, people do talk over each other, they

11   finish each other's sentences and they shrug, but we

12   have to try to be little more formal today.

13           My questions and the way I take depositions is

14   a little informal, it tends to be a little

15   conversational.  If I get a little conversational and

16   start to violate my own rules, one of these two

17   attorneys will correct me and I'll to do better.  Or if

18   you feel that I'm going too fast or my questions are bad

19   or too long, just tell me and I'll ask the question in a

20   different way.  All right?

21       A.    Okay.

22       Q.    In fact, sometimes I do that, I'll change the

23   question in the middle of the question because I think

24   of something else I want to ask.  If I do that and it's

25   not understandable or you don't feel that it's fair to

1   answer or you have any questions, just tell me to ask it

2   a different way and I will.

3       A.    Okay.

4       Q.    All right.  After the deposition is over, I

5   mentioned that the court reporter will type this up into

6   a booklet and you'll have a chance to read it and make

7   any corrections you want.  Depending on the kind of

8   corrections, if you change a yes to a no, I'll be able

9   to comment on that someday and say, "Uh-huh, this

10  witness changed her testimony, she's not believable,

11  ladies and gentlemen of the jury."  So be careful when

12  you make the corrections and be careful on your

13  testimony today so you don't have to make any

14  corrections.  All right?

15      A.    Okay.

16      Q.    And you understand you're sworn to tell the

17  truth?

18      A.    Yes.

19      Q.    And by being sworn to tell the truth, that

20  doesn't mean that you have to have an answer to every

21  question that I ask.  What happened, the things that

22  happened in this case happened a couple three years ago,

23  and lots of times lawyers will say, "Where were you on

24  the night of March 14, 2004?"  Nobody knows.  And if you

25  don't remember, you can say "I don't remember" and

1    that's -- in other words, you're sworn to tell the

2    truth, but if you don't remember something, it's fine to

3    say "I don't remember." All right?

4    *A.*    Okay.

5    *Q.*    Jennifer, where did you go to high school?

6    *A.*    GW.

7    *Q.*    Were you born and raised on Guam?

8    *A.*    Yes.

9    *Q.*    And what's your mom's name?

10    *A.*    Michoiko Holbrook.

11    *Q.*    And your father's?

12    *A.*    Greg Holbrook.

13    *Q.*    And your family is from the south, right?

14    *A.*    Yes.

15    *Q.*    Around the Windward Hills area?

16    *A.*    Windward Hills.

17    *Q.*    What's your residence address?

18    *A.*    504 Fairway Drive, Windward Hills Golf Course.

19    *Q.*    And you're Phil's neighbor?

20    *A.*    Close by.

21    *Q.*    Close by. And you went to GW; when did you

22    graduate?

23    *A.*    1997.

24    *Q.*    Did you go to college?

25    *A.*    Yes.

1     Q.      Where did you go?

2     A.      University of Guam.

3     Q.      And when did you graduate -- did you graduate

4  from UOG?

5     A.      Yes.

6     Q.      What year?

7     A.      December 2004.

8     Q.      So were you going to UOG while you had your

9  LeoPalace job?

10    A.      Yes.

11    Q.      Did you go to night school?

12    A.      No.

13    Q.      You just worked your classes around your

14  LeoPalace schedule?

15    A.      Yes.

16    Q.      What was your degree in?

17    A.      Consumer Family Science Nutrition.

18    Q.      What was your first job out of high school?

19    A.      CCP Golf Course.

20    Q.      And what was your rate of pay?

21    A.      $8.50.

22    Q.      And what were your job duties at CCP?

23    A.      Front desk.

24    Q.      What years were those?

25    A.      1997 to 2000.

1    Q.    What was your next job after CCP?

2    A.    I believe I applied at LeoPalace.

3    Q.    Yeah, you did.  You worked at LeoPalace two

4  separate occasions, right?

5    A.    Yes.

6    Q.    And so I think it was 2001 you worked at

7  LeoPalace?

8    A.    Yes.

9    Q.    What was your rate of pay on that first job

10  with LeoPalace?

