1    A.    Not that day.

2    Q.    Or not to Mr. Iijima either, right?

3    A.    No.

4    Q.    Did you talk about it with Rose?

5    A.    That day?

6    Q.    Yes.

7    A.    I don't remember.

8    Q.    Was Rose your supervisor?

9    A.    Yes.

10   Q.    Did it occur to you that you ought complain to

11   Rose?

12   A.    That day?

13   Q.    Yes.

14   A.    I believe she saw it.

15   Q.    So did you talk with Rose about it?

16   A.    No.

17   Q.    Did Rose try and talk with you about it?

18   A.    I don't remember.  I don't think so.

19   Q.    After this incident, did you tell anybody at

20   LeoPalace, "I don't want to work with Christina Camacho

21   anymore"?

22   A.    No.

23   Q.    And as you look back on it today, do you think

24   you might have made a mistake in not reporting this

25   particular incident to May Paulino?

Case 1:06-cv-00028   Document 62-2   Filed 09/10/2007   Page 1 of 50

1     *A.*     Again, at that time, I still didn't know who to

2  report it to.

3     *Q.*     Well, did you think -- did you know you were

4  supposed to -- you ought to report it to someone?

5               MS. MORRISON:  Asked and answered.

6     *A.*     I knew, but I felt that it would compromise my

7  job, it would compromise me being there.

8     *Q.*     (By Mr. Roberts)  I mean you didn't think you

9  were supposed to report it to the janitors, right?

10    *A.*     Of course not.

11    *Q.*     And you didn't think you were supposed to

12  report it to the bus drivers, right?

13    *A.*     Right.

14    *Q.*     You knew you -- did you know you were supposed

15  to report it to your supervisor?

16    *A.*     No, I did not know who to report it to.

17    *Q.*     How about -- well, did you think you should

18  report it to the starter at the golf course, Angel?

19    *A.*     No.

20    *Q.*     And how about the greenskeeper?

21    *A.*     No.

22    *Q.*     The maids over at the condominium?

23    *A.*     No.

24    *Q.*     So you knew who you weren't supposed to report

25  it to, but you didn't know who you were supposed to

1   report it to?

2       A.    Correct.

3       Q.    All right.  Now we're three to four weeks into

4   the job and now there's been two incidents of sexual

5   harassment involving touching, right?

6       A.    Yes.

7       Q.    After this second incident with the dress,

8   what's the next incident involving touching that you

9   experienced or saw with your own eyes?

10      A.    Touching.

11      Q.    Physical contact.

12      A.    For myself, what I can remember what Christina

13  did to me, the third incident was when she slapped me on

14  my ass.

15      Q.    Okay.  Now when was this, the second incident

16  -- well let me back up.  Did you tell anybody about this

17  second incident?

18      A.    Which second incident?

19      Q.    The feeling up of the dress incident.

20      A.    No.

21      Q.    You didn't tell your boyfriend?

22      A.    I don't remember.

23      Q.    All right.  Did you ever talk with Viviene

24  about it, that particular incident?

25      A.    I don't remember.

1     Q.     All right.  So when did this -- and now you're

2  going to talk about an incident wherein Christina

3  slapped your butt, right?

4     A.     Um-hmm.

5     Q.     How many days or weeks after the dress

6  incident, this butt-slapping incident occur?

7     A.     I believe it was on July 7th.

8     Q.     July 7th would be 31 days or right around 30

9  days after you first started the job.

10    A.     Okay.

11    Q.     So the second incident was three to four weeks

12  into the job; that puts it at either 30 days into the

13  job or about 23 days into the job.  Does that help you

14  remember when this third incident might have happened,

15  how many days after the dress incident?

16    A.     No.

17    Q.     Was it within a day, or two days, or three

18  days, or four days, a week?

19    A.     I remember July 7th.

20    Q.     Okay.  What happened on July 7th?

21    A.     It was Christina and I working at the front

22  desk for the morning shift.

23    Q.     And she had previously tried to, before this

24  incident, before this day, tried to put her hand on your

25  -- or put your hand on her breast, right?

1    A.    Previous.

2    Q.    Previous to this?

3    A.    Yes.

4    Q.    And she had tried to feel your vaginal area on

5    a prior occasion too?

6    A.    Yes.

7    Q.    And so now we're on July 7th.  Are you sure

8    about that date?

9    A.    Yes.

10    Q.    Before July 7th, had you seen or experienced

11    any incident of sexual harassment involving touching

12    yourself with Christina?

13    A.    I don't remember.  I don't think so.

14    Q.    I mean, she didn't harass you every day, right?

15    A.    I felt harassed by her through her words that

16    she would be using every day that I worked with her.

17    Q.    The words "fuck" and "shit"?

18    A.    Yeah.  And --

19    Q.    What other words?

20    A.    I don't remember the other words.

21    Q.    You say you felt harassed.  Did you think

22    Christina was trying to sexually harass you by using

23    these words?  Let me withdraw that.  You said Christina

24    used swear words as a normal part of her conversation.

25    A.    (Witness nodded head in the affirmative.)

1    Q.    You have to speak up.

2    A.    Yes.

3    Q.    Did she do that with everybody?

4    A.    Yes.

5    Q.    So did you feel that these words were directed

6  at you personally?

7    A.    I felt that it wasn't necessary to use those

8  type of words in the working environment.

9    Q.    Are you -- would you consider yourself a

10  religious person?

11   A.    Define religious.

12   Q.    That's a really good response.  Do you go to

13  church?

14   A.    No.

15   Q.    Are you Catholic?

16   A.    No.

17   Q.    Your father was an American --

18   A.    Yes.

19   Q.    -- from the States?  Your father was a white

20  Anglo-Saxon Protestant?

21   A.    He was Catholic.

22   Q.    Okay; your father was Catholic.  Was he born on

23  Guam?

24   A.    No.

25   Q.    He moved to Guam at some point, right?

1    *A.*    Yes.

2    *Q.*    Do you know when your father came to Guam?

3    *A.*    When he was young.

4    *Q.*    And your mother was Japanese?

5    *A.*    Yes.

6    *Q.*    Did your father meet your mother in Japan?

7    *A.*    I believe so.

8    *Q.*    And is your mother alive?

9    *A.*    Yes.

10   *Q.*    And is your father alive?

11   *A.*    No.

12   *Q.*    He passed away?

13   *A.*    Yes.

14   *Q.*    And when did your father pass away?

