1     A.     I don't think they took $10.00 out -- I don't

2   think it was about a dollar amount that they were taking

3   out, but the fact that they cut my hours, I was given 80

4   hours every two weeks and now I wasn't even getting

5   that.

6     Q.     (By Mr. Roberts)  An hour and 15 minutes less?

7     A.     I had -- there were days that I had three days

8   off for that week, and I wasn't making 40 hours anymore.

9     Q.     How much longer after August 17th did you work

10   for LeoPalace?

11     A.     I believe a week.

12     Q.     Is that why you quit, because your hours were

13   reduced?

14     A.     I quit because I was tired of dealing with all

15   the stress I was getting from LeoPalace.  I was tired of

16   not being spoken to by Mr. Maruyama, I was tired of

17   feeling uncomfortable.

18     Q.     It was only a week.  I mean -- let me ask you

19   this.  Was it understandable to you that Mr. Maruyama,

20   being new on the job and getting a sexual harassment

21   complaint against him, would have been upset?

22     A.     Repeat your question.

23     Q.     Were you surprised that Mr. Maruyama was upset

24   that a sexual harassment complaint had been filed

25   against the company he was general manager of?

1   A.    Was I surprised that he was upset?

2   Q.    Yes.

3   A.    No.

4   Q.    So was it understandable to you that he would

5   be upset about having a sexual harassment complaint

6   filed against the company he was GM of?

7   A.    Yes.

8                           (Exhibit 11 marked:

9                           Letter of Resignation.)

10   Q.    This is Exhibit 11, and I think you've all seen

11   this before.  I believe this is your letter of

12   recommendation.

13   A.    Resignation.

14   Q.    What did I say?

15   A.    Recommendation.

16   Q.    Yeah, that's not a letter of recommendation,

17   that's a letter of resignation.  You quit on August

18   28th?

19   A.    Yes.

20   Q.    And what did you handwrite on this letter of

21   resignation?

22          MS. MORRISON:  Objection; document

23   speaks for itself.

24   Q.    (By Mr. Roberts)  You can answer the question.

25   A.    "To also find out about an immediate family

1  member, my mother having cancer (uterus) which needs

2  immediate attention."

3      *Q.*     Did your mother have uterine cancer at the time

4  you wrote this letter?

5      *A.*     She was diagnosed with pre-cancer cells.

6      *Q.*     Was that one of the reasons you quit LeoPalace,

7  to take care of your mother?

8      *A.*     Not the main reason why I quit.

9      *Q.*     Was it one of the reasons?

10     *A.*     No.

11     *Q.*     Then why did you put it in the letter?

12     *A.*     I wrote this letter because I just wanted to

13 get out of there, and I didn't want to be hassled

14 anymore or give a two-week notice.  And, you know, with

15 all the stress I had to deal with at LeoPalace, I just

16 wanted to get out of there, and I also indicated here

17 that I really felt management didn't take appropriate

18 care of their staff in many manners.

19     *Q.*     I know that, I'm not asking about that.  You

20 put -- do you agree with me that one of the reasons that

21 you said in your letter of resignation that you were

22 quitting was to also take care of your mother who was

23 diagnosed with cancer of the uterus?  You wrote that;

24 didn't you?

25     *A.*     I did.

1    Q.    And so was it true?

2    A.    What was true, that I quit to take care of her?

3    Q.    No.  That one of the reasons you were quitting

4 was to help take care of your mother.

5    A.    No.  I knew I was going to be able to take care

6 of her, but my main reason for quitting was because

7 management, because I wasn't going to deal with

8 management anymore.  Even though my mom was having her

9 pre-cancer cells removed, I just -- I didn't want to

10 tolerate anymore working at LeoPalace.

11    Q.    Why did you put that in your letter then?

12    A.    Because that was a concern that I had also for

13 myself.

14    Q.    So it was one of the reasons you were leaving?

15         MS. MORRISON:  Objection; asked and

16 answered.

17    A.    Yes, it was one of the reasons.  But the

18 biggest reason that I indicated up here was because of

19 management.

20    Q.    Thanks.  Do you remember how many days you

21 actually came to work at LeoPalace after Phil Torres'

22 letter of August 16, but before you resigned on August

23 28th?

24    A.    No.

25         MR. ROBERTS:  I'll show you what we'll

1  mark as Exhibit 8.

2                                    (Exhibit 8 marked:

3                                    front office work

4                                    schedule, 0096.)

5      *Q.*    (By Mr. Roberts)  Is your handwriting on this

6  document somewhere?

7      *A.*    Yes.

8      *Q.*    What is this document?

9      *A.*    This is our work schedule.

10     *Q.*    Can you tell me how many days you actually

11 worked after August 16th from this work schedule?

12     *A.*    According to this, it says I only worked for

13 four days which I find this not accurate.

14     *Q.*    You think you worked for more days than that?

15     *A.*    Yes.

16     *Q.*    Where did you get that document?

17     *A.*    You gave it to me.

18     *Q.*    I gave it to you?  Okay.  Yeah, this document

19 was given to me by your attorney in the course of -- we

20 trade documents, there's not supposed to be any

21 surprises in real live litigation unlike on TV.  Real

22 live is supposed to be real orderly, everybody gets

23 everybody else's documents.

24     *A.*    Yes.

25     *Q.*    And so this is one of the documents I've been

1    given by your attorney, and I'm assuming he got it from

2    you.  Did you give this to your lawyer?

3        A.    I don't remember.

4        Q.    Okay.  Let me show you --

5        A.    The --

6        Q.    Go ahead.

7        A.    I remember, this document was provided to me by

8    Mr. Griffin.  He e-mailed this to me.

9                                    (Exhibit 9 marked:

10                                    work schedule.)

11       Q.    I'm going to show you a different document,

12   this was given to me by the EEOC, this is Exhibit 9.

13                   MR. ROBERTS:  And for the record, the

14   original has highlighting on it, I'm sorry, when we copy

15   it the highlighting will disappear, but I'm not going to

16   ask you about the highlighted stuff.  I'm trying to

17   figure out how many days she actually worked after

18   August 17th, that's all I'm trying to find out right

19   now.

20       Q.    (By Mr. Roberts)  Have you ever seen this

21   document before?

22       A.    Yes.

23       Q.    What is it?

24       A.    It's a work schedule.

25       Q.    And were you the employee who was given these

1    work schedules at LeoPalace?

