Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant LeoPalace Resort



**FILED**

DISTRICT COURT OF GUAM

SEP 1 0 2007

**JEANNE G. QUINATA**
**Clerk of Court**

IN THE DISTRICT COURT
OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) CASE NO. 1:06-CV-00028 |
| Plaintiff, | ) |
| vs. | ) |
| LEO PALACE RESORT, | ) |
| Defendant. | ) **FILING OF TRANSCRIPT OF** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, | ) **DEPOSITION OF VIVIENE VILLANUEVA** ) **IN SUPPORT OF MOTION FOR** ) **SUMMARY JUDGMENT** |
| Plaintiff-Intervenors, | ) |
| vs. | ) |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | ) |
| Defendants. | ) |

Defendant Leopalace Resort hereby files with the court a copy of the transcript of the

deposition of Viviene Villanueva in support of its motion for partial summary judgment.

DOOLEY ROBERTS & FOWLER LLP

Date:     September 10, 2007          By: _____

**TIM ROBERTS**
Attorneys for Defendant

F:\Documents\TLR (07.04)\M108\M108-330\Pleadings\M108-330.PSJM-Filing of Deposition Transcript.doc

**ORIGINAL**

IN THE DISTRICT COURT OF GUAM

U.S. EQUAL EMPLOYMENT     ) CASE NO. 1:06-CV-00028
OPPORTUNITY COMMISSION,     )
                                   )
               Plaintiff,  )
                                   )
       vs.              )
                                   )
LEO PALACE RESORT,        )
                                   )
            Defendant.   )
JENNIFER HOLBROOK,        )
VIVIENE VILLANUEVA and    )
ROSEMARIE TAIMANGLO,     )
                                   )
      Plaintiff-Intervenors,)
                                   )
       vs.              )
                                   )
MDI GUAM CORPORATION dba LEO )
PALACE RESORT MANENGGON HILLS )
and DOES 1 through 10,    )
                                   )
     Defendants.        )



COPY

FILED
APR 25 2007
MARY L. M. MORAN
CLERK OF COURT

### DEPOSITION OF VIVIENE VILLANUEVA

*Taken on Behalf of the Defendant*

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of
Viviene Villanueva was taken before Veronica F. Reilly,
Certified Shorthand Reporter, on Wednesday, the 21st day of
March 2007, at 1:30 p.m. in the Law Offices of Dooley Roberts
& Fowler, 865 South Marine Corps Drive, Suite 201, Orlean
Pacific Plaza, Tamuning, Guam.

Case 1:06-cv-00028 Document 43 Filed 09/10/2007 Page 2 of 41

DISK
ENCLOSED

APPEARANCES


Appearing on behalf of the plaintiff:

TEKER TORRES & TEKER
Suite 2A
130 Aspinall Avenue
Hagatna, Guam 96910
By:  Mr. Philip Torres, Esq.
Phone:  671.477.9891

Appearing on behalf of the defendant:

DOOLEY ROBERTS & FOWLER
Suite 201, Orlean Pacific Plaza
865 S. Marine Drive
Tamuning, Guam 96913
By:  Mr. Tim Roberts, Esq.
Phone:  671.646.1222

Appearing on behalf of the EEOC:

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
333 S. Las Vegas Boulevard
Suite 300
Las Vegas, Nevada 89101
By:  Ms. Angela D. Morrison, Esq.
Phone:  702.388.5072

ALSO PRESENT


Rosemarie Taimanglo, Plaintiff

May Paulino, Leo Palace

Nichiro Niikura, Leo Palace

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

Case 1:06-cv-00028    Document 63    Filed 09/10/2007    Page 3 of 41

# I N D E X

## EXAMINATION

|  | Direct | Cross | Redirect |
|---|---|---|---|
| Mr. Roberts: | 4 |  | 83 |
| Ms. Morrison: |  | 79 |  |
| Mr. Torres: |  | 82 |  |

## EXHIBITS

Page

Exhibit 1: Notice of Rescheduled Deposition........... 4:12

Exhibit 2: Request for Production of Documents......... 4:13

Exhibit 3: Authorization for the Release of Records.... 5:15

Exhibit 4: Employee Orientation....................... 12:15

Exhibit 5: Employee Handbook.......................... 13:19

Exhibit 6: Leo Palace Resort Employee Handbook......... 13:20

Exhibit 7: Dialogue................................... 37:14

Exhibit 8: August 16, 2004 Letter..................... 51:8

Exhibit 9: August 19, 2004 Letter..................... 52:19

Exhibit 12: October 15, 2004 Letter................... 54:9

Exhibit 15: Front Office Work Schedule................ 55:11

Exhibit 16: 2004 Tax Return........................... 67:6

Exhibit 17: 2005 Tax Return........................... 67:6

1              VIVIENE VILLANUEVA,

2  called as a witness on behalf of the defendant, having first

3  been duly sworn, was examined and testified as follows:

4

5              DIRECT EXAMINATION

6  BY MR. ROBERTS:

7      Q.    All right then, let's begin.  This is the time and

8  place for the deposition of Viviene Villanueva in District

9  Court Civil Action 1:06-28, US Equal Employment Opportunity

10 Commission versus Leo Palace Resort and the three intervenors

11 verus MDI Guam Corporation dba Leo Palace Resort.

