Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant LeoPalace Resort



**FILED**
DISTRICT COURT OF GUAM

SEP 1 0 2007 *mba*

**JEANNE G. QUINATA**
**Clerk of Court**

IN THE DISTRICT COURT
OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) CASE NO. 1:06-CV-00028 |
| | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| LEO PALACE RESORT, | ) |
| | ) |
| Defendant. | ) **FILING OF TRANSCRIPT OF** |
| JENNIFER HOLBROOK, | ) **DEPOSITION OF ROSEMARIE** |
| VIVIENE VILLANUEVA and | ) **TAIMANGLO IN SUPPORT OF MOTION** |
| ROSEMARIE TAIMANGLO, | ) **FOR PARTIAL SUMMARY JUDGMENT** |
| | ) |
| Plaintiff-Intervenors, | ) |
| vs. | ) |
| | ) |
| MDI GUAM CORPORATION dba LEO | ) |
| PALACE RESORT MANENGGON HILLS | ) |
| and DOES 1 through 10, | ) |
| | ) |
| Defendants. | ) |

Defendant Leopalace Resort hereby files with the court a copy of the transcript of the

deposition of Rosemarie Taimanglo in support of its motion for partial summary judgment.

DOOLEY ROBERTS & FOWLER LLP

Date:    September 10, 2007            By:  _____

**TIM ROBERTS**
Attorneys for Defendant

F:\Documents\TLR (07.04)\M108\M108-330\Pleadings\M108-330.PSJM-Filing of Deposition Transcript.doc

ORIGINAL

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) CASE NO. 1:06-CV-00028 |
| Plaintiff, | ) |
| vs. | ) |
| LEO PALACE RESORT, | ) |
| Defendant. | ) |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, | ) |
| Plaintiff-Intervenors, | ) |
| vs. | ) |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | ) |
| Defendants. | ) |

COPY

## *DEPOSITION OF ROSEMARIE TAIMANGLO*

*Taken on Behalf of the Defendant*

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of Rosemarie Taimanglo was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Tuesday, the 20th day of March 2007, at 9:00 a.m. in the Law Offices of Dooley Roberts & Fowler, 865 South Marine Corps Drive, Suite 201, Orlean Pacific Plaza, Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email: vreporter1@teleguam.net

Case 1:06-cv-00028   Document 64   Filed 09/07/2007   Page 2 of 70

DISK ENCLOSED

APPEARANCES


Appearing on behalf of the Plaintiff-Intervenors:

        TEKER TORRES & TEKER
        Suite 2A
        130 Aspinall Avenue
        Hagatna, Guam 96910
        By:  Mr. Philip Torres, Esq.
        Phone:  671.477.9891


Appearing on behalf of the Defendant:

        DOOLEY ROBERTS & FOWLER
        Suite 201, Orlean Pacific Plaza
        865 S. Marine Drive
        Tamuning, Guam 96913
        By:  Mr. Tim Roberts, Esq.
        Phone:  671.646.1222


Appearing on behalf of the Plaintiff:

        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
        333 S. Las Vegas Boulevard
        Suite 300
        Las Vegas, Nevada 89101
        By:  Ms. Angela D. Morrison, Esq.
        Phone:  702.388.5072

                ALSO PRESENT


Viviene Villanueva, Plaintiff

May Paulino, Leo Palace

Nichiro Niikura, Leo Palace

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email Document: reilly@guam.net
Case 1:06-cv-00008  Document 64  Filed 09/04/2007  Page 3 of 70

# I N D E X

## EXAMINATION

|  | Direct | Cross | Redirect |
|---|---|---|---|
| Mr. Roberts: | 4 |  | 130 |
| Ms. Morrison: |  | 129 |  |
| Mr. Torres: |  | (None) |  |

## EXHIBITS

Page

Exhibit 1: Notice of Deposition.......................4

Exhibit 2: Request for Production of Documents.........4

Exhibit 3: Authorization for Release of Records........4

Exhibit 4: October 11, 2004 letter....................16

Exhibit 5: 2005 Income Tax Return.....................23

Exhibit 6: 2006 Income Tax Return..................... 24

Exhibit 7: Leo Palace Resort Employee
Handbook.............................................. 33

Exhibit 8: MDI Employee Handbook..................... 35

Exhibit 10: Record of Counseling..................... 48

Exhibit 11: LRP 00001 document  ..................... 51

Exhibit 12: Statement ............................... 69

Exhibit 13: LRP 00189 document....................... 85

Exhibit 14: August 16, 2004 letter................... 102

Exhibit 15: August 19, 2004 letter................... 113

```
1                    ROSEMARIE TAIMANGLO,

2    called as a witness on behalf of the defendant, having first

3    been duly sworn, was examined and testified as follows:

4

5                    DIRECT EXAMINATION

6    BY MR. ROBERTS:

7        Q.   Hi.  This is the time and place set for the

8    deposition of Rose Taimanglo in District Court Civil Case

9    06-00028.  Exhibit 1 will be the Notice of Deposition that

10   scheduled this deposition, Exhibit 2 will be our Request for

11   Production of Documents served on January 31, 2007, and

12   Exhibit 3 will be an Authorization for the Release of Records

13   that I'll show you in one minute.

14            I guess I'll start by a statement.  Exhibit 2 is a

15   Request for Production of Documents.  It requested medical

16   records and wage losses.  I just got those documents recently

17   and I will reserve my right to redepose Ms. Taimanglo in the

18   event the late response to that request causes any prejudice

19   to me in taking your deposition today.

20            Rose, have you ever had your deposition taken

21   before?

22       A.   No.

23       Q.   How many depositions have you actually seen, other

24   than on TV?

25       A.   Two.
```

1    Q.    Those were last week of a Leo Palace representative?

2    A.    Yes.

3    Q.    Do you remember all those instructions that Attorney

4    Greg McClinton for the EEOC gave to those representatives,

5    all those deposition, what he called, ground rules?

6    A.    Do I remember everything he said?

7    Q.    Do you remember him giving certain ground rules?

8    A.    I remember him saying the ground rules but I don't

9    remember everything.

10   Q.    I'll tell you what they are again.  In conversation,

11   just on the street or with your family, people always tend to

12   talk over each other and finish each other's sentences and

13   the conversation goes fast.  If we do that today, it's going

14   to make for a messy deposition transcript, so I'd ask you to

15   wait, if you can, until I'm finished asking my question

16   before you start to give your answer.  Okay?

17   A.    Yes.

18   Q.    And I'll do the same courtesy for you.  I'll try to

19   wait until you're done answering my question before I start

20   to ask another one.  All right?

21   A.    All right.

22   Q.    And I see you're saying yes and all right.  That's

23   important, too.  In normal conversation, people nod yes when

24   they mean yes and shake their head sideways when they mean

25   no, but the court reporter can't take that down, so you have

1    to say your answers out loud.  All right?

2        A.    Yes.

3        Q.    You're sworn to tell the truth but these things

4    we'll be talking about today happened two and a half years

5    ago and sometimes people forget.  If I ask you what you had

6    for dinner last Wednesday, you probably wouldn't remember.  I

7    don't remember what I had for dinner last Wednesday.  So I

8    can't ask you to guess or speculate.  All I can ask for is

9    your best recollection.

10           If I ask for a specific date and you just don't

11   remember, please tell me I don't remember, but if you think

12   you know, then you can say I think I know, I think it's this.

13   And it's my job to figure out what you know, this is what you

14   think you know versus what you don't really know.  Okay?

15       A.    Yes.

16       Q.    Let me show you what we'll mark as Exhibit 3.  Can I

17   ask you if you've ever seen that document before?

18       A.    Yes.

19       Q.    Have you signed this document before or a copy of

20   this document?

21       A.    Yes, I have.

22       Q.    And do you remember why you did that?  Let me ask

23   you this:  Did you sign that so your Counselor, Lilli Perez

24   Iyechad, would be able to give your lawyer some medical

25   records?

1    A.    Can you repeat the question?

2    Q.    Yeah.  Did you sign this in Phil Torres's office?

3    A.    No.

4    Q.    Do you remember why you signed the document?

5    A.    Why?  My attorney, Philip Torres, had asked me to

6    sign it.

7    Q.    And you did sign it?

8    A.    Yes.

9    Q.    And then you returned it to Phil?

10   A.    Yes.

11   Q.    Rose, when were you born?

12   A.    November 26, 1969.

13   Q.    And where were you born?

14   A.    Guam.

15   Q.    Are you married?

16   A.    If I'm married right now?

17   Q.    Yeah.

18   A.    No, sir.

19   Q.    Have you ever been married?

20   A.    Yes, sir.

21   Q.    Are you divorced?

22   A.    Yes, sir.

23   Q.    Do you remember when you were divorced?

24   A.    About 1996.

25   Q.    How long were you married?

1    A.    About a year.

2    Q.    What was your husband's name?

3    A.    Roy Taimanglo.

4    Q.    What's your maiden name?

5    A.    Bocatija.  Rosemarie Bocatija.

6    Q.    B-O-C-A?

7    A.    T-I-J-A.

8    Q.    Did you go to high school?

9    A.    Yes, sir.

10   Q.    Where did you go to high school?

11   A.    George Washington High School.

12   Q.    Did you go on to get any education after high

13   school?

