1      Q.   To your knowledge, did Viviene Villanueva complain

2  to anyone in management before you?

3      A.   I don't know.

4      Q.   And to your knowledge, did Jennifer Holbrook

5  complain to anyone in management before you?

6      A.   I don't know.

7      Q.   Do you believe that Leo Palace is at fault somehow

8  for any conduct on Ms. Camacho's part that would have

9  occurred before Leo Palace management was aware that there

10 was a problem?

11     A.   Before they knew?

12     Q.   Yes.

13     A.   No, they shouldn't be hold for something they didn't

14 know.

15     Q.   Okay.  I'm forgetting about verbal things now, oral

16 things or vulgarity.  What was the first incident of sexual

17 harassment that you saw Christine Camacho commit at Leo

18 Palace with your own eyes?

19     A.   It happened to me, the first week of June.

20     Q.   I'm listening.

21     A.   She had just came back from lunch and she went

22 behind my back close enough like touching the back of my hair

23 and she said lunch -- eating me tonight would taste better

24 than the lunch she just had.

25     Q.   What else did she say?

1        A.    That's all I remember.

2        Q.    Is that the first sexually vulgar remark that she

3   made in your presence?

4        A.    Yes.

5        Q.    How did you respond to her?

6        A.    I didn't say anything and I walked away.  I was

7   surprised of what she said to me.

8        Q.    Why didn't you say shut up or something like that?

9        A.    I don't know.

10        Q.    When was the next incident of sexual harassment that

11   you witnessed with your own eyes after this particular

12   incident?

13        A.    Sometime in June also, she had grabbed Jennifer's

14   hand and put it -- tried to put it on her breast and Jennifer

15   had pulled her hand right away before she can even touch her

16   breast, Christina's breast.

17        Q.    Did Jennifer say anything?

18        A.    She said stop it while she pulled her hand, jerked

19   her hand like that.

20        Q.    What did Christine Camacho say, if anything, to

21   Jennifer?

22        A.    I don't remember what she said but she was laughing

23   at that, what she did to Jennifer.

24        Q.    Christine was laughing?

25        A.    Christine was laughing.

1      Q.   In June, did you and Jennifer ever discuss this

2   incident?

3      A.   No.

4      Q.   Are you friends with Jennifer?

5      A.   Yes, yes, we're friends.

6      Q.   Okay.  And then when's the next incident of what you

7   would consider as sexual harassment that you saw with your

8   own eyes at Leo Palace?

9      A.   Her -- she has done that also with me, tried to take

10  my hand.

11     Q.   How many times?

12     A.   On the month of June?

13     Q.   At any time.

14     A.   At least four times.

15     Q.   Did she try to do this in June?

16     A.   Yes.

17     Q.   And in July?

18     A.   Yes.

19     Q.   Any time in August?

20     A.   I don't remember in August.

21     Q.   And what did you say after the first time she tried

22  this?

23     A.   The first time when she did that --

24     Q.   To you?

25     A.   To me, I had pulled my hand before I can even, you

1    know, place my hand on her breast.  I pulled it away and I

2    said, you better stop that, and then same thing, she would be

3    laughing.

4        Q.   And the first time that she did this, did you report

5    it to management?

6        A.   I had report it to Suzuki, this is ending of

7    sometime in June, ending of June.

8        Q.   Did you ever --

9        A.   The same time when I asked for the approval, if I

10   can go see May and report the incident to May.

11       Q.   Tell me about this conversation.  What happened in

12   this first conversation with Mr. Suzuki with Christine

13   Camacho?

14            MS. MORRISON:   Objection; misstates her

15   testimony.

16   BY MR. ROBERTS: (Continuing)

17       Q.   You were describing a conversation you had with

18   Mr. Suzuki about going to May?

19       A.   Yeah.

20       Q.   When did this conversation take place?

21       A.   Ending of June.

22       Q.   Had you spoken with Mr. Suzuki about Ms. Camacho's

23   conduct prior to the ending of June meeting with Mr. Suzuki?

24       A.   I think I spoke to him once in June.  Once.

25       Q.   Once before -- well, all right.  On this one

1  occasion in June that you spoke to Mr. Suzuki, what did you

2  talk about with him?

3      A.    I told him that Christina is not only harassing the

4  employees but also our hotel guests, so I asked him if I can

5  go -- have the permission to go see May and report it to May.

6      Q.    What did he tell you?

7      A.    He said that I could go and talk to May, report it

8  to May about Christina's sexual behavior at the front desk.

9      Q.    And did you tell Suzuki that's what you were going

10 to do?

11     A.    Yes.

12     Q.    Was Greg Perez with you in this conversation?

13     A.    No.

14     Q.    So what did you do, if anything, as a result of this

15 conversation with Mr. Suzuki?

16     A.    I went to see May.  I called her first if I could

17 talk to her.

18     Q.    What did she say to you?

19     A.    Yes, that I can come down and talk to her.

20     Q.    When you say down, that would mean --

21     A.    Downstairs to her office.

22     Q.    Yeah.  You'd go down the lobby, down the stairs at

23 end of the lobby, right?

24     A.    No, you take the back, there's an elevator in the

25 back.

1      Q.    Behind the front desk?

2      A.    Yes.

3      Q.    How many feet is it to the elevator from the front

4    desk?

5      A.    Or we can take the staircase going down.  It's much

6    faster.  Do you want me to explain.

7      Q.    What's the quickest way to get to May's office from

8    the front desk?

9      A.    From the staircase, the staircase going toward the

10   Human Resources office.

11     Q.    How long would it take to get to her office?

12     A.    Less than five minutes about, less than five

13   minutes.

14     Q.    Did May ever come up and say hi to the front desk

15   clerks while you were working there, after the hotel opened?

16     A.    I don't recall.

17     Q.    Well, okay, anyway, May said, yeah, come on down.

18   So did you go down to her office and talk to her?

19     A.    Yes.

20     Q.    And this is in late June or are we on --

21     A.    July.

22     Q.    July 1?

23     A.    July 1st, yes.

24     Q.    And what did you tell her?

25     A.    I told her that -- about Christina's sexual behavior

1    regarding Viviene's incident and she had told me she --

2       Q.    Wait.   When you say she had told me?

3       A.    May had told me that she is aware of it --

4       Q.    I'm sorry.   I'm confused on the word had.   What did

5    May tell you at this meeting?

6       A.    On July 1st?

7       Q.    Yeah.

8       A.    May had told me that she is aware of Viviene's

9    incident because Greg's letter of complaint.

10      Q.    When you say May had told me, you don't mean May had

11   told you before July 1, you mean May told you on July 1?

12      A.    Yes, on July 1.

13      Q.    Okay.   What else did she say?

14      A.    Then I told her about other incidents that had

15   happened on June.

16      Q.    Did May say she was aware of those incidents as

17   well?

18      A.    No.

19      Q.    So you're saying that May told you she was aware of

20   the Viviene Villanueva incident?

21      A.    Yes.

22      Q.    And what was that incident again?

23      A.    About Christina Camacho sexually humping Viviene.

24      Q.    When you say humping, I know this is embarrassing to

25   talk about, but when you say humping, you mean --

1      A.    Riding her.

2      Q.    Simulating or grinding, right?

3      A.    Yes.

4      Q.    And so you told May that there were other incidents

5  as well; correct?

6      A.    Yes.

7      Q.    What incidents did you mention?

8      A.    About Christina grabbing Jennifer's hand to try to

9  put it on her breast and it also happened to me and also the

10  incident with the hotel guests, when they came to check out

11  at the front desk and what Christina had said to our hotel

12  guests when they checked out.

13      Q.    What was that?

14      A.    There was a box which the Bridal Department had

15  given the front desk to give to the hotel guest when they

16  check out.  It was in a box, it's a candle.  And when

17  Christina had hand over the candle to the -- the box to the

18  hotel guest, the customer had asked *nani*, meaning what's

19  this, and Christina said, oh, it's a vibrator and the

20  customer was -- they understood because they were shocked,

21  then they --

22      Q.    How do you know that?  How do you know the -- how do

23  you know the Japanese guest -- The customer was Japanese?

24      A.    Yes.

25      Q.    How do you know the guest spoke English?

1    A.    Because they repeated it and then when we --

2    Q.    In English?

3    A.    Yes.  And then I -- because I was there and I was

4    the supervisor, so what I did is I said, I'm sorry, it's a

5    candle, and Christina at the same time kept laughing about it

6    and then I said, I'm really sorry, it's your candle from your

7    wedding.