11    A.    I believe it was $8.50.

12    Q.    What were your duties?

13    A.    Front desk.

14    Q.    So you were hired -- that was your starting

15  wage, $8.50?

16    A.    Yes.

17    Q.    What was your starting wage on the second time

18  you worked for LeoPalace?

19    A.    $8.50.

20    Q.    It wasn't $6.50?

21    A.    No.

22    Q.    And that CCP job, did you leave the job

23  voluntarily or were you let go?

24    A.    Voluntary.

25    Q.    And why did you leave the job?

1    A.    Because there was an opening at LeoPalace.

2    Q.    Was it for a higher pay at LeoPalace?

3    A.    No.

4    Q.    Lower pay?

5    A.    It was the same pay.

6    Q.    The same, $8.50?

7    A.    (Witness nodded head in the affirmative.)

8    Q.    And who interviewed you for that first job at

9    LeoPalace?

10   A.    May Paulino.

11   Q.    The same May Paulino who's here today?

12   A.    Yes.

13   Q.    And how long did you work for LeoPalace that

14   first time?

15   A.    I believe eight months.

16   Q.    Did you have any problems with management?

17   A.    No.

18   Q.    Were you sexually harassed on your first job

19   with LeoPalace?

20   A.    No.

21   Q.    How were you treated by management on your

22   first job with LeoPalace?

23   A.    Good.

24   Q.    And why did you leave again?

25   A.    I went to University of Hawaii for the Exchange

1    Program.

2        Q.      Exchange program of some sort of deal with UOG?

3        A.      The National Student Exchange Program.

4        Q.      And how long did you live in Hawaii?

5        A.      One year.

6        Q.      When did you return to Guam?

7        A.      May 2004 -- no, May 2002.

8        Q.      And where did you work when you got back to

9    Guam in May of 2002?  Or did you?

10       A.      I did, I worked at Bank of Guam.

11       Q.      How long?

12       A.      I don't remember.

13       Q.      What was your rate of pay?

14       A.      $8.50.

15       Q.      What was your next job after Bank of Guam?

16       A.      Guam Junior Golf League coach.

17       Q.      Do you golf?

18       A.      Yes.

19       Q.      And what years were those?

20       A.      I believe I worked until June of that year.

21       Q.      Of 2002 or 2003?

22       A.      3.

23       Q.      And that's about when you started at LeoPalace?

24       A.      When?

25       Q.      Well, not -- I'm wrong.  It was a year before

1    you started at LeoPalace, right?

2        A.      (No response.)

3        Q.      Let me ask it a different way.  In May or June

4    of 2003, you left the Junior Golf League?

5        A.      Well, it ended.

6        Q.      It ended?

7        A.      Yes.

8        Q.      And then did you take a job?

9        A.      Yes.

10       Q.      Where?

11       A.      LeoPalace.

12       Q.      Were you hired in 2003 or 2004 at LeoPalace?

13       A.      2004.

14       Q.      On June 5th of 2004; does that sound familiar?

15       A.      I believe so.

16       Q.      Maybe June 7th sounds a little more familiar.

17   Let me show you what we'll mark as Exhibit 3, this is a

18   new employee work sheet that we've been talking about

19   most of the week.

20                                    (Exhibit 3 marked: New.

21                                     Employee Orientation.)

22       Q.      (By Mr. Roberts)  When you were interviewed by

23   May Paulino back in 2001 for the job with LeoPalace,

24   were you given an employee handbook?