15   *A.*    When I was 10; 18 years ago.

16   *Q.*    Is your mother a particularly religious person?

17   *A.*    No.

18   *Q.*    And do you -- I asked you this already, but I

19   forgot the answer -- do you go to church?

20   *A.*    No.

21   *Q.*    Do you ever swear?

22   *A.*    Swear?

23   *Q.*    Yeah.  Have you ever said the word "fuck"?

24   *A.*    Yeah.

25   *Q.*    And have you ever said the word "shit"?

1    A.    Yes.

2    Q.    Have you ever said those words around other

3    people?

4    A.    Yes.

5    Q.    And when you said those words to other people,

6    were you trying to harass them?

7    A.    No.

8    Q.    Okay.  This third incident, what happened on

9    this third incident when she slapped your butt?

10    A.    Okay.  The third incident, Christina and I were

11    working at the front desk in the Belvedere, we were

12    doing our morning duties, and I was on the third

13    computer if you are looking from the desk -- being

14    behind the counter out, third computer, the last

15    computer on the end.

16    Q.    On the -- looking from the front desk out

17    towards the lobby --

18    A.    Yes.

19    Q.    -- you're on the third computer on the left?

20    A.    I'm on the left computer.

21    Q.    So if I'm walking into the lobby, you're going

22    to be over on my right?

23    A.    Yes.

24    Q.    Is that the way you get into the back office,

25    around to the right as you look at the desk?

1    A.    Yes, there's two doors at the front.

2    Q.    One on each side?

3    A.    Yes.

4    Q.    So what happened?

5    A.    I was working on the computer and all I

6  remember -- what I remember is working on the computer,

7  doing some work so I guess getting ready for check-out

8  time, all I get is this big slap, bam!  right on me.

9              MR. ROBERTS:  The record should indicate

10 the witness has clapped her hands.

11   A.    And I yelled.

12   Q.    What did you say?

13   A.    I reacted by screaming.  My face was red, I

14 could feel my -- the anger, my ears were tipped red

15 also.

16   Q.    You had this reaction before you knew who did

17 that to you?

18   A.    I knew who -- I knew Christina slapped me

19 because I was --

20   Q.    How?  I mean, did you see her coming?

21   A.    No, I didn't see her coming.

22   Q.    Okay.

23   A.    She was behind me, she slapped me on my butt, I

24 turned around really quickly, I felt red, I felt angry.

25 I told her -- I screamed really loud and I said, "What

1   are you" -- I don't remember, I believe I said, "What

2   are you doing?" And she giggled and she said, "I'm

3   sorry. I can't help myself." I said, "No, that wasn't

4   nice at all." And I told her, I said, "Don't you ever

5   do that again to anybody. And if I find out that you do

6   that to anybody else, I will report you in." And Hong

7   came out also.

8       Q.    But he came out after -- did he come out while

9   you were screaming?

10      A.    Right after I was done getting mad with

11  Christina, and I told her.

12      Q.    After you had got done telling off Christina?

13      A.    Yes.

14      Q.    So Mr. Hong didn't see what had happened?

15      A.    He asked me what happened.

16      Q.    What did you tell him?

17      A.    I told him, "Christina just came up to me and

18  hit me on my butt really hard, and she laughed about

19  it."

20      Q.    Who's Mr. Hong?

21      A.    Mr. Hong, I believe, was the sales supervisor.

22      Q.    Sales supervisor?

23      A.    I believe so.

24      Q.    And the sales supervisor was in charge of

25  coordinating J Pax from Japan?

1     A.     I don't know.

2     Q.     It's a common abbreviation, it stands for

3   Japanese customers or passengers, J Pax.  Do you know

4   the nature of his job?

5     A.     I don't really remember.

6     Q.     Was he your direct supervisor?

7     A.     No.

8     Q.     And so what did Mr. Hong say?

9     A.     He didn't say anything, he didn't take it

10  seriously.

11    Q.     How do you know that?

12    A.     Because he laughed also and he -- he laughed,

13  thought it was funny.  I remember he laughed about it,

14  and then he just walked away.

15    Q.     How do you know he didn't talk with Christina

16  later?

17    A.     I don't know that.

18    Q.     Did you report this incident to Mr. Suzuki?

19    A.     No.

20    Q.     Did you report it to Mr. Iijima?

21    A.     No.

22    Q.     Or May Paulino?

23    A.     No.

24    Q.     Mr. Maruyama had -- well, do you remember when

25  Mr. Maruyama came and started working?

1    A.    I remember we were told of his coming on July
2  1st.
3    Q.    And did you meet Mr. Maruyama when he came
4  onboard?
5    A.    Yes.
6    Q.    And he's Japanese?
7    A.    Yes.
8    Q.    And you speak Japanese?
9    A.    Yes.
10   Q.    Did you converse with Maruyama in Japanese or
11 in English or both?
12   A.    Both.
13   Q.    Did he come by the front desk every morning and
14 say "hi"?
15   A.    Yes.
16   Q.    And between July 1 and July 7, did you ever say
17 anything to Mr. Maruyama about Christine Camacho?
18   A.    No.
19   Q.    Why not?
20   A.    Again, I really didn't know who to report it
21 to.
22   Q.    Well, you had just threatened Christine that if
23 she ever did that to anyone, you would report her.
24   A.    Yes.
25   Q.    And who were you talking about, that you would

1  report it to when you said this to Christina?

2       A.     To Mr. Suzuki, knowing he's my supervisor.

3       Q.     Okay.  So on July 7, you knew you were supposed

4  to report sexual harassment to Mr. Suzuki?

5       A.     Repeat your question.

6       Q.     All right.  So as of July 7, you knew that you

7  should report sexual harassment to your supervisor, Mr.

8  Suzuki?

9       A.     Yup.

10      Q.     And why didn't you know that on the previous

11 skirt incident or the previous breast, attempted

12 breast-touching incident?

13      A.     I don't know.

14      Q.     All right.  Did you report her to Mr. Suzuki?

15      A.     Repeat your question.

16      Q.     You said, "If you ever do that again, I'm going

17 to report you to Mr. Suzuki," right?

18      A.     Yes.

19      Q.     Why didn't you report her that day?

20      A.     I didn't want -- I was afraid to compromise my

21 job.

22      Q.     Did you know generally when Christina had been

23 hired?