2       A.    It was posted in the back office.

3       Q.    What does this document say in terms of how

4    many days you actually came to work after August 17th?

5       A.    You said these are the originals?

6       Q.    I'm not saying anything.  I'm just saying what

7    does this document say in terms of how many days you

8    actually came to work?

9                    MR. TORRES:  Can we identify this?

10                   MS. MORRISON:  Objection; document

11   speaks for itself.

12                   MR. TORRES:  We're referring to document

13   -- Exhibit 9 now, right?

14                   MR. ROBERTS:  Yes.

15      Q.    (By Mr. Roberts)  Well, Jennifer, I don't want

16   to be unfair to you; okay?  Forget the documents for

17   now.

18      A.    Okay.

19      Q.    August 16th is a Monday, right, and you weren't

20   at the office, the day that Phil Torres faxed his

21   letter, August 16.  Look at me, stop --

22      A.    Correct; yes.

23                   MS. MORRISON:  Is that a question?

24                   MR. ROBERTS:  No, stop looking at the

25   document.  I'm not being mean.

1    MS MORRISON:  Okay.

2    Q.    (By Mr. Roberts)  Jennifer, please forget the

3    documents for now.  Let's try and figure it out.

4    A.    Okay.

5    Q.    Because you said you think you worked more than

6    those documents say you did.  At this point of the

7    deposition, I'm just really trying to find out the

8    truth.  I really am.

9          August 13th Christine is fired, right?

10   A.    Yes.

11   Q.    And August 16th is the date of Phil Torres'

12   letter?

13   A.    Yes.

14   Q.    And I think you said you weren't actually at

15   work on the day of that letter.

16   A.    Yes.

17   Q.    And that your run-in with Mr. Maruyama was on

18   Tuesday the 17th.

19   A.    Yes.

20   Q.    So you worked on Tuesday the 17th, right?

21   A.    Yes.

22   Q.    And do you remember if you worked the next day

23   on Wednesday the 18th?

24   A.    I think so.

25   Q.    Do you remember if you worked on Thursday the

1    19th?

2        A.     I don't remember.

3        Q.     Do you think it looked -- here's a bunch of

4    questions I have to ask.  Is your present memory of your

5    exact work schedule faulty, you can't remember it today?

6        A.     (No response.)

7        Q.     Do you have an exact recollection of your exact

8    work schedule two and a half years ago in mid August of

9    2004?

10       A.     Not an exact.

11       Q.     Do you think if you looked at some documents it

12   might help refresh your recollection about your work

13   schedule in August of 2004?

14       A.     Yes.

15       Q.     Okay, now you can look at the documents.  And

16   if these are inaccurate, if you believe these are not

17   correct, you're free to tell me.

18              Let's take a break.

19                   MR. TORRES:  Okay.

20                   MR. ROBERTS:  Because these documents

21   are confusing to me.

22                                    (Off the record.).

23                                    (Back on the record.)

24       Q.     (By Mr. Roberts)  When did you get your degree

25   at UOG?

1      A.      December 2004.

2      Q.      And what was your degree in?

3      A.      Consumer Family Science Nutrition.

4      Q.      Are you a school teacher now?

5      A.      No.

6      Q.      What do you do now?

7      A.      Program Coordinator for the Food & Nutrition

8   Services.

9      Q.      Did you intend to stay at LeoPalace as a front

10  desk clerk at $8.50 an hour after you got your college

11  degree?

12     A.      I don't know.

13     Q.      You don't know?  Do you think so?

14     A.      I know I was considering trying to get a -- see

15  if there was any F&B position.

16     Q.      Why did you go to college to get a degree?  To

17  get a good job?

18     A.      To get a degree, basically meet my goal.

19     Q.      So you could get a better job?

20     A.      In some -- yes.

21     Q.      Did you consider being a front desk clerk for a

22  hotel at $8.50 an hour your career goal?

23     A.      No.

24     Q.      Okay.  Did you have a chance to look at these

25  work records while we were taking our break?

1     *A.*     Yes.

2     *Q.*     After having looked at these records, do you

3 have any better recollection now about what days you

4 actually worked after August 17th of 2004?

5     *A.*     (Witness nodded head in the affirmative.)

6     *Q.*     You have to answer yes or no.

7     *A.*     Yes.

8     *Q.*     Okay.  Did you work on the 18th?

9     *A.*     Yes.

10     *Q.*     And the 19th?

11     *A.*     No.

12     *Q.*     20th?

13     *A.*     I was off.

14     *Q.*     Do you think you had those two days off because

15 of your sexual harassment complaint?

16     *A.*     Those were my normal days scheduled off, a

17 Thursday and a Friday.  I don't know why it's scratched

18 up here.

19     *Q.*     And how about Saturday the 24th?

20     *A.*     I worked C shift and that's normal.

21     *Q.*     So as of Saturday the 21st, nobody had altered

22 your work schedule?

23     *A.*     No.  Mr. Suzuki makes the schedule two weeks in

24 advance.

25     *Q.*     But he hadn't altered your work schedule after

1  your sexual harassment complaint as of Saturday the

2  21st, right?

3      A.    I don't understand this alteration here.

4      Q.    On the right margin of -- what's the Bates

5  stamp?

6                    MR. TORRES:  97.

7                    MR. ROBERTS:  EEOC --

8                    MR. TORRES:  Oh.  EEOC 352.

9                    THE WITNESS:  352.

10     Q.    (By Mr. Roberts)  There's some writing over on

11  the right; do you know whose writing that is?

12     A.    Mr. Suzuki.

13     Q.    And do you know what Mr. Suzuki has written?

14     A.    12:45 to 15:45.

15     Q.    Do you know what he's referring to?  No?

16     A.    No.

17     Q.    All right.  Did you work on the 22nd?

18     A.    Yes.

19     Q.    Normal shift?

20     A.    Yes.

21     Q.    The 23rd?

22     A.    Off.

23     Q.    Were you scheduled to be off that day?

24     A.    Yes.

25     Q.    So that wasn't a day off in reprisal or

1  retaliation for you filing a sexual harassment

2  complaint?

3      A.    No.

4      Q.    And the 24th, which is a Tuesday I believe, did

5  you work on the 24th?

6      A.    Yes.

7              MR. TORRES:  Can I clarify one thing?

8  Are we testifying as to what this says she worked, or

9  are we testifying -- her recollection in conjunction

10  with this?