12         Exhibit 1 will be the Notice of Rescheduled

13 Deposition.  Exhibit 2 will again be the First Request for

14 Production of Documents served on intervenors and the EEOC on

15 January 31, 2007.

16         Viviene, you sat through many of the depositions in

17 this case for the last couple of weeks, so I'll go over the

18 rules real quick.  I think you've seen that it's troublesome

19 if we talk over each other, so let me finish my question

20 before you give your answer and I'll let you finish your

21 answer before I give you my question.  Okay?

22     A.    Yes.

23     Q.    And, of course, as you know, everything has to be

24 out loud.  You can't shake your head no or nod your head yes.

25 Well, you can as long as you also say yes or no when you do

1    that.  All right?

2         A.   Yes.

3         Q.   Okay.  You're sworn to tell the truth.  You've had a

4    couple weeks of hearing what the questions are going to be,

5    so maybe your deposition will go a little quicker than others

6    but we'll see.  Have you ever had your deposition taken

7    before?

8         A.   No, this is the first time.

9         Q.   Ever been in a lawsuit before?

10        A.   No.

11        Q.   Ever been divorced before?

12        A.   No.

13        Q.   Ever been married before?

14        A.   No.

15        Q.   Exhibit 3 is a form called Authorization for the

16   Release of Medical Records.  Let me ask you if you've ever

17   seen -- it's got your name on it, a place for your signature.

18        A.   Okay.

19        Q.   Did you ever sign a document like that to allow your

20   attorney to go to your counselor and get medical records?

21        A.   Yes.

22        Q.   Okay.  That's all for that.  I see you have a napkin

23   today?

24        A.   Yeah, sorry.

25        Q.   Are you a little bit under the weather today?

1    A.    I'm allergic to smoke and -- well, I have allergies.

2  Sorry.

3    Q.    And are you on any allergy medication that might

4  affect your ability to remember the things I'll be asking you

5  about two and a half years ago?

6    A.    I'm on cough and colds medication but I don't think

7  that they're going to affect me.

8    Q.    Cough and cold?

9    A.    Cough and colds.

10    Q.    Over-the-counter stuff?

11    A.    It was prescribed by my doctor.

12    Q.    Is it cough medicine?

13    A.    Yes.  It's called Phenergan with Codeine, Mucinex,

14  and for my allergies, Fenadine, a generic for Allegra.

15    Q.    So the cough syrup has codeine in it?

16    A.    Codeine.

17    Q.    Did you take some this morning?

18    A.    No.  I only take it at night because it makes me

19  drowsy.

20    Q.    So we can go forward today, right?  You're not under

21  the influence of codeine to the best of your knowledge?

22    A.    We can go on.

23    Q.    Yeah, but to the best of your knowledge --

24    A.    To the best of my knowledge, yes.

25    Q.    -- you're not under the influence of codeine right

1  now?

2      A.    No, I'm not.

3      Q.    Where were you born?

4      A.    In the Philippines.

5      Q.    Where in the Philippines?

6      A.    In a province Pangasinan.

7      Q.    Pangasinan?

8      A.    Yes.

9      Q.    I've been there.  And when did you move to Guam?

10     A.    As immigrant or tourist?

11     Q.    When did you move here permanently?

12     A.    Permanently, like when I didn't go back to the

13  Philippines anymore?

14     Q.    Are you a US citizen?

15     A.    Yes.

16     Q.    When did you become a US citizen?

17     A.    Last year, November.

18     Q.    And before that, were you a --

19     A.    Green card holder.  Sorry.

20     Q.    It's all right.  A green card holder?

21     A.    Yes.

22     Q.    Which meant you were a lawful, permanent resident of

23  the United States of America?

24     A.    Yes.

25     Q.    And that's called a green card?

1     A.    Yes.

2     Q.    When did you get your green card?

3     A.    1990.

4     Q.    1990?

5     A.    Yes.

6     Q.    Have you lived on Guam more or less permanently

7  since 1990?

8     A.    I wouldn't say permanently because I went to school

9  in the Philippines.

10    Q.    Where did you go to school?

11    A.    Where?

12    Q.    Yeah.   Santo Tomas?

13    A.    No.   It's in a province.

14    Q.    Is it a college?

15    A.    Yes.

16    Q.    What's the name of the college?

17    A.    Lyceum Northwestern.

18    Q.    Can you spell that?

19    A.    L-Y-C-E-U-M and then Northwestern.

20    Q.    Northwestern?

21    A.    Yes.

22    Q.    In the US?

23    A.    No, it's one --

24    Q.    Oh, I see.   Lyceum Northwestern College?

25    A.    Yes.

1     Q.    And that's in Pangasinan province?

2     A.    Yes.

3     Q.    What years did you go to college?

4     A.    1994 to '98.

5     Q.    Did you get a degree?

6     A.    Yes, I did.

7     Q.    In what?

8     A.    BS tourism -- I'm sorry.  BS in tourism, major in

9 travel management.