14   A.    Do you mean college?

15   Q.    Yeah.

16   A.    I went to University of Guam.

17   Q.    How many years did you go to UOG?

18   A.    Until -- I started 1988 and until 1990.

19   Q.    Did you get any sort of a degree?

20   A.    No, sir.

21   Q.    What was your major area of study, if you had one?

22   A.    I was taking the basic classes.  I didn't decide yet

23   what I wanted to be.

24   Q.    And after leaving UOG in 1990, did you go out and

25   get a job?

1      A.    I had a job already.

2      Q.    Okay.  What was your job?

3      A.    In the year of?  What year are you talking about?

4      Q.    What was your first job out of high school?

5      A.    I had a job before I got out of high school.

6      Q.    What was that job?

7      A.    I worked at Children's World.

8      Q.    Where?

9      A.    Children's World.

10     Q.    What's that?

11     A.    It's a toy store.

12     Q.    Is that in the Compadres Mall?

13     A.    No, sir.

14     Q.    Where is it?

15     A.    Agana Shopping Center.

16     Q.    And after that job, what was your next job?

17     A.    I worked at Pacific Star Hotel.

18     Q.    What years did you work for the Pacific Star?

19  That's the current Marriott Hotel?

20     A.    Yes, sir.  An estimation of the year?  I can't

21  really remember what year.

22     Q.    Yeah, just an estimation?

23     A.    1989 or 1990.

24     Q.    At the Pacific Star?

25     A.    Yes, sir.

1    Q.   Do you remember how many years you worked for the

2  Pacific Star?

3    A.   About a year -- or less than two years, sir.  Less

4  than two years.

5    Q.   Do you remember your rate of pay when you started

6  the job?

7    A.   At where, sir?

8    Q.   At Pacific Star?

9    A.   Pacific Star?  I don't remember exactly how much.

10   Q.   Do you remember what your rate of pay was when you

11 left Pacific Star?

12   A.   I don't remember the exact number.

13   Q.   Did you ever have any sexual harassment training at

14 Pacific Star?

15   A.   No, sir.

16   Q.   Did they ever put on any seminars by any outside

17 agencies or any internal seminars regarding sexual harassment

18 in the workplace?

19   A.   I don't remember.

20   Q.   Do you remember what job you took after Pacific Star

21 Hotel?

22   A.   When I left Pacific Star Hotel, what position?

23   Q.   Well, you started at Leo Palace in 1994, I think,

24 right?

25   A.   Yes.

1      Q.  So between your Leo Palace job and your Pacific Star

2   job, were you working?

3      A.  Like from what year?

4      Q.  At any time?

5      A.  In between -- from Pacific Star and Leo Palace?

6      Q.  Yeah.

7      A.  There was a time I wasn't employed.

8      Q.  Did you leave Pacific Star voluntarily?

9      A.  Meaning?

10     Q.  Were you fired?

11     A.  No.

12     Q.  Why did you leave Pacific Star?

13     A.  I took care of my daughter.

14     Q.  Okay.  And is that the reason you weren't working

15  for a while after your Pacific Star job and before your Leo

16  Palace job?

17     A.  Yes.

18     Q.  Because you had a daughter to take care of?

19     A.  Yes.

20     Q.  Okay.  While you were at the Pacific Star, did you

21  ever personally witness any incident of what you would

22  characterize as sexual harassment in the work place at

23  Pacific Star?

24     A.  No, sir.

25     Q.  At some point, I'm guessing, and tell me if I'm

1   guessing wrong or tell me if I shouldn't guess at all, your

2   daughter became old enough and you wanted to go back to work?

3       A.   Yes.

4       Q.   How old was your daughter when you decided to go

5   back to work?

6       A.   About three months old.

7       Q.   And so you started at Leo Palace in 1994?

8       A.   Yeah.

9       Q.   That's what I said to you, but do you remember?  I

10  mean, I said you worked at Leo Palace in -- you started

11  working there in 1994 and you agreed?

12      A.   Yes.

13      Q.   Is that a true answer?

14      A.   That I started in 1994?

15      Q.   Yeah.

16      A.   Yes.

17      Q.   Do you remember what your rate of pay was when you

18  first started?

19      A.   At Leo Palace Resort?

20      Q.   Yes.

21      A.   I'm not too sure, sir.

22      Q.   What was your first job when you were hired at Leo

23  Palace?

24      A.   I was a front desk clerk.

25      Q.   Was the Belvedere Hotel opened in 1994?

1    A.   No, sir.

2    Q.   So where was the front desk that you worked?

3    A.   I worked at the Club House.

4    Q.   And is that Club House is where all the hotel or

5    excuse me, all the condo and -- yeah, all the condo

6    reservations were done, right?

7    A.   (No response.)

8    Q.   Let me withdraw that question.  As a front desk

9    clerk in 1994 at the Club House, what were your job duties?

10   A.   We took care of the golf, the check-in and

11   check-out, we took care of the condo check-in and check-out.

12   Q.   Anything else?

13   A.   You want me to describe everything I did?

14   Q.   Oh, just in general, golf, reservations, condo

15   check-in and check-out; like what other kinds of things did

16   you do?

17   A.   That's basically it.

18   Q.   Did you ever get any promotions while you were

19   working at Leo Palace?

20   A.   Yes, sir.

21   Q.   And what were you promoted to?

22   A.   To?  Front desk supervisor.

23   Q.   Do you remember what year you were promoted to front

24   desk supervisor?

25   A.   No, sir.

1    Q.   Did you ever receive any pay raises while you were

2  at Leo Palace?

3    A.   Yes, sir.

4    Q.   I asked you what your rate of pay was when you first

5  started and you didn't remember, right?

6    A.   No, sir.

7    Q.   Do you remember what your rate of pay was when you

8  left Leo Palace?

9    A.   (No response.)

10    Q.   I just switched forward ten years to October of

11  2004.  Do you remember what your rate of pay was in October

12  of 2004?

13    A.   Yes.

14    Q.   What was it?

15    A.   $11.50 per hour.

16    Q.   You're working at Alupang Beach Tower today?

17    A.   Am I currently employed?

18    Q.   Yes, at Alupang Beach Tower?

19    A.   Yes.

20    Q.   Alupang?

21    A.   Yes, sir.

22    Q.   What's your job duty there?

23    A.   I'm -- My title?

24    Q.   Uh-huh.

25    A.   Assistant front office manager and lease manager.

```
 1      Q.   What's your rate of pay today at ABT, Alupang Beach
 2   Tower?
 3      A.   2,300 a month.
 4      Q.   Is that higher or lower than what you were being
 5   paid at Leo Palace when you left in October of 2004?
 6      A.   It's higher than Leo Palace Resort.
 7      Q.   Do you remember when you first started working at
 8   Alupang Beach Tower?
 9      A.   I'm sorry?
10      Q.   Believe me, I know these aren't the questions that
11   you probably came here thinking you were going to answer
12   right off the bat.  You'll have your chance.  I will ask you
13   about the things you want to testify about.  But I'm asking
14   these first so we can talk about other things later.  When
15   did you get your job at Alupang Beach Tower?
16      A.   When I first started?
17      Q.   Uh-huh.
18      A.   I started 2005 February.
19      Q.   Was that your first job after Leo Palace Resort?
20      A.   No, sir.
21      Q.   What was your first job after you left Leo Palace
22   Resort?
23      A.   I worked at Wells Fargo, Agana Branch.
24      Q.   What was your job title?
25      A.   Account representative 1.
```

1      Q.    Do you remember what your pay was there at Wells

2   Fargo?

3      A.    Yes.

4      Q.    What was it?

5      A.    12.50 an hour.

6      Q.    And how long did you work for Wells Fargo?

7      A.    About less than two months.

8      Q.    I can't remember if I asked you this:  Do you

9   remember when you first started working at Wells Fargo?

10     A.    I don't know exact date.  Late October 2004.

11     Q.    And you left Leo Palace in late October of 2004,

12   right?

13     A.    Yes.

14     Q.    Did you pretty much start at Wells Fargo right after

15   you resigned from Leo Palace?

16     A.    What do you mean?

17     Q.    Well, I'll show you.  I think I was unfair to you.

18   Let me show you what we'll mark as exhibit next in line which

19   I think is 4.

20                        (Exhibit 4 marked.)

21   BY MR. ROBERTS: (Continuing)

22     Q.    And this is LPR 58.  Rose, are these your letter of

23   resignation from Leo Palace?  Would I be correct in

24   characterizing this as your letter of resignation?

25     A.    Yes.

1    Q.   And did you write this on October 11 of 2004?   If
2    you don't remember the exact date --
3    A.   Yes.
4    Q.   And you gave it to Mr. Suzuki?
5    A.   Yes.
6    Q.   And then you began working for Wells Fargo in late
7    October of 2004?
8    A.   Yes.
9    Q.   Did you have the job with Wells Fargo already set up
10   before you resigned from Leo Palace?
11   A.   What do you mean?
12   Q.   Well, had you interviewed with Wells Fargo before
13   October 11 of 2004?
14   A.   Yes.
15   Q.   Do you remember about when you first interviewed
16   with Wells Fargo?
17   A.   No, sir.
18   Q.   And then you started working with Alupang Beach
19   Tower, you said, I think February, approximately 2005, or
20   approximately February of 2005?
21   A.   Yes.
22   Q.   And did I ask you what your rate of pay was when you
23   first started with Alupang?
24   A.   Yes, sir.
25   Q.   What was your answer?