8    Q.    In Japanese or in English?

9    A.    In English.

10   Q.    And did the guest respond to you?

11   A.    Yes, and they opened the box actually in front of

12   us.  And at the time, I was already worried because hotel

13   guests don't really complain when they're in a hotel.  They

14   don't complain until they get back home and I was scared

15   because I'm working at that time and, you know, most likely

16   the guest will complain, so that's why I also reported that

17   to May and also Mr. Ijima.

18   Q.    We've heard before this incident but I'd always

19   understood that the candle was out of the box when the

20   comment was made.  The candle was still in the box?

21   A.    It was still in the box.

22   Q.    And so you told this to May on this July 1 meeting?

23   A.    Yes.

24   Q.    And I hate to get away from the July 1 meeting, so

25   don't forget about it.  When did you tell Ijima about the

1  vibrator and candle-in-the-box incident?

2      A.   On June.  On June, before I went down to see May.

3      Q.   In June?

4      A.   Yes.

5      Q.   Beginning of June?  Middle of June?  Late June?

6      A.   I don't remember.

7      Q.   Did Ijima respond to your comment in any way?

8      A.   Yes.

9      Q.   What did he say?

10     A.   At first he said -- I guess he said what, he asked

11 me what, what did she say?  I guess he was taken by surprise

12 what I had said, then I repeated myself, then he started to

13 laugh and he shook his head and he was laughing also.

14     Q.   Did he say anything other than what did she say?

15     A.   He called her, in Japanese, *baka*.

16     Q.   Did he say anything else to you?

17     A.   That's all I remember.

18     Q.   What else did you tell May on this meeting of July

19 1?

20     A.   That's all I can remember.

21     Q.   Okay.  Have you ever had a conversation with

22 Mr. Suzuki about Ms. Camacho?

23     A.   After I spoke to May in July?

24     Q.   I'll strike the question.  Withdraw the question.

25 After July 1, what's the next incident of sexual harassment

1    you saw with your own eyes involving Christine Camacho?

2        A.    She had -- she did it again where she had grabbed

3    Jennifer's hand.

4        Q.    When was this?

5        A.    It happened on July again.

6        Q.    July, approximately when?

7        A.    I'm not too sure when -- in July.  That's all I can

8    remember.

9        Q.    What did Jennifer do?

10       A.    Same thing again when she puts her hand.

11       Q.    Did Jennifer say anything to Christina on this

12   incident?

13                        (Mr. Torres entered room.)

14       A.    Because every incident, Jennifer would get mad at

15   her and say "You better stop it, you better quit it," I'm not

16   -- she would say, "I'm not joking with you."

17       Q.    After this incident, what's the next incident that

18   you witnessed with your own eyes?

19       A.    In July, when I was in the shuttle van with

20   Christina, she had smacked me on my butt inside the van and

21   this is in July of 2004.

22       Q.    Why were you in the van with Christina?

23       A.    We were heading to the Club House to drop the guest

24   laundry.

25       Q.    Did anyone order you to go with Christina in the

1    shuttle to drop the guest laundry?

2       A.   She had not done this before where you go to the

3    Club House, so I showed her where to go at the Club House,

4    where to bring the guest laundry.

5       Q.   Would I be correct that you worked a lot of days

6    with Christina where nothing bad happened?

7                  MS. MORRISON:  Objection; vague.

8                  THE WITNESS:  I'm sorry?

9    BY MR. ROBERTS: (Continuing)

10      Q.   Did you ever work with Christina for an entire shift

11   where she didn't make any vulgar remarks or she didn't

12   physically touch your body?

13      A.   (No response.)

14      Q.   Strike that question.  Were there days that nothing

15   happened?

16      A.   Physically?

17      Q.   Yes.

18      A.   Yes.

19      Q.   And this is over more than three-month period since

20   -- Christina was hired again on May 10, right?

21      A.   That's what you said --

22      Q.   Is that what we agreed to?

23                 MR. TORRES:  Yes.

24   BY MR. ROBERTS: (Continuing)

25      Q.   And she was fired on August 13.  You can assume she

1  was fired August 13.  That's over a three-month period,

2  right?

3      A.   Yes.

4      Q.   And you've named several incidents of physical

5  touching.  Would it be correct that for the vast majority of

6  the days you worked with Christina, there was no physical

7  touching of any sort?

8              MS. MORRISON:  Objection; argumentative.

9              THE WITNESS:  No, it wasn't everyday that she

10  physically harassed.

11  BY MR. ROBERTS: (Continuing)

12     Q.   Yeah, in fact, most days she didn't do anything in

13  the way of physical sexual harassment; isn't that correct?

14     A.   Physically, not everyday.

15     Q.   Most days she didn't touch you, right?

16     A.   Yes.

17     Q.   Like the vast majority of days, she didn't touch

18  you?

19     A.   Yes.

20     Q.   It's only a few times?

21     A.   Yes.

22     Q.   And so when she slapped your butt, were you getting

23  into or out of the shuttle van?

24     A.   I don't remember but I was inside the van.

25     Q.   And what did you tell her to do?

1      A.    (No response.)

2      Q.    Did you say anything to Christina?

3      A.    Yes.

4      Q.    What did you say?

5      A.    You better *fuckin'* don't do that again.

6      Q.    And what did she say?

7      A.    She was laughing, like always.

8      Q.    Was that on the way to the Club House or on the way

9  back to the Club House?  Excuse me.  You were riding the

10  shuttle bus from the hotel to the Club House and then -- Were

11  you on your way from the hotel to the Club House?

12      A.    When that happened?

13      Q.    Yes.

14      A.    I don't remember.

15      Q.    Who was the shuttle driver?

16      A.    Joe.

17      Q.    Joe who?

18      A.    Isizaki?

19      Q.    Is it Ishizaki?

20      A.    I --

21            MR. TORRES:  It is.

22  BY MR. ROBERTS: (Continuing)

23      Q.    Is he Japanese?

24      A.    (No response.)

25      Q.    Or a mixture of something else?

1      A.    I'm not sure, but I'm guessing he's Chamorro.  I

2  don't know how he got his last name.

3      Q.    Did he see what happened?

4            MS. MORRISON:  Objection; calls for speculation.

5            THE WITNESS:  Yes, he did.

6  BY MR. ROBERTS: (Continuing)

7      Q.    How do you know that?

8      A.    Because we talked about it.

9      Q.    You and Joe?

10     A.    Yes.

11     Q.    When did you talk about it?

12     A.    This is, I think, August -- in August after the

13  second incident of her slapping my butt.  I was crying to him

14  about it.

15     Q.    Do you remember what Joe would have said?

16     A.    I don't remember what he said to me, because at that

17  time, I was crying to him that I didn't understand that she's

18  not fired until now.

19     Q.    Oh, was this after Leo Palace fired Christina that

20  you had your conversation with Joe?

21     A.    Before.

22     Q.    And you said a second incident where she slapped

23  your butt, was this after the -- I'm a little confused.  Was

24  that after the shuttle van incident?  It happened again or

25  was the other slapping incident before the shuttle bus

1    incident?

2       A.    After the second slapping.

3       Q.    The shuttle bus, was that first or the second?

4       A.    The shuttle bus?  That's the first.

5       Q.    And then it happened again after that?

6       A.    Yes.

7       Q.    Tell me what happened.

8       A.    This was in August 10, 2004.  We just had started

9    our shift around -- that morning, and she was behind my back

10   and she smacked me in the butt really hard that when I turned

11   around, she told me that she can't help herself and she kept

12   laughing and I remember she walked away and I was behind her

13   yelling at her and cussing at her and I didn't talk to her

14   the whole day.

15      Q.    Do you want to break?

16      A.    No, it's okay.

17                      (Exhibit 13 marked.)

18   BY MR. ROBERTS: (Continuing)

19      Q.    Is it because of this incident that you went to see

20   May Paulino that same day on August 10 at about 2:20 p.m.?

21              MS. MORRISON:  Objection; assumes facts not in

22   evidence.

23   BY MR. ROBERTS: (Continuing)

24      Q.    Well, did you go see May Paulino on August 10 around

25   2:20 p.m.?

1       A.   I went to see her, yes, that same week of the

2  incident.

3       Q.   Was it right after the incident or did you wait

4  until your shift was over?

5       A.   In the afternoon already.

6       Q.   And why did you go to May?

7       A.   Because --

8       Q.   You were fed up, right?

9       A.   Yes.  And I actually spoke to Jennifer.  We were in

10  the back office and I told Jen what had happened to me and

11  she said, "Rose, it's okay, you can report it because it has

12  happened to me, too.  I know how you feel.  I know how you

13  feel.  You should report it."