25       A.      I don't remember.

1    Q.    Did you go through an orientation interview
2    with May when she hired you in 2001?
3    A.    Can you explain that better?
4    Q.    What did the interview with May consist of?
5    A.    I don't remember.
6    Q.    Did she tell you any of LeoPalace's policies or
7    procedures and what would be expected of you; do you
8    remember anything like that?
9    A.    I remember what my duties were supposed to be.
10   Q.    Yeah, I mean they didn't just say "go over
11   there and start working."  Right?
12   A.    No.
13   Q.    Who was your immediate supervisor in this first
14   job with LeoPalace?
15   A.    Mr. Suzuki.
16   Q.    So you and Mr. Suzuki had known each other
17   prior to 2004 when you took your second job with
18   LeoPalace?
19   A.    Yes.
20   Q.    And did you communicate with Mr. Suzuki in
21   English?
22   A.    Yes.
23   Q.    And in Japanese?
24   A.    Yes.
25   Q.    Do you speak fluent Japanese?

1    A.    No.

2    Q.    *Koshi* Japanese?

3    A.    Pretty well.

4    Q.    You speak it pretty well?

5    A.    Yes.

6    Q.    It's not your native language though, right?

7    A.    No.

8    Q.    Because you were born here in Guam?

9    A.    Yes.

10   Q.    And did you learn Japanese from your mother?

11   A.    Yes.

12   Q.    All right.  But you did communicate with Mr.

13   Suzuki in both English and Japanese?

14   A.    Yes.

15   Q.    Back to Exhibit 3.  Do you recognize that

16   document?

17   A.    Yes.

18   Q.    What is it?

19   A.    It's a new employee orientation paper.

20   Q.    That's what it's called, right?  Do you

21   remember signing this document?

22   A.    Yes.

23   Q.    Is that your signature on the second page of

24   the document?

25   A.    Yes.

1    Q.    And are those your initials on both pages of

2  the document?

3    A.    Yes.

4    Q.    And this is for the second job interview with

5  LeoPalace, right?

6    A.    Yes.

7    Q.    Do you see, about three quarters of the way

8  down the line, or down the page, it says "Sexual

9  Harassment"?

10   A.    Yes.

11   Q.    And there's a space for your signature to the

12 right of that?

13   A.    Yes.

14   Q.    Do you remember being spoken to about Leo

15 Palace's sexual harassment policy in June of 2004 when

16 you took your second job?

17   A.    You need to define sexual harassment policy

18 you're talking about.

19   Q.    Yeah.  Do you remember any -- who interviewed

20 you for your second job at LeoPalace?

21   A.    I was interviewed I believe by Mrs. Paulino.

22   Q.    Could it have been Pat Clymer?

23   A.    I don't remember if it was Pat.

24   Q.    All right.  Whoever it was, did they discuss

25 with you that LeoPalace had a no sexual harassment

Case 1:06-cv-00028    Document 62    Filed 09/10/2007    Page 19 of 40

1  policy in their workplace?

2    *A.*    No.

3    *Q.*    They did not?

4    *A.*    No.

5    *Q.*    So you checked that box across in sexual

6  harassment?

7    *A.*    (Witness nodded head in the affirmative.)

8    *Q.*    You have to speak up.

9    *A.*    Yes.

10    *Q.*    Did you think you were checking it because

11  sexual harassment was okay at LeoPalace?

12    *A.*    No.

13    *Q.*    Why do you think you were checking that box?

14    *A.*    Because we were required to read the Employee

15  Handbook and after we read each section, then we were to

16  initial them.

17    *Q.*    So did you read the Employee Handbook?

18    *A.*    Yes.

19    *Q.*    I'll show you what we'll mark as Exhibit 4, and

20  ask you if you recognize this document.  And be careful

21  because the handbook has changed a couple of times, and

22  I'm still trying to figure out which was the one -- the

23  sexual harassment policy has not changed, but I'm trying

24  to figure out which one it was that was in effect when

25  you were hired.

1    *A.*    Okay.

2                      (Exhibit 4 marked:

3                      Employee Handbook.)

4    *Q.*    (By Mr. Roberts)  This is a 15-page document.

5  And let me caution you again, it may have been in a

6  booklet form not necessarily 8 x 11 like this is; I just

7  don't know.  I see you're looking at page 11?

8    *A.*    Yes.