24      A.     No.

25      Q.     She was hired before you though, right?

1      A.      Yes.

2      Q.      Did you know that she had been hired about a

3  month before you?

4      A.      I don't know.

5      Q.      Did you speak with Rose Paulino about this

6  butt-slapping incident?  Did I say Rose Paulino?

7      A.      Yes.

8      Q.      Rose Taimanglo.

9      A.      Did I speak to Rose Taimanglo about this

10  incident; I did.

11      Q.      And what did you tell her?

12      A.      I told her after finding out that Christina

13  slapped her on her buttocks.

14      Q.      Wait a minute.  I'm asking what you told Rose.

15      A.      Yes.

16      Q.      Okay.

17      A.      And I'm telling you.

18      Q.      Okay; I'm sorry.

19      A.      I told Rose Taimanglo after I found out that

20  Christina slapped her on her buttocks what happened to

21  me.

22      Q.      When did you find out that Christina had

23  slapped Rose on her buttocks?

24      A.      In August.

25      Q.      Do you remember approximately when in August?

1       A.      The 9th or the 10th; I don't.

2       Q.      Is that right about the time that you -- when

3  you finally told Rose, is that about the time that you

4  and Viviene and Rose went to May Paulino --

5       A.      Yes.

6       Q.      -- that resulted in Christine getting fired?

7       A.      Around this same time; yes.

8       Q.      Did Christina ever slap you on your butt again?

9       A.      No.

10      Q.      So you told her, "Don't do that again" and she

11 didn't do it?

12      A.      Correct.

13      Q.      After this third incident, this slapping -- let

14 me strike that.  Knowing what you know today, do you

15 think that if you reported this third incident to May

16 Paulino, that May would have fired Christina?

17              MR. TORRES:  Objection; calls for

18 speculation.

19      A.      Repeat your question one more time.

20      Q.      (By Mr. Roberts)  Yeah.  Knowing what you know

21 today, do you think that if you had reported this first

22 incident, this second incident and the third incident to

23 May Paulino, that May would have terminated Christina?

24      A.      No.

25      Q.      You don't think so?

1      A.      No.

2      Q.      Why not?

3      A.      Because of the other incidences I heard with

4  what Christina did to Viviene and what Rose did with

5  Christina, and the actions that they had taken; nothing

6  was done.

7      Q.      Well, on August 11th, you and Rose and Viviene

8  went to May and said, "Christina is sexually harassing

9  us," right?

10     A.      We complained to her about Christina's actions.

11     Q.      Yes.  And Christina was fired on August 13th,

12  right?

13     A.      Three days later.

14     Q.      You think it was three days?

15     A.      Wednesday, Thursday, Friday; three days.

16     Q.      Actually, I think the record will reflect that

17  Ms. Camacho was terminated on August 13th, Friday,

18  August 13th --

19     A.      Yes.

20     Q.      And that August 11 was a Wednesday.  Were you

21  there the day that Christina was fired?

22     A.      Yes.

23     Q.      What shift, do you recall?  Actually, I

24  withdraw the question, I'm getting ahead of myself;

25  okay?  So if May fired Christina after you three went to

Case 1:06-cv-00028   Document 62-2   Filed 09/10/2007   Page 16 of 50

1    her and told her about Christina, why don't you think

2    May would have fired Christina if you had told her about

3    the first incident or the second incident or the third

4    incident involving you?

5        A.    Because when we went to our interview with May,

6    I remember the discussion about how she told me that it

7    was brought up prior to her and Mr. Suzuki did not want

8    to let Christina go because of our short of staff.

9        Q.    I guess now I'm getting very close to arguing

10   with you, and I'll try not to.

11       A.    Okay.

12       Q.    May fired Christina, right?

13       A.    Yes.

14       Q.    And she fired her for sexually harassing you;

15   didn't she?

16                MS. MORRISON:   Objection; calls for

17   speculation.

18       Q.    (By Mr. Roberts)   What's your understanding of

19   why Christina was fired?

20       A.    Because of the complaints that was brought to

21   May.

22       Q.    Complaints about what?

23       A.    Of the -- the three individuals, Rose, Viviene

24   and I.

25       Q.    Complaining of what?

1      A.     Of Christina's behavior towards us.

2      Q.     And that behavior was what?

3      A.     Harassment.

4      Q.     And Christina was fired as a result of that,

5  right?

6      A.     I believe so.

7      Q.     But you didn't tell May about incidents 1, 2,

8  or 3; did you?

9              MS. MORRISON:  Objection; vague as to

10  time.

11     Q.     (By Mr. Roberts)  And I'll ask it a different

12  way.  When is the first time you ever told May Paulino

13  that Christina was sexually harassing you?

14     A.     That day that she brought us down for an

15  interview.

16     Q.     Was that on August 11th?

17     A.     Yes, I believe so.

18     Q.     And Christina was fired, you say, three days

19  later, but the record will reflect that it was two days

20  later on August 13th.

21     A.     I believe Wednesday Rose spoke with May, and

22  then on the next -- Wednesday is when Christina was told

23  to go home, then she did not report back to work on

24  Thursday, Friday.  So as of Wednesday she got suspended

25  and was told to go home by May that day.  So the reason

1    why I count three days is because Wednesday, Thursday,

2    Friday.

3        Q.    Okay.

4            THE WITNESS:  May I take a break?

5            MR. ROBERTS:  Yes, please.  Let us take a

6    break.

7                              (Recess was taken.)

8                              (Back on the record.)

9            MR. ROBERTS:  Okay, we're back on the

10   record, we had just taken a short break.

11       Q.    (By Mr. Roberts)  Jennifer, did you ever make

12   any jokes that could be considered of a sexual nature

13   towards Christine?

14       A.    No.

15       Q.    Did you ever hear any other employees make any

16   jokes that could be considered of a sexual nature to

17   Christine?  For example, Rose or Viviene.

18       A.    I don't remember.

19       Q.    Did you ever laugh at any jokes that Christine

20   made?

21       A.    What kind of jokes?

22       Q.    Jokes of a sexual nature?

23       A.    No.

24       Q.    Did you ever hear Rose or Viviene laugh at

25   anything Christine might have said of a sexual nature?

1    A.    I don't remember.

2    Q.    So if Christine Camacho testified under oath

3  last Thursday that you and Rose and Viviene would laugh

4  when she made jokes of a sexual nature, was she lying?