11             MR. ROBERTS:  It's supposed to be what

12  you now remember, but I'm guessing it's not, it's more

13  of the former, what the document says.

14             MR. TORRES:  Couldn't you just clarify

15  whether she's testifying -- and her answers to you are

16  coming from her work schedule or from her recollection.

17      Q.    (By Mr. Roberts)  Jennifer, let's do that.  Are

18  you testifying about what you remember now, or are you

19  just reading from the document?

20      A.    I'm remembering while I'm going through the

21  document.

22      Q.    Okay; then I'll keep going.  What does it say

23  about Sunday the 22nd?

24      A.    I worked.

25      Q.    And this work period that we're talking about,

1  when had this work schedule come out, and I guess been

2  posted

3      A.    Mr. Suzuki always does our work schedule and

4  posts it at least by the Thursday or Friday. So what

5  I'm trying to say is I believe this work schedule went

6  up on either the 19th or the 20th, and when I reviewed

7  it when I got back to work, that's when I noticed my

8  hours were getting cut to three days off.

9      Q.    Okay. So this work schedule had been posted

10 either the 19th or the 20th, and it posted the schedule

11 for what dates?

12     A.    From August 22 to September 4th.

13     Q.    So it's the 9/22 through 9/4 time period that

14 you believe your hours were cut?

15     A.    Yes.

16     Q.    And why do you think your hours were cut?

17     A.    Retaliation.

18     Q.    Because you had three days off during the week

19 of Sunday -- or, excuse me, the second week of this work

20 shift you had three days off rather than your usual two?

21     A.    Yes.

22     Q.    And you think --

23     A.    And I was given a B shift.

24     Q.    Do you consider that a retaliation?

25     A.    Yes.

1    Q.    Why?

2    A.    We had five people gone from the front desk.

3    Q.    What's a B shift?

4    A.    B shift was from 6:15 to 1:00.

5    Q.    In the morning?

6    A.    6:15 a.m. to 1:00 p.m.

7    Q.    That's still 8 hours though, right?

8    A.    No.

9    Q.    I mean, is the B shift less hours than the A

10   shift or the C shift?

11   A.    A shift is from 6:15 to 2:45.

12   Q.    What's the B shift?

13   A.    6:15 to 1:00.

14   Q.    So that's an hour and 45 minutes difference,

15   right?

16   A.    Yes.

17   Q.    And you think that you were given a B shift by

18   Leo -- your testimony is you were given a B shift by

19   LeoPalace, which is an hour and 45 minutes less than an

20   A shift or a C shift, in retaliation for your sexual

21   harassment complaint?

22   A.    Yes.

23   Q.    Had you ever worked a B shift before this in

24   the two months you worked at LeoPalace?

25   A.    Never.

1    *Q.*    Had you ever had three days off in a week

2    before this?

3    *A.*    No.

4    *Q.*    Let's find Exhibit 10, shall we?  All right,

5    here's Exhibit 10.  I'm sorry, I didn't show these to

6    you.  These are Bates stamped LeoPalace Resort 732, 736,

7    740, 744, 748 and 752.

8                          (Exhibit 10 marked: Punch.

9                          Detail Report.)

10                   MR. TORRES:  Do you mind, could we go

11   off the record for a second?

12                          (Off the record.)

13                          (Back on the record.)

14   *Q.*    (By Mr. Roberts)  You've never seen these

15   documents before, right?

16   *A.*    No.

17   *Q.*    These are Bates stamped LeoPalace Resort --

18   well, what I said they were Bates stamped.  According to

19   these documents, which you've never seen, can you look

20   at July 22nd, 23rd, and 24th?

21                   MR. TORRES:  You mean August?

22                   MR. ROBERTS:  No, July.

23                   THE WITNESS:  Okay.

24                   MR. ROBERTS:  You're looking at June.

25   *Q.*    (By Mr. Roberts)  Do these records, which again

1    you've never seen, show that you had three days off in a

2    row on July 22nd, July 23rd and July 24th?

3                    MS. MORRISON:  Objection; document

4    speaks for itself, and speculative.

5        Q.    (By Mr. Roberts)  Go ahead and answer the

6    question.

7        A.    Can I have some time just to review it?

8        Q.    Of course.

9        A.    Thank you.  Okay; can I have your question

10   again?

11       Q.    Do these documents, Exhibit 10, show that you

12   had three days off in a row on July 22nd, July 23rd and

13   July 24th?

14       A.    Yes.

15       Q.    And can you look at June 23rd -- June 23rd, 24

16   and 25 on Exhibit 10?

17       A.    For the record, hold on.

18       Q.    No -- you -- all right, go ahead, for the

19   record.

20       A.    Okay; July 23rd -- 22nd was my day off, the

21   23rd was also a day off, and the 24th I was unscheduled

22   because I called in sick; and that refreshes my

23   recollection.

24       Q.    Can you look at June 23rd, 24 and 25?

25       A.    Okay.

1    Q.    Actually, look at the six-day period between
2    June 23rd and June 28th.  Does Exhibit 10 show that you
3    had four of those six days off?
4    A.    Hold on, please.
5    Q.    Okay.  And you're looking at Exhibits 8 and 9,
6    I believe, but I'm asking you about Exhibit 10.
7    A.    Okay.
8    Q.    Does Exhibit 10 show that you had four of the
9    six days off between those dates I just mentioned?
10   A.    And the dates again were?
11   Q.    June 23 through June 28.
12   A.    Yes, I had four days off because there were two
13   different pay periods, week periods.
14   Q.    Can I get that exhibit back, please?  Did you
15   say that Mr. Suzuki had always guaranteed you 80 hours?
16   A.    Yes.
17   Q.    Take a look at this document again -- actually,
18   I have to show it to you.  May I approach your witness?
19             MS. MORRISON:  Phil?
20             MR. TORRES:  Sure.
21   Q.    I'll come over here.  This is Exhibit 10, it
22   shows you started working on June 7th; correct?
23   A.    Okay.
24   Q.    And are the dates June 13 through June 26
25   starting on Sunday, is this the next two weeks work

1   schedule?

2       A.      Yes, it is.

3       Q.      And how many hours were you scheduled for that

4   week?

5       A.      I was scheduled 80 according to the time

6   sheets.

7       Q.      Well, I just mean on this document.  I see

8   75.25.