10    Q.    What was your first job on Guam?

11    A.    I was a sales clerk and cashier.

12    Q.    Where?

13    A.    At Onward Beach Resort.

14    Q.    What years were you at Onward?

15    A.    '98 to '99.

16    Q.    So you didn't work before on Guam before 1994?

17    A.    No, I did not.

18    Q.    What were you doing from 1990 to 1994 after you got

19 your --

20    A.    I was a student.

21    Q.    On Guam?

22    A.    No, in the Philippines.  I'm sorry --

23    Q.    Did you get your green card in 1990?

24    A.    Yes, that's correct.

25    Q.    So that meant you could lawfully live in the United

1    States in Guam?

2        A.    In Guam but I chose to study in the Philippines, so

3    I keep coming back and forth.

4        Q.    Do you have family here?

5        A.    Yes, I do.

6        Q.    So between 1990 and 1994, you were a student?

7        A.    Yes, I was.

8        Q.    Where?

9        A.    In the Philippines.

10       Q.    What school?

11       A.    Dominican School, or high school.

12       Q.    Did you graduate from high school?

13       A.    Yes, I did.

14       Q.    In '94?

15       A.    Yes, I did.

16       Q.    And in '94, you went to college at Lyceum

17   Northwestern?

18       A.    Correct.

19       Q.    And graduated in 1998?

20       A.    Correct.

21       Q.    And then have you lived on Guam more or less

22   permanently since 1998?

23       A.    Not permanently, because I went back again.

24       Q.    What did you go back for?

25       A.    My grandma, my late grandma, had a stroke.

```
1    Q.    I see.

2    A.    And so I had to go back and take care of her.

3    Q.    Your first Guam job was at the Onward Resort?

4    A.    Correct.

5    Q.    In 1998?

6    A.    Correct.

7    Q.    How long did you work at Onward?

8    A.    Ten, eleven months.

9    Q.    And why did you leave?

10   A.    Because of my grandma, she had a stroke.

11   Q.    Did your grandma pass away?

12   A.    Recently.

13   Q.    Oh, okay.  When did you come back to Guam?

14   A.    Permanently?

15   Q.    Yes.

16   A.    2002.

17   Q.    And did you get a job in 2002?

18   A.    No, I did not.

19   Q.    Did you get a job in 2003?

20   A.    Yes.

21   Q.    Where did you get a job?

22   A.    At Leo Palace.  I applied for Leo Palace.

23   Q.    In 2003?

24   A.    Yes.  June of 2003.

25   Q.    Were you hired?
```

1      A.    Yes.

2      Q.    What month of what year?

3      A.    June of 2003.

4      Q.    What was your rate of pay when you were hired?

5      A.    At Leo Palace?

6      Q.    Uh-huh.

7      A.    $5.15.

8      Q.    That was minimum wage?

9      A.    I'm sorry.  At Leo Palace?  $6, I'm sorry.

10     Q.    6.15?

11     A.    No, 6, just flat 6.

12     Q.    Six.  So you worked at Leo Palace from June of 2003

13  through October of 2004?

14     A.    Correct.

15     Q.    Let me show you what I marked as Exhibit 4 and this

16  is a new employee orientation.  Are your initials on that

17  anywhere?

18     A.    Yes.  These are my initials.

19     Q.    On the first and second pages?

20     A.    That's correct.

21     Q.    And is your signature on there?

22     A.    Yes, on the second page.

23     Q.    All right.  On the first page, do you see the words

24  sexual harassment about three quarters of the way down, the

25  first page?

1    A.    Yes, I do.

2    Q.    Are your initials across the page from those words

3    sexual harassment?

4    A.    Yes, I do.

5    Q.    Do you remember why you placed your initials across

6    from those two words?

7    A.    I believe with this orientation, Ms. May Paulino

8    went through helping scope.

9    Q.    Was May your interviewer?

10   A.    Yes, she was.

11   Q.    Did May go through the subjects that are listed on

12   this new employee orientation?

13   A.    All of them?

14   Q.    Yeah.

15   A.    Yes, I think so.

16   Q.    Did you get an employee handbook from May or anyone

17   else when you first started your job in 2003?

18   A.    No, sir.

19   Q.    Let me show you what we've marked as Exhibits 5 and

20   6.  They're both employee handbooks, one is longer than the

21   other.  Do you know if you've ever seen Exhibits 5 or 6?

22   A.    Other than yesterday?

23   Q.    Yeah, before these depositions started?

24   A.    No, sir.

25   Q.    Do you know if you have or not?

1     A.    I don't have.

2     Q.    You've never seen these?

3     A.    I've never seen, sir.

4     Q.    What did May Paulino discuss with you about sexual

5   harassment, if you can recall, when you interviewed with her?

6     A.    About sexual harassment?  I don't recall.

7     Q.    Do you remember discussing it with her?

8     A.    No.

9     Q.    When you said May went through these things with

10  you, can you explain your answer a little bit more?

11    A.    All I remember was she went through it very quick

12  and with this orientation, all I can remember was her telling

13  me that we're not to have like open-toes shoes and about like

14  the cell phone policies that we're not to have it in the work

15  area, but other than that --

16    Q.    Can I see that again?  On the second page of this

17  exhibit, it appears you've put your signature under "I

18  understand all the information covered.  I also acknowledge

19  receipt of the employee orientation packet."  Do you see

20  those words Employee Orientation Packet?

21    A.    Yes.

22    Q.    Did you get an employee orientation packet?

23    A.    I don't remember if I receive.

24    Q.    Obviously, we're here to talk about Christine

25  Camacho and other things today.  Do you know Christine

1    Camacho?

2        A.    Yes, I do.

3        Q.    Do you remember when you first met her?

4        A.    When she started working for Leo Palace.

5        Q.    Do you remember approximately when that might have

6    been?

7        A.    All I remember was the month and the year that she

8    started.