*March 30, 2007: Rosemarie Taimanglo*

1      A.   2,300 a month.

2      Q.   I'm maybe confused.  I thought that's what you were

3  getting paid now at Alupang Beach Tower?  2,300 a month?

4      A.   I'm sorry?

5      Q.   Well, I thought you said 2,300 a month was what you

6  are getting paid now at Alupang rather than back in early

7  February of 2005?

8      A.   I'm sorry, did you ask how much I started with

9  Alupang Beach Tower?

10      Q.   Yeah.  That's what I'm asking now.  Do you remember

11  what your pay rate was when you first started working for

12  Alupang in February of 2005?

13      A.   I started out with $8.50 an hour at Alupang Beach

14  Tower.

15      Q.   So you went from a $12.50-hour job at Wells Fargo to

16  an $8.50-an-hour job at Alupang?

17      A.   Do you want me to explain?

18      Q.   Yes.  Yes, I do.  Please explain.

19      A.   I started at Wells Fargo at 2004 late October and I

20  had to quit my job on Wells Fargo, December 2004, because I

21  fell into depression because of what happened to me at Leo

22  Palace Resort.

23                      (Witness cried.)

24      Q.   You want to take a break?

25      A.   Yes.

1                 (Off the record at 9:35 a.m.)

2                 (Back on the record at 9:41 a.m.)

3   BY MR. ROBERTS: (Continuing)

4      Q.    We'll go back on the record. We've just taken a

5   short break. Rose, are you okay to continue with the

6   deposition?

7      A.    Yes.

8      Q.    You had just said before our break that you had

9   resigned your job at Wells Fargo because you had gone into

10   depression over what had happened to you at Leo Palace? Is

11   that what you said?

12      A.    I didn't resign.

13      Q.    From Wells Fargo?

14      A.    No.

15      Q.    Okay. How did you leave?

16      A.    I just woke up one day and I was emotionally

17   stressed and depressed that I just didn't go to work anymore.

18      Q.    Were you eventually let go or terminated by Wells

19   Fargo?

20      A.    I don't know what my status there when I left.

21      Q.    All right. Do you remember what your rate of pay

22   was at Wells Fargo when you left?

23      A.    When I didn't show up?

24      Q.    On your last day at work, what were you getting

25   paid?

1     A.    12.50 an hour.

2     Q.    And you started at Wells Fargo at 8.50 an hour?

3     A.    Wells Fargo?

4     Q.    Yeah.

5     A.    No, sir.

6     Q.    What was your rate of pay when you first started at

7 Wells Fargo?

8     A.    12.50 an hour.

9     Q.    And then you were getting paid 12.50 when you left

10 Wells Fargo?

11     A.    When I left?

12     Q.    When you stopped going?

13     A.    When I stopped working?

14     Q.    Yeah.

15     A.    Yes, I made 12.50 an hour.

16     Q.    For the entire time at Wells Fargo?

17     A.    Yes, sir.

18     Q.    And do you remember when you stopped working at

19 Wells Fargo?

20     A.    December 2004.

21     Q.    And then eventually, you went back to work at

22 Alupang Beach Tower in February of 2005, am I right?

23     A.    Yes.

24     Q.    And what was your rate of pay when you first started

25 at Alupang Beach Tower?

1    A.   $8.50 an hour.

2    Q.   I take it you've gotten raises over the years at

3  Alupang Beach Tower?

4    A.   An increase, yes, sir.

5    Q.   And at some point, you went from, I think you're

6  saying an hourly wage to a salary base of compensation,

7  right?

8    A.   Salary, yes.

9    Q.   You're on salary right now, right?

10   A.   Yes, sir.

11   Q.   How long have you been on salary at Alupang Beach

12  Tower?

13   A.   I don't remember.

14   Q.   But did you go on salary in connection with a

15  promotion that you got?

16   A.   Yes, sir.

17   Q.   What's the name of the company that owns Alupang?

18  Is it SSFM or something like that?

19   A.   JMSH.

20   Q.   Not even close. JM?

21   A.   SH.

22   Q.   SH.  Is that a Japanese-owned company?

23   A.   No, sir.

24   Q.   Chinese owned?

25   A.   No, sir.

1     Q.    Korean owned?

2     A.    Yes, sir.

3     Q.    Do you know what the JMSH stands for?

4     A.    Yes.

5     Q.    Can you tell me?

6     A.    J stands for Jay, M stands for Min, S stands for

7  Sung and H stands for Hee.

8     Q.    Do you remember, and this will be a tough question,

9  you started working for Alupang Beach Tower in February of

10 2004 at 8.50 an hour, right?

11    A.    Alupang Beach Tower, I started 2005.

12    Q.    I'm sorry, 2005.  My mistake.  February of 2005,

13 you started working for ABT, Alupang Beach Tower, at, did you

14 say 8.50 an hour?

15    A.    $8.50 an hour, yes.

16    Q.    Do you remember when your first raise was?

17    A.    No, sir.  I was promoted twice, that's why I can't

18 remember.

19            MR. ROBERTS:  Can we go off the record for one

20 second?

21            MS. MORRISON:  Sure.

22                        (Off the record at 9:46 a.m.)

23                        (Back on the record at 9:49 a.m.)

24            MR. ROBERTS:  Rose, Exhibits 5 and 6 are going

25 to be what appear to be your 2005 and 2006 tax returns, but

1    I'm going to need to make copies of these, so, unfortunately,

2    I'm going to have to go off the record again.

3                              (Off the record at 9:50 a.m.)

4                              (Back on the record at 9:51 a.m.)

5    BY MR. ROBERTS: (Continuing)

6        Q.    Rose, is Exhibit 5 your 2005 income tax return?  If

7    you know?

8        A.    (No response.)

9        Q.    Let me ask you a different way.  Do you know who

10   Librado Saludo is?

11       A.    Yes.

12       Q.    Who's that?

13       A.    He's the person who prepared the income tax.

14       Q.    And is his signature on Exhibit 5?

15       A.    Yes, sir.

16       Q.    Do you think that helps you remember if this is your

17   2005 tax return or at least part of your tax return?

18       A.    Yes, sir.

19       Q.    And so do you remember what your income was from any

20   source in 2005?

21       A.    From what date are you talking?

22       Q.    Entire 2005?  January 1, 2005 to December 31 of

23   2005?

24       A.    January --

25              MR. TORRES:  Objection; the document speaks for

1  itself.
2              THE WITNESS:  How much I made?
3  BY MR. ROBERTS: (Continuing)
4     Q.   Do you remember how much you made?
5     A.   Full year?  17,443.
6     Q.   And you were just reading from the document, right?
7     A.   Yes, sir.
8     Q.   Do you really remember what you made in that year?
9     A.   No, sir.
10    Q.   Exhibit 6, do you recognize Exhibit 6?  And, again,
11 Mr. Librado's signature is on that document, too.
12    A.   No, it's not.
13    Q.   It's not?
14    A.   No. (Witness pointed to document.)
15    Q.   Oh, okay.  But his name is there, right?
16    A.   Yes, sir.
17    Q.   Oh, this is a joint return, right?
18    A.   No.
19    Q.   Is that your signature?
20    A.   Yes, sir.
21    Q.   Okay.  And who prepared these tax returns for you?
22    A.   Saludo Enterprises.
23    Q.   And how much did these tax returns say that you
24 earned in 2006?  How much income?
25    A.   I'm going to read from what it says here.

1    Q.    Fine.

2    A.    $24,085.

3    Q.    And today, your salary at Alupang Beach Tower is

4  3,600 per month?  Or is it 2,600 per month?

5    A.    Right now currently?

6    Q.    Yes, currently?

7    A.    2,300 a month.

8    Q.    How much do you earn per year?

9    A.    I don't know.

10    Q.    Going back to your job at Leo Palace.  Are you with

11  me?

12    A.    Yes.

13    Q.    Going back to your job at Leo Palace, did you only

14  ever receive one promotion while you worked for that company?

15    A.    Yes, sir.

16    Q.    But did you receive more than one raise?

17    A.    Yes, sir.

18    Q.    Do you know Christina Camacho?

19    A.    Yes.

20    Q.    And do you remember generally she was fired in

21  August of 2004 from Leo Palace?

22    A.    Are you asking me if I just know it or I was told?

23  What do you mean by your question?

24    Q.    Do you know if Christine was ever fired from Leo

25  Palace?

1      A.    Yes.

2      Q.    Because you worked there for another couple of

3  months after she was fired, right?

4      A.    Yes.

5      Q.    And she never came to work anymore after the middle

6  of August of 2004; isn't that correct?

7      A.    (No response.)

8      Q.    I know what you're thinking.  I'll withdraw the

9  question.  You know that Christine was fired by Leo Palace in

10 August of 2004, right?

11     A.    Yes, I do know.

12     Q.    And you continued to work at Leo Palace until -- Can

13 I see the exhibits?  Until you resigned on October 11 of

14 2004; isn't that right?