14       Q.   Did you know that it happened to Jennifer?

15       A.   No, I did not know.

16       Q.   And so the two of you decided to report it to May,

17  right?

18       A.   I decided to go down to May.

19                         (Witness cried.)

20            MR. ROBERTS:   Let's take a break, okay.

21                         (Off the record at 1:35 p.m.)

22                         (Back on the record at 1:46 p.m.)

23  BY MR. ROBERTS:  (Continuing)

24       Q.   Back on the record.  Exhibit 13, May Paulino

25  testified -- is her transcript of an interview she had with

1   you on August 10 at 2:20 and then again on August 11 at 11:25

2   in the morning.  I think that you looked at this during one

3   of the earlier depositions last week.

4       A.   Yes.

5       Q.   Did you have a chance to read it or were you just

6   looking at it to pass the time in the depo?

7       A.   Yeah, just looked, briefly read it.  But I didn't --

8       Q.   All right.  Just to speed things up, May interviewed

9   you on the 10th and 11th of August, right, about Christine

10  Camacho?

11      A.   Yes.

12      Q.   And they fired Christine on the 13th of August;

13  correct?

14      A.   Yes.

15      Q.   Did Christine Camacho joke around a lot on the job?

16      A.   Yes, she always joked.

17      Q.   And did she sometimes make jokes of a sexual nature?

18      A.   Yes.

19      Q.   And did she sometimes make jokes of a nonsexual

20  nature?

21      A.   Yes.

22      Q.   Did you ever laugh at any of her jokes?

23           **MS. MORRISON:**  Objection; vague.

24           **THE WITNESS:**  Nonsexual jokes, yes.

25  BY MR. ROBERTS: (Continuing)

1      Q.    You never laughed at a joke that was sexual in

2   nature made by Christine Camacho?

3      A.    No.

4      Q.    Did you laugh at every single one of her nonsexual

5   jokes?

6      A.    I don't remember.

7      Q.    Was she a funny person?

8      A.    Funny, sometimes.

9      Q.    Was she a nice person?

10     A.    What do you mean by nice?

11           MR. TORRES:  Do you like Mr. Roberts?

12           MR. ROBERTS:  I was looking for someone other

13   than me.

14   BY MR. ROBERTS: (Continuing)

15     Q.    Is Viviene a nice person?

16     A.    Yes.

17     Q.    Is Phil Torres a nice person?

18     A.    Yes.

19     Q.    Was Christine a nice person?

20     A.    No.  Where --

21     Q.    Well, go ahead.  If you want to answer that, go

22   ahead.

23     A.    No.

24     Q.    Was she usually a nice person?

25     A.    No.  I would say no.  She didn't care how you felt.

1  She just doesn't care.

2      Q.   Objection.  That calls for speculation and it

3  doesn't really respond to my question, so it's technically

4  nonresponsive so I technically object.  Let me ask you this,

5  you said she was constantly joking around, right?

6      A.   Yes.

7      Q.   Was it your impression that she was trying to be

8  funny when she would make jokes?

9      A.   I don't know, sir.

10     Q.   Well, when she told jokes of a nonsexual nature,

11  sometimes you laughed at them, right?

12     A.   Yes, sir.

13     Q.   Was it your impression on those occasions that she

14  was trying to make you laugh?

15     A.   I don't know.

16     Q.   Can you take a minute or so and read Exhibit 13 to

17  yourself?

18     A.   (Witness complied.)

19     Q.   May has testified under oath.  This is an accurate

20  transcript of her two interviews with you on August 10 and

21  August 11.  So here are my questions:  Is there anything

22  inaccurate about what May says that you said during the two

23  interviews in Exhibit 13?

24     A.   I don't remember these are my exact word.

25     Q.   Do you see anything that jumps out at you, Rose, as

1   being, "Wait a minute, I didn't say that"?  Do you see

2   anything like that in Exhibit 13?

3       A.   I don't remember asking May that did I speak to

4   Suzuki-san.  I don't remember that.

5       Q.   Let's take it a step at a time.  First time I asked

6   you -- I've just asked you that.  Do you see anything that

7   you're sure you didn't say and the next question I'll ask is,

8   do you see anything that you don't remember saying?  Do you

9   understand the distinction I'm making?

10      A.   (Witness nodded head.)

11      Q.   You have to answer out loud.

12      A.   (No response.)

13      Q.   Rose?

14      A.   Yes.

15      Q.   Do you understand that?

16      A.   Yes.

17      Q.   Okay.  And in response to my question, do you see

18  anything that you know you didn't say, you pointed to

19  something that says well, I don't remember saying that.  So

20  two questions, first question is, do you see anything that

21  you're certain that you didn't say in your two interviews

22  with May reflected on Exhibit 13?

23      A.   I never said, yeah, we laughed at her sexual jokes,

24  comments.

25      Q.   Do you see anything else that you're certain you did

1   not say in your interview, your two interviews on the 10th

2   and 11th of August?

3       A.    This portion here, this question about did Suzuki

4   know about it.

5       Q.    Can you point it out to me?

6       A.    This right here.

7       Q.    You're pointing to, May wrote that you said, you

8   know, May, Suzuki-san is very busy, always busy, period.

9   You're saying you didn't say that?

10      A.    We never talked about Mr. Suzuki in that

11  conversation.  We talked about basically Christina.

12      Q.    Okay.  I'm just trying to get your best recollection

13  here.

14      A.    Yes.

15      Q.    And remember, the next question is going to be, do

16  you see anything you don't remember saying.  So do you see

17  anything else in this exhibit that you're certain you did not

18  say?

19      A.    This one here, that I will be feeling sorry for her.

20      Q.    I'm looking at what is the second to the last

21  paragraph on the second page of this document.  You're sure

22  you didn't say, May, I feel sorry for her.  Right?

23      A.    No.

24      Q.    You're sure you didn't say that?

25      A.    No.  Am I sure?

1      Q.    Yes.

2      A.    Yes, I'm sure.

3      Q.    Did you tell May, this is the only job that

4  Christina has?

5      A.    That Christina has?  I don't think I -- I didn't say

6  that.

7      Q.    Did you say -- Go ahead.

8      A.    I didn't say that.

9      Q.    Do you remember saying, her other job, she is no

10 longer working there.  She tells us she is but really she is

11 not.  Did you say that to May?

12     A.    No.

13     Q.    As we sit here today, do you remember at some point,

14 Christina was working two jobs, one at Leo Palace and one

15 somewhere else?

16     A.    Yes, Jennifer had mentioned that.

17     Q.    All right.  Is there anything else that you're sure

18 you didn't say in Exhibit 13?

19     A.    No, that is it, sir.

20     Q.    Do you see anything in there that you don't remember

21 saying?

22     A.    This portion here, I don't remember.

23     Q.    Yeah, you've mentioned one.  I believe you said this

24 part about --

25     A.    This one here.

1    Q.   I'm sorry.  Can you point it out?

2    A.   This one, this portion.  I don't remember.

3    Q.   You remember coming into May's office, right?

4    A.   Yes.

5    Q.   And did you say May --

6    A.   The exact words, I don't remember, but I did report

7    to her about her slapping my butt.

8    Q.   All right.

9    A.   But this portion about Jennifer, I --

10   Q.   You don't remember saying to May that Jennifer said

11   she could sue the company for sexual harassment?

12   A.   I don't remember, sir.

13   Q.   Okay.  I thought that would go faster.  Now I want

14   you to look at what May wrote that May said and ask you the

15   same question.  Do you see anything in there that May

16   testified that she said to you that you know May didn't say

17   to you?

18   A.   Where she says he should be told, he has to know all

19   of these, you are the supervisor, you have to tell him.

20   Q.   And that's something you know you didn't say?

21   A.   We never talked about Mr. Suzuki in this meeting.

22   Q.   In that particular meeting?

23   A.   Yes.

24   Q.   Have you ever talked about Mr. Suzuki with May

25   before this meeting with respect to Christina Camacho?

1    A.    I'm sorry, can you repeat the question, sir?  I'm

2  sorry.

3    Q.    Did you ever go directly to Mr. Suzuki to complain

4  about Christina Camacho?

5    A.    Yes.

6    Q.    When?

7    A.    June 2004.

8    Q.    About when in June?

9    A.    About ending of June already.

10    Q.    What did you say?

11    A.    I told them about Viviene's incident, also, that

12  she's been harassing other employees, including myself, and

13  the incident about the candle and the -- he gave me approval

14  to go and report it to May.