9    *Q.*    And that's the page on the top of which is

10  entitled Sexual Harassment?

11    *A.*    Okay.

12    *Q.*    Having read the section of this particular

13  handbook -- let me strike that question.  Do you know if

14  this is the handbook you were given when you were hired

15  in 2004?

16    *A.*    I don't remember.

17    *Q.*    Does it look similar to the handbook you were

18  given in 2004?

19    *A.*    I don't remember.

20    *Q.*    But you know you were given a handbook?

21    *A.*    Yes.

22    *Q.*    And the handbook contained a sexual harassment

23  policy?

24    *A.*    Yes.

25    *Q.*    And the anti-sexual harassment policy on page

1    11 of this document, was that the policy that was in

2    effect at LeoPalace when you worked there in 2004?

3        *A.*    (No response.)

4        *Q.*    Let me ask it a different way.  Was that

5    LeoPalace's written policy in 2004 when you worked

6    there?

7        *A.*    I don't remember.

8        *Q.*    Have you ever read -- do you ever remember

9    reading that section of the handbook before?

10       *A.*    Yes, but I don't remember the section fully.

11       *Q.*    Okay.  Is it your understanding that was

12   LeoPalace's policy against sexual harassment when you

13   worked there?  Well, let me ask you -- let me strike

14   that question, Jennifer, and ask it a different way.

15       *A.*    Okay.

16       *Q.*    What do you remember, what do you remember as

17   you sit here today was LeoPalace's written policy

18   against sexual harassment when you worked for LeoPalace

19   in May -- or excuse me, June, July and August of 2004?

20       *A.*    I remember in the book that it was titled

21   Harassment and what type of forms harassment was within

22   the policy, and that's what I remember about the

23   harassment, was the type -- the forms of harassment that

24   was indicated.

25       *Q.*    Do you recall whether there were instructions

1   on what you should do if you thought you were a victim

2   of sexual harassment?

3       A.      No.

4       Q.      You don't recall?

5       A.      I don't.

6       Q.      Do you remember from looking at Exhibit 3, does

7   it appear to you that you were hired for the second time

8   on or about June 7th of 2004?

9       A.      Yes.

10      Q.      When was your first day on the job, if you

11  recall?

12      A.      I don't remember.

13      Q.      You don't remember if it was that day or the

14  next day or the next week?

15      A.      I know this day was shift orientation.

16      Q.      Okay.

17      A.      So I think it was maybe the next day; I don't

18  remember.

19      Q.      Okay.  Well, we are here today to talk about

20  one Christina Camacho.  Do you remember meeting Ms.

21  Camacho when you started your job?

22      A.      Yes.

23      Q.      And how did you meet her?

24      A.      At the front desk.

25      Q.      And did you meet her the first day you worked

1   there?

2       A.      I believe so.

3       Q.      Did you like her?

4       A.      Define like.

5       Q.      Well, when people meet, they introduce

6   themselves, they chat, they have a conversation usually.

7   Did you have a conversation with Christina when you

8   first started working with her?

9       A.      I don't remember if I did.

10      Q.      All right.  Now you're suing LeoPalace Resort

11  in this case because you claim you were sexually

12  harassed on the job, right?

13      A.      Yes.

14      Q.      Were you sexually harassed by Ms. Camacho on

15  the first day of the job?

16      A.      No, I don't think so.

17      Q.      Did anything unusual happen with Christina

18  Camacho the first time you worked for, that you can

19  recall, two and a half years later?

20      A.      Can you repeat your question?

21      Q.      Yeah, sure thing.  Was there anything unusual

22  or remarkable that you remember about the first day you

23  worked with Christina Camacho at Leo Palace?

24      A.      During our working, she felt comfortable enough

25  to come right out and say that, you know, she's like,

1    "Don't worry, I am a lesbian."

2        Q.    Was that on the first day though?

3        A.    No.

4        Q.    Well, how --

5        A.    She introduced herself on the first day.

6        Q.    Did she introduce herself, "Hi, I'm Christina

7    Camacho, I'm a lesbian"?

8        A.    No, she just said her name.

9        Q.    Okay.  But at some point she said, she openly

10   said to you, "I'm a lesbian"?