5    A.    I did not laugh at Christina's sexual jokes.

6  If they were clean jokes, I laughed at them, but once I

7  felt that the jokes were offensive in any sexual way, I

8  didn't laugh at it I just walked away and felt

9  disgusted.

10    Q.    Can you remember any sexual jokes that

11  Christina made of an oral nature?

12    A.    No.

13    Q.    And I think you testified you never told Yutaka

14  Maruyama after he came onboard about any of these first

15  three incidents that we were talking about earlier,

16  right?

17    A.    Correct.

18    Q.    After this third incident where Christina

19  slapped your buttocks, did you ever tell anyone in

20  management or any supervisor that you didn't want to

21  work with Christine anymore?

22    A.    I believe I told Rose.

23    Q.    Do you remember what Rose said to you?

24    A.    No.

25    Q.    Do you remember exactly what words you said to

1   Rose?

2       *A.*      I told Rose that I wasn't comfortable anymore

3   working with Christina and I was sick and tired of

4   tolerating her, the way she was acting at the front desk

5   with us, and the way she was around us.

6       *Q.*      Did you describe any particular incident to

7   Rose?

8       *A.*      Again, when I found out that Rose -- that

9   Christina slapped Rose on her buttocks, that's when I

10  told her about all these incidents that were bothering

11  me and that I just -- I hated it, you know.  I'm sick

12  and tired of dealing with Christina, her language, the

13  way she carries herself, conducts herself at work.  I

14  kept my distance from her all the time.  I didn't want

15  to deal with Christina anymore.

16      *Q.*      And you told Rose this on August 9th, about?

17      *A.*      Yes.

18      *Q.*      After this third incident where she slapped

19  your butt, did she ever touch you again?

20      *A.*      No.

21      *Q.*      Did she ever make any jokes of a sexual nature

22  to you again?

23      *A.*      I don't remember.

24      *Q.*      So I'm understanding your testimony to be that

25  you never personally made any complaints directly to Mr.

1  Suzuki about Christine Camacho.

2      A.    I -- there was one incident with Mr. Suzuki.

3  We all had to do room checks in the afternoon, and I

4  paired up with Christina and I asked him not to send me

5  with her, and he jokingly responded by saying, "We'll

6  handcuff you together."

7      Q.    That what?

8      A.    We will -- I will handcuff you together.

9      Q.    What did he mean by that, do you think?

10     A.    I don't know.  And so I separated myself from

11 Christina, I told her to take care of those three rooms

12 and I went to the other three rooms and I did not -- I

13 kept my distance from her as much as I could every day

14 at work.

15     Q.    Okay.  Mr. Suzuki was joking, you think, right?

16          MS. MORRISON:  Objection; calls for

17 speculation.

18     Q.    (By Mr. Roberts)  Did you think that Mr. Suzuki

19 really suggested that he was going to physically

20 handcuff you to Christine Camacho?

21     A.    No.

22     Q.    Okay.  So did you assume he was joking?

23     A.    I knew that he didn't take my comment seriously

24 that I asked to not be with her.

25     Q.    Did you tell him why you didn't want to be with

1  her?

2      A.      He knew that I wasn't comfortable.  I told him

3  I didn't want to be with her.

4              MR. ROBERTS:  And I guess I'd have to

5  interpose an objection to the question as

6  non-responsive.

7      Q.      (By Mr. Roberts)  The question was, did you

8  tell him why you did not want to go with her to do the

9  room checks?

10     A.      I don't remember.

11     Q.      Well, did anything happen when you went to do

12  the room checks with Christina?

13     A.      I personally just didn't want to be around her

14  because she made me uncomfortable.

15     Q.      Did she touch you?

16     A.      Because of all the incidents that led up --

17     Q.      No, but on this room check, did she touch you

18  that day?

19     A.      No, because I separated myself from her.

20     Q.      Okay.  Did she harass you on that day?

21     A.      No, because separated myself from her.

22     Q.      I understand.  And did you personally ever

23  complain to Mr. Iijima about Christine Camacho?

24     A.      I remember a day that I told him when Christina

25  broke out some Kotex and she was waving it around to him

1  at the front desk.  I said, "Don't you see that's

2  disgusting?"

3      Q.    What day did this happen?

4      A.    Oh, I don't remember.

5      Q.    Was it before or after the third incident of

6  butt slapping?

7      A.    Probably before.

8      Q.    Do you specifically remember?

9      A.    No.

10     Q.    Okay; bad question.  What did Christina do that

11 day with the Kotex?

12     A.    She grabbed it out, she waved it in front of

13 Mr. Iijima and myself at the front desk.

14     Q.    What did she say?

15     A.    I don't remember.

16     Q.    Did she say anything?

17     A.    I think so.

18     Q.    But you don't remember what she said?

19     A.    No.

20     Q.    And when you say she waved it, can you describe

21 what you mean?

22     A.    She took out her Kotex from the drawer and

23 waved it at the front desk, and Mr. Iijima was on the

24 opposite side of the counter and she goes, "Look."

25     Q.    She said "look"?

1    A.    Yeah.

2    Q.    The Kotex was in its wrapper, I take it?

3    A.    Yes.

4    Q.    And what did Mr. Iijima do?

5    A.    I think he told her to put it away.

6    Q.    Iijima-san spoke English, right?

7    A.    Yes.

8    Q.    Pretty good English?

9    A.    Pretty well.

10   Q.    And when Mr. Iijima told her to put it away,

11   did she do it?

12   A.    I believe she went to the rest room right after

13   that

14   Q.    Were there any other incidents other than the

15   melon, discussing her breast as being a melon, or

16   reaching under your skirt, or slapping your butt, or the

17   waving of the Kotex, that you remember that you would

18   consider sexual harassment, that you saw with your own

19   eyes?  Or heard with your own ears.

20   A.    Yeah, I felt her jokes were unnecessary, her

21   sexual jokes, you know, her vulgar language, the way she

22   talked.  It made me feel uncomfortable and it made me

23   keep myself away from her.

24   Q.    But you don't remember any specific jokes,

25   right?

1    A.    She -- she said she would enjoy having oral sex

2  when a female is on her menstruation.

3    Q.    And when did she say that?

4    A.    About the same time she asked me to feel her

5  melons.

6    Q.    That would have been back on, like the first

7  incident, right?

8    A.    Yes.

9    Q.    The same time?

10   A.    The same time?

11   Q.    I mean, was it a part of the same incident or

12  is it around the same time?