9       A.      I was given seven --  I worked the 75.25.

10      Q.      And how about the next scheduled two week pay

11  period, June 27th through July 10th, how many hours does

12  this document show you worked?

13      A.      68.

14      Q.      And how about the next period, July 11th

15  through July 24th, how many hours does this document

16  show that you worked?

17      A.      73.

18      Q.      And the next two week pay period?

19      A.      73.

20      Q.      And then this next one is the -- okay, yeah,

21  how about the next one, August 8th through August 21,

22  how many hours does it show you worked?

23      A.      65.

24      Q.      And this schedule came out on the Thursday or

25  Friday before Sunday, August 8th, right?

1     *A.*     Uh-huh.

2     *Q.*     Before, before you made your harassment

3  complaint?

4     *A.*     Repeat your question.

5     *Q.*     This schedule, LPR 00752, a part of Exhibit 10

6  --

7     *A.*     Uh-huh --

8             MS. MORRISON:  I just have a question.

9  You're calling that a schedule, but is that the schedule

10  or is it the chrono's time record?

11             MR. ROBERTS:  Is it a chrono's?

12             THE WITNESS:  Yes.

13             MR. ROBERTS:  Yeah, this chrono's --

14             MS. MORRISON:  So it isn't the schedule?

15             MR. ROBERTS:  I'm calling it a schedule.

16             MS. MORRISON:  Okay.

17     *Q.*    (By Mr. Roberts)  This document would have --

18  what does this document show you worked for the -- never

19  mind, I withdraw the question.

20         Why do you think, if LeoPalace wanted to

21  retaliate against you for filing a sexual harassment

22  complaint, they only cut one day off your schedule?

23             MS. MORRISON:  Objection; calls for

24  speculation.

25     *A.*     Repeat your question.

1    Q.    (By Mr. Roberts)  Why do you think, if
2  LeoPalace wanted to retaliate against you for making a
3  sexual harassment complaint, it only cut one day off
4  your schedule?
5    A.    I think they were upset with us for filing a
6  complaint against them.
7    Q.    Why not, why not a week off?
8    A.    I don't know.
9    Q.    When you found out, according to you, that your
10 hours had been cut, did you talk to anybody about that?
11   A.    Yes.
12   Q.    Who?
13   A.    Mr. Suzuki.
14   Q.    What did you say?
15   A.    I asked him why was he cutting my hours, why am
16 I being short of time.
17   Q.    And approximately when did this conversation
18 take place?
19   A.    I believe it was this week.
20   Q.    What week?
21   A.    The week of August 21st -- the 15th through the
22 21st, that week.
23   Q.    What did Mr. Suzuki tell you?
24   A.    He said, "I don't know."  And then I spoke to
25 Mr. Sekine on the Saturday, 28th, August 28th.

1    Q.    And what did Mr. Sekine say?

2    A.    He was asking me why I was leaving at 1

3 o'clock, and I said, "Ask Mr. Suzuki, he cut my hours."

4 And so he called Mr. Suzuki on the phone and he asked Mr

5 Suzuki about it and then the response I got from Mr.

6 Sekine is, "It's up to you if you want to stay or

7 leave."

8    Q.    Is that when you decided to write your letter

9 of resignation and quit?

10   A.    That day I had it, I was done with all this

11 retaliation and being treated unfairly.

12   Q.    It was a yes or no question.

13   A.    Yes.

14   Q.    Okay.  So did you write your letter of

15 resignation immediately after that telephone call with

16 Mr. Sekine, or that conversation with Mr. Sekine?

17   A.    No.

18   Q.    When did you write it?

19   A.    Prior to that.

20   Q.    Well, you just said -- never mind.  Didn't you

21 just say you decided to write your letter of resignation

22 after this conversation?

23            MS. MORRISON:  Objection;

24 mischaracterizes her testimony.

25   A.    I decided then after the conversation that I

1  wasn't going to put up with it anymore and I was going

2  to turn in my letter of resignation.

3      Q.    (By Mr. Roberts)  So when had you written this

4  letter of resignation?

5      A.    I wrote it -- I believe I wrote it a week

6  before, and I had it with me.

7      Q.    And a week before, was that approximately when

8  the new work schedule came out?

9      A.    I don't remember.

10     Q.    Did you write your letter because you saw the

11 new work schedule?

12     A.    No.  I wrote my letter because I was tired of

13 being there.

14     Q.    But you didn't give it to anybody?

15     A.    No.

16     Q.    You came to work for another week?

17     A.    Even though it was one week.

18     Q.    You came to work for another week, right?

19     A.    Yes.

20     Q.    And then you had your conversation with Mr.

21 Sekine?

22     A.    Uh-huh.

23     Q.    And then you decided to turn in your letter of

24 resignation?

25     A.    Yes.

1    Q.    You didn't speak with Mr. Suzuki personally

2  about this?

3    A.    About what?

4    Q.    I'm sorry; about your hours being cut.

5    A.    I did.

6    Q.    When?

7    A.    I thought I told you --

8    Q.    You may have.  It's hard to ask questions and

9  remember everything you said.

10    A.    It's August 21st.

11    Q.    That was in person with Mr. Suzuki, right?

12    A.    Yes.

13    Q.    And what did he tell you?

14    A.    I asked him why he was -- why I was getting

15  little hours when we were short of staff.

16    Q.    What did he say?

17    A.    I don't remember what he said, but I remember

18  talking with him on the side of the office about the

19  incident, and I asked him why were my hours being cut.

20    Q.    When you say "the incident," you mean your

21  hours being cut?

22    A.    Yes.

23    Q.    And again, how much had your hours been cut?

24    A.    I wasn't given the 80 hours or the 40 hours

25  every week anymore.

1    Q.    Well what had you been given?

2    A.    For the one week I saw that I was given a B

3    shift, and then the next week I saw that I had three

4    days off.

5    Q.    Instead of the usual two?

6    A.    Yes.

7    Q.    And wen you spoke with Mr. Suzuki personally on

8    the 21st, did he stare at you in a hostile manner?

9    A.    I don't remember.

10   Q.    Did he treat you rudely?  Did he yell at you?

11   That's two questions.  Did he treat you rudely?

12   A.    No.

13   Q.    Was he mean to you?

14   A.    I don't remember.

15   Q.    Is he generally a nice guy?

16   A.    Yes.

17   Q.    Was he nice to you on this occasion too?

18   A.    What occasion?

19   Q.    On the 21st when you spoke to him about your

20   hours.