9        Q.    What do you remember the month and year was?

10       A.    May 2004.

11             MR. ROBERTS:  Everybody stipulate that it was

12   May 10, 2004?

13             MS. MORRISON:  Yes, we will.

14   BY MR. ROBERTS: (Continuing)

15       Q.    So now that we all stipulated to that, that's magic.

16   Now you can assume the record is clear or you can assume

17   that Christine was hired on May 10 of 2004.  Do you remember

18   Christine's first day on the job?

19       A.    Yes.

20       Q.    Do you remember if anything unusual happened?

21       A.    No.  It was regular first day of schedule, you know,

22   teach her how things go in the front desk, how, what to say,

23   the greetings, from outside to the in-house call to outside

24   calls.

25       Q.    How do you define sexual harassment?

1      A.    From what I know now or?

2      Q.    Yeah.

3      A.    That it's a serious offense, that it's not tolerable

4    and that there are three types of harassment.

5      Q.    What are they?

6      A.    Verbal, and this can be verbal explicit jokes and

7    visual which are like cartoons which they show like nudeness

8    or something and physical, touching.

9      Q.    Where did you learn that?

10      A.    From Marriott.

11      Q.    And at the Marriott, did you learn that these things

12    are not appropriate in the workplace?

13      A.    Yes, I did.

14      Q.    Before you took your job with Leo Palace, did you

15    think it was appropriate or inappropriate for employees to be

16    touching each other in a sexual manner?

17      A.    From what I know now?

18      Q.    No, before you took your job at Leo Palace.

19      A.    If I thought it was inappropriate?

20      Q.    (Nodded head.)

21      A.    Yes.

22      Q.    Before you took your job with Leo Palace, did you

23    know that it was appropriate or inappropriate for

24    co-employees to be making jokes of a sexual or vulgar nature

25    while on the job?

1      A.    I'm sorry.  Can you repeat the question?

2      Q.    Yeah.  Before you took your job at Leo Palace, did

3  you know that it was inappropriate for co-employees to be

4  making jokes of a sexual or vulgar nature while on the job?

5      A.    No.

6      Q.    You didn't know that was inappropriate?

7      A.    (Witness shook head.)

8      Q.    And before you took your job with Leo Palace, did

9  you know it was inappropriate for employees to be -- I'll

10  withdraw the question.  When did Christine Camacho first

11  start committing acts of what you now understand to be sexual

12  harassment?

13      A.    Verbal or physical?

14      Q.    Either one.

15      A.    The first one that I saw?

16      Q.    Yeah, with your own eyes.

17      A.    With my own eyes?  Was that when she said that she

18  wanted to make a sandwich out of us.

19      Q.    And who was there when this comment was made?

20      A.    Christina, me, Christine Valencia, Rita Villagomez

21  and two more that I am not sure who it was.

22      Q.    Were they other Front Desk Clerks?

23      A.    Front Desk and Reception.

24      Q.    So if I were to look at the work schedule, would I

25  be able to figure out who you were working with that day and

1  who those names were?

2          MS. MORRISON:  Objection; calls for speculation.

3  BY MR. ROBERTS: (Continuing)

4      Q.    That's a terrible question.  I'll withdraw the

5  question.  Your answer should be, probably not.  I'll look at

6  it later.  What did she say, she'd like to make a sandwich

7  out of you?

8      A.    Yes.

9      Q.    Did you say anything to her?

10     A.    No.

11     Q.    What did you think she meant by that?

12     A.    Well, I thought that she was just hungry and then I

13  didn't think of anything else.

14     Q.    Did you interpret it as sexual harassment as a

15  remark as being sexual at the time or did you think it was

16  just an odd comment?

17     A.    At the time, I thought she just had made a mistake,

18  like when they say I'm so hungry, I could eat a horse.  You

19  know, the idiomatic phrase?  You know, I'm so hungry, I could

20  make a sandwich.  I thought that she had made a mistake of

21  saying a horse to a sandwich.

22     Q.    Okay.  Do you remember approximately how many days

23  -- how long between the time Christina first started working

24  and this comment approximately went by?

25     A.    From the time she started working?

1      Q.    Yeah.

2      A.    I'm not sure.  It was somewhere around May 2004.

3      Q.    And she started working on May 10 of 2004.  We all

4  know that, right?

5      A.    Yes.

6      Q.    Do you remember how many days or weeks later this

7  comment was made?

8      A.    (Witness shook head.)

9      Q.    After this comment, what was the next incident that

10 occurred that you saw with your own eyes that you would

11 consider sexual harassment?

12     A.    She and I, Christina and I, were working at the

13 hotel front desk and we had a lady guest passing by the lobby

14 area and she was wearing very short shorts and --

15     Q.    I'm sorry to interrupt, but how many days or weeks

16 after this sandwich comment did this incident you're

17 describing occur?

18     A.    I don't remember.

19     Q.    Okay.  Tell me what happened.

20     A.    This lady, she passed by, she was, you know, a

21 guest.  She passed by the lobby area and she was wearing

22 shorts that were -- and like tank top that was really tight

23 and as she passed by, Christina had commented, she goes,"Ooh,

24 nice boobs, nice ass."