15     A.    That's the date on my -- October 11 is the date on

16 my resignation letter.

17     Q.    Is that the date you resigned from Leo Palace?

18     A.    You mean my last day?

19     Q.    Yeah.  Well, I don't know, what's it say?  It says

20 your last day was October 23, it says that right there.

21 Right?

22     A.    Yes.

23     Q.    Did you ever get any raises at Leo Palace after

24 Christine Camacho was fired?

25     A.    No.

1      Q.   Let me take you back to 1994 again when you first
2  started working at Leo Palace.  Did you like your job?
3      A.   When I first started?
4      Q.   Uh-huh.
5      A.   Yes.
6      Q.   When's the first time in your ten year time that you
7  worked for Leo Palace that you started to not like your job?
8      A.   It's not like I don't like the job.  It's not that.
9      Q.   I'll try to ask it a different way.  You liked your
10 job in 1994 at Leo Palace, right?
11     A.   Yes.
12     Q.   In '95, did you like your job at Leo Palace?
13     A.   Yes.
14     Q.   Until the problem with Christine Camacho, did you
15 ever have any problems with management or co-employees at Leo
16 Palace?
17     A.   What do you mean by problems?
18     Q.   Before Christine Camacho, did you ever have any
19 arguments with any of your co-workers?
20     A.   Maybe we have disagreement about work.
21     Q.   And before the Christine Camacho incident, did you
22 ever have any arguments with any supervisor or manager at Leo
23 Palace?
24     A.   I'm sorry, can you repeat your question?
25     Q.   Do you remember when Christine Camacho incidents

1    started to happen?  Do you remember what month of what year?

2         A.    Yes.

3         Q.    When?

4         A.    2004 June.

5         Q.    Do you remember when she was hired?

6         A.    I don't know.

7         Q.    Before June of 2004, did you ever have any arguments

8    with any managers at Leo Palace?

9         A.    About work.  Maybe about work.

10        Q.    Go ahead.

11        A.    None I can think of anything.  Maybe about work,

12   that we disagree about work.

13        Q.    Before June of 2004, and that's about a ten-year

14   period of you working at Leo Palace, did you like your job

15   before 2004?

16        A.    I love my job at Leo Palace.

17        Q.    Go ahead.

18        A.    I always loved working at Leo Palace, even till the

19   last day.

20        Q.    When you say the last day, you mean the day --

21        A.    Even the day, my last day to work there, I still

22   love -- I loved working there.

23        Q.    Why?  What did you like about it?  Or excuse me,

24   what did you love about it?

25        A.    I loved the hours what Leo Palace had given me,

1    morning shifts, that I will be able to spend time with my

2    daughter, the benefits, I liked working with the customers.

3        Q.   What else?

4        A.   I just enjoy that job, being -- working at the front

5    office.

6        Q.   Before June of 2004, did you like your supervisor?

7        A.   Mr. Suzuki?  Are you talking about Mr. Suzuki?

8        Q.   Let me be fair to you.  Who was your supervisor on

9    the last day that you worked at Leo Palace?

10       A.   I work under Mr. Suzuki and Mr. Ijima.

11       Q.   How long had you worked under Mr. Suzuki and

12   Mr. Ijima before late October of 2004?

13       A.   I don't remember.

14       Q.   And that's fair enough.  Had it been a long time?

15       A.   Yes.

16       Q.   Do you remember was Mr. Suzuki hired after 1994?

17       A.   After 1994?

18       Q.   Yeah, were you working at Leo Palace when Mr. Suzuki

19   came onboard?

20       A.   You're talking about Suzuki S-U-Z-U-K-I, right?

21       Q.   Yeah, not Tsuzuki T-S-U-Z -- Not Tsuzuki, but

22   Suzuki?

23       A.   Suzuki, he started after 1994.

24       Q.   You were there when he was hired, right?

25       A.   Yes, I was working there already.

1      Q.    Okay.  Was he your supervisor when he was hired?

2      A.    Yes.

3      Q.    Were you on friendly terms with Mr. Suzuki?

4      A.    Meaning?

5      Q.    Did you like him?

6      A.    We got along.

7      Q.    Did you talk with him in English?

8      A.    Yes.

9      Q.    You don't remember when Suzuki-san was hired though,

10    do you?

11     A.    No.

12     Q.    Did you continue to get along with Mr. Suzuki after

13    the Christine Camacho incident started in June of 2004?

14     A.    After?

15     Q.    Yes.

16     A.    You want me to explain when we had disagreements

17    about --

18     Q.    Well, how about I'll withdraw the question and I'll

19    come back to this subject later.  Okay?

20     A.    (Witness nodded head.)

21     Q.    Before June of 2004, were you ever sexually harassed

22    on the job at Leo Palace?

23     A.    No, sir.

24     Q.    I'm asking June of 2004 because that's when you said

25    certain problems with Christine Camacho started to happen,

1  right?

2      A.   Can you repeat the question?

3      Q.   I think you said earlier that Christine Camacho --

4  there were certain problems that started when Christine

5  Camacho started in June of 2004.  That's why I'm using June

6  of 2004 as a date for asking you before and after.  Do you

7  understand?

8      A.   I'm sorry.  Can you repeat the question?

9      Q.   Yeah.  Here's my question:  Prior to June of 2004,

10 did you ever see any sexual harassment of anyone on the job

11 at Leo Palace?

12     A.   Like exactly what type of harassment are you talking

13 about?

14     Q.   What do you think sexual harassment is?

15     A.   Any vulgar language, any sexual language, it can be

16 physical, it can be verbal, is sexual harassment.

17     Q.   Any vulgar language you consider to be sexual

18 harassment?

19     A.   Any sexual vulgar language.

20     Q.   So if a co-worker is walking down the hallway and

21 says damn it, because she's mad about something, is that

22 sexual harassment in your mind?

23     A.   No.

24     Q.   So in your mind, does the particular language that

25 is vulgar have to be of a sexual nature to be sexual

1   harassment?

2       A.    Yes.

3       Q.    And then what physical things would you consider to

4   be sexual harassment?

5       A.    Physical harassment?  Sexual physical harassment?

6       Q.    Uh-huh.

7       A.    Smacking someone on their butt.

8       Q.    Okay.

9       A.    Grabbing someone's hand to touch their breast.

10      Q.    What else?  Physical things?

11      A.    Trying to reach in someone's -- under their skirt,

12  humping someone, sexually humping someone.

13      Q.    Did you ever see any of those physical things on the

14  job or hear any of those verbal things that you mentioned

15  before June of 2004 at Leo Palace Resort?

16      A.    The one I just mentioned?

17      Q.    Yeah, I asked you to define what you thought verbal

18  sexual harassment was and then I asked you to describe what

19  you thought physical sexual harassment was and you gave some

20  answers and did you ever see any of those kinds of harassment

21  on the job at Leo Palace before June of 2004?

22      A.    No, sir.

23      Q.    Did Leo Palace have an employee handbook while you

24  were there?

25      A.    I don't remember.

1          Q.    What I'll mark is Exhibit 7 is a fifteen-page

2     document entitled Leo Palace Resort Employee Handbook and

3     it's Intervenor bates-stamped 68 through 84.  And let me show

4     this to you, Rose, and tell me if you recognize this.  I can

5     also tell you this was given to me by your lawyer, but I have

6     no way of knowing where he got it.

7                           (Exhibit 7 marked.)

8          A.    What was your question, sir?

9     BY MR. ROBERTS:  (Continuing)

10         Q.    Have you ever seen a document that looks like this

11    before?

12         A.    Yes.

13         Q.    And you said you didn't remember if Leo Palace

14    Resort had an employee handbook.  Does this appear to you to

15    be a copy of a Leo Palace Resort Employee Handbook?

16         A.    It's a Leo Palace Resort Handbook, yes.

17         Q.    It is?

18         A.    Yes, sir.

19         Q.    Did you have a copy of this while you were working

20    at Leo Palace?

21         A.    You mean when I first started?  When I was hired?

22         Q.    Fair enough.  At any time, did you ever have an

23    employee handbook at Leo Palace?

24         A.    Was it ever given to me?

25         Q.    Uh-huh.

1      A.    Was it ever given to me by the management?  Is that

2  --

3      Q.    Well, no.  My question is:  Were you ever personally

4  in possession of any Leo Palace Resort Handbook at any time

5  during the ten years that you worked there?

6      A.    I did get -- I got a copy but I don't who I got the

7  copy from.  I don't remember.

8      Q.    Do you remember when you got the copy from?  When

9  you got the copy?

10     A.    When?  Sometime in June.

11     Q.    Of what year?

12     A.    2004.

13     Q.    This document, which is fifteen pages long, do you

14 know if this is a true copy of the document that you were

15 given in June of 2004?

16     A.    If I'm really sure?

17     Q.    Yeah.  Are you certain?

18     A.    No.

19     Q.    And do you know was it a manager, a co-employee that

20 gave you a copy of the handbook or someone else?

21     A.    I don't remember.  I know it's not from any of the

22 management.

23     Q.    But you're pretty sure that you first -- that you

24 got a copy of the handbook in June of 2004?