15    Q.    Did he say anything else?

16    A.    That's all I can remember.

17    Q.    After this conversation, did you ever have another

18  conversation with Mr. Suzuki about Christine Camacho?

19    A.    Yes.

20    Q.    When was this next conversation?

21    A.    I spoke to him at least once every week on July

22  because she was still sexually harassing us and I also asked,

23  you know, when she'll be terminated, when are we going to let

24  her go, then in one of the conversation that I have in

25  July --

1    Q.    Go ahead.

2    A.    He told me that Mr. Ijima had told him that

3    Mr. Ijima had spoke to May regarding Christina, uhm, sexual

4    behavior and Mr. Suzuki had said that Mr. Ijima had made a

5    decision of not letting Christina go unless we hired a new

6    staff because we're short of staff and we are busy.

7    Q.    Did you say anything back to Mr. Suzuki when he told

8    you this?

9    A.    I don't remember what I said to him.

10   Q.    Before we leave Exhibit 13, do you see anything else

11   in there that you're certain that May did not say?

12   A.    Mr. Roberts, this portion here.

13   Q.    That's the paragraph on the second page that says

14   whenever you talk to your staffs, you warn them verbally,

15   that section?

16   A.    Yes.

17   Q.    Why are you pointing that out?

18   A.    Because she never gave me instruction what to

19   actually do.

20   Q.    So I mean, your testimony is she never said any of

21   the words in that paragraph?

22   A.    No.  She never gave me instructions what to do next.

23   Q.    So she never asked you how would you feel if

24   Christina was to continue working the front desk?

25   A.    No.

1      Q.    Now, we've talked about two occasions you spoke with

2   Suzuki.  Actually, no, that's not fair to you.  You spoke to

3   him once in late June and then proximately once a week in

4   July?

5      A.    Yes, sir.

6      Q.    Until she was fired?

7      A.    Yes, sir.

8      Q.    And you said on one occasion - I want to make sure

9   that I got this right - Suzuki told you that Ijima had spoke

10  to May regarding Christine Camacho and Suzuki said to you

11  that Ijima had decided not to let Christina Camacho go unless

12  we hired new staff because we're short of staff and we're

13  busy.  That's what you said and now I want to ask you

14  questions about it or, actually, the record will reflect

15  exactly what you said and what I said you said doesn't count.

16  So Suzuki told you that Ijima had spoken with May about

17  Christina Camacho.  Am I correct on that?

18     A.    Yes.

19     Q.    And then Suzuki told you that Ijima had decided not

20  to let Christina Camacho go.  Right?

21     A.    Yes.

22     Q.    And that the reason they were not going to let her

23  go -- he said we're not going to let her go unless we hire

24  new staff?

25     A.    Yes, to replace Christina Camacho.

1    Q.    Because we were short of staff?

2    A.    Yes, they're not going to fire her unless they find

3  a replacement for her because we were short of staff and

4  we're busy.

5    Q.    Were you short of staff?

6    A.    (No response.)

7    Q.    I withdraw the question.  You know, in these

8  depositions, we've been talking about Viviene and you and

9  Jennifer.  Weren't there lots of front desk employees?

10   A.    Like two or three per shift in just that one area,

11  because we have also a reception center, that's also the

12  front desk of the condo.

13   Q.    Isn't it fair to say that Christina Camacho would

14  have come into contact on a daily basis with other MDI Leo

15  Palace employees, other employees other than Viviene and you

16  and Jennifer?

17   A.    (No response.)

18   Q.    Was that an accurate statement?

19   A.    That she would have contact with other --

20   Q.    I'll withdraw the question.  To your knowledge, did

21  Christine Camacho work with other front desk employees other

22  than you three girls:  Viviene, you and Jennifer?

23   A.    Yes.  She worked with Steven.  We worked along with

24  Young.

25   Q.    Is Young a man or a woman?

1      A.    Young is male.

2      Q.    Did you work with any other female front desk

3    clerks?

4      A.    With Louisa.

5      Q.    Who's Louisa?

6      A.    She's our front desk -- she works at the front desk,

7    too.

8      Q.    Did Louisa ever complain to you in the three months

9    you were working with Christine Camacho that Christine was

10   sexually harassing her?

11     A.    No, she never complained.

12     Q.    Who's --

13     A.    She works swing shift.  Louisa, she works swing

14   shift.

15     Q.    Who's Gigi?

16     A.    Gigi?

17     Q.    Is that a man or woman?

18     A.    Female.

19     Q.    Okay.  And did she ever complain to you that

20   Christine Camacho was sexually harassing her?

21     A.    No, sir.

22     Q.    And then there's a Christine Valencia as well,

23   right?

24     A.    Yes, sir.

25     Q.    She's front desk?

1      A.    Front desk at the condo center.

2      Q.    Did she ever complain to you that Christine Camacho

3  was ever sexually harassing her?

4      A.    I don't remember.

5      Q.    Who's Sang?

6      A.    Sang?  Oh, I'm sorry, that's --

7      Q.    Song?

8      A.    Sang?

9      Q.    Yeah, did you say Young?

10      A.    Young, I'm sorry.

11      Q.    Okay.  Young you meant Sang?

12      A.    Sang.

13      Q.    Or Song.  Depending on your pronunciation?

14      A.    Yeah.

15      Q.    Either way, it's a man, right?

16      A.    Yes.

17      Q.    How about a Mary?  Do you remember a Mary?

18      A.    Yes.  Mary worked at the condo hotel -- condo front

19  desk.

20      Q.    Did Mary ever tell you that Christine Camacho was

21  sexually harassing her?

22      A.    No.

23      Q.    And Rita, who's Rita?

24      A.    Rita, she is a front desk clerk.  She sometimes

25  works at the hotel or sometimes at the reception center.

1    Q.   Did Rita ever tell you that Christine Camacho was

2  sexually harassing her?

3    A.   No, sir.

4    Q.   Did you ever ask any of those people if they ever

5  had any problems with Christine Camacho?

6    A.   No.

7    Q.   Were you all these people's supervisor?

8    A.   Yes, sir.

9    Q.   Why didn't you ever ask any of those people if they

10 were having any problems with Christine, too?

11   A.   You want me to explain?

12   Q.   Yeah.

13   A.   When I had already complained to the managers and

14 they didn't do anything regarding my complaint or Greg's

15 complaint, so what I did is warn Christina repeatedly and

16 there was one time that I actually took her back in the

17 office and sat her down and I had told her, you cannot harass

18 anybody, just anybody, the staff, the guests, housekeeping.

19 When I told her, it's in general, because we all still work

20 at the front desk and I didn't want to have it even harder

21 that, you know, will cause more tension than there is already

22 at the front desk.  So because management didn't do anything,

23 we just put up with her behavior.

24   Q.   When did you first meet with Mr. Torres?

25   A.   (No response.)

1      Q.    Let me help you out.  You met with May on August 11

2   of 2004, right?

3      A.    Yes, I did --

4      Q.    I mean, you do agree that Exhibit 13, which is May

5   Paulino's transcript, accurately reflects that you met with

6   -- actually, it says August 10 and I think I was saying

7   August 11 before.  No, August 10 the first time and August 11

8   the second time?

9      A.    Yes.

10     Q.    Right?  That's correct, what May wrote?

11     A.    The day, yes.

12     Q.    So it is true you met on August 10 and August 11

13  with May Paulino concerning Christina Camacho, right?

14     A.    Yes.

15     Q.    And it is also true that Leo Palace fired Christine

16  on August 13?

17     A.    Yes.

18     Q.    When did you first meet with Phil Torres?

19     A.    Before they had fired Christina.

20     Q.    Was it after your two interviews with May but before

21  they fired Christina?  Was it on the evening of Thursday,

22  August 12?

23     A.    I know it's before they fired Christina.

24     Q.    And do you think it was before or after your two

25  interviews with May?

1      A.   I don't remember the date but I know it's before
2 they fired Christina.
3      Q.   Okay.  This will be Exhibit 14.
4                          (Exhibit 14 marked.)
5 BY MR. ROBERTS: (Continuing)
6      Q.   And this is a letter written by your lawyer, Phil
7 Torres, to Leo Palace on August 16.  The record will reflect
8 that's a Monday and that the prior 13th of August was a
9 Friday and the Friday they fired Christina.  And for further
10 identification purposes, this is Leo Palace Resort bates
11 stamp 182 through 187.  Have you seen that letter before?
12      A.   Yes.
13      Q.   And that's your attorney's letter complaining of
14 sexual harassment to Leo Palace, right?
15      A.   Yes.
16      Q.   Were you subjected to sexual harassment between your
17 two interviews with May Paulino on the 10th and 11th of
18 August and August 16th?
19      A.   From the 10th to the 16th?
20      Q.   Yeah.
21      A.   No, sir.
22      Q.   Jennifer Holbrook has testified about a conversation
23 she had with General Manager Yutaka Mariyama after Phil
24 Torres's letter was sent and she said that you may have heard
25 or saw part of that particular conversation and the

1   conversation was about the sexual harassment complaint. Do

2   you know what conversation I'm talking about?