11       A.    Yes.

12       Q.    And what else did she say?

13       A.    I don't remember what else she said, but I know

14   she told me that --

15       Q.    I thought you said something like, "Don't be

16   uncomfortable" or something like that.

17       A.    I did not say that.

18       Q.    I thought you did; I'm sorry.

19       A.    No, I did not say that.

20       Q.    Okay.  Did she say anything other than "I'm a

21   lesbian"?

22       A.    I don't remember.

23       Q.    I mean, people wouldn't just ordinarily say,

24   "Hi, I'm a lesbian."  They would say, "I want you to

25   know something" or something like that; do you remember

1    anything of that nature?

2        A.    No.

3        Q.    Okay.  When was the first incident of what you

4    would consider sexual harassment that you saw with your

5    own eyes or experienced yourself at LeoPalace Resort?

6        A.    From Christina?  Or in general?

7        Q.    In general, that you saw with your own eyes.

8        A.    The first incident that I could recall would

9    probably be with me when Christina grabbed my hand and

10   she -- before she grabbed my hand, she asked me, "Do you

11   think my breasts are either watermelons or melons?"

12       Q.    And about how many days or weeks after you

13   started working did Christina ask you that?

14       A.    Maybe two weeks into the job.

15       Q.    So you think about the third week in June?

16       A.    Yes.

17       Q.    And so she said, "Do you think my breasts are

18   watermelons or melons" -- what did she say?

19       A.    She asked me if I thought that her breasts were

20   watermelons or melons.

21       Q.    And did you answer her?

22       A.    I didn't answer her.  I was like I don't think

23   -- I believe what I said is "I don't know."

24       Q.    And then what did she do?

25       A.    She grabbed my hand forcefully and tried to

1   pull it to her breast.

2        Q.     And how did you react to that?

3        A.     I pulled -- I jerked my hand away and I said,

4   "No."

5        Q.     Did anybody else see this?

6        A.     I don't remember.

7        Q.     Was there anybody else at the front desk?

8        A.     I don't remember that.

9        Q.     Where did it happen?

10       A.     At the front desk.

11       Q.     Were there any guests around?

12       A.     I don't think so.

13       Q.     And you don't remember if there were any other

14  co-employees around?

15       A.     Correct, I don't remember.

16       Q.     And what did Christina say or do when you

17  jerked your hand away, or when you pulled your hand

18  away?

19       A.     I don't remember after that.

20       Q.     How did this make you feel?

21       A.     It made me feel uncomfortable.

22       Q.     So what did you do about it?

23       A.     I kept my distance from her.

24       Q.     Did you tell any supervisor?

25       A.     No.

1    Q.    Who was your supervisor at the time?

2    A.    If it's the morning shift, it was with Mr.

3  Suzuki.

4    Q.    Did you ever work the evening shift?

5    A.    C shift, yes.

6    Q.    The C shift. And what hours are the C shift?

7    A.    I believe --

8    Q.    Is it 12:45 p.m. to 8:15 p.m.?

9    A.    Yes.

10    Q.    And who was the night manager at the time?

11    A.    I believe it was Mr. Sekine.

12    Q.    Sekine?

13    A.    Yes.

14    Q.    Do you remember Mr. Sekine's first name?

15    A.    No.

16    Q.    Was Greg Perez ever the night manager while you

17  worked there?

18    A.    Not on my C shift.

19    Q.    So Greg -- do you remember Greg Perez?

20    A.    Yes.

21    Q.    Was he a night manager of some sort while you

22  were there?

23    A.    Yes.

24    Q.    And so I think you're saying he came in later

25  than 8:15 p.m. Or are you saying that?

1    *A.*    I believe he worked the swing shift, the mid --

2    until the next morning.

3    *Q.*    Did you have a usual shift while you worked

4    there?