13   A.    Around the same time.

14   Q.    And what did you tell her when she said that?

15   A.    I said, "That's sick," and I walked away from

16  her.

17   Q.    Okay.  So now we've got the three incidents

18  involving touching, physical contact between you and

19  Christine, and then we've got the waving of the Kotex

20  and the comment about having sex with a woman during

21  menstruation.  Anything else of an oral nature that you

22  would consider sexual harassment?

23   A.    There were days she would describe what she did

24  with her partner during the working hours.

25   Q.    Her sexual partner, her girlfriend?

1    *A.*    Her girlfriend at LeoPalace.

2    *Q.*    And so what did she do, describe --

3    *A.*    Having sex with her.

4    *Q.*    And did you tell Christine, "Stop that, I'm not

5    interested in your sex life"?

6    *A.*    I didn't respond to her, I just walked away.

7    *Q.*    Did you report her conduct to management, or a

8    supervisor?

9    *A.*    No.

10   *Q.*    Have you ever heard about this memorandum that

11   was supposedly drafted by night manager Greg Perez

12   detailing an incident involving Viviene?

13   *A.*    I heard about it.

14   *Q.*    And what did you hear?

15   *A.*    Viviene told me that Christina grabbed her from

16   the back and tried to hump her.

17   *Q.*    And when did Viviene tell you this?

18   *A.*    Maybe the second or third week I started

19   working.

20   *Q.*    Did you report that to management or

21   supervisor?

22   *A.*    She told me that Greg and Ralph were there and

23   she --

24   *Q.*    Who's Ralph?

25   *A.*    A co-worker that worked the shift with Viviene.

1    She told me that -- you know, Greg Perez reported the

2    incident and supposedly talked to Christina about it.

3        Q.    Reported the incident to whom?

4        A.    I don't know.

5        Q.    I'm sorry; do you remember when Viviene might

6    have said this to you?

7        A.    I believe it was the second or third week I was

8    there.

9        Q.    It wasn't towards the middle of August when you

10   all three went to talk with Rose?

11       A.    No.

12       Q.    Do you know who supposedly gave this memo to --

13   let me strike that question.  Do you know who this memo

14   was supposedly addressed to?

15       A.    All I remember is that Greg -- I was told that

16   Greg took the memo down to May.

17       Q.    Himself?

18       A.    I don't know.

19       Q.    And do you know what was in the memo?

20       A.    No.

21       Q.    Do you know when this memo was supposed to have

22   been delivered to May?

23       A.    No.

24       Q.    Assuming that May got this memo, and assuming

25   it detailed the incident wherein Viviene had been

Case 1:06-cv-00028    Document 62-2    Filed 09/10/2007    Page 28 of 50

1 inappropriately touched by Christine, in your view, what

2 should May Paulino have done about it?

3    A.    There should have been immediate discipline.

4    Q.    Of what nature, in your mind?  Well, let me

5 just strike that.  Do you think May would have been, in

6 your view, in your mind, do you think May would have

7 been entitled to investigate the situation?

8    A.    Yeah.

9    Q.    Okay.  And then if the allegations were

10 substantiated after an investigation, would it have been

11 reasonable for Rose to -- excuse me, May to warn

12 Christina?

13    A.    Yeah.

14    Q.    And from what you know now as we sit here all

15 today, do you think a warning to Christina would have

16 made Christina stop acting inappropriately at the

17 workplace?

18          MS. MORRISON:   Objection; calls for

19 speculation.

20    A.    I don't know.

21    Q.    (By Mr. Roberts)  And to your knowledge, when

22 was May Paulino first informed -- let me strike that

23 question.  Other than this Greg Perez memo, the first

24 time you told May what was going on was August 9th or

25 August 10th, right?

1     A.     Correct.

2     Q.     In your mind, do you fault LeoPalace for

3 anything that Christine may have done or said before

4 LeoPalace became aware that she was behaving

5 inappropriately at work?

6     A.     Repeat your question.

7     Q.     Yeah; thanks.  If a company doesn't know that

8 an employee is acting inappropriately at work, it can't

9 do anything about it, right?

10    A.     They knew.  I believe LeoPalace knew what was

11 going on, and I personally feel that they didn't do

12 anything about it.

13    Q.     Well, they fired Christine.

14    A.     After all the incidences led up to it, and the

15 fact that we were told short of staff, can't fire her.

16    Q.     Who told you short of staff?

17    A.     May told me that day that she had a

18 conversation with Mr. Suzuki, and because they felt that

19 they were short of staff, they weren't going to let her

20 go.

21    Q.     And then May fired her two days later?

22    A.     Yes.

23    Q.     Do you fault LeoPalace for anything that

24 Christine may have done before LeoPalace was made aware

25 that she was acting inappropriately?

1     *A.*     Yes.

2     *Q.*     Why?

3     *A.*     Because they knew --

4     *Q.*     No, no, no; listen to my question. Do you

5 fault LeoPalace for anything that Christine may have

6 done before LeoPalace Resort was aware that she was

7 acting inappropriately at the workplace?

8     *A.*     No.

9     *Q.*     We've talked about certain incidents and

10 certain comments that Christine made. Were these -- and

11 she slapped your butt on, you remember, July 7, right?

12     *A.*     Yes.

13     *Q.*     Was there anything else that happened in July

14 that you could specifically remember?

15     *A.*     About Christina's behavior?

16     *Q.*     Yeah; that you saw with your own eyes or

17 experienced for yourself in July.

18     *A.*     I just continued to hear again -- she continued

19 to create a hostile environment for me, uncomfortable

20 feeling at --

21     *Q.*     Because of her language and the words she said?

22     *A.*     Yeah. I was afraid of what she's going to --

23 what -- I was afraid of what she was going to do to me

24 next, you know, three incidences, and she slapped me on

25 my butt. I told her to stop, but she continued to use

1  vulgar language.  I felt uncomfortable being at the

2  front desk with her.

3      Q.     Let me show you what we'll mark as Exhibit 5,

4  and this is a form we've all seen.  It's what May

5  Paulino testified is a transcript of her interview with

6  you on August 11 of 2004, I think you saw it yesterday

7  at the deposition but I could be wrong about that.

8      A.     No, I didn't see this yesterday.

9                              (Exhibit 5 marked: August

10                              11, 2004 interview

11                              transcript.)

12     Q.     What I'd like you to do, and I'll tell you, May

13  Paulino testified that she typed this up after her

14  interview with you on August 11th, and that it was an

15  accurate summary of what you talked about.