21   A.    He took the time to talk to me.

22                        (Exhibit 12 marked:

23                         Bates stamped 61-62.)

24   Q.    Let me show you Exhibit 12.  I don't know if

25   you've seen this.  It's marked LeoPalace Resort, Bates

1   stamped 61-62, it's an August 19, 2004 letter from Phil
2   Torres enclosing a letter from a counselor named Doctor
3   -- do you pronounce that Iye-yaad?

4       A.      Iye-yad.

5       Q.      Iyechad.  Is that a Palauan name?

6       A.      Yes.

7       Q.      Who's Dr. Lilli Perez Iyechad?

8       A.      She is a family therapist.

9       Q.      Have you ever seen this exhibit before?

10      A.      I don't remember.

11      Q.      Have you ever seen Dr. Perez' letter that's
12  attached to Phil Torres' letter?

13      A.      (Witness nodded head in the affirmative.)

14      Q.      You have to answer out loud.

15      A.      I've never seen Rose's letter.

16      Q.      Did I -- let's see -- did I attach Rose's?

17      A.      Yeah.

18      Q.      I apologize.  Let's go off the record for a
19  second.

20                                  (Off the record.)

21                                  (Back on the record.)

22      Q.      (By Mr. Roberts)  Here you go, Exhibit 12.  Can
23  you take a look at the second page; is Dr. Perez
24  referring to you?

25      A.      Yes.

1    Q.    Okay.  Why did you go see Dr. Perez?

2    A.    Because I was stressed.

3    Q.    When did you first see Dr. Perez?

4              MS. MORRISON:  Objection; vague.

5              MR. ROBERTS:  Yeah.

6    Q.    (By Mr. Roberts)  When were you first counseled

7    by Dr. Perez with respect to the incident that occurred

8    at LeoPalace Resort?

9    A.    I don't remember.

10   Q.    Was it before you quit?

11   A.    Yes, it was.

12   Q.    Was it before you complained about sexual

13   harassment?

14   A.    To who?  To who?

15   Q.    Yeah, good question.  Was it before your

16   attorney sent this letter of August 16th?

17   A.    No, it was after.

18   Q.    What was Dr. Perez' advice with respect to your

19   work schedule in this letter?  I mean, didn't Dr. Perez

20   recommend two weeks for you?

21   A.    Yes.

22   Q.    And why didn't you follow your therapist's

23   advice?

24   A.    I couldn't afford it.

25   Q.    How many times were you counseled by Dr. Perez?

1   A.      I don't remember.

2   Q.      Was it more than one?

3   A.      Yes.

4   Q.      Was it more than two?

5   A.      Yes.

6   Q.      More than three?

7   A.      Uh, I don't remember.

8   Q.      When is the last time you were counseled by Dr.

9   Perez?

10  A.      I don't remember.

11          MR. ROBERTS:  I've said this before but

12  I'll reiterate.  I requested Dr. Perez' records in

13  discovery back on January 31st in a request for

14  production of documents, and I sent a HIPPA waiver form,

15  but I have not received these documents yet.  And I have

16  to reserve my right to take your deposition again if my

17  -- the absence of those records here today has

18  prejudiced my ability to take your deposition in any

19  way.

20          Having said --

21          MR. TORRES:  My response.  I have

22  forwarded the HIPPA request and I have requested the

23  records and I have forwarded to you everything I have

24  received from Dr. Perez.  I have yet to receive

25  responses from them.

1    MR. ROBERTS:   I understand.

2    Q.    (By Mr. Roberts)  Did Dr. Perez charge you?

3    A.    A fee?

4    Q.    Yes.

5    A.    Yes.

6    Q.    Do you remember what it cost per session?

7    A.    No.

8    Q.    Did you pay it?

9    A.    Yes.

10   Q.    Did she ever come to a diagnosis of what was

11   bothering you, to your knowledge?

12   A.    Yes.

13   Q.    And what was her diagnosis?

14   A.    Post-traumatic stress.

15   Q.    Post-traumatic stress.  Do you remember those

16   words exactly?

17   A.    I was told that.

18   Q.    Those three words, post-traumatic stress?

19   A.    It was an abbreviation, P -- I don't --

20   Q.    Was it PTSD?

21   A.    Probably.

22   Q.    Post-traumatic stress disorder; have you heard

23   those words?

24   A.    I don't remember.

25   Q.    Do you remember if she used the words acute

1   stress disorder?

2       A.      No.

3       Q.      Post-traumatic stress are the words you

4   remember, right?

5       A.      Yes.

6       Q.      The records will say what they say.

7       A.      Yes.

8       Q.      Why did you stop seeing -- I've asked you this?

9   Why did you stop seeing Dr. Perez?

10      A.      I believe our sessions -- we worked on dealing

11  with the issues and she helped me through many sessions,

12  or the sessions that I went through, understand how to

13  cope with this.

14      Q.      Did she prescribe any medication?

15      A.      No.

16      Q.      And did you, as a result of your sessions with

17  Dr. Perez, come to be able to cope with the stress that

18  you were feeling?

19      A.      Yes.

20      Q.      After you resigned from LeoPalace, did you get

21  another job?

22      A.      Yes.

23      Q.      When?

24      A.      I don't remember.

25      Q.      Did you finish your degree first, which you got

1    in December of 2004, after you resigned from LeoPalace

2    in late August, September, October or November; is that

3    what you did, complete your schooling?

4        A.    No, I went back to golf coaching.

5        Q.    With the Guam Junior Golf --

6        A.    Junior Golf League.

7        Q.    What was your pay at Guam Junior Golf League?

8        A.    $20.00 an hour.

9        Q.    And what was your pay at LeoPalace?

10       A.    $8.50.

11       Q.    But was the Guam Junior Golf League full-time

12   work?

13       A.    No.

14       Q.    How many hours a day did you work for Guam

15   Junior Golf League?

16       A.    Two hours, Monday through Friday.

17       Q.    Do you remember how long you acted as a junior

18   golf coach?

19       A.    Until May 2005.

20       Q.    And did you have any other jobs between -- how

21   long after you quit LeoPalace did you get your Guam

22   Junior Golf League job back?

23       A.    I don't remember.

24       Q.    Was it a week or two, or a month, or what?

25       A.    Maybe beginning of September.

1    Q.    And then in May you got another job?

2    A.    No.

3    Q.    Oh; I'm sorry.  What was your next job after

4    Guam Junior Golf League?

5    A.    I was working at -- I was working for GPSS

6    already May 2005.