25     Q.    What was that word?  Boobs?

```
 1      A.    Boobs, yes.

 2      Q.    Did the guest hear it?

 3      A.    No.

 4      Q.    Was this at the front desk?

 5      A.    Yes, it was at the front desk.

 6      Q.    Who else was behind the front desk at the time?

 7      A.    Just the two of us.

 8      Q.    Did you say anything to her when she made this

 9  remark to you?

10      A.    Yes, I did.

11      Q.    What did you say?

12      A.    I told her to stop, you know, she can't say that,

13  the guest might have heard her.

14      Q.    Did she respond to you?

15      A.    She laughed.

16      Q.    After this incident, what's the next incident that

17  occurred that you would consider to be sexual harassment?

18      A.    We had a balloon in the shape of a sword in the

19  counter and then she took it, she waved it around, like

20  started to fence, and then she put the balloon to her private

21  area and she started saying to one of our male co-worker, I

22  believe his name was Sang or Song, he's Korean, and he said

23  do you want to like dick fight, sword fight.

24      Q.    Sword fight?

25      A.    Yes.
```

1     Q.   Were those the words she said?

2     A.   Dick sword fight.

3     Q.   Okay.   She said the word dick?

4     A.   Yes.

5     Q.   What did Song say?

6     A.   He didn't say anything.   He just looked at her.

7     Q.   He didn't laugh?

8     A.   No.

9     Q.   Did you laugh?

10    A.   No, sir.   He, Song, looked at her like he was kind

11 of disgusted.

12    Q.   Who was your supervisor at the time?

13    A.   There was no supervisor at the time.

14    Q.   Wasn't Rose your supervisor?

15    A.   Yes, but she wasn't there.

16    Q.   Did you report any of these incidents to Rose?

17    A.   No.

18    Q.   Why not?

19    A.   It didn't cross my mind.

20    Q.   Okay.   So after the balloon incident, what's the

21 next thing that you saw with your own eyes that you consider

22 sexual harassment from Christine Camacho?

23    A.   She started to hump me.

24    Q.   How long after she had started work at Leo Palace on

25 May 10 of 2004 did this humping incident occur?

1    A.    May incident, June, so two weeks, less than three

2  weeks.

3    Q.    Do you remember when in June?

4    A.    I don't remember the date but it was somewhere

5  around the first week, sir.

6    Q.    Tell me what happened.

7    A.    I was -- I took off the front desk.  I was in the

8  computer, computer No. 3.  We had four computers.  Computer 1

9  being the Ving card to make keys, 2 for, you know -- 3 and 4,

10  and I was in the middle and I noticed that she -- you know,

11  from my view, side view, that she had entered from the door

12  and then she was approaching me and then all of a sudden, she

13  put her right hand to my stomach and her left to my back and

14  started to hump me and grind me.

15    Q.    And what did you do?

16    A.    I was shocked.  I told her, stop it, Christina,

17  you're scaring me.  And all she said was, you know, "Sorry, I

18  couldn't help myself," but she was laughing anyways.

19    Q.    Did you push her away?

20    A.    I went like this.  I didn't push her away.

21    Q.    That looked like a side step?

22    A.    Yes.  Then --

23    Q.    Was anybody else behind the front desk when this

24  happened?

25    A.    My supervisor, Rose, was there but she didn't see

1    it.

2         Q.    Rose didn't see it?

3         A.    Yes.  Because she was kneeling down getting

4    something from the storage cabinet.

5         Q.    Did you tell Rose what had happened?

6         A.    Yes, I did.

7         Q.    What did Rose say?

8         A.    She said that she's crazy, she's going to get

9    herself in trouble.

10        Q.    By this time, June of 2004, you had known May

11   Paulino for about a year, right?

12        A.    Yes.

13        Q.    Did you ever think of reporting Christina's conduct

14   to May Paulino?

15        A.    No.  It didn't cross my mind, you know, at the time.

16   It didn't cross my mind.

17        Q.    Did you tell anybody else about this humping

18   incident?

19        A.    Yes, I did.

20        Q.    Who?

21        A.    Other than Rose?

22        Q.    Yeah.

23        A.    I told other supervisors, Jun Layug, which at the

24   time, he was Reception Center Front Desk Supervisor for B

25   Shift.

1    Q.   What's Jun's last name?

2    A.   Layug L-A-Y-U-G.

3    Q.   Layug.  And why did you tell Jun Layug?

4    A.   Because I felt uneasy.

5    Q.   What was Jun Layug's position?  Front Desk?

6    A.   I'm sorry.  Reception Center Supervisor for B shift.

7    Q.   For B shift?

8    A.   For swing shift.

9    Q.   Swing shift?

10   A.   Or I think that was C, C shift.

11   Q.   Did Jun say anything to you?

12   A.   He laughed.  He thought I was joking.

13   Q.   Who else did you tell about this humping incident

14   other than Jun?

15   A.   I told Concierge Supervisor, Ray Ocasamora.  I

16   believe he was the supervisor for the concierge back then and

17   he works swing shift as well.

18   Q.   What did he say?

19   A.   Nothing.  He laughed.

20   Q.   Anybody else other than Jun, Ray and Rose?

21   A.   Yes.

22   Q.   Who?

23   A.   Han Jang Min.  He was the Assistant Night Manager

24   for graveyard.

25   Q.   Can you spell that for the court reporter?

1     A.    H-A-N space J-A-N-G space M-I-N.

2     Q.    Did he say anything?

3     A.    No.  He laughed as well.

4     Q.    Who else did you tell?

5     A.    Greg Perez and he's the Night Manager, Graveyard

6  Night Manager.

7     Q.    So were you pretty angry as a result of this humping

8  incident?

9     A.    I wasn't angry but I was -- like I didn't understand

10  why they took it like a joke.