25     A.    Yes, I got a copy of it; yes.

1    Q.   Let me show you another document we'll mark as

2 Exhibit 8.

3                       (Exhibit 8 marked.)

4 BY MR. ROBERTS: (Continuing)

5    Q.   This is another book that's called an MDI Guam

6 Corporation Employee Handbook.  It's a lot longer though.

7 This has sixty-one pages.  Can I show you that and ask you if

8 -- well, what's the question I'm really going to ask?  Here

9 is what the question I'm going to ask is:  Do you know if

10 what you were given or what you received as an employee

11 handbook was the fifteen-page version that is Exhibit 7 or

12 the sixty-one-page version that is Exhibit 8?

13   A.   Mr. Roberts, this is all I remember.

14   Q.   The cover?

15   A.   This cover.

16   Q.   When you say this, you mean Exhibit 7, are you

17 referring to the leopard and palm tree logo?

18   A.   Yes, that's all I can remember.

19   Q.   That's okay.  I'm asking for your best memory.  I

20 said that at the beginning of the deposition and I meant it.

21 So you know you received an employee handbook, right?  At Leo

22 Palace?

23   A.   Not by the management.

24   Q.   I'm not asking you that.  You know you received an

25 employee handbook while you were at Leo Palace, right?

1     A.    Yes.

2     Q.    And you know you received it in June of 2004?

3     A.    Yes.

4     Q.    And you know it had the Leo Palace trade mark,

5 leopard and palm tree design?

6     A.    Yes.

7     Q.    Why did you get a copy?  What were the circumstances

8 that led to you getting a copy of the Leo Palace Employee

9 Handbook?

10    A.    My attorney asked for it.  Phil Torres asked for it.

11    Q.    In June of 2004?

12    A.    Yes.

13             MR. ROBERTS:  Let's go off the record.  Okay?

14                            (Off the record at 10:16 a.m.)

15                            (Back on the record at 10:33 a.m.)

16 BY MR. ROBERTS: (Continuing)

17    Q.    We just took a little break and we were talking

18 about the date that you first retrieved a copy of the Leo

19 Palace Resort Handbook.  After the break, do you have any

20 correction to make on your testimony just before the break on

21 when you first retrieved this handbook?

22    A.    Yes.

23    Q.    Okay.  And so what's the answer?  When did you first

24 retrieve this handbook?

25    A.    August 2004.

1    Q.    And it was Phil that said go get it, right?  Phil

2  Torres?

3    A.    Yes, sir.

4    Q.    How did you know where to find it?

5    A.    I think I -- I asked around.

6    Q.    On the job?

7    A.    Yes.

8    Q.    And what were you asking?

9    A.    If they had the Leo Palace Handbook.

10   Q.    Did you know it existed at the time?

11   A.    I wasn't sure.

12   Q.    Before August of 2004, you had never seen a copy of

13 MDI's Employee Handbook?

14   A.    No, sir.

15   Q.    And you weren't sure if one existed and so you asked

16 around to find out if it did, I'm hearing, right?

17   A.    Yes.

18   Q.    Do you remember who told you, yeah, it exists?

19   A.    No, sir.

20   Q.    Do you remember where you got a copy from?

21   A.    I don't remember who I got it from.

22   Q.    Do you remember somebody handing it to you or if you

23 went to a physical location and found it?

24   A.    I don't remember.

25   Q.    Do you remember if it was hard to find?

1    A.   I just don't remember.

2    Q.   Do you remember how many people you had to ask

3  before you were given a copy of this document?

4    A.   No, sir.

5    Q.   Do you remember if what you gave to Mr. Torres was

6  Exhibit 8 or 7 or some other document?

7    A.   I don't remember the contents of it.  I just

8  remember this logo being on the front.  That's all I --

9    Q.   Let me try and summarize your testimony and if you

10 disagree, let me know.  The document you gave to Mr. Torres

11 was a Leo Palace Employee Handbook?

12   A.   Yes, sir.

13   Q.   And it did have this logo on the cover of Exhibit 7

14 which is the leopard and palm tree logo?

15   A.   Yes.

16   Q.   Did what you give to Mr. Torres have a sexual

17 harassment policy in it?

18   A.   Yes, it did, sir.

19   Q.   And how do you know that?

20   A.   Because I looked.

21   Q.   You read it?

22   A.   Well, briefly read it.

23   Q.   Before you gave it to Mr. Torres?

24   A.   Yes, sir.

25   Q.   And before you gave this document, the Leo Palace

1    Handbook, to Mr. Torres, did you know that Leo Palace

2    prohibited sexual harassment in the workplace?

3         A.   Before I gave the handbook?

4         Q.   Yes.

5         A.   Yes, sir.

6         Q.   And how did you know that?

7         A.   I had training, sexual harassment training.

8         Q.   And that would have been in September of 2003?

9         A.   (No response.)

10        Q.   Let me ask a better question.  Was this sexual

11   harassment training that you received, was that at Leo

12   Palace?

13        A.   Yes, sir.

14        Q.   And was it before Christine Camacho was hired?

15        A.   Before, yes, sir.

16        Q.   Do you remember if it was in September of 2003?

17        A.   I don't remember if that's the month, but yes, 2003.

18        Q.   Who was the trainer?

19        A.   Mr. Borja.

20        Q.   Bill Borja?

21        A.   I don't remember his first name.

22        Q.   Do you remember the company that Mr. Borja was from?

23        A.   No, sir.

24        Q.   Where did this training take place?

25        A.   In the Club House, in one of the rooms.

1     Q.   Do you remember if Mr. Borja was from the Guam

2   Employer's Council?

3     A.   I don't know, sir.

4     Q.   Do you remember how you got notice that Mr. Borja

5   would be having a sexual harassment training seminar at Leo

6   Palace?

7     A.   I was -- if I was given notice?

8     Q.   Yeah.  Do you remember how you found out there was

9   going to be this seminar?

10    A.   (Witness nodded head.)

11    Q.   Tell me.

12    A.   Yes, sir.

13    Q.   Tell me.

14    A.   They put out a memo with all the names of the

15   employees that need to attend that training, the sexual

16   harassment training.

17    Q.   Was it more of an invitation and a sign-up sheet

18   kind of thing?

19    A.   No, sir.

20    Q.   Is it your recollection that you were instructed by

21   management to attend this training seminar?

22    A.   A letter that says there's going to be a sexual

23   harassment training and there was a list of names on that

24   paper.

25    Q.   And your name was on it?

1      A.    Yes, sir.

2      Q.    And so you went to this training seminar?

3      A.    Yes, sir.

4      Q.    And do you remember how many people were on the list

5  that you saw?

6      A.    I don't remember.

7      Q.    The people that were on list that you saw, did it

8  look like, if you can remember, there were people that were

9  generally in your department?

10     A.    It's different departments.

11     Q.    Uh-huh.

12     A.    Different departments.

13     Q.    Oh, I see.  There were different departments?

14     A.    Yes.  Employees from different departments.

15     Q.    That were represented on this list?

16     A.    That was on the -- yes, sir.

17     Q.    Do you know if more than one list went out to

18  different sets of employees?

19     A.    Do I -- I'm sorry?

20     Q.    The instructions that you were given with a list of

21  employees, to the best of your recollection, did that list

22  contain every single Leo Palace employee?

23     A.    No, sir.

24     Q.    All right.  I asked you this and you didn't

25  remember.  Can you give me just your best estimate of how

1    many names were on the list?

2        A.    My estimation?  Between ten and maybe less twenty.

3        Q.    Okay.  Fair enough.  Did you ever have any

4    understanding of why you and these other people were

5    instructed to go to this sexual harassment training seminar?

6        A.    I guess -- Do I understand why I'm going?  Yes, for

7    training, for the sexual harassment.

8        Q.    Okay.  Let me ask it like this:  You've been working

9    there nine years now?  1994 to 2003, right?

10       A.    I'm sorry?

11       Q.    Before this training in 2003, you'd been working for

12   Leo Palace for nine years, right?

13       A.    Yes, sir, about nine years.

14       Q.    And then one day, you get instructed by Leo Palace

15   to go to this sexual harassment training seminar put on by

16   Mr. Borja, right?

17       A.    Yes, sir.

18       Q.    Had there been any incidents that you're aware of,

19   of sexual harassment that prompted this seminar?

20       A.    (No response.)

21       Q.    That you were aware of?

22       A.    I don't know, sir.

23       Q.    Did you ever ask anybody, hey, how come I have to go

24   to this sexual harassment training seminar?

25       A.    I didn't ask.

1    Q.   Was the seminar held during working hours?

2    A.   Yes.

3    Q.   So did you get paid for the time you attended this

4    training seminar?

5    A.   Yes.

6    Q.   What did you learn about sexual harassment at the

7    seminar you attended?

8    A.   The different types of sexual harassment:  It could

9    be verbal, it could be physical and sexual harassment can

10   happen with opposite sex or the same sex and if it does

11   happen, if the harassment had happened, you could go to your

12   supervisor or to your manager or you can go to Human

13   Resource.

14   Q.   To report it?

15   A.   Yes, sir.

16   Q.   I'm going to go to a different time period now.

17   Earlier this morning, we were talking about you leaving your

18   job with Wells Fargo.  Remember that?