3       A.   Yes.

4       Q.   Where did it take place?

5       A.   The front desk.

6       Q.   And where were you at the time of the conversation?

7       A.   I was on the phone.

8       Q.   What happened?

9       A.   He came inside, behind the front desk and then he

10  yelled at --

11      Q.   First, for the record, he didn't jump over the front

12  desk, right?  He walked in from behind the front desk?

13      A.   He went through the door.  He went through the door.

14      Q.   The normal way.  Okay, he came through the door.

15  Did he slam the door open?

16      A.   We never closed the door.  To get into the front

17  desk, we don't close that, meaning the front door.  You know

18  how it automatically just closes, so they went inside there.

19  He yelled at Jennifer.

20      Q.   Did he yell or raise his voice?

21      A.   He yelled.

22      Q.   What did he say?

23      A.   He was upset that we're suing the company, and

24  Jennifer, she was scared, so she said like -- she answered

25  him in a -- I think it's -- she answered -- when he asked --

1    Q.    What did he say?

2    A.    Why are you suing Leo Palace Resort?  Or I'm not too

3    sure if he said why you're suing the Leo Palace or are you

4    suing the company.  I don't remember the exact -- but he said

5    something, why you suing.  And Jennifer had said, no, I'm not

6    suing Leo Palace Resort or the company.  She said I'm suing

7    HR because they didn't do anything regarding the sexual

8    harassment that was done to us, then he answered something

9    like, I am Leo Palace Resort or I am the company.  And --

10    Q.    Did he say that or yell that?

11    A.    He yelled.  He was yelling.  Because when I was on

12    the phone, I kind of covered it, because even I was nervous

13    at the time because --

14    Q.    Who else was -- I'm sorry.

15    A.    I was nervous also at the time because he came in

16    all of a sudden and he yelled at Jennifer.

17    Q.    It came over the fax, right?

18    A.    I'm sorry?

19    Q.    Did it come over the fax machine?

20    A.    Which one?

21    Q.    Phil's letter.

22    A.    I don't know.

23    Q.    You and Jennifer were working, right?

24    A.    Yes.

25    Q.    Was Viviene working at this time?

1      A.    I don't know.

2      Q.    Did you know the letter was coming?

3      A.    Phil had mentioned it to us that he would be sending

4  --

5      Q.    Wait, wait.  Actually, don't tell me what your

6  attorney told you.  Although I very interested in it, it's

7  protected by the attorney-client privilege.  But I'm able to

8  ask you some limited things about Phil, like when you met

9  with him; things like that.  Let me put it this way, do you

10 know if the letter was delivered to letter Leo Palace by fax

11 or hand delivery or by mail?  Do you know?

12     A.    I'm not sure.

13     Q.    I guess what I'm asking is:  Did you and Jennifer

14 know that it was going to be delivered --

15     A.    I know that Leo Palace is going to receive it but I

16 don't know how, in what form, if it's going to be faxed or

17 hand delivered.

18     Q.    Do you know if it was received on Monday the 16th

19 when it's dated or the next day on Tuesday the 17th?  If you

20 remember?  It's really not all that important what we're

21 talking about.  If you remember?

22     A.    I don't remember, sir.

23     Q.    What else did Mr. Mariyama say?

24     A.    That's all I can remember.  And when he had left, he

25 was -- he kept pacing back and forth in the lobby and then I

1   don't know where he went after that.

2       Q.    Did you notice whether anybody else in the lobby or

3   behind the front desk or in the room looked up at

4   Mr. Mariyama as he yelled at Jennifer?

5       A.    I don't know because I was on the phone.

6       Q.    Were there any other front desk employees working at

7   this time?

8       A.    I don't remember.

9       Q.    Were there guests in the lobby?

10      A.    I don't know if there was a guest in the lobby.

11      Q.    Do you have any reason to believe there might be

12  someone else other than you and Jennifer who heard

13  Mr. Mariyama's yelling at Jennifer?

14      A.    I don't remember if there was anybody there.

15      Q.    When Mr. Mariyama was done talking to Jennifer, what

16  did he do?

17      A.    He --

18      Q.    How did he exit the front desk area?

19      A.    I don't know but -- I don't know how he -- where he

20  exit.  I don't know.  I just remember he was walking in the

21  lobby, pacing back and forth.

22      Q.    Did you see him slam or push open any doors after

23  this incident?

24      A.    No, I don't remember.  After I saw him pacing back

25  and forth?

1     Q.    No, I mean before you saw him pacing back and forth

2   and after he was through talk with Jennifer, did he push open

3   or slam any doors around or near the front desk area?

4     A.    I don't remember.

5     Q.    Were there any doors for him to slam or push open?

6     A.    (No response.)

7     Q.    Or were they all open already?

8     A.    The one entrance to the front desk, it's always

9   open, and to get inside to our office, meaning the front desk

10  and also the back office, yes, there's a door there but it's

11  one of those things that, you know, closes on its own.  You

12  open it and it automatically closes.

13    Q.    Okay.  Did you see him slam that door or push that

14  door open?

15    A.    I didn't see him leave or where did he exit.  I

16  didn't see him.

17    Q.    All right.  Can you generally describe for me

18  whether there was any difference working for Leo Palace after

19  August 16 than there was before working there before August

20  16 when your sexual harassment complaint was filed?

21    A.    Management treated us differently.

22    Q.    When you say management, who are you referring to?

23    A.    Mr. Mariyama, Mr. Suzuki and Mr. Ijima.

24    Q.    Anyone else?

25    A.    That's all I can remember.

```
 1        Q.    How did Mr. Mariyama treat you differently?

 2        A.    He doesn't greet us -- greet me like he used to,

 3   like when he comes in to pick up his messages at the front

 4   desk, he doesn't say good morning to us and when he needed

 5   something in the front desk and there was other employees

 6   there, he wouldn't look at me, he would talk to another

 7   employee.  Not like before, he used to talk to me directly

 8   when I'm in the front desk.

 9             And there was -- When I came back from my leave

10   where Dr. Lilli had put us on a two-week leave, Mr. Mariyama

11   had come by to pick up his messages and before I can hand in

12   his messages, he told me sarcastically that is there any

13   sexual harassment report.  And I think for him to say that,

14   knowing what I've been through --

15             MR. ROBERTS:  Objection.  That calls for

16   speculation.  You don't really know whether he knew

17   everything you had been through, do you?  You don't know

18   that.

19             MS. MORRISON:  Objection; argumentative.

20   BY MR. ROBERTS: (Continuing)

21        Q.    Do you?

22        A.    Why would he not know?  He's the general manager.

23   Why won't his managers inform him?

24        Q.    It's my turn to object.  You can't ask me the

25   questions.  Well, I'm not obligated to answer them in any
```

1  event.  Isn't it true you don't know what Mr. Mariyama knew

2  or when he knew it, right?

3      A.   Yes.

4      Q.   I mean, do you blame Mr. Mariyama for being upset

5  inside?

6      A.   No.

7      Q.   He just started on July 1st, right?

8      A.   Yes.

9      Q.   Can you think of any other ways that Mr. Mariyama

10  treated you differently after your complaint than he did

11  before your complaint?

12      A.   He had come by the front desk and he asked me about

13  my conversation with Mr. Ijima that I was crying, then I --

14  then he said to me, "I didn't know local girls cry."

15      Q.   Was he being nice at the time?

16      A.   (No response.)

17      Q.   That's a bad question.  Did you interpret his words   ;

18  as being mean to you in any way?

19      A.   I don't know.

20      Q.   What conversation was Mr. Mariyama asking you about?

21      A.   With Mr. Ijima -- After I had complained, Mr. Ijima

22  had told me that out of the three girls, the ladies, I was

23  the biggest voice and that I had asked him that why, you

24  know, he didn't want to terminate Christina and then he said,

25  "Why would I be the one to terminate her, because I don't

1  know the whole story. You were one that reported to HR," and

2  he said that May's the one that did not want to fire her. I

3  said, no, Suzuki-san said that you were the one that didn't

4  want to fire her. Then at that time, I had left the back

5  office, I went to another room and I was crying, so he left

6  me alone.