5    *A.*    Yes.

6    *Q.*    What was your usual shift?

7    *A.*    I did a few A shifts and I always did at least

8    two C shifts.

9    *Q.*    So you think it was mixed, or did you do one

10   shift more than the other shift?

11   *A.*    No, it was always set to do a few A shifts and

12   always two C shifts.

13   *Q.*    Always two C shifts?

14   *A.*    I believe so, most of the time.

15   *Q.*    And did you ever do the -- ever have the B

16   shift?

17   *A.*    I was -- yes, I did a B shift.

18   *Q.*    And how about the D shift, did you ever work

19   the D shift?

20   *A.*    What is the D shift?

21   *Q.*    It looks like 9:00 in the morning until 5:30

22   p.m.

23   *A.*    I don't remember if I did a D shift.

24   *Q.*    Did you -- I guess I asked you this, did you

25   tell your supervisor at the time about this incident

1    with Christine?

2       A.      No.

3       Q.      Did you tell any other employees about this?

4       A.      At the time?

5       Q.      Yeah, on this first occasion?

6       A.      No.

7       Q.      Did you tell Mr. Suzuki or Mr. Iijima?

8       A.      No.

9       Q.      Did you tell May Paulino?

10      A.      No.

11      Q.      Did you tell Rose?  This is the first time, I'm

12   talking about.  We'll get to every incident that you can

13   remember before we all leave today.

14      A.      Okay.

15      Q.      So on this first occasion, you didn't tell

16   anybody?

17      A.      I don't remember.

18      Q.      Were you married at this time?

19      A.      No.

20      Q.      Did you have a boyfriend at this time?

21      A.      Yes.

22      Q.      Were you living with this boyfriend at the

23   time?

24      A.      No.

25      Q.      Do you remember if you told your boyfriend when

1    you got home that night what had happened at work that

2    day?

3         A.     I don't remember.

4         Q.     Did you tell any of your friends?

5         A.     That day?  No, I --

6         Q.     About this first incident.

7         A.     Not my friends, I don't think so.

8         Q.     You are generally aware that Christine Camacho

9    was fired only two days after May Paulino did an

10   investigation in the early part of August of 2004,

11   right.

12                MS. MORRISON:   Objection; foundation.

13        Q.     (By Mr. Roberts)  Are you aware of that?

14        A.     Yes.

15        Q.     Did you see Ms. Paulino on the job, around the

16   job site the next day, two days, three days after this

17   first incident?

18        A.     Which first incident?

19        Q.     The first incident of the melons or watermelons

20   incident, and then the grabbing of the hand, this first

21   incident.  Let me back up.  This is sort of in the

22   nature of a -- I guess a deposition instruction.  I know

23   you just want to go on and on about all the incidents

24   together, but as lawyers we are trained, and have to,

25   try to pinpoint exactly when things happened and what

1   happened, and what happened next, and it can get tough

2   because people don't often remember things that way.

3       A.    Okay.

4       Q.    So if you'll work with me, I'll try to work

5   with you.  I'm going to go incident by incident --

6       A.    Okay.

7       Q.    -- and we'll see how we do; okay?

8       A.    Okay.

9       Q.    So now we're talking about you were hired June

10  7th and you think probably a couple of weeks into the

11  job Christine Camacho grabbed your -- or asked you if

12  you thought her breasts were melons or watermelons and

13  she tried to put your hand on her breast.

14      A.    Yes.

15      Q.    And that made you uncomfortable?

16      A.    Yes.

17      Q.    And you testified you don't think you told

18  anybody.  And now I'm asking you, did you see May

19  Paulino over the next week on the job site?

20      A.    Yes, I believe so.

21      Q.    As you look back on the events of June, July

22  and August of 2004 today, do you think you made a

23  mistake in not reporting this incident immediately to

24  May Paulino?

25      A.    I didn't know who to report it to.

1    Q.    You had had prior jobs though, right?

2    A.    Yes.

3    Q.    And did you read the employee handbook you were

4    given?