16     A.     Okay.

17     Q.     Read this to yourself and I'll ask you some

18  questions; okay?

19                              (Witness complied.)

20                              (Off the record.)

21                              (Back on the record.)

22     A.     Okay.

23     Q.     (By Mr. Roberts)  Okay, we're back on the

24  record.  You're looking at Exhibit 5 which has been

25  previously identified by May Paulino as a transcript of

1  her interview with you on August 11th.  Do you see how

2  May has transcribed what she said and then transcribed

3  what you said, at least according to May, right?

4      A.    Okay.

5      Q.    Do you see that?

6      A.    Um-hmm.

7      Q.    Is there anything inaccurate about what May

8  said that she said to you?

9      A.    I don't remember May saying sexual harassment

10 is a very sensitive matter, and it has to be corrected

11 immediately.

12     Q.    Okay; you don't remember that.  Do you remember

13 you and her talked about sexual harassment though during

14 the meeting, right?

15     A.    Yes.

16     Q.    Do you remember in particular what May might

17 have said about sexual harassment in the workplace?

18     A.    I remember telling her that Christina should

19 have known about sexual harassment because it's in our

20 handbook.  I remember, I remember saying that.

21     Q.    Do you see anything else that May said that she

22 said that you don't think she said?

23     A.    I don't see it in here that she told me what

24 Mr. Suzuki said about letting go -- we can't let go of

25 Christina because we're short of staff.

1      Q.    Okay.  So there's not in there, right?

2      A.    No.

3      Q.    But you think May Paulino said that to you

4  during that meeting?

5      A.    Yes.

6      Q.    And I think she said that -- I'm not going to

7  tell you what you said.  What did May say exactly during

8  this meeting about Mr. Suzuki?

9      A.    That she brought it up to Mr. Suzuki and Mr.

10  Suzuki responded in that, we can't let Christina go

11  because we're short of staff.

12      Q.    How about -- anything else that you consider

13  inaccurate?

14      A.    On this document?

15      Q.    Yeah, about what May said that she said.

16      A.    This part that says, "Did Mr. Iijima say

17  anything when she flashed her Kotex in front of him?

18  She was told not to do that.  You folks jokes with her.

19  You folks entertained her sexual jokes."

20            My response was, "Yes, at times we laughed

21  about it."

22            "May:  That's the mistake.  If she makes sexual

23  comments/jokes and you folks don't appreciate, you

24  should tell her to stop immediately.  Tell her stop."

25            That part I don't -- I don't even recall her

1  saying that to me, that it was mistake, that that's our

2  mistake and that we should tell her to stop. I remember

3  during that conversation, May asked us if we laughed at

4  her jokes and I said yes, at times we did. And she

5  said, "Well, you're entertaining it," and that's all. I

6  think this here is inaccurate.

7      Q.    I'm sorry, when you point, what are you

8  pointing at?

9      A.    One, two, three -- fourth May --

10     Q.    The fourth May?

11     A.    -- dialogue.

12     Q.    May I see that? Do you recall what May did

13  say, if anything, when you said, "Yes, at times we did

14  laugh"? Do you remember what May's response to you

15  might have been?

16     A.    She responded by saying, "Well, you guys are

17  entertaining her."

18     Q.    Okay. Anything else in this document that May

19  wrote that May said that you don't think is accurate?

20     A.    The Jennifer part where it says "yes." I don't

21  think I said "yes."

22     Q.    Okay.

23     A.    What is accurate is she asked me how would I

24  feel if Christina -- "How do you feel if she continued

25  working at the front desk?" And I told her I was very

1   uncomfortable and I didn't want her to work around me

2   anymore.  I didn't want her around.

3      Q.     And did she ever work with you again after this

4   day?

5      A.     After that day, no.

6      Q.     Is there anything that May wrote that you,

7   Jennifer, said that you disagree with?  You said a

8   couple of things already, you said the "yes" part, the

9   single word "yes" with an exclamation point in that

10  document.  You don't remember saying that.  Anything

11  else that you think is inaccurate or that you don't

12  remember about what you might have said?

13     A.     I remember going -- speaking with May about the

14  candle incident.

15     Q.     Okay; what candle incident?

16     A.     I was told when I came into my shift by Rose

17  that Christina handed over candles to a wedding couple.

18     Q.     Who told this, Rose?

19     A.     Yeah.

20     Q.     And when did Rose tell you this?

21     A.     I don't remember.

22     Q.     All right.

23     A.     So Christina was giving the customer during

24  checkout the candles and said, "These are yours."

25     Q.     This is what Rose told you?

1     *A.*    Yes.

2     *Q.*    And this incident, you think you discussed this

3 with May on August 11th?

4     *A.*    I did.  I remember saying -- because I was, I

5 was concerned about Christina's work ethics.  I said --

6 I told May that -- you know, "Christina gave candles to

7 a customer and told them it was a dildo, a vibrator, now

8 that's inappropriate customer service."

9     *Q.*    Did May agree with you?

10    *A.*    She did.

11    *Q.*    Anything else -- well, that's something that

12 you think May -- that you say May didn't put in this

13 transcript, right?

14    *A.*    Yes.

15    *Q.*    Is there anything that May wrote that you said

16 that you think is inaccurate other than the word "yes"?

17    *A.*    Just the fourth May and the Jennifer right

18 after that.

19    *Q.*    The fourth May and the Jennifer; okay, got it.

20 Did May ask you to prepare a written statement?

21    *A.*    I don't remember.

22            **MR. ROBERTS:**  And we'll mark this as

23 Exhibit 6.

24               (Exhibit 6 marked:

25                Handwritten document

1                              dated 8/11/04.)

2    Q.    (By Mr. Roberts)  Do you recognize this

3  document, Jennifer?

4    A.    Yes.

5              MR. ROBERTS:  Let's go off the record

6  for a second.

7                            (Off the record.)

8                            (Back on the record.)

9              MR. ROBERTS:  Back on the record.  Thank

10  you.

11              THE WITNESS:  You're welcome.

12    Q.    (By Mr. Roberts)  Do you recognize Exhibit 6?

13    A.    Yes.

14    Q.    What is it?

15    A.    It's a -- I wrote it.

16    Q.    Did you write it on August 11th while you were

17  with May Paulino?