7    Q.    What's your job with -- and that's the Guam

8    Public School System?

9    A.    Yes.

10   Q.    Lucky you.

11   A.    Whatever.

12   Q.    What was your job with Guam Public School

13   System?

14   A.    Program Coordinator II.

15   Q.    And that's a computer job, right?

16   A.    No.

17   Q.    No.  What is it?

18   A.    Program Coordinator in nutrition.

19   Q.    Oh, in nutrition; I'm sorry.  And what was your

20   rate of pay when you first signed up with GPSS?

21   A.    $12.75.

22   Q.    $12.75 an hour?

23   A.    Yes.

24   Q.    Are you still with GPSS?

25   A.    Yes.

1      Q.     What's your rate of pay today?

2      A.     $13.55.

3      Q.     And your current job, is that what you went to

4  UOG to train for?

5      A.     Yes, it's in the same field.

6      Q.     Did we ever figure out how many days you

7  actually worked after August -- from August 17th to

8  August 28th, or did I get sidetracked in my questioning?

9      A.     Sidetracked.

10     Q.     Okay; let's go.  Thank you.  You said you

11 worked on Sunday the 22nd?

12     A.     Hold on, please.

13     Q.     All right.

14     A.     Sunday, yes.

15     Q.     And Monday the 23rd?

16     A.     No.

17     Q.     Scheduled day off?

18     A.     Yes.

19     Q.     Tuesday the 24th?

20     A.     Yes.

21     Q.     And Wednesday the 25th?

22     A.     Yes.

23     Q.     Thursday the 26th?

24     A.     I believe I worked that day.

25     Q.     You're looking at a document that apparently

1    says otherwise?

2        A.      Yes.

3        Q.      What are you looking at?

4        A.      The work schedule.

5        Q.      What's the Bates number of the document you're

6    looking at?

7        A.      EEOC 00354.

8        Q.      And what does that show for Thursday the 26th?

9        A.      SL.

10       Q.      Sick leave?

11       A.      Yes.

12       Q.      And does it show the same thing for Friday the

13   27th?

14       A.      Yes.

15       Q.      SL, it shows sick leave; do you know who's

16   writing that is?

17       A.      Mr. Suzuki's.

18       Q.      Do you think you were at work those days?

19       A.      I believe so; yes

20       Q.      How about the 28th; did you work on the 28th?

21       A.      Yes.

22       Q.      We know you did already.

23                                (Exhibit 14 marked:

24                                 Statement of Jennifer.

25                                 Holbrook.)

1       (Exhibit 15 marked:

2       Memo to file dated.

3       April 5, 2005 from.

4       Raymond J. Griffin, Jr.)

5       Q.    All right.  Let me show you my last three

6   exhibits.  I wouldn't jumble all those together, but you

7   can move them aside.  13, 14 and 15, these are

8   declarations, we're almost done, that you prepared for

9   the EEOC.  Yeah, better look at them.  Let's go off the

10  record for a second.

11      (Off the record.)

12      (Back on the record.)

13      Q.    (By Mr. Roberts)  Can you take a look at

14  Exhibit 13?

15      A.    Yes; okay.

16      Q.    And do you recognize this document?

17      A.    Yes.

18      Q.    Does your signature appear on the last page of

19  this document?

20      A.    Yes.

21      Q.    Did you write this document?

22      A.    Did I --

23      Q.    All right; did you physically type this

24  document?

25      A.    No.

1    Q.    Did somebody else type this document for you?

2    A.    I believe so.

3    Q.    And did somebody else type this for you -- who

4    typed this for you?

5    A.    I don't know.

6    Q.    All right.  Did your lawyer help you prepare

7    this?

8    A.    Yes.

9    Q.    That's about as far as I can go with that

10   question.  No, keep it.  Look at the, look at paragraph

11   3 on the last three lines, I want you to read those to

12   yourself.

13   A.    Okay.

14   Q.    You say that after you made your complaint when

15   you'd make eye contact with managers, they would either

16   quickly turn away or stare at you in a hostile manner;

17   do you see that?

18   A.    Yes.

19   Q.    Who are you talking about?

20   A.    Mr. Iijima, the other Japanese staff across the

21   way.

22   Q.    Japanese staff across the way; who are they?

23   A.    Man, i don't remember.

24   Q.    The guys on the other side of the lobby?

25   A.    Where they take care of the tour groups.

1    Q.    Yeah.  Those aren't managers though, are they?

2    A.    No, I believe that they are just employees.

3  Mr. Saito, he was the manager in the back also.

4    Q.    So would he have to come out from the back to

5  stare at you in a hostile manner?

6    A.    He would walk by with a stare.

7    Q.    Can you describe what a -- describe a hostile

8  manner; what do you mean?

9    A.    Just staring at you without saying a word, you

10  know, without -- giving you direct eye contact, making

11  you feel uncomfortable with that stare and not being

12  able to -- really feeling intimidated with the stare.

13  Sometimes they would stand; for example, I remember them

14  standing at the front door of the main lobby and we

15  could just feel that they -- we saw -- I saw that they

16  were watching us, and just staring at us without saying

17  anything.

18    Q.    Their job was to watch the front desk, right?

19    A.    I don't think that's their job, to stand at the

20  front desk and watch us.

21    Q.    They're front desk supervisors though, aren't

22  they?

23    A.    Mr. Suzuki was my front desk supervisor.

24    Q.    And what was Iijima's job?

25    A.    I don't -- a supervisor, manager.

1    *Q.*    Of what?

2    *A.*    I don't know.

3    *Q.*    And what was -- did Suzuki ever stare at you in

4    a hostile manner?

5    *A.*    Not that I recall.

6    *Q.*    You recall Iijima?

7    *A.*    Yes.

8    *Q.*    On how many occasions?

9    *A.*    I don't know.

10   *Q.*    Did you ever speak with Mr. Iijima about that?

11   *A.*    About his stare?

12   *Q.*    Yes.

13   *A.*    No.  Mr. Iijima doesn't speak to us much either

14   anymore.

15   *Q.*    After your sexual harassment complaint?

16   *A.*    Yes.

17   *Q.*    For the next 10 days until you quit.