11     Q.    You're telling a lot of people.  You're telling

12  Rose, you're telling Jun, you're telling Ray, Han, Greg.  Why

13  were you telling all these people?

14     A.    Because to me, at that time, I felt like if I told

15  somebody, then they'd know that it really happened.

16     Q.    Why did you think it was important for somebody to

17  know that it really happened?

18     A.    Because at that time, they might think that it's a

19  joke.  So I figured if I told someone else, they might

20  believe.

21     Q.    Did you think it was important that somebody believe

22  you?

23     A.    Yes.

24     Q.    Why?

25     A.    Because I was violated.

1    Q.   Okay.  You felt violated?

2    A.   Yes.

3    Q.   Did you tell Christina Camacho anything?

4    A.   After the incident?

5    Q.   Yeah.  You may have given me the answer, I just

6    can't remember what.  Did I ask you, did you say anything to

7    Christina?

8    A.   Yes, right after she humped me, I told her, you

9    know, I said stop it, you're scaring me and I stepped away.

10   And at the time, Christine Valencia, she was walking in from

11   the door, the side door.  She saw it or I'm not sure if she

12   saw, but when I looked at her, her eyes got big like she was

13   shocked.

14   Q.   You told all these people about this incident.  Did

15   you ever tell anyone about this humping incident that you

16   didn't want to work with Christina anymore?

17   A.   No, we didn't have a choice.  We just have to work

18   together.  I mean, we couldn't request, because when you work

19   front desk, you have to follow whatever the managers put you

20   for schedule.

21   Q.   So you never told anybody, I don't want to work with

22   Christina Camacho anymore?

23   A.   No.

24   Q.   You were eventually interviewed by May Paulino in

25   August of 2004, right?

March 21, 2007; Viviene Villanueva

1      A.    Yes, that's correct.

2      Q.    Do you remember that it was August 11, 2004?

3      A.    Yes, after lunch.

4      Q.    And Christina Camacho was fired two days later,

5  right?

6      A.    Yes, on the 13th.

7      Q.    So looking back on it now, do you think you made a

8  mistake in not reporting this humping incident to May

9  Paulino?

10     A.    I did report.

11     Q.    When's the first time you reported it -- well, on

12  August 11, right?

13     A.    No.  To the managers or supervisors?

14     Q.    I'm talking about May.

15     A.    No.

16     Q.    When's the first time you complained to May Paulino

17  about Christine Camacho?

18     A.    First time?

19     Q.    (Nodded head.)

20     A.    She -- About my incident?

21     Q.    Was the first time that you talked directly with May

22  Paulino about Christina Camacho, was that on August 11 when

23  May interviewed you?

24     A.    Yes.

25     Q.    Other than these people that you just mentioned

1  about the humping incident sometime in the first week of

2  June, Rose, Jun, Ray, Han and Greg, did you tell anybody

3  else?

4      A.   There were some staff that somehow like heard about

5  my incident and asked if it were true, but I could not recall

6  who.

7      Q.   Were these two Filipino guys?

8      A.   Filipino guys?

9      Q.   Yeah.

10     A.   (No response.)

11     Q.   You don't remember?

12     A.   (Witness shook head.)

13     Q.   Some staff heard about it and they asked you?

14     A.   If it were true and they thought that we're kidding,

15  so they wanted to confirm if it were true.

16     Q.   And what did you tell them?

17     A.   I told them that it's true.

18     Q.   After this humping incident, what's the next

19  incident of what you would consider sexual harassment that

20  you saw or witnessed with your own eyes?

21     A.   Christina -- we had a box of tissue at the front

22  desk and she took like a lot of it and stuffed it.  She

23  unzipped and she put it to the private area.

24     Q.   How many days or weeks after the humping incident

25  did this occur?

1      A.    I'm not sure but it was sometime in June.

2      Q.    So Christina stuffed tissue down her pants, right?

3      A.    Yes.

4      Q.    What else did she do on this tissue incident?

5      A.    She just said that "Oh, I have a dick."

6      Q.    Was there anything sticking out of her pants?

7      A.    No.  She just make it, you know, like make it look

8  like it's bulky.

9      Q.    Like it's bulky?

10     A.    Yes.

11     Q.    So she stuffed tissue down her pants and made it

12  look like she had a lump in her pants where a male penis

13  would be?

14     A.    Yes, and she was walking around, saying "Look, I

15  have a penis."

16     Q.    Okay.  Who else was there when this happened?

17     A.    I'm not sure who.

18     Q.    Did you tell her anything at all?

19     A.    To Christina?

20     Q.    Did you say anything to Christine?

21     A.    No.

22     Q.    Did you report this incident to anybody?

23     A.    No.

24     Q.    Did you go to May Paulino?

25     A.    No.

1    Q.    You didn't tell anybody about this incident?

2    A.    (Witness shook head.)

3    Q.    Okay.  After this tissue-stuffing incident, what's

4  the next thing that happened that you would consider being

5  sexual harassment that you saw?

6    A.    She -- we had a mannequin in the back office and she

7  did that hand of the mannequin and I saw her put the hand on

8  the pants, like touching like this. (Witness gestured.)

9    Q.    You got to kind of explain because the court

10  reporter can't really write gesturing, so try and explain

11  exactly what Christine did.

12    A.    We -- she wanted the hand of the mannequin to

13  scratch it, scratch her private area.