19   A.   (No response.)

20   Q.   Remember I was talking about it?

21   A.   Yes.

22   Q.   And I'd asked you when you think you left and you

23   said December of 2004.  Do you recall that?

24   A.   Yes, sir.

25   Q.   Do you remember what date it was in December that

1    you stopped going to work at Wells Fargo?

2         A.    No, sir.

3         Q.    Were you dating any co-employee in December of 2004?

4         A.    No, sir.

5         Q.    Did you ever date Angel Porton, the starter down at

6    the golf course?

7         A.    No, sir.

8         Q.    Did you attend the Wells Fargo Christmas party in

9    2004?

10        A.    Yes, sir.

11        Q.    Did you go with anybody?

12        A.    Yes, sir.

13        Q.    Who did you go with?

14        A.    With Angel.

15        Q.    But you weren't dating him?

16        A.    No.

17        Q.    Do you remember when the Christmas party was?

18        A.    In December.

19        Q.    Where was this Christmas party?

20        A.    At Hilton.

21        Q.    In one of the ballrooms?

22        A.    Yes, in one of banquet rooms, yes.

23        Q.    Okay, banquet room is a better name for it.  Was

24    your last day on the job at Wells Fargo after the Christmas

25    party or before the Christmas party?

```
 1      A.    After.
 2      Q.    Were you promoted to be a front desk supervisor
 3 before 2004?
 4      A.    Before 2004?
 5      Q.    At Leo Palace Resort?
 6      A.    Yes.
 7      Q.    Do you remember for how many years you had been the
 8 front desk supervisor before 2004?
 9      A.    I'm not sure, sir.
10      Q.    As a front desk supervisor, did you have the power
11 to hire people?
12      A.    No, sir.
13      Q.    Did you have the power to fire people?
14      A.    No, sir.
15      Q.    Did you have the power to discipline employees?
16      A.    Yes, sir.
17      Q.    And what forms of discipline did you have the power
18 to impose?
19      A.    Verbally warn them.
20      Q.    Could you send them home?
21      A.    No.
22      Q.    Could you suspend them?
23      A.    No.
24      Q.    Did you have the power to warn them in writing?
25      A.    Yes, sir.
```

1    Q.    And I call it writing up an employee.  Is that what
2    you would call it?

3    A.    Yes.

4    Q.    Like if somebody's doing something wrong, you say
5    I'm going to write you up unless you stop that.  Do you know
6    what I'm taking about?

7    A.    Yes.

8    Q.    Did you ever write up any employees as a supervisor?

9    A.    Yes.

10   Q.    Do you remember who?

11   A.    Larry.  Larry -- I don't remember his last name.

12   Q.    What did Larry do?

13   A.    He was always using vulgar language, teasing
14   employees.

15   Q.    What was Larry's job?

16   A.    Shuttle driver.

17   Q.    Were the shuttle drivers under your supervision at
18   Leo Palace Resort when you were a front desk supervisor?

19   A.    No, they had their own supervisor.

20   Q.    So how did you write up Larry?

21   A.    Because he was bothering the front desk.

22   Q.    So what did you do?

23   A.    I spoke to May about it.

24   Q.    Did May tell you to do anything?

25   A.    Yes.

1    Q.    What did she tell you to do?

2    A.    She said that she wanted me to write a letter of

3  what he was doing and so I did what she instructed me to do.

4    Q.    And who did you give the letter to?

5    A.    May Paulino.

6    Q.    Do you know if May did anything as a result of your

7  letter?

8    A.    Yes.

9    Q.    What did she do?

10   A.    What she did exactly, I know she talked to him.

11   Q.    To Larry?

12   A.    Yes.

13   Q.    As a result of your letter?

14   A.    Yes.

15   Q.    And did Larry correct his behavior?

16   A.    He stopped talking to the employees.  He just didn't

17  want to talk to any employees after that.

18   Q.    So that's certainly a form of correcting his

19  behavior, right?

20   A.    Yes.

21   Q.    Let me mark another exhibit.  Well, first, before I

22  mark it, let me show you Intervenor Documents 94 and 93.  Is

23  this your handwriting on this document?

24   A.    Yes.

25   Q.    And then let me show you another document.  Well,

1  first, we'll mark this document as an exhibit, 9, and then

2  we'll figure out how many pages this exhibit is supposed to

3  have.  Do these two pages on this exhibit go together or are

4  they -- Let me ask it in a different way.  Do you recognize

5  the document that's stamped No. 93 that is chronologically in

6  sequence before the document that's marked 94?

7      A.    If this one --

8      Q.    Yeah, do these two pages go together?

9      A.    I don't know, sir.

10     Q.    Okay.  What is Exhibit 10?

11           MR. ROBERTS:  I've lost my markers.  Let's go

12 off the record.

13                         (Off the record at 10:50 a.m.)

14                         (Back on the record at 10:53 a.m.)

15                         (Exhibit 10 marked.)

16 BY MR. ROBERTS: (Continuing)

17     Q.    What is Exhibit 10?

18     A.    It's my notes, sir.

19     Q.    It's entitled Record of Counseling, right?

20     A.    Yes, sir.

21     Q.    And it has the name of Christine Camacho on the top.

22 Do you see that?

23     A.    Yes, sir.

24     Q.    And so can you describe what else this might be

25 other than just your notes?

1       A.    (No response.)

2       Q.    Let me strike that question.  Do you remember

3    writing this?

4       A.    Yes.

5       Q.    Do you remember why you wrote this?

6       A.    Why I wrote it?  Because of the incidents on June

7    regarding Christina had been sexually harassing Viviene,

8    other employees, and so I took notes and in July, just for my

9    own notes.

10      Q.    And when I was talking earlier about writing up an

11   employee, is that what this document is?  Were you writing up

12   Christine?

13      A.    No, I wasn't writing her up, sir.  I was taking

14   notes on my own.  This is my notes.  I wrote it on this paper

15   recording her counsel.

16      Q.    This form, this record of counseling, is it fair to

17   say this is the form that was available to you to make a

18   complaint or to write up an employee that you supervised or

19   in Larry's case, another employee, for doing something wrong

20   at work, right?

21      A.    Yes.

22      Q.    This is the form you're supposed to use?

23      A.    Yes.

24      Q.    And so what are you supposed to do with this form

25   after you fill it out?

1      A.    I'm supposed to inform Mr. Suzuki first.

2      Q.    That you're going to write a report?

3      A.    Yes.

4      Q.    And then you fill out this report, like Exhibit 10,

5 right?

6      A.    Yes.

7      Q.    And then what do you do with the report after that?

8      A.    After I speak to my manager?

9      Q.    Yes.

10     A.    Turn it in to Human Resource.

11     Q.    Do you know if you turned in Exhibit 10 to Human

12 Resources?

13     A.    No, sir.

14     Q.    You didn't?

15     A.    No, sir.

16     Q.    You remember that you didn't, right?

17     A.    Yes.

18     Q.    Why not?

19     A.    I don't know.

20     Q.    And if you know the answer to this, fine, if you

21 don't, that's fine.  Do you know what Human Resources would

22 then do with this record of counseling after it's received it

23 from a supervisor?

24     A.    (No response.)

25     Q.    That may be a bad question.  I'll ask a more

1  specific question.  After you turned this over to Human

2  Resources, is Human Resources supposed to put it in the

3  employees's personnel file among other things?

4      A.    Yes.

5      Q.    I'll mark this as Exhibit 11.

6                      (Exhibit 11 marked.)

7  BY MR. ROBERTS: (Continuing)

8      Q.    Did you have access to Christine Camacho's personnel

9  file since you were a supervisor?

10     A.    No.

11     Q.    If you had officially written up Christine Camacho,

12 would you expect that report to be in her personnel file?

13                 MS. MORRISON:   Objection; calls for speculation.

14 BY MR. ROBERTS: (Continuing)

15     Q.    Go ahead and answer.

16     A.    I'm sorry.  Can you repeat the question?

17     Q.    Yeah.  I'll ask the question again subject to the

18 EEOC's attorney's objection.  If you had ever written

19 Christina up in a formal way by using this record of

20 counseling represented by Exhibit 10, would you expect that

21 record of counseling to be in Christina Camacho's personnel

22 file somewhere, subject to her objection?

23     A.    If I wrote that, would it be in Christina's file?

24     Q.    Would you expect it to be in Christina's personnel

25 file?

1      A.    Yes.

2      Q.    What complaints did you have against Christine

3   Camacho when you wrote Exhibit 10?

4             MS. MORRISON:   Objection; vague.  Go ahead and

5   answer.

6   BY MR. ROBERTS: (Continuing)

7      Q.    Could you read Exhibit 10 for us in the record?

8             MS. MORRISON:   And I'll say the document speaks

9   for itself.

10  BY MR. ROBERTS: (Continuing)

11     Q.    In response, it's handwritten and I can't understand

12  it all, so it speaks for itself but it's confusing.

13     A.    Read?

14     Q.    Yeah, can you read your handwriting for the record

15  subject to your attorney's objection or the EEOC attorney's

16  objection.

17     A.    Spoke to May, HR on July 1st regarding about

18  employee.  Spoke to employee on July 6, Tuesday, regarding

19  behavior, gave verbal warning.  July 2nd, employee left at

20  1:55 p.m. to do room check and came back at 2:45 and she did

21  only two rooms.