7      Q.   I've never heard this before, so I'm a little slow

8  right now. Was it after that that Mariyama came to talk to

9  you about your conversation with Ijima?

10     A.   Yes, I had that conversation with Ijima and

11  Mr. Mariyama had asked me the following day.

12     Q.   And was Mariyama asking you about your conversation

13  with Ijima?

14     A.   About me crying.

15     Q.   Before you reported the sexual harassment, did you

16  get along with Mr. Mariyama?

17     A.   Yes. He's a good guy.

18     Q.   He would stop by and say hi on the way to work

19  everyday --

20     A.   Yes.

21     Q.   -- to whoever was working behind the front desk,

22  right?

23     A.   Yes.

24     Q.   Did he chat with you?

25     A.   Yes, he would talk to us and have conversations with

1  us; yes.

2     Q.   This is the general manager of the entire operation?

3     A.   Yes.

4     Q.   Did you appreciate that?

5     A.   Yes.

6     Q.   Did the prior general manager say hi to you as he

7  came into the office everyday?

8     A.   Mr. Takihara, yes.

9     Q.   Mr. Mariyama came to ask you if you had been crying,

10 right?

11    A.   Yes.

12    Q.   What did you say?

13    A.   I don't remember what I said.

14    Q.   What was your impression as to why Mr. Mariyama had

15 come to talk to you?

16    A.   I don't know.

17    Q.   Please continue describing how it was different

18 working at Leo Palace after you complained about sexual

19 harassment than it was before you complained about sexual

20 harassment with respect to Mariyama.

21    A.   After we complained, I spoke again to Ijima because

22 he wanted to talk to me again in -- not this time in his

23 office but in the smaller office where we keep our files.  He

24 had apologized to me regarding that conversation about me

25 asking him, you were the one that didn't want to fire

1   Christina, and he apologized to me.

2         He told me that I'm really sorry for, you know,

3   scolding me for it and he said that, "Rose, I don't know

4   anything about the whole story" and that Mr. Mariyama had

5   told him that the three ladies are dangerous.  I don't

6   understand why would he say we're dangerous.

7         Q.   You don't know that Mr. Mariyama actually said that,

8   you just know that Mr. Ijima said that Mariyama had said

9   that, right?

10        A.   Yes.

11        Q.   Was Mr. Ijima being nice to you at this time during

12  this conversation?

13        A.   Yes.  He had actually asked me since you don't know

14  what would happen outside of the company and Christina might

15  want to harass us outside, he said it's best that we go to

16  the police station.

17        Q.   Make a police report?

18        A.   Yes.

19        Q.   For your own protection?

20        A.   Yes.

21        Q.   Did you ever do that?

22        A.   Yes.

23        Q.   Did you ever hear back from the police?

24        A.   No.

25        Q.   You took two weeks off after August 16, right?

1  Actually, August 19 I guess it was?

2      A.    (No response.)

3                  MR. ROBERTS:  This will be 15.

4                              (Exhibit 15 marked.)

5  BY MR. ROBERTS: (Continuing)

6      Q.    This is a letter that your lawyer delivered to Leo

7  Palace and it appears to be regarding you from your

8  counselor, Lilli Perez Iyechad.  Did you ever see this

9  letter?

10     A.    Yes.

11     Q.    Did you take two weeks off?

12     A.    Yes.

13     Q.    And that's what Lilli recommended you do?

14     A.    Yes.

15     Q.    When did you come back to work?

16     A.    September 2.

17     Q.    And did you work a regular schedule between

18  September 2nd and the end of October when you left the

19  company?

20     A.    Yes, I work the morning shift; yes.

21     Q.    On a regular basis?

22     A.    Yes.

23     Q.    Can you remember any incidents or conversations

24  specifically related to Mr. Mariyama that happened between

25  September 4 when you came back to work and the end of August,

1  excuse me, the end of October when you left the company?

2      A.    Conversation with Mr. Mariyama?

3      Q.    No.  Let's back up.  I'm asking how is it different

4  working at Leo Palace after you complained than it was before

5  you complained and you've just -- we've been talking about

6  Mariyama and Ijima.  Other than the conversations you've

7  already described with Mr. Ijima, did you have any others

8  with Ijima?

9      A.    After the conversation when he told me what Mariyama

10 had said?

11     Q.    Yeah, did you have any other conversations with

12 Mr. Ijima after you came back to work on September 2nd and

13 the time that you left the company in late October?

14     A.    I don't remember.

15     Q.    Was Mr. Ijima ever mean to you after you came back

16 to work?

17     A.    No, he wasn't mean.

18     Q.    Was Mr. Suzuki mean to you after you came back to

19 work?

20     A.    No.  They just hardly speak to me.

21     Q.    And was Mr. Mariyama mean to you after you came back

22 to work on September 2nd?

23     A.    The conversation where he asked for sexual

24 harassment, is there any sexual harassment report, the day I

25 came back.

1    Q.   And you described that as being sarcastic?

2    A.   Yes, sir.

3    Q.   Anything else other than that?

4    A.   I don't remember.

5    Q.   This will be Exhibit 16.  No, it won't.  Well, let

6    me ask you this.  Forget the exhibits.  When you complained

7    to the EEOC, you claimed you were a victim of racial

8    discrimination as well as sexual discrimination.  Isn't that

9    right?

10   A.   Yes.

11   Q.   And the EEOC - I don't want to use the wrong word -

12   they didn't determine that that was true, did they?

13              MS. MORRISON:   Objection; mischaracterizes what

14   the EEOC did.

15              THE WITNESS:   I don't know.

16   BY MR. ROBERTS: (Continuing)

17   Q.   Why do you think you're a victim of racial

18   discrimination at Leo Palace?

19   A.   I think they would have handled the complaint if I

20   was Japanese.

21   Q.   Can you give me any examples of why you think that's

22   true?

23   A.   When like we have assistant managers also in our

24   department, when they complain about employees, they would

25   take their side.  You know, they would take the story of

1  their Japanese staff.

2      Q.   Can you remember any specific incident like you're

3  describing?

4      A.   Like for example, which has happened to me where I

5  complained one of the managers and they didn't reprimand her

6  -- or him, or talk to him.

7      Q.   Who are you talking about?

8      A.   There's a Mr. Sekine.  There's two of them.

9      Q.   There's two Sekines?

10     A.   Yes.

11     Q.   And they're both men?

12     A.   Yes.

13     Q.   And they're both Japanese?

14     A.   Yes.

15     Q.   Who did you complain to?

16     A.   Mr. Suzuki.

17     Q.   What were you complaining about?

18     A.   That regarding the workload at the front desk,

19  Mr. Sekine should actually, you know, share it with the same

20  -- with the employees.  And then when I complained to him

21  that he doesn't do his part and that he leaves the front desk

22  and we don't have Japanese speaker, he didn't talk to him

23  about it.

24     Q.   How do you know he didn't talk to him about it?

25     A.   Because he continued to do that.

1    Q.   But are you with Mr. Suzuki all the whole day long?

2    A.   I'm sorry?

3    Q.   Are you with Mr. Suzuki the whole day long?

4    A.   No, sir.

5    Q.   Then he could have had a conversation with

6  Mr. Sekine in your absence, right?

7    A.   Yes.

8         MR. ROBERTS:  Let's take a really short break,

9  okay.

10  BY MR. ROBERTS: (Continuing)

11   Q.   Back on the record.  I'm going to tidy something up.

12  We agreed, I think, that earlier you wrote your letter of

13  resignation on October 11th?

14   A.   Yes.

15   Q.   And then your last day was, I think you said,

16  October 23rd?

17   A.   23rd.

18   Q.   And I asked you did you have your job with Wells

19  Fargo set up before you left the company and you said yes?

20   A.   Yes.

21   Q.   Let me ask a slightly different question:  Did you

22  have your job with Wells Fargo set up before you wrote your

23  resignation letter on October 11?

24   A.   I had my job?  I was working there?

25   Q.   No, did you get your job set up with Wells Fargo

1  before you wrote your October 11th resignation letter?

2      A.    Yes.

3      Q.    How long before October 11, if you can recall?

4      A.    I think after I accepted the job off at Wells Fargo.

5  I don't know how many days after.  I know it's just days but

6  I don't remember the date.

7      Q.    Are you saying like a few days before October 11th,

8  you had accepted the job with Wells Fargo?

9      A.    Yes.

10     Q.    When did you decide to leave your job at Leo Palace?

11     A.    Ending of -- maybe -- when I decided, I decided

12  maybe ending of September.

13     Q.    Did Lilli Perez ever tell you, you ought to get out

14  of that company?