5    A.    For the LeoPalace?

6    Q.    Yes.

7    A.    Yes.

8    Q.    And don't you recall it said if you think you

9    were a victim of sexual harassment, you should report it

10   to your supervisor or to Human Resources?

11                MS. MORRISON:  Objection; asked and

12   answered.

13   A.    No, I didn't know who to report it to.  I

14   didn't know that -- who exactly we have to report it to.

15   Q.    (By Mr. Roberts)  You didn't assume that would

16   be somebody in a superior position to you?

17   A.    I knew that Mr. Suzuki was my supervisor.

18   Q.    Did you know before you took the LeoPalace job

19   that sexual harassment in the workplace was

20   inappropriate?

21   A.    I wasn't fully aware of what sexual harassment

22   was prior to that.

23   Q.    And did you -- when this first incident

24   happened, did you recognize it as sexual harassment?

25                MS. MORRISON:  Objection; calls for a

1  legal conclusion.

2      A.    Yes, I realized it was a form of harassment

3  that I didn't have to tolerate.

4      Q.    (By Mr. Roberts)  And at the time you say you

5  didn't know who to report it to when you -- did you know

6  you ought to have reported it to someone?

7      A.    Repeat your question?

8      Q.    Yeah; okay, I'll ask it a different way.  Did

9  it ever cross your mind to report this to somebody?

10     A.    Yes.

11     Q.    And when it crossed your mind to report it to

12 somebody, what kind of employee may have crossed your

13 mind as to who it should be reported to?

14     A.    I believe the person I did tell these

15 incidences to --

16     Q.    Wait, wait, let me --

17     A.    Okay.

18     Q.    I can't stop you from your answer.  Let me just

19 make my question clear.

20     A.    Okay.

21     Q.    I'm talking about the first incident, the very

22 first incident; what we call the melon incident.

23     A.    Okay.

24     Q.    Did you think anybody in particular you ought

25 to report that incident to?

1 *A.* No.

2 *Q.* Did you tell Christina Camacho anything after

3 she did this to you?  I think you said no earlier; I

4 mean, did you tell her anything else?

5 *A.* I don't remember.

6 *Q.* Did you say "If you do that again, I'm going to

7 report you"?

8 *A.* No.

9 *Q.* "If you do that again, I'm going to knock you

10 on your *dah-gan*"?

11 *A.* No.

12 *Q.* Did you warn her or threaten her in any way?

13 *A.* No.

14 *Q.* Did you tell anyone after this first incident,

15 of this melon incident, did you tell anyone at

16 LeoPalace, "I don't want to work with Christine Camacho

17 anymore"?

18 *A.* I don't remember.

19 *Q.* All right.  After this first incident of the

20 melon comment, when was the next incident of what you

21 would now consider sexual harassment that you saw or

22 experienced yourself at LeoPalace?

23 *A.* I heard Christina using vulgar language every

24 day that I worked with her.

25 *Q.* Even the first day?

1    A.     The first day I don't remember.

2    Q.     Your second day?

3    A.     I don't remember.

4    Q.     Do you remember when the first time you heard

5    her use vulgar language was?

6    A.     Maybe the first week.

7    Q.     And in that first week, do you remember what

8    kind of vulgar language Christina Camacho used?

9    A.     She likes to use the "fuck" word, "shit."

10   Q.     Do you consider that sexual harassment?

11   A.     Yes.

12   Q.     So if an employee says the words "fuck" or

13   "shit" on the job, you consider that sexual harassment?

14   A.     A form of harassment; yes.

15   Q.     Sexual harassment?

16   A.     Yes.

17   Q.     And when she said these words, was she talking

18   to you or to others?

19   A.     I believe it was in her general vocabulary.

20   She was using it to talk with those words.

21   Q.     That was her manner of conversation, she used

22   swear words as a general habit in talking with people?