18    A.    Repeat your question.

19    Q.    Did you write this while you were with May

20  Paulino on August 11th?

21    A.    No.

22    Q.    When did you write it?

23    A.    Before.

24    Q.    So you wrote it before and gave this to May?

25    A.    I brought it with me.

1    *Q.*    When did you write it?

2    *A.*    Before I went down.

3    *Q.*    I mean like -- oh, you were scheduled -- I

4    think you were saying you were scheduled to have a

5    meeting with May and so you wrote this for the meeting?

6    *A.*    Yes.

7    *Q.*    Did you write it while you were working?

8    *A.*    I believe so.

9    *Q.*    And what was your purpose in writing this

10   document?

11   *A.*    I wrote this because I wanted to jot down my

12   thoughts with Christina, and I wanted to bring this

13   knowing that we were going to have the meeting with May

14   to discuss Christina.

15   *Q.*    And the first thing you wrote is, "As a worker,

16   she was briefed about sexual harassment matters during

17   orientation," right?

18   *A.*    Yes.

19   *Q.*    The second thing you wrote is, "She's weak in

20   her customer service" -- what's that word?

21   *A.*    Area.

22   *Q.*    -- area."  And then you wrote, "One day she

23   asked if she could spank your rear and you told her no."

24   *A.*    (Witness nodded head in the affirmative.)

25   *Q.*    You have to say yes or no, Jennifer.  I'm

1   sorry.  Yes, that's what you wrote?

2       A.      Yes.

3       Q.      And the next day she just did it anyway?

4       A.      Yes.

5       Q.      Is that the July 7th incident you talked about

6   earlier?

7       A.      Yes.

8       Q.      And then the last thing you wrote was, "I

9   emphasized when I spoke with Rose yesterday" -- you were

10  talking about a conversation the day before with Rose

11  Taimanglo, right?

12      A.      Yes.

13      Q.      What was that conversation about with Rose

14  Taimanglo?

15      A.      That was a conversation when I found out Rose

16  was spanked by Christina and we started talking about

17  Christina, how I was disgusted with her, and I didn't

18  feel comfortable working with her.

19      Q.      And there's no mention about the melons and the

20  breast incident in this handwritten report; is there?

21              MS. MORRISON:  Objection; document

22  speaks for itself.

23      Q.      (By Mr. Roberts)  Go ahead.

24      A.      No, there wasn't.

25      Q.      And you didn't mention Christine trying to

1   reach up your skirt; did you?

2     *A.*    In this document?

3     *Q.*    Yes.

4     *A.*    No.

5     *Q.*    And you didn't mention anything about a dildo

6   incident in this letter; did you?

7     *A.*    No.

8     *Q.*    And you didn't mention anything about a Kotex-

9   waving incident in this memo; did you?

10     *A.*    Again, this wasn't a memo for her, it was my

11   thoughts at the time, during that day, what I was

12   bringing up about Christina.

13     *Q.*    All right.  So the answer is no?

14     *A.*    No.

15     *Q.*    Exhibit 7 will be Phil Torres' letter of August

16   16, 2004, and let me ask you if you've ever seen this?

17     *A.*    Yes.

18                        (Exhibit 7 marked: Letter

19                         dated August 16, 2004

20                         from Phil Torres to May

21                         Paulino.)

22     *Q.*    And what's the date of this letter?

23     *A.*    August 16, 2004.

24     *Q.*    And Christine Camacho had been fired the

25   previous Friday, the 13th, right?

1    A.    Yes.

2    Q.    When did you first meet with Mr. Torres?  Don't

3 tell me anything he said to you or that you said to him.

4 When did you first meet with him?

5    A.    Thursday.

6    Q.    The day before Christine was fired?

7    A.    Yes.

8    Q.    And were all three of you together, you and

9 Viviene and Rose?

10    A.    No.

11    Q.    Was it just you?

12    A.    No.

13    Q.    Okay; you got me.

14    A.    It was Rose and I.

15    Q.    All right.  Can I get the letter back?  Did you

16 have a conversation with Mr. Maruyama after Phil Torres

17 sent this letter on August 16th?

18    A.    Yes.

19    Q.    And did you have a conversation with Mr.

20 Maruyama about this letter?

21    A.    I had a confrontation from Mr. Maruyama about

22 this letter.

23    Q.    Did you talk during the confrontation?

24    A.    Yes.

25    Q.    So you had a conversation.

Case 1:06-cv-00028   Document 62-2   Filed 09/10/2007   Page 42 of 50

1      MS. MORRISON:  Objection; asked and

2  answered.

3      MR. ROBERTS:  It was.

4      Q.   (By Mr. Roberts)  What happened?

5      A.   A letter was dropped off in an envelope to the

6  front desk for Mr. Maruyama, we put that letter -- I put

7  that letter --

8      Q.   That letter is Mr. Torres' letter?

9      A.   The same letter, yes, in an envelope addressed

10  to Mr. Maruyama.  This was a fax --

11      Q.   Right.

12      A.   -- right?  So the letter, I put it into his

13  mail stack because he comes in every morning to get his

14  mail, every morning.

15      Q.   Did you work on August 16th?

16      A.   I don't remember.

17      Q.   Okay.

18      A.   And that was on a Tuesday, August 17th, when he

19  got that letter in the morning.

20      Q.   And you were at work on that day?

21      A.   Yes, Tuesday morning.  He came, gave him the

22  letter -- gave him his mail.  I guess he opened it and

23  Rose and I were working that morning, he walked by and

24  stormed right straight towards me in the front desk, and

25  he said, "Why are you doing this?"  He had his voice

1    raised and he was up in my face asking me why am I suing

2    him.

3        Q.    Was he behind the front desk?

4        A.    Behind the front desk.

5        Q.    Where you were?

6        A.    Yes.

7        Q.    And he said, "Why are you doing this"?

8        A.    And I said, "I am not doing this to you."  He

9    said, "But I am the company.  I am LeoPalace."  And I

10   responded to him, "I'm doing this because HR didn't do

11   anything about it."  And he said, "I can't trust you

12   anymore."  He kept on staring at me, I can feel anger

13   coming off of his voice.  I started to tremble inside, I

14   felt butterflies inside and I started feeling scared.

15   And then he stormed out of the front desk, Rose got off

16   the phone and she was freaking out too.

17       Q.    Rose was on the phone while this conversation

18   was taking place?