18           MS. MORRISON:  Is that a question?

19           MR. ROBERTS:  Yeah.

20   *Q.*    (By Mr. Roberts)  So the period of time in

21   which you feel that Mr. Iijima was mean to you was 10

22   days?

23   *A.*    Yeah, 10 long days.

24   *Q.*    And how many of those days did you actually

25   work?

1    A.    Did you get a count?

2    Q.    No.

3    A.    About nine days, 9 days, 8 hours.

4    Q.    And you're counting those two, you're counting

5    those two days that somebody's written in sick leave,

6    right

7    A.    Yes.

8    Q.    You worked between August -- counting August

9    18th through August 28th --

10   A.    Yes.

11   Q.    -- you claim you worked nine of those days?

12   A.    Yes.

13   Q.    And that's an 11-day period.

14   A.    Repeat your comment.

15   Q.    You said you worked 9 days --

16   A.    Yes.

17   Q.    -- from and including August 18th until -- and

18   including August 28?

19   A.    From the 18th?

20   Q.    Actually --

21   A.    Let's start from the 17th.

22   Q.    -- let's start from the 17th.  Thank you.  From

23   the 17th --

24   A.    Okay.

25   Q.    -- through and including the 28th --

Case 1:06-cv-00028  Document 62-3   Filed 09/10/2007   Page 39 of 50

1      A.      Okay.

2      Q.      -- and that's an 11-day period?

3      A.      That's a total of 12.

4      Q.      Yeah.  Of those 12 days, from and including

5   August 17th through and including August 28th, a 12-day

6   period, how many days did you work?

7      A.      Eight.

8      Q.      Eight of the 12 days?

9      A.      Yes.

10     Q.      Look at paragraph 7 of Exhibit 13, please.

11     A.      Okay.

12     Q.      Do you say in that paragraph that sometimes

13  management would just not acknowledge your presence on

14  these eight days after you filed your sexual harassment

15  complaint?

16     A.      Yes.

17     Q.      What do you mean by that?

18     A.      They wouldn't talk to us anymore.  I mentioned

19  to you I had a good relationship with Mr. Maruyama, Mr.

20  Suzuki was our front desk manager, Mr. Iijima was also

21  part -- his office was behind us.  They didn't talk to

22  us anymore, nobody talked to us.  I remember one day

23  also when May walked by and she didn't talk to us, you

24  know.  A lot of the Japanese staff that were behind us

25  or across the way, nobody talked to us.  It was an

1   unfriendly environment.  It's like we couldn't talk to

2   anybody anymore.  It wasn't the same anymore, it was

3   just so unhappy being there from my perspective.

4       Q.      Can I have that exhibit back, please?  Well,

5   you were still able to talk with Mr. Suzuki, right?

6       A.      I did, I spoke to him.  I continued doing my

7   job.  If I had to communicate with my supervisor, he was

8   the one I communicated with.

9       Q.      Yeah, you went to him and said, "Hey, what's up

10  with these hours," right?

11      A.      I asked him about my hours.

12      Q.      And he wasn't rude to you, was he?

13      A.      No, I don't think so.

14      Q.      Can you look at Exhibit 16, I believe -- no,

15  15.  You haven't seen this document, but this was given

16  to me by the EEOC and there's an EEOC Bates stamp that's

17  partially cut off, it's marked as Exhibit 15.  Mr.

18  Griffin reported -- this is a report by Mr. Griffin

19  after his conversation with you on or about April 5th of

20  2005.  Mr. Griffin wrote after Christine Camacho was

21  discharged, you told him that you retained legal counsel

22  and were advised to go see a therapist because of their

23  ordeal with sexual harassment.  Did you tell Mr. Griffin

24  that?

25      A.      I don't remember.

1     Q.     Do you remember, were you advised to go seek a

2   therapist?

3     A.     Does that breach patient --

4     Q.     No, it doesn't breach doctor-patient privilege

5   but it may breach another privilege.

6     A.     I believe -- yes, I believe so, that it was a

7   recommendation to seek -- to see a therapist about our

8   stress.

9     Q.     By whom?

10    A.     By Phil.

11    Q.     I know you've testified today that you were

12  sexually harassed on the workplace.  I want to ask you,

13  do you feel like -- new subject -- do you feel that you

14  were discriminated against in any way by LeoPalace

15  Resort?

16    A.     Explain discrimination.

17    Q.     Do you think you were treated differently --

18  before August 16th, before Phil wrote his letter, your

19  sexual harassment complaint, do you feel like management

20  treated you differently than other employees?

21    A.     Before August 16th, was I treated differently?

22    Q.     Yes.  I'll just ask you a direct question;

23  okay?

24    A.     Okay.

25    Q.     Do you feel like you were treated differently

1   by management because you were a female before August

2   16th?

3                   MR. TORRES:  Objection; vague.  I don't

4   understand.

5       Q.    (By Mr. Roberts)  Do you think you were

6   discriminated against on account of sex prior to August

7   16?

8       A.    No.

9                   MS. MORRISON:  Objection; calls for a

10  legal conclusion.

11                  MR. ROBERTS:  And I'm trying to ask it

12  in layman's terms but...

13      Q.    (By Mr. Roberts)  That's why I asked you, do

14  you feel like you were discriminated against by

15  management at LeoPalace before August 16th because you

16  were a female?

17      A.    No.

18      Q.    Mr. Griffin reported that you told him that

19  your hours had been reduced from five days to three

20  days; do you remember telling Mr. Griffin that?

21      A.    Yes.

22      Q.    I thought earlier you said they were reduced

23  from five days to four days.

24      A.    No, five working days; because of the three

25  days off, it was reduced.  That's what I meant, I was

1  given three days off, so it was reduced from five

2  working days, and then I was given three days off; so

3  really, two working -- it would be, yeah, four working

4  days.

5      Q.    So that should have been -- did you tell him

6  your work schedule was reduced from five working days

7  per week to three working days per week; is that what

8  you told Mr. Griffin?

9      A.    It should have been from five working days to

10  four working days a week.

11          MR. ROBERTS:  Okay, let's take a quick

12  break.  I'm almost finished, I just want to make sure I

13  didn't miss anything.

14                    (Off the record.)

15                    (Back on the record.)

16      Q.    (By Mr. Roberts)  I just want to confirm that

17  the first time -- when was the first time that you went

18  to Rose, Rose Taimanglo, to complain about Christine

19  Camacho; was it in that mid August date you were talking

20  about?