14    Q.    Was anybody else around who witnessed this?

15    A.    Yes.

16    Q.    Who?

17    A.    Rose.

18    Q.    I'm sorry?

19    A.    Rose Taimanglo.

20    Q.    Anyone other than Rose?

21    A.    There was more but I cannot recall who else.

22    Q.    Did you see anybody tell Christina to stop or take

23  the mannequin from her?

24    A.    Yes.

25    Q.    Who?

1      A.    Rose.  She told her to like stop, take it out,

2   that's not good.

3      Q.    What were Rose's exact words?

4      A.    Like stop, don't do that.

5      Q.    Did Christina stop?

6      A.    She eventually stopped but she laughed anyways.

7      Q.    And how long after the tissue incident did the

8   mannequin incident occur?  Are we in July yet?

9      A.    Maybe June, July.  I'm not sure.

10      Q.    Okay.  What's the next thing that happened after

11   this that you considered sexual harassment?

12      A.    (No response.)

13      Q.    Before you answer that, the mannequin incident, did

14   you think it was funny?

15      A.    No.

16      Q.    Was it your impression that Christina was trying to

17   maybe make a joke?

18      A.    No, she -- I guess she wanted us to see like it's --

19   the hand was scratching it.

20      Q.    You don't think that she was trying to be funny?

21      A.    No.

22      Q.    Was Christina -- did she joke around a lot?

23      A.    Joke in a clean joke or --

24      Q.    Any kind of joke?

25      A.    Yes.

1    Q.   Was she usually a nice person?

2    A.   Usually like in general?

3    Q.   Yeah, in general.

4    A.   She would -- she's a nice person, but in a way,

5    there's like a meaning to it; like she would say sexually --

6    sexual jokes.  I guess, you know, she would have been like --

7    continued on being nice if she stopped bothering people with

8    her sexual jokes.

9    Q.   Did you ever laugh at any of her jokes, even the

10   clean ones?

11   A.   Clean ones, yes.

12   Q.   Can you recall some clean jokes that she told or

13   jokes she made?

14   A.   No.

15   Q.   Did you consider Christina generally a happy person?

16   A.   Well --

17   Q.   Let me withdraw.  A better question is, was she

18   smiling a lot on the job?

19   A.   Sometimes.

20   Q.   After the mannequin incident, what's the next thing

21   that you saw happen that you would consider to be sexual

22   harassment?

23   A.   She would tell us about her sexual life, that she

24   had a girlfriend who worked at the Housekeeping Department

25   and she would describe how they have sex.

1      Q.   Viviene, I'm trying to go incident by incident but I

2  think you -- Let me try and clarify.  When you say she would

3  describe how she had sex with her girlfriend, was the first

4  time she ever did that after these first six incidents you

5  mentioned, after the mannequin incident?

6      A.   Was that the first time?

7      Q.   Yeah.

8      A.   That I could recall, yes.

9      Q.   And how did you react when she described how she had

10  sex with her girlfriend?

11      A.   I felt disgusted.

12      Q.   Did you tell her that?

13      A.   No.

14      Q.   Did you tell anybody that?

15      A.   No.

16      Q.   Did you tell anybody, I don't want to work with

17  Christine Camacho anymore?

18      A.   I had concerns that I initially asked Rose about her

19  behavior and she said that management were aware but cannot

20  release her yet because of short staff.

21      Q.   Were those Rose's exact words?  Excuse me, May's

22  exact words?

23      A.   May or Rose?

24      Q.   I'm sorry.  Rose.  Were those Rose's exact words?

25      A.   Not exact but to the best of my recollection.

1      Q.   This comment by Rose, was this after the first time

2  that Christine described having sex with her girlfriend?  Let

3  me withdraw that question.  When did this conversation with

4  Rose happen where Rose said management can't release her yet?

5      A.   Sometime in June -- July.

6      Q.   What's the next thing that happened that you would

7  consider to be sexual harassment?

8      A.   She would tell us that she used dildos with her

9  girlfriend.

10      Q.   I'm sorry?

11      A.   Dildos.

12      Q.   She would describe that she had used dildos on her

13  girlfriend?

14      A.   Yes, when they have sex.  And she would brag about

15  that her girlfriend's husband like knows and that the

16  girlfriend likes having sex with her than the husband.

17      Q.   Was anybody else around when she told you this?

18      A.   I don't remember.

19      Q.   Did you tell her to shut up because you're not

20  interested?

21      A.   No, I just moved away.

22      Q.   Moving ahead.  When --

23      A.   I'm sorry?

24      Q.   About when did this comment happen about Christine

25  describing how she liked to use a dildo with her girlfriend?

1       A.   I can't recall.

2       Q.   But it was sometime in July?

3       A.   I'm sorry, I don't remember.

4       Q.   The last two incidents of sexual harassment that you

5    described were both verbal, right?

6       A.   Yes.

7       Q.   Did anything happen of a physical nature that you

8    saw with your own eyes after these two verbal comments until

9    Christine was fired?

10      A.   Before she was fired?

11      Q.   Yeah, at any time between these two oral comments

12   that you consider sexual harassment, did anything happen

13   after those but before Christine was fired of a physical

14   nature?

15      A.   Yes.

16      Q.   What?

17      A.   August 10, Rose was slapped in the butt.

18      Q.   And you saw that?

19      A.   Yes.

20      Q.   Was it behind the front desk?

21      A.   Yes, it was.

22      Q.   Tell me what happened.

23      A.   I was on the left side and her and Rose and

24   Christina went on the opposite side and Rose was near the

25   door, like facing towards the door and Christine was, like

 1  she was following her and then all of a sudden, she slapped

 2  her really hard and her hand stayed there and Rose just got

 3  mad.