22     Q.    Can I stop you there?

23     A.    (Witness nodded head.)

24     Q.    Is that conduct that you're complaining about there,

25  is that what you're talking about when you are writing about

 1  Christine's behavior?  Performing a room check inadequately?

 2  Is that what you're talking about?  Let me strike that and

 3  ask it a different way.

 4        You wrote, July 2nd, employee left at 1:55 p.m. to

 5  do room check and came back at 2:45 p.m. and she did only two

 6  rooms.  Just before that, you wrote, "Spoke to employee on

 7  Tuesday regarding behavior and gave verbal warning."  Were

 8  you --

 9        MR. TORRES:  Spoke to May, HR.  Oh, I'm sorry.

10  BY MR. ROBERTS: (Continuing)

11     Q.   There's three sentences that start this out.  The

12  first one is spoke to May, HR on July 1 regarding about

13  employee, period.  The second one is spoke to employee on

14  Tuesday, July 6, regarding behavior, gave verbal warning,

15  period.  So far, this document doesn't describe what behavior

16  you mean, right?  Would you agree with me?

17     A.   Yes, on that, it doesn't.

18     Q.   The third sentence is, July 2nd, employee left at

19  1:55 p.m. to do room check and came back at 2:45 and she did

20  only two rooms.  Does the third sentence refer to the

21  behavior you're referring to in the first and second

22  sentences?

23     A.   No, sir.

24     Q.   In the first and second sentences, what behavior are

25  you referring to?

1     A.   Sexual behavior, harassment.

2     Q.   Why didn't you say that?

3     A.   Why didn't I say?  These are my notes.  It's not

4  clear, because this paper, sometimes I would put it in the

5  drawer and I didn't want someone to read it and know exactly

6  what I'm referring to.

7     Q.   On those occasions, why wouldn't you want somebody

8  to know what you're referring to in a record of counseling?

9          MS. MORRISON:  Objection; mischaracterizes what

10  she described this exhibit as.

11          MR. ROBERTS:  Can you read the witness's answer

12  back to me?

13                    (Reporter read back.)

14  BY MR. ROBERTS: (Continuing)

15     Q.   What did you mean by your answer?

16     A.   The sexual harassment, it needs to be confidential,

17  so that's what I meant.  You don't want somebody reading

18  something about sexual harassment and then you're not making

19  it confidential.  If someone were to actually read that, then

20  you're not making it confidential.  Like right now, it's not

21  clear to you what I'm talking about.

22     Q.   What was your purpose in preparing Exhibit 10?

23     A.   For preparing it, it's my notes that I would show

24  Suzuki in a later time what notes I'd been taking regarding

25  Christina's sexual behavior and her performance in the job,

1   too.

2       Q.   So you had a concern about her actual job

3   performance aside from the matters of a sexual nature?

4       A.   It's mostly her sexual behavior, sir.

5       Q.   But that's not my question.  As Christine's

6   supervisor, you thought she was a lousy employee, right?

7       A.   She slacks off.

8       Q.   On the job?

9       A.   Yes, sir.

10      Q.   She wasn't doing her job right, you felt?

11      A.   Yes, sir.

12      Q.   And that was one of the reasons that you wrote what

13  you wrote in this exhibit, right?

14      A.   Yes.

15      Q.   When you spoke to May Paulino on July 1 regarding

16  Christine Camacho, is that about her sexual behavior?  Is

17  that what you talked about with May, sexual behavior?

18      A.   Yes, sir.

19      Q.   Is that the first time you ever spoke with May

20  Paulino about it?

21      A.   Yes, sir.

22      Q.   What did you say to May?

23      A.   I told her on July 1st that Christina had sexually

24  humped Viviene and she acknowledged that she knows about it

25  because of Greg's letter of concern, complaint.

1    Q.   What were May's exact words?

2    A.   Letter of complaint that --

3    Q.   Do you believe May had actually received a memo from

4  Greg Perez when you first spoke with her on July 1?

5    A.   I'm sorry.  Can you repeat the question?

6    Q.   Do you believe that May Paulino had already received

7  a memorandum from Greg Perez as of July 1?

8    A.   Yes, sir.

9    Q.   And why do you believe that?

10   A.   Because when I went to see her on July 1st, she

11 acknowledged that in a meeting, that she did receive letters

12 -- Greg's letter of complaint.

13   Q.   Are you sure she didn't say Greg had mentioned it to

14 her and he was going to send her a letter?

15   A.   No, sir.

16   Q.   Did you give Greg's letter of complaint to May?

17   A.   I had put it with the incoming mail.

18   Q.   What do you mean with the incoming mail?

19   A.   The front office receives incoming mail.  All

20 incoming mails, it's received at the Hotel Belvedere front

21 desk and with that mail or any messages for HR, it's put in

22 there.

23   Q.   Put in where?

24   A.   Put together and given to our bell service to bring

25 down to the Human Resource office.

 1      Q.    Who gave you the letter to put with the incoming

 2   mail to HR?

 3      A.    Greg himself.

 4      Q.    And when did he do this?

 5      A.    In June 2004.

 6      Q.    Can you be a little more specific?

 7      A.    I don't remember the exact date, sir.

 8      Q.    When Greg gave you the letter, did he show the

 9   letter to you or was it in an envelope?

10      A.    An envelope, sir.

11      Q.    What kind of envelope?

12      A.    I don't remember.

13      Q.    And did you open the envelope?

14      A.    No, sir.

15      Q.    So you don't know what was in the envelope, right?

16      A.    I'm sorry?

17      Q.    What did Greg tell you when he gave you this

18   envelope?

19      A.    Before he gave me the envelope, we actually spoke

20   prior to that already, that May had told him to give him --

21   to give her a letter stating Christina's sexual behavior, the

22   complaint, and --

23      Q.    What did Greg say again?

24      A.    Greg told me that he had spoke to May and May had

25   instructed him to provide a letter of complaint.

1    Q.    What kind of letter of complaint?

2    A.    About Christina's sexual behavior.

3    Q.    Greg told you this?

4    A.    Yes, sir.

5    Q.    And that's before he gave you this envelope to

6  deliver to HR?

7    A.    Not deliver, it was put together with the incoming

8  mail.

9    Q.    And when Greg handed you the envelope, did he say

10 anything?

11   A.    Yes.

12   Q.    What did he say?

13   A.    He said this is the letter for Christina's -- that

14 you need to give it to May.  It's not formal, like this is

15 the letter -- you know, he didn't open the envelope, if

16 that's what you're trying to ask.

17   Q.    I'm just trying to get your best recollection about

18 this incident.  That's all.

19   A.    He told me that was the letter regarding the

20 complaint against Christina's sexual behavior, then I just

21 put it together with the incoming mail.

22   Q.    And you say you don't remember what kind of

23 envelope?

24   A.    No, sir.

25   Q.    Do you remember what color the envelope was?

1      A.    No, sir.

2      Q.    Do you remember if it was a normal-size-letter

3  envelope or an 8x11 packet or a folder?

4      A.    I don't remember what kind of envelope.

5      Q.    Do you remember looking at who it was addressed to?

6      A.    I don't remember.

7      Q.    Did Greg tell you about any specific incident that

8  he was going to report to May about?

9      A.    Regarding Viviene's incident, sir.

10     Q.    And what was Viviene's incident, in your

11  understanding?

12     A.    Christina sexually humping Viviene.

13     Q.    But you didn't see that, right?

14     A.    No, sir.

15     Q.    Did Greg tell you that or did Viviene tell you that?

16     A.    That?

17     Q.    Do you remember how you found out how this incident

18  had occurred?

19     A.    Yes.

20     Q.    How?

21     A.    Viviene told me about it.

22     Q.    What did Viviene say?

23     A.    She was actually scared to -- she was scared to --

24  she was scared when she was telling me about it.  She told me

25  that Christina -- what Christina has done to her, then I told

1   her that I'm going to talk to the manager about it.

2       Q.   And did you?

3       A.   Yes.

4       Q.   And that was May?

5       A.   No, sir.

6       Q.   Who was it?

7       A.   The first manager I told was Greg.

8       Q.   And, again, what specific incident are we talking

9   about?

10      A.   About Viviene's incident where Christina had

11  sexually humped her.

12      Q.   And you're sure it wasn't about Christina slapping

13  her butt?

14      A.   Whose butt?

15      Q.   Viviene's.

16      A.   No.  No, sir.

17      Q.   You're sure?

18      A.   Yes.

19      Q.   So assuming that you testified that May got this

20  letter from Greg Perez, what do you think May should have

21  done about it?

22      A.   She should have investigated.

23      Q.   Did you think she should have fired Christine on the

24  spot?

25      A.   No, she should have -- she should investigate it

1  first before coming to a conclusion.

2      Q.   And what do you think that investigation should have

3  consisted of?

4      A.   She should have called Viviene and get Viviene's

5  statement of the incident.

6      Q.   And Christine as well?

7      A.   Yes, sir.

8      Q.   May did that eventually, didn't she?

9      A.   In August 11.

10     Q.   Yeah, but I mean May did do those things eventually,

11 right?