15     A.    I'm sorry?

16     Q.    You know who Dr. Lilli Perez is, right?

17     A.    Yes.

18     Q.    We'll talk about her in a minute.  Did she ever tell

19  you, you ought to leave Leo Palace?

20     A.    I don't remember.

21     Q.    Why did you go see Lilli Perez for treatment?

22     A.    Jennifer actually told me that I should go see

23  Dr. Lilli and also Jennifer had spoke to Mr. Suzuki about it

24  to -- if we can have the same day off so she can take me to a

25  therapist and Mr. Suzuki agreed because I was always crying

1   at work, so I went to see Dr. Lilli.

2   ‒‒   Q.   When you say, I was always crying at work, are you

3   talking about the few-day period between the time that

4   Mariyama-san got your sexual harassment complaint and when

5   you started taking time off, your two weeks off earlier?

6       A.   (No response.)

7       Q.   Just to get the dates right, Jennifer Holbrook

8   testified that the letter, Phil Torres's letter, is dated the

9   16th, but Mariyama and her first talked about it, she said he

10  raised his voice to her the next day on August 17th.  Do you

11  recall that?

12      A.   I don't remember the date.

13      Q.   Okay.  And then I've got a letter here, Exhibit 15,

14  from Lilli Perez to Mr. Suzuki dated August 19 recommending

15  that you be given a two-week leave of absence starting August

16  19.  Do you see that?

17      A.   Yes.

18      Q.   So when you just said I was always crying at the

19  office, are you talking about generally the time period

20  August 17 and 18 before you took your two weeks off?

21      A.   Before.

22      Q.   When did Jennifer tell you you should go see

23  Dr. Perez?

24      A.   Before the 19th.  It's probably between this date

25  and that date.

1      Q.    Okay.   That's what I'm asking?

2      A.    On August 16 --

3      Q.    Between the 16th and the 19th?

4      A.    Yes, sir.

5      Q.    Is probably when Jennifer said you ought to go see

6  Lilli Perez Iyechad?

7      A.    Yes.

8      Q.    Did you see Dr. - am I pronouncing that right -

9  Iyechad?

10      A.    I don't know how to pronounce her name.

11      Q.    You call her Dr. Lilli I'll bet, right?

12      A.    Yeah.

13      Q.    All right.   Let's call her Dr. Lilli then.   When's

14  the first time you saw Dr. Lilli?

15      A.    August 19.

16      Q.    And did you undergo any kind of counseling or

17  therapy that day with Dr. Lilli?

18      A.    She -- yes, she tried to talk to me about what

19  happened to me, but in that session, I was crying again.

20      Q.    Well, let me ask to get you away from that, Rose.

21  How many times did you see Dr. Lilli?

22      A.    Twice.

23      Q.    And that would have been both times in August of

24  2004?

25      A.    Once in August 2004.

1    Q.   And when was the next time you saw her?

2    A.   Last week.

3    Q.   Why did you go see her last week?

4    A.   Because with my attorneys interviewing me, I was

5 still crying after more than two years after what has

6 happened to me.

7    Q.   Have you ever cried on the job at Alupang Beach

8 Tower?

9    A.   Not at work, sir.

10    Q.   Was Dr. Lilli able to make any sort of -- did she

11 tell you what was wrong with you on the first meeting in

12 August of 2004?

13    A.   No.  She only called my doctor to prescribe me a

14 medicine.

15    Q.   Do you remember the name of the medicine?

16    A.   It's spelled.

17    Q.   Does it have two X's in it?

18    A.   Yes.

19    Q.   It's Xanax, right?

20    A.   Yes.

21    Q.   That's an anti -- - Dr. Roberts speaking here - it's

22 an anxiety pill?

23    A.   I don't know.

24    Q.   Did you fill the prescription?

25    A.   I'm sorry?

1    Q.   Did you go to a pharmacy and fill the prescription?

2    A.   (No response.)

3    Q.   Did you get the pills?

4    A.   Yes.

5    Q.   And did it help?

6    A.   Yes, it did.

7    Q.   Are you still taking Xanax today?

8    A.   No, sir.

9    Q.   By the way, today as we speak, are you on any

10   medication?

11   A.   My high blood pill.

12   Q.   Anything else?

13   A.   Medication?  Birth control, sir.

14   Q.   I was going to say -- Sorry.

15   A.   That's medication, right?

16   Q.   I was going to ask you, are you on any medication

17   that could interfere with your ability to remember things

18   that happened two and a half years ago.  And your answer

19   would be no, right?

20   A.   I'm sorry?

21   Q.   You're not taking any medication as we talk today

22   that would interfere with your ability to remember or testify

23   truthfully, right?

24   A.   No, sir.

25   Q.   How many pills were in your first prescription, if

1   you can remember, or if it's easier for you, how many weeks

2   or months did you take Xanax?

3        A.   I stopped in November that same year, 2004.  I

4   didn't take it everyday, only when I felt like I'm emotional,

5   depressed.

6        Q.   After November of 2004, forgetting about last week's

7   appointment with Dr. Lilli, after November of 2004, did you

8   ever see any other counselor or health care specialist as a

9   result of what happened at Leo Palace?

10       A.   You mean therapist?

11       Q.   Therapist, for example.  Other than the first visit

12  with Lilli Perez, did you ever see a therapist again?

13       A.   Until this day?

14       Q.   Until last week.

15       A.   Last week, no, sir.

16       Q.   And have you ever seen any physician for any

17  medical condition that happened to you as a result of what

18  happened at Leo Palace, other than Dr. Lilli?

19       A.   I've gone to the doctor for -- I've been sick.

20       Q.   But that's not because of Leo Palace, right?

21       A.   No.  I had colds.

22       Q.   You had the sniffles, the flu?

23       A.   (Witness nodded head.)

24       Q.   You were emotionally upset over what happened to you

25  at Leo Palace, right?

1    A.    Stressed.  Emotionally stressed; yes.

2    Q.    And then so you went to see Dr. Lilli on one time?

3    A.    In August.

4    Q.    And did you ever see any other counselor or doctor

5    because you were stressed?

6    A.    No.

7    Q.    And did you ever see any other doctor or health

8    care professional, I already asked this, for anything wrong

9    with your body, physically wrong with your body as a result

10   of what happened at Leo Palace?

11   A.    No.

12   Q.    Did Dr. Lilli say anything to you about your

13   condition in this first meeting with her?

14   A.    I don't remember what she said to me.

15   Q.    Let me ask you just a preliminary question.  Did you

16   take any Xanax at any time during December of 2004 while you

17   were working at Wells Fargo?

18   A.    No.

19   Q.    After you left your Wells Fargo job and before you

20   took your job with Alupang Beach Tower, were you willing to

21   come back to work at Leo Palace?

22   A.    There was a time that I wanted to work for Leo

23   Palace, yes.

24   Q.    Thank you.  Jennifer Holbrook testified that Leo

25   Palace reduced her hours in retaliation for her complaint

1    about sexual harassment.  She testified to that last Saturday

2    morning.  Do you have any knowledge of what she's talking

3    about?

4        A.    She -- yes, she had mentioned it.

5        Q.    But you weren't there on the job at the time, right?

6    Were you there on the job when Leo Palace reduced her hours?

7        A.    I don't remember.

8        Q.    Do you believe her when she says her hours were

9    reduced in retaliation for her complaining about sexual

10   harassment?

11       A.    Do I believe her?  No.

12       Q.    Were your hours reduced in retaliation for your

13   sexual harassment complaint?

14       A.    No, only -- the day I had the conversation with

15   Mr. Ijima, I had gone home and then I got a phone call from

16   work saying that I'm going to work C Shift the next day,

17   which I don't work C Shift, I always work the morning shift

18   which is the A Shift, but I did work that shift, the C Shift.

19   I didn't complain because I was scared I might get fired for

20   complaining.

21       Q.    Was it just that one time?

22       A.    Yes.

23       Q.    But you didn't just work solely the A Shift for your

24   entire time at Leo Palace, right?  What was your normal shift

25   again?

1     A.    A Shift, the morning shift.

2     Q.    But there were times where you worked the C Shift as

3 well also, right, before that?

4     A.    No, sir.  The day I spoke to Mr. Ijima, I remember

5 getting a phone call from Leo Palace that the next day I have

6 to work C Shift.

7     Q.    And did that ever happen again after that single

8 incident?

9     A.    No, sir.

10    Q.    Did you lose any wages as a result of the shift

11 change?

12    A.    No, sir.

13    Q.    Has Leo Palace ever retaliated against you

14 financially as a result of your sexual harassment complaint?