23   A.     Yes.

24   Q.     And in just saying sentences?

25   A.     Yes.

1    Q.    Other than those particular words -- well, what
2    other words did you hear her say on the job?  That's a
3    terrible question that I withdraw; what other words did
4    you hear her say on the job.  Here's a different
5    question.  What's the next incident that you can
6    specifically recall after this melon incident that
7    involved touching?
8    A.    We were all walking to lunch --
9    Q.    When though, when did this happen?
10   A.    Maybe a week later or a week -- a week or two
11   weeks later.
12   Q.    So this is either three weeks or four weeks
13   into the job?
14   A.    Yes.
15   Q.    The first incident happened, was it two weeks
16   into the job approximately?
17   A.    I believe so.
18   Q.    Okay.  And so the second incident that we're
19   going to talk about right now involving touching was
20   either --
21   A.    The third or --
22   Q.    -- approximately three or four weeks into the
23   job?
24   A.    Yes.
25   Q.    And what happened?

1    **A.**    I was wearing a black skirt that day and we
2    were walking to lunch from the front desk --
3    **Q.**    Who's we?
4    **A.**    We would be Rose, Viviene, Christina and I, and
5    I believe --
6    **Q.**    You were walking to lunch?
7    **A.**    Yes, to the cafeteria.
8    **Q.**    So the four of you were going to have lunch
9    that day?
10   **A.**    We were scheduled to have lunch.
11   **Q.**    Well, you were walking together?
12   **A.**    Yes.
13   **Q.**    And you were going to the cafeteria?
14   **A.**    Yes.
15   **Q.**    Where you were going to have lunch with each
16   other?
17   **A.**    Yes.
18   **Q.**    Okay.  So what happened?
19   **A.**    As we were walking, she tried to stick her hand
20   under my skirt because she wanted to know if I was wet.
21   **Q.**    Did she say those words?
22   **A.**    She said, "I want to feel if you're wet."
23   **Q.**    And when you say she tried to put her hand
24   under your skirt -- I know there's a lot of people here,
25   I know this is embarrassing for you, I'm sorry, we have

1    to do it.  Tell me exactly what she did.

2        A.     She tried to go under my skirt to see if I was

3    wet, she tried to reach for me in my genital area.

4        Q.     Okay.  Did she actually touch your genital

5    area?

6        A.     No.

7        Q.     Why not?

8        A.     Because I pushed her down with my hand and I

9    said, "Stop!"

10       Q.     Did Viviene see this?

11       A.     I believe so.

12       Q.     Did Rose see this?

13       A.     I believe so.

14       Q.     So what did Christine do when you pushed her

15   hand away and said stop?

16       A.     Christina laughed at it and I ran ahead of the

17   group.

18       Q.     Ran?

19       A.     Well, I went further ahead of the group.

20       Q.     You walked a little faster, right?

21       A.     Yes.

22       Q.     And so did you have lunch with Christina and

23   Rose and Viviene that day?

24       A.     Yes.

25       Q.     Anything unusual happen during the lunch that

1  you had with those girls that day?

2     A.     It was uncomfortable, I was uncomfortable.  I

3  just went, got my food, sat at the table.  As soon as --

4     Q.     With them though, right?

5     A.     Well, I remember sitting at the end of the

6  table.

7     Q.     This is either three weeks or four weeks into

8  the job at this point, right?

9     A.     Yes.

10    Q.     And you knew other employees by this time,

11 didn't you?

12    A.     Not personally.

13    Q.     Did you see anybody in the cafeteria you might

14 want to have lunch with rather than Rose, Christina and

15 Viviene?

16    A.     No, I don't think so.

17    Q.     What did you guys talk about during lunch that

18 day, if you can remember two and a half years later?

19    A.     I don't, I don't remember.

20    Q.     Okay.  After this -- did you report this

21 incident to anyone?

22    A.     No.

23    Q.     Not to May Paulino?

24    A.     No.

25    Q.     Or Mr. Suzuki?

Case 1:06-cv-00028   Document 62   Filed 09/10/2007   Page 40 of 40