19       A.    Yes.

20       Q.    Where was Rose?

21       A.    At the front desk.

22       Q.    I know, but there's several computers, right?

23       A.    Rose was right -- okay, this is the counter --

24       Q.    All right.

25       A.    -- i was probably here on the back -- there's a

1    back counter that we store stuff in, so I was standing

2    there, Rose was on the phone probably between the far

3    left and the middle computer.

4        Q.    Was she on the phone for the entire incident?

5        A.    I don't remember.

6        Q.    Okay.

7        A.    But I glanced at her and she was looking over

8    at me while she was on the phone.

9        Q.    Okay.

10       A.    So --

11       Q.    When you say Mr. Maruyama stormed away, what do

12   you mean stormed?

13       A.    He pushed the door open hard and then he pushed

14   the other door open, and he walked this way back to his

15   office and in a few minutes he walked back the other

16   way, across the lobby, walked out the front door, and he

17   just kept on pacing back and forth that day and just not

18   talking to us, and just pushing -- I remember, the

19   reason why I'm saying storm is because I remember him

20   pushing the door really hard to get out of it.

21       Q.    Okay.  When you say he raised his -- did you

22   say he raised -- he didn't shout -- did he raise his

23   voice or shout?

24       A.    He raised his voice.

25       Q.    He wasn't shouting, right?

1     A.     No, he raised his voice.

2     Q.     And would you describe Mr. Maruyama as

3    generally a calm kind of individual?

4     A.     Calm, happy, greeted me every morning.

5     Q.     So every morning that you were working, he

6    would come in and say, "Hi, how are you doing," right?

7               MS. MORRISON:   Objection; vague as to

8    time?

9     Q.     (By Mr. Roberts)  What time did Mr Maruyama

10   generally get to the office?

11    A.     About 8 o'clock.

12    Q.     And were you usually at work at that time?

13    A.     If I worked A shift.

14    Q.     If you worked A shift.  And did Mr. Maruyama

15   always say "Hello, good morning, how are you doing,"

16   words to that effect?

17    A.     Yes, he greeted the front desk staff.

18    Q.     Would you describe Mr. Maruyama as generally a

19   friendly person?

20    A.     Yes.

21    Q.     Did you get along with him prior to this

22   incident?

23    A.     Yes.

24    Q.     Was he your friend prior to this incident?

25    A.     Define friend.

1    Q.    Were you on friendly terms with him?

2    A.    He was my GM and I showed him the respect of a

3    GM.

4    Q.    How long did this incident take from the time

5    he first came to talk to you and the time he left your

6    area?

7    A.    You have to repeat the question, please.

8    Q.    I will.  I'll just ask a different question.

9    Other than what you've already said, did Mr. Maruyama

10   say anything else to you during this incident?

11   A.    That morning?

12   Q.    Yes.

13   A.    No, he didn't talk to me ever after that.

14   Q.    And did you say anything to Mr. Maruyama during

15   this incident that you haven't already described?

16   A.    No.

17   Q.    In your own words, as if you had any other

18   words, describe how working at LeoPalace after the

19   sexual harassment Complaint was filed was different than

20   working at LeoPalace before the sexual harassment

21   Complaint was filed?

22   A.    It was not comfortable anymore.

23   Q.    Why?

24   A.    Because of all the stress I had to deal with.

25   Q.    Like what?

1      *A.*     The stress, knowing that Christina harassed me,

2    knowing I got yelled at by the GM.

3      *Q.*     But you said he didn't yell.

4      *A.*     Okay; I'm sorry. Who raised his voice at me

5    and made me feel intimidated every day.

6      *Q.*     How?

7      *A.*     He no longer said "hello," he no longer smiled.

8    He just walked by and stared at me or stared at us at

9    the front desk, and it wasn't a nice stare. Our

10   supervisors didn't talk to us -- you know, we were -- I

11   felt like I was given the silent treatment, you know. I

12   was questioned if I was wearing my uniform or not from a

13   telephone conversation I had with May. I mean, it just

14   wasn't the same anymore. A memo was put out saying that

15   we no longer can use our cell phones on the premises.

16     *Q.*     And you think that was related to your sexual

17   harassment complaint?

18     *A.*     Yes.

19     *Q.*     Why?

20     *A.*     It never -- it never had occurred -- it never

21   bothered HR office that we were using our cell phones

22   during our break or anything, but it came out right

23   after the fact that we filed this.

24     *Q.*     How do you know that you guys using your cell

25   phones at work didn't bother management?

1    A.    I don't know that.

2    Q.    All right. What else then, how else was it

3    different after the complaint than before the complaint?

4    A.    My hours got cut.

5    Q.    And do you think your hours were cut because

6    you complained about sexual harassment?

7              MS. MORRISON: Objection; calls for

8    speculation.

9    Q.    (By Mr. Roberts) Why do you think your hours

10   were cut?

11   A.    Because management -- because of this suit.

12                          (Exhibit 13 marked:

13                          Supplemental

14                          Declaration.)

15   Q.    Let me get ahead of myself and show you Exhibit

16   13, this is a Supplemental Declaration that I believe

17   you signed -- well, let me ask you, is that your

18   signature on this document?

19   A.    Yes.

20   Q.    All right. In paragraph 8 of this document,

21   you said, "I went into work one Saturday morning and

22   found that my hours had been cut and instead of being

23   off at 2:45 p.m. I was to be off at 1:30 p.m."

24              And then in the next paragraph you said, "I

25   quickly realized that management reducing my work hours

1  was retaliatory against me."

2          Do you remember saying those words, or using

3  those words in the Supplemental Declaration?

4      A.    Yes.

5      Q.    Do you really think -- what was your pay at the

6  time, $8.50 an hour?

7      A.    Yes.

8      Q.    And at $8.50 an hour, an hour and 15 minutes is

9  about 10 bucks; isn't it?

10      A.    (Witness nodded head in the affirmative.)

11      Q.    You have to say yes.

12      A.    Yes.

13      Q.    Do you really think management retaliated

14  against you by reducing your pay by $10.00 because you

15  filed a sexual harassment complaint?

16      A.    Yes.

17      Q.    $10.00?

18      A.    I believe so.  We were short five staff, why

19  would they cut my hours when we were short of five

20  individuals.  I felt that they were cutting my hours.

21      Q.    So your testimony is that you believe that

22  management took $10.00 out of your pay check in

23  retaliation for your sexual harassment complaint?

24              MS. MORRISON:  Objection;

25  mischaracterizes her testimony.