21      A.    Yes.

22      Q.    Like August 9th or 10th?

23      A.    Yes.

24      Q.    That's the first time you complained to Rose

25  about Christine?

1     *A.*    Yes.

2              MR. ROBERTS:  Okay; no further

3  questions.

4              MR. TORRES:  Okay; I have a few

5  questions.

6                CROSS EXAMINATION

7  BY MR. TORRES:

8     *Q.*    You talked about your meeting with May Paulino

9  on August 11, 2004.

10    *A.*    Yes.

11    *Q.*    How long did that meeting last?

12    *A.*    I remember leaving about 3:15.

13    *Q.*    And when did it start?

14    *A.*    I believe 2:45.

15    *Q.*    And this was a scheduled meeting for you to

16  come up and talk with her?

17    *A.*    Yes.

18    *Q.*    Did you expect that she was going to take some

19  action after she had talked with you?

20    *A.*    Yes.

21    *Q.*    And were you expecting to walk out of there

22  feeling this -- as though something was going to be

23  done?

24    *A.*    Yes.

25    *Q.*    Was a decision made after your meeting, or were

1   you told of any decision?

2       A.    On Friday, we were told --

3       Q.    I'm sorry; on that day.

4       A.    No.

5       Q.    So for all you know as of that day, nothing had

6   been resolved by management?

7       A.    Correct.

8       Q.    You stated in reviewing the exhibit of the

9   transcript from that day written by May that there were

10  some things, that's Exhibit 5, that there were some

11  things that were inaccurate.  Did you have a

12  conversation with her about your relationship with Mr.

13  Maruyama?

14              MR. ROBERTS:  Object; leading.

15      A.    Yes.  At the end of our conversation, she asked

16  me if I was still interested or if I decided in taking

17  the position to be Mr. Maruyama's executive assistant, I

18  believe.

19      Q.    Okay.

20      A.    And I told her I was still thinking about it.

21      Q.    (By Mr. Torres)  There's nothing in here to

22  reflect that, in Exhibit 5?

23      A.    No.

24      Q.    Thinking about what position as executive --

25  what is that, executive assistant?

1    A.    Mr. Maruyama needed, I believe like a secretary

2 in his office to help him with his daily -- day-to-day

3 events.

4    Q.    When you would converse with Mr. Maruyama,

5 would you do that in both English language and Japanese

6 language?

7    A.    Yes.

8    Q.    When were you told about this opportunity to be

9 an executive assistant, initially?

10    A.    A week -- about a week before we went to May,

11 so that would be the week before like August 11th

12 probably.

13    Q.    Okay.  And who approached you about that?

14    A.    I believe I saw the job opening and I kind of

15 inquired about it.  Mrs. Paulino made a recommendation

16 to Mr. Maruyama about me applying for the position.

17    Q.    And then after the August 11th complaint to Ms.

18 Paulino, was that -- was there any other further

19 discussion about that opportunity?

20    A.    No.

21    Q.    Also in here it talks about jokes and you say

22 that you would laugh.  Do you see that where it says,

23 "Yes, at times we laughed about it"?

24    A.    Yes.

25    Q.    Okay.  And it says, "You folks entertained her

1    sexual jokes."  Did you entertain her sexual jokes?

2      A.    No.

3      Q.    Did you entertain her jokes?

4      A.    Her clean jokes, yes.

5      Q.    So that's an inaccuracy within that?

6      A.    Yes.

7      Q.    You were asked to review your time sheet and

8    state how many different hours you worked and there was

9    a chrono's that was put into exhibit, that's Exhibit

10   Number 10.  On the last page, which goes from the time

11   frame of August the 8th to August the 21st, you were

12   asked how many hours you worked and your response was

13   65.

14     A.    Yes.

15     Q.    Do you remember that?

16     A.    Yes.

17     Q.    But why does this document actually says you

18   worked 65.75 regular hours and 9.25 overtime hours?  So

19   you actually worked 75 hours that week?

20     A.    Yes.

21     Q.    You testified that you make use of the words

22   "fuck" and "shit" occasionally -- or just make use of

23   those words, right?

24     A.    Yes.

25     Q.    They come out of your mouth too?

1     A.     Yes.

2     Q.     Why is that offensive then if Christine Camacho

3  is using those words?

4     A.     Because it's in a work environment.  I don't

5  use it in a work environment, and I don't feel it's

6  appropriate to be used in a work environment.

7     Q.     So there's a distinction?

8     A.     Yes.

9     Q.     Mr. Roberts told you that prior to receiving

10 the letter from me, that they had already terminated

11 Christine Camacho.

12    A.     Yes.

13    Q.     When did you find out she had been terminated;

14 do you remember?

15    A.     On Friday morning.

16    Q.     The 13th?

17    A.     Yes.

18    Q.     And did you think that things were going to get

19 better after she was terminated?

20    A.     Yes.

21    Q.     Did they get better after she was terminated?

22    A.     No.

23    Q.     How so?

24    A.     Management wasn't treating us fairly anymore,

25 you know.  Mr. Maruyama approached me and made me -- the

Case 1:06-cv-00028   Document 62-3   Filed 09/10/2007   Page 49 of 50

1    day he approached me on the 17th, he made me feel scared

2    every day after that even when he walks by because I

3    never know if he's going to storm in through the front

4    desk and yell at me for something else, or raise his

5    voice.

6             I didn't appreciate the fact that I was wearing

7    a jacket to work because it was so cold at the front

8    desk and I get a call from May asking me if I'm wearing

9    my uniform.  I had to turn around, unzip the front and

10   show her through the cameras that I was, and she

11   acknowledged it.  And like the fact that -- you know, I

12   was treated like I was the bad guy now. Nobody wanted to

13   talk to us; it wasn't the same happy environment that I

14   was working at anymore.

15   *Q.*     Okay.  But before you called this a happy

16   environment.  Were you happy in those times from June,

17   July, August 2004?

18             MR. ROBERTS:  Objection; leading.

19   *Q.*     (By Mr. Torres)  Can you explain -- you use the

20   word happy; can you explain it to me?  Let me strike

21   that.  You said you worked for LeoPalace in 2001?

22   *A.*     Yes.

23   *Q.*     And did you like your job then?

24   *A.*     Yes.

25   *Q.*     You worked for LeoPalace in 2004?

Case 1:06-cv-00028   Document 62-3   Filed 09/10/2007   Page 50 of 50