 4      Q.    What did Rose do?

 5      A.    She just got mad and told her, you know, "I warned

 6  you so many times but you still do it."

 7      Q.    What did Christina say?

 8      A.    She just said, "I'm sorry.  I couldn't help myself,"

 9  but she laughed, like she was laughing like she was happy.

10      Q.    Did you report this incident to anybody above Rose?

11      A.    No.

12      Q.    Why not?

13      A.    Because I don't want to make it my problem.  She's

14  not my responsibility.

15      Q.    After August 10, did you say it was August 10 was

16  the date you said?

17      A.    Yes, with Rose's butt slapping.

18      Q.    Things started to happen pretty fast then, right?

19      A.    Yes.

20      Q.    What happened next?

21      A.    On the next day, when she was told to go home --

22      Q.    Okay.  I think you got ahead of me there, but it was

23  my fault because I said what happened.  Rose got slapped on

24  the butt on August 10.  Shortly after that, did you get word

25  that May Paulino wanted to see you?

1      A.   On the 11th, I was called by Ms. Paulino to see her.

2      Q.   Okay.  What did May tell you when she called you?

3      A.   Over the phone, I don't exactly remember what she

4  said.

5      Q.   Did you go see her in her office?

6      A.   Yes, I did.

7      Q.   And it was downstairs at the HR office?

8      A.   Yes.

9      Q.   What did May tell you about why she wanted to see

10  you?

11      A.   Something about my incident with Christina.

12      Q.   And what did you tell Rose?

13      A.   What I did tell Rose or May?

14      Q.   Well, let me show what you we've marked as Exhibit

15  7.  May Paulino, at her deposition, which I think you were

16  at, right?  Were you at May's deposition?

17      A.   I was.

18      Q.   Okay.  Well, anyway, May testified at her deposition

19  that Exhibit 7 was an accurate transcript of what she said to

20  you and what you said to her on August 11th.  I'd like you to

21  take a minute to read that to yourself while we take a break.

22  Okay?

23                        (Off the record.)

24                        (Back on the record.)

25  BY MR. ROBERTS: (Continuing)

1    Q.    We're back on the record.   Viviene, did you have a

2  chance to read Exhibit 7 yourself?

3    A.    Yes, I did.

4    Q.    Did May leave anything out of what she talked about

5  with you?   Anything important?

6    A.    Yes.

7    Q.    Like what?

8    A.    In that meeting, she said about that she had talked

9  to Christina about her behavior and that she understands and

10  that she knows that she's not to talk to us or come near us

11  while there's investigation going on.

12    Q.    Okay.   So you're saying that during your meeting

13  with May on August 11, May told you -- I don't want to put

14  words in your mouth.   What did she tell you?

15    A.    That I had a conversation with Christina --

16    Q.    That May had a conversation with Christina?

17    A.    Yes, that Ms. May Paulino had a conversation with

18  Christina and they talked to her about her behavior and she

19  -- that Christina knows that she's not to speak to us or be

20  near us while there's investigation.

21    Q.    Do you see what May says that you said in the second

22  paragraph after Viviene?   Did you say those words to May?

23    A.    The second May?

24    Q.    The first Viviene.

25    A.    Since then?

1    Q.   Yeah, those words, "Since then, Christina does not

2    joke or talk to me."  Did you say those words?

3    A.   Yes, I did.

4    Q.   So what were you telling May, since the, was it the

5    humping incident?

6    A.   Yes, since my humping incident, that she does not

7    directly joke with me.

8    Q.   And why did Christina stop bothering you after the

9    humping incident?

10   MS. MORRISON:  Objection; calls for speculation.

11   BY MR. ROBERTS:  (Continuing)

12   Q.   You had told Christina to stop, right, after the

13   humping incident?

14   A.   After the incident?

15   Q.   Yeah.

16   A.   Like all her other -- or during the humping

17   incident?

18   Q.   Yeah.

19   A.   Yes, I told her.

20   Q.   After that, did she touch you anymore?

21   A.   Physically, no, and that she did not directly say

22   those things but I was still present.

23   Q.   So after you told her stop, she didn't physically

24   touch you anymore; correct?

25   A.   Correct.

1      Q.    And she didn't direct any unwelcome sexually

2  harassing verbal -- That's too long a question.  I withdraw

3  it.  She didn't direct any unwelcome sexual comments to you

4  personally after that?

5      A.    Not directly.

6      Q.    But you heard some nonetheless?

7      A.    Yes, I did.

8      Q.    Directed to other people?

9      A.    Yes, I did.

10     Q.    Did you tell her that you were comfortable working

11 with Christina after you told her no, don't do that anymore,

12 after the humping incident?

13     A.    Yes, because the question was, will you be

14 comfortable if Christina was to work at the front desk still.

15     Q.    And what did you tell her?

16     A.    Yes, that I would be, because I assume that with all

17 the incidents that had already happened, that management

18 won't release her because of short staff.  So I had no other

19 choice but to deal with it again and, you know, be more

20 watchful and careful the next time when she's gonna work.

21     Q.    Let me ask you directly:  On August 11, did you tell

22 May that you were comfortable working with Christina behind

23 the front desk?

24     A.    Yes, in response to her question, if she was going

25 to be -- still going to work at the front.