12     A.   Yes, in August 11, sir; yes.

13     Q.   Do you have any personal knowledge of when Leo

14 Palace Resort management first became aware that Christina

15 Camacho was engaging in inappropriate conduct on the job?

16     A.   On June 2004.

17     Q.   I'm talking about management now.

18     A.   Yes.

19     Q.   Okay.  Why do you say they should have become aware

20 of inappropriate conduct on Christina's part in June of 2004?

21     A.   Well, Greg and I both reported it.

22     Q.   Approximately when?

23     A.   June 2004.

24     Q.   Do you think it was toward the latter part of June?

25     A.   For me?  My --

1    Q.    Yeah, what you know.

2    A.    I actually spoke to Suzuki the ending of June.

3    Q.    And what did you tell Suzuki?

4    A.    About Christina sexually harassing the employees.

5    Q.    What did you tell him specifically?

6    A.    I told him about Viviene's incident.

7    Q.    The humping incident?

8    A.    Yes, sir.  And with Christina using sexual language

9    to employees, including myself, and that he -- he also had

10   witnessed Christina Camacho putting paper towel in her pants

11   to shape it like a penis.  He had witnessed that.

12   Q.    How do you know?

13   A.    Because I was there and he actually got mad at her.

14   Q.    Suzuki did?

15   A.    Yes.

16   Q.    How did he manifest his anger?

17   A.    He went to her and he gestured his hand like -- like

18   stop it.  He called her *baka*.

19   Q.    What's *baka* mean?

20   A.    Stupid in Japanese.  Then I remember Christina left

21   to go to the rest room and I guess remove the paper towels

22   from her pants.

23   Q.    Okay.  You speak a little Japanese, right?

24   A.    Yes.

25   Q.    You were learning on the job, I think?

1    A.    Yes.

2    Q.    And how were you learning Japanese on the job?

3    A.    (No response.)

4    Q.    Who was teaching you, if anyone?

5    A.    Not teaching, I took the initiative to ask how to

6  say something and then I would practice it.

7    Q.    Who did you usually talk to about Japanese words at

8  Leo Palace?

9    A.    Different managers.

10   Q.    Did you ever get help from Suzuki?

11   A.    Yes.

12   Q.    And from Ijima?

13   A.    Ijima, I don't recall if I ever.

14   Q.    In your mind, if May Paulino had investigated the

15 Viviene Villanueva humping incident as reported to her by

16 Greg Perez and the allegation was true, what would have been

17 the appropriate thing for May to do with respect to

18 Christina?

19   A.    She should have investigate the incident, of course

20 interview the parties involved or any witnesses or so forth,

21 thoroughly, or --

22   Q.    I interrupted you.  Go ahead.

23   A.    Or she could have actually reviewed the surveillance

24 camera.  We have one at the front desk, behind the front

25 desk.

1    Q.   How do you know she didn't?

2    A.   Because she's still employed.  Why would they --

3    Q.   Well, here's my question:  Assuming that May had

4  investigated and determined that the humping incident did in

5  fact occur between Christine and Viviene - now she's

6  determined it did occur - what would be the appropriate

7  course of action for May to take at that point?

8    A.   After she did an investigation?

9    Q.   Yes.

10        MR. TORRES:  You're asking her opinion?  Not any

11  legal?

12        MR. ROBERTS:  Yeah.

13  BY MR. ROBERTS: (Continuing)

14    Q.   Your view, I'm asking for your view.  In your view,

15  May investigates and finds out yeah, this humping incident

16  happened.  I'll make the question easier for you.  Do you

17  think May should have immediately terminated Christina on the

18  spot or do you think less drastic sanctions would have been

19  appropriate?

20    A.   Fired her.

21    Q.   On the spot?

22    A.   Yes.

23    Q.   For a single incident?

24    A.   Yes -- No, it's not a single incident.  It's not a

25  single incident.  It's not a single incident.

1    Q.   Well, what did Greg tell you he reported to May?

2    A.   About Viviene's incident.

3    Q.   Okay.  That's, I guess, the nature of my question.

4    A.   Yes.

5    Q.   As far as you knew, Greg only reported to May about

6    a single incident and that was Viviene being humped by

7    Christine Camacho, right?

8    A.   Yes.

9    Q.   And so if that's in fact what Greg told May, then

10   all May knows about is a single incident and she investigates

11   it, finds out this single incident occurred.  Should May have

12   fired Christina based on this single incident?  Or suspended

13   her, disciplined her or some other less drastic sanction?

14            MS. MORRISON:  And this is still her opinion?

15            THE WITNESS:  (Witness nodded head.)

16   BY MR. ROBERTS: (Continuing)

17   Q.   In your opinion?

18   A.   She should have called a manager and the manager can

19   explain that incident, then she should ask opinions about

20   other employees, if they were subjected to that.

21   Q.   Oh, okay.  I think you're saying that if --

22   A.   Because that's a serious accusation, sexual

23   harassment is a very serious accusation and I think it's very

24   serious and they should not take it lightly.

25   Q.   Well, they fired her, right?

1          MS. MORRISON:  Objection; argumentative.

2          THE WITNESS:  After over two months of ongoing

3   sexual harassment, I don't call that responsible.

4   BY MR. ROBERTS: (Continuing)

5      Q.   Well, let's see.  You think management first became

6   aware in late June that there were sexual harassment going

7   on?

8      A.   I wouldn't say late June.

9      Q.   I thought you did say that.

10     A.   The letter was provided, for what I know, third week

11  of June.  So they knew as early as June.

12     Q.   And then she was fired on August 13, right?

13     A.   Yes, because she didn't show up anymore to work.

14     Q.   So it's not two months, is it?

15         MS. MORRISON:  Same objection; argumentative.

16         THE WITNESS:  Mr. Roberts, sexual harassment

17  didn't just occur in August 10.  It occurred since June,

18  early June.

19  BY MR. ROBERTS: (Continuing)

20     Q.   Well, now you're saying early June.  What incident

21  in early June are you aware of that constitutes sexual

22  harassment that Leo Palace management should have known

23  about?

24     A.   (No response.)

25     Q.   Christine Camacho was hired on June 5th.  Do you

1  remember that?

2       A.   I don't know, sir.

3            MS. MORRISON:  Objection; lacks foundation.

4            THE WITNESS:  I don't know, sir.

5  BY MR. ROBERTS: (Continuing)

6       Q.   Okay.  Well, Christina could not have started

7  harassing people at Leo Palace before she was hired, right?

8       A.   Yes.

9       Q.   And when did you first personally go to management

10 complaining about Christine Camacho?

11      A.   Ending of June.

12      Q.   And do you have any knowledge, any personal

13 knowledge, that Leo Palace management was on notice of sexual

14 harassment before the day you went to management in late

15 June?

16            MS. MORRISON:  Objection; calls for a legal

17 conclusion as to notice.

18            THE WITNESS:  I'm sorry.  Can you repeat the

19 question, sir?

20 BY MR. ROBERTS: (Continuing)

21      Q.   Yeah.  As far as you know, was that the first time

22 that anyone reported to management that Christine Camacho was

23 engaging in inappropriate activity was when you went to

24 management in late June?

25      A.   Yes, sir.

1           MS. MORRISON:  Tim, do you mind if we take a

2    quick break?

3           MR. ROBERTS:  Not at all.

4           MS. MORRISON:  Okay.  Thanks.

5                        (Lunch break at 11:28 a.m.)

6                        (Back on the record at 1:03 p.m.)

7                        (Mr. Torres not present.)

8    BY MR. ROBERTS: (Continuing)

9       Q.   We're back on the record after a lunch break.

10   You're still under oath and you're still sworn to give me

11   your best testimony and to try and remember as best you can,

12   okay?

13      A.   Yes.

14      Q.   I think we've stipulated with Phil that Christine

15   Camacho was hired on May 10 of 2004, so that's now on the

16   record.  You can assume that's true, okay?

17      A.   Yes.

18      Q.   All right.  And you have said that you believe you

19   personally first went to management in late June or the third

20   week in June of 2004?

21      A.   Yes.

22      Q.   Did you go to Greg Perez?

23      A.   On June 2004?

24      Q.   Well, you went to management in June of 2004, right?

25      A.   Yes.

1    Q.    Just so I'm clear, who did you go to?

2    A.    I went to Greg first.

3    Q.    And it's your understanding that Greg then followed

4    up with May Paulino?

5    A.    Yes.

6    Q.    We'll make this another exhibit, this will be

7    Exhibit 12.

8                         (Exhibit 12 marked.)

9    BY MR. ROBERTS: (Continuing)

10   Q.    This will be Exhibit 12 and it appears to be a

11   statement and it appears to have your signature on the last

12   page?

13   A.    Yes.

14   Q.    Is that your signature?

15   A.    Yes.

16   Q.    You said in the middle of this, I was aware that a

17   written complaint about Ms. Camacho's behavior was made out

18   to the Human Resources office on June 23, 2004 by Greg Perez.

19   Do you see that language?

20   A.    Yes, on about June 23.

21   Q.    Okay.  And is that about the time that you went to

22   Greg, if you can recall?

23   A.    Before that, before that.

24   Q.    Shortly before that?

25   A.    Yeah, shortly before that.