15    A.    You mean cutting my hours?

16    Q.    Yeah, cut your pay, cut your hours?

17    A.    No, they did not cut my hours.

18    Q.    Or your pay?

19    A.    My pay?  No, sir.

20    Q.    Why don't you believe Jennifer when she says her

21 hours were cut in retaliation for her sexual harassment

22 complaint?

23    A.    Because I remember her actually talking to

24 Mr. Suzuki about going back to school.

25    Q.    Was this before your sexual harassment complaint?

1    A.   Yes.

2    Q.   She was out at UOG, right, pursuing a degree in some

3  sort?

4    A.   I don't know exactly.

5    Q.   Do you remember what she was saying to Mr. Suzuki?

6    A.   She was asking of a certain time and day.

7    Q.   What?

8    A.   To work.

9    Q.   She was requesting her schedule be changed?

10   A.   She was requesting for a certain schedule.  I don't

11 know what schedule is that.

12   Q.   That's because she was going back to school?

13   A.   Yes.

14   Q.   And do you remember when this conversation would

15 have taken place?

16   A.   (No response.)

17   Q.   Do you remember that Jennifer was hired in early

18 June of 2004?

19   A.   I don't know.

20   Q.   But you know this conversation was before your

21 sexual harassment complaint, right?

22   A.   Yes.

23   Q.   Do you think it might have been -- or I don't know.

24 I don't want to suggest the answer.  Is there any way for you

25 to remember June, July, August, when this conversation might

1  have taken place?

2  ..  A.   I don't know, sir.  I don't remember.

3          MR. ROBERTS:  Okay.  I think I have no more

4  questions for you, but a lawyer will never stop a deposition

5  unless he has a chance to go over his notes first.  So we'll

6  go off the record and I'll go over my notes and I think I'm

7  done.  Okay?

8                          (Off the record at 3:16 p.m.)

9                          (Back on the record at 3:22 p.m.)

10 BY MR. ROBERTS: (Continuing)

11    Q.   Do you remember a particular incident where you were

12 at work, you were short-staffed and you asked Suzuki to call

13 Christina at home and tell her to come to work and tell her

14 to help out?

15    A.   I don't remember, sir.

16    Q.   Do you ever recall asking Christina -- or asking

17 Suzuki to call employees to come into work because you were

18 short-staffed?

19    A.   He's the one that decides on the staffing, sir.

20    Q.   Did he ever consult with you about being

21 short-staffed which resulted in him calling Christina to come

22 to work on a day that she was off?

23    A.   He doesn't ask me.  He decides who -- who shall he

24 pick to cover the shifts.

25    Q.   And you don't recall ever asking him to call

1   Christina to come to work because you were short-staffed?

2       A.    No, sir.

3               MR. ROBERTS:   That's it.   That's all the

4   questions I have.

5                       CROSS-EXAMINATION

6   BY MS. MORRISON:

7       Q.    I'll have a few questions.   Earlier, Mr. Roberts

8   asked you whether you could write an employee up and you

9   responded that you could do that, but did you have to get

10  approval from anyone in management to write an employee up?

11      A.    Yes.

12      Q.    Who did you have to get approval from?

13      A.    From Mr. Suzuki.

14      Q.    Did you also have to get approval from someone in

15  management before you could go to Human Resources?

16      A.    Yes.

17      Q.    Who did you have to get approval from?

18      A.    Mr. Suzuki.

19      Q.    And how do you know that you had to get approval

20  from Mr. Suzuki before you went to Human Resources?

21      A.    You want me to explain?

22      Q.    Yeah, I want to know how you know that.

23      A.    I had wrote up an employee, Larry, and Larry had

24  confronted Suzuki about my complaint and Suzuki got upset at

25  me that how come I didn't let him know first.

1    Q.   And you took that to mean that you needed to go to

2 Mr. Suzuki in the future before you could go to Human

3 Resources?

4    A.   Yes, and that's what I did also on June 2004.

5    Q.   Okay.  Earlier, Mr. Roberts also asked you about

6 whether sexually harassing physical incidents occurred with

7 Christina everyday and you responded no, but did you

8 experience other, like verbal, sexually harassing comments or

9 vulgar language from Christina everyday?

10   A.   Yes, that was daily.

11   Q.   And what sort of things did you experience daily?

12   A.   She would say -- ask us about if we like to be eaten

13 or she'll discuss her sexual things that she does with her

14 girlfriend.

15   Q.   Anything else that you can remember?

16   A.   She would talk to Jennifer about sexual things and

17 Jennifer just ignores her or walks away.

18   Q.   Are you still under the care of Dr. Lilli?

19   A.   Yes.  I have an appointment tomorrow.

20        **MS. MORRISON:**  I don't have any further

21 questions.

22        **MR. TORRES:**  I have no questions.

23                  REDIRECT EXAMINATION

24 BY MR. ROBERTS:

25   Q.   Are you saying that Christine Camacho, every single

1   day that she came to work, would tell you "I like to be eaten

2   by girls"?

3       A.   Different sexual verbal comments that she would make

4   and we were very scared of what -- when she makes these

5   comments, because we don't know if she'll be physical with

6   us.  So when these comments are made, we stay away from her.

7       Q.   I understand.  But I mean, the EEOC lawyer was

8   asking you whether these things, these comments, like I like

9   to be eaten or discussing sexual things that Christine did

10  with her girlfriend or talking to Jennifer Holbrook about

11  sexual things, she asked you if these things happened every

12  single day that Christina came to work; is that true?

13      A.   In my presence, yes, sir.

14      Q.   Every single day?

15      A.   Yes, sir.  Yes.

16      Q.   The record is what the record is, but that's not

17  what you told me when I was questioning you.

18           MS. MORRISON:  Objection; mischaracterizes her

19  earlier testimony and argumentative.

20  BY MR. ROBERTS: (Continuing)

21      Q.   Earlier, you said sometimes --

22      A.   Physical --

23           MR. TORRES:  Excuse me.  Let him finish the

24  question.

25  BY MR. ROBERTS: (Continuing)

1    Q.   And, again, I can't change what the testimony is and

2  what my questions were or what your answers were and so if

3  I'm wrong about this, the world will know because the

4  transcript will say so.  But I thought you said, in response

5  to my question, I asked you if sometimes nothing happened in

6  any particular day and you said yeah, sometimes nothing

7  happened.

8    A.   Sir, I understand the physical, that's what I

9  understood from you, sir.

10    Q.   Okay.  Remember we decided that Christina Camacho

11  was hired on May 10 of 2004, right?

12    A.   May 10, yes, sir.

13    Q.   And you first brought problems with respect to

14  Christina to management's attention in late June of 2004?

15    A.   Yes, sir.

16    Q.   And it's your testimony that every single day

17  between May 10 of 2004 and late June of 2004, she made

18  comments like "I like to be eaten" and she discussed sex with

19  her girlfriend and things like that every single day?

20    A.   Yes, sir.

21    Q.   And you didn't report it to management for the

22  entire time between May 10 of 2004 and late June of 2004?

23         MS. MORRISON:  Is that a question?

24  BY MR. ROBERTS: (Continuing)

25    Q.   Correct?

1      A.    Can you repeat?

2      Q.    And it's correct that you did not report these

3 incidents to management at any time between June 10 of 2004

4 -- excuse me, May 10 of 2004 and late June of 2004; correct?

5      A.    Yes, sir.

6             MR. ROBERTS:  Nothing further.

7             MS. MORRISON:  I don't have anything else.

8             MR. TORRES:  No questions.

9             MR. ROBERTS:  Rose, whenever our friendly court

10 reporter gets around to it, she'll have my questions and your

11 answers and the EEOC attorney's questions and your answers

12 typed up into a transcript.  You'll have a chance to read

13 that transcript and you'll have the opportunity to make

14 changes to it.

15             You can change your testimony only.  You can't

16 change my questions.  If it's a nonsubstantive kind of

17 change, like a change with the word "a" to the word "the," I

18 won't make any comments about it, but be careful if you make

19 a change that we call substantive changes, like change a yes

20 to a no, because under the rules of court, I get a chance to

21 argue that that detracts from your credibility as a witness.

22 Okay?

23             THE WITNESS:  Yes.

24             MR. ROBERTS:  All right then.  That's it.

25     {Whereupon the deposition was concluded at 3:31 p.m.}

# CERTIFICATE OF WITNESS

I, Rosemarie Taimanglo, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 133; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

Rosemarie Taimanglo

# REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Rosemarie Taimanglo personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 133, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 15th day of July 2007.


_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter