# ORIGINAL

1  Anna Y. Park, Regional Attorney
   Derek Li, Supervisory Trial Attorney
2  Gregory McClinton Senior Trial Attorney
   Angela D. Morrison, Trial Attorney
3  U.S. EQUAL EMPLOYMENT
   OPPORTUNITY COMMISSION
4
   255 East Temple Street, Fourth Floor
5  Los Angeles, CA 90012
6  Telephone:  (213) 894-1068
   Facsimile:  (213) 894-1301
7  E-Mail:  lado.legal@eeoc.gov
8
   333 S. Las Vegas Blvd., Suite 8112
9  Las Vegas, NV 89101
10 Telephone:  (702)894-5072
   Facsimile:  (702)894-5094
11 E-mail:  angela.morrison@eeoc.gov
12
   Attorneys for Plaintiff
13 U.S. EQUAL EMPLOYMENT
   OPPORTUNITY COMMISSION
14

FILED
DISTRICT COURT OF GUAM
SEP 2 4 2007
JEANNE G. QUINATA
Clerk of Court

15        **UNITED STATES DISTRICT COURT**

16            **DISTRICT OF GUAM**

17 | U.S. EQUAL EMPLOYMENT          ) Case No.: 2:06-CV-00028
18 | OPPORTUNITY COMMISSION,        )
   |              Plaintiff,         ) PLAINTIFF EEOC'S OPPOSITION TO
19 |      v.                         ) DEFENDANT'S MOTION FOR
   |                                 ) PARTIAL SUMMARY JUDGMENT
20 | LEO PALACE RESORT,             )
21 |              Defendant.         )
   |                                 )
22 |_____)
   | JENNIFER HOLBROOK; VIVIENE     )
23 | VILLANUEVA; and ROSEMARIE      )
   | TAIMANGLO,                      )
24 |              Plaintiff-Intervenors, )
25 |      v.                         )
   |                                 )
26 | MDI GUAM CORPORATION d/b/a LEO )
27 | PALACE RESORT MANENGGON        )
   | HILLS and DOES 1 through 10,    )
28 |              Defendants.        )
   |                                 )

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) --------------------------------------- 11

*Baucom v. Holiday Cos.*, 428 F.3d 764 (8th Cir. 2005) -------------------------------------- 15

*Burlington N. & Santa Fe Ry. Co. v. White*, -- U.S. ----, 126 S. Ct. 2405 (2006)-14, 15, 16

*Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559 (8th Cir. 1992) ------------------------ 12

*County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001) -------------- 11

*Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998) ----------------------- 12, 17

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)------------------------------------------------- 11

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) --------------------------------- 11, 12

*Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864 (9th Cir. 2001)---------------------------- 11

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)). ------------------------- 15

*Porter v. Cal. Dept. of Corr.*, 419 F.3d 885 (9th Cir. 2005) ---------------------------------- 15

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000)------------------------------------------- 15, 17

*Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir.1994) -------------------------- 17

*Valenti v.City of Chicago*, 2004 Dist. LEXIS 2779 (N.D. Ill.) -------------------------------- 14

*Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007)------------------------------- 17, 18

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885 (9th Cir. 1994) --------------------------------------- 11

*Watson v. Nationwide Ins. Inc.*, 823 F.2d 360 (9th Cir. 1987).------------------------------- 17

*West v. Maxon Corp.*, 2001 U.S. Dist. LEXIS 22228 (S.D. Ind.)----------------------------- 14

## RULES

Fed. R. Civ. P. 56(c)------------------------------------------------------------------------------------10

# I.  INTRODUCTION

The Court should deny Defendant Leo Palace Resort's ("Leo Palace" or "Defendant") Motion for Partial Summary Judgment because the three Claimants for whom the Plaintiff United States Equal Employment Opportunity Commission ("EEOC") seeks relief were subjected to ongoing, harassing conduct, unwanted sexual touching, and crude sexual comments, far beyond the threshold for establishing a triable of fact under Title VII.  Despite that Defendant's managers knew about the conduct, the managers allowed it to continue for two months and then subjected the Claimants to further intimidation.  This conduct altered the terms and conditions of the Claimant's employment.  Consequently, the EEOC has established triable issues of fact regarding the hostile work environment claims even after Camacho was terminated.

EEOC also has established a triable issue of fact regarding whether Defendant retaliated against and constructively discharged Jennifer Holbrook and Rosemarie Taimanglo.  Leo Palace's actions against Ms. Holbrook and Ms. Taimanglo would dissuade a reasonable person from filing a complaint with the EEOC.  Moreover, a reasonable person in Ms. Holbrook's and Ms. Taimanglo's position would have found the working conditions at Leo Palace intolerable.  Accordingly, the EEOC requests the Court to deny Defendant's Motion for Partial Summary Judgment.

# II.  FACTUAL BACKGROUND

Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964.   The EEOC represents the public interest in securing an employment environment free of discrimination, and seeks relief on behalf of the three Plaintiff-Intervenors in this suit, Jennifer Holbrook, Viviene Villanueva, and Rosemarie Taimanglo (collectively "Plaintiff-Intervenors").

Rosemarie Taimanglo worked as a front desk supervisor at Leo Palace in 2004, a position which she had held since July 1, 2003.  (Decl. of Angela Morrison in Supp. of Opp'n to Partial Mot. for Summ. J. ["Morrison Decl."], Ex. 1 at LPR 00091.)  Jennifer

Holbrook began working as a front desk clerk at Leo Palace on June 7, 2004. (*Id.* at LPR 00039.) Viviene Villanueva started working as a front desk clerk at Leo Palace on June 2, 2003. (*Id.* at 00139.)

On May 10, 2004, Camacho began work as a front desk clerk at Leo Palace. (*Id.* at LPR 00006.) Christina Camacho began engaging in sexually inappropriate behavior towards Plaintiff-Intervenors shortly after she began her employment with Leo Palace. Beginning in May 2004, Camacho made almost daily sexual comments to or in the presence of Plaintiff-Intervenors. (*Id.*, Ex. 2 at 18:22-19:2; Ex. 3 at 64:20-23, 70:18-21.) For example, in May 2004, Camacho said that she would make a sandwich out of her coworkers and eat them. (*Id.*, Ex. 2 at 79:12-25.) In the first week of June, Camacho told Taimanglo that "eating [Taimanglo] tonight would taste better than the lunch she just had." (*Id.* at Ex. 4 at 70:21.) During May or June 2004, Ms. Camacho made comments to the effect of "nice boob, nice ass" about a female guest. (*Id.*, Ex. 2 at 19:20-24.) Camacho would talk about her sexual relations with her girlfriend in front of Villanueva, Taimanglo and Holbrook. (*Id.* Ex. 2 at 32:23-25; 34:8-9 (Camacho told Villanueva that "she used dildos with her girlfriend"); Ex. 4 at 130:10-14 (Camacho discussed the sexual things she did with her girlfriend almost daily); Ex. 3 at 65:1-2 (Camacho told Holbrook that Camacho "would enjoy having oral sex when a female is on her menstruation); Ex. 3 at 65:23-66:3.) Taimanglo also heard Camacho tell hotel guests that a box from the bridal department contained a vibrator. (*Id.*, Ex. 4 at 77:8-21.)

Camacho did not limit her sexually offensive behavior to comments, she also engaged in physically harassing behavior during the period from June 2004 through August 2004. On several occasions, Camacho placed objects like balloons or rolled up towels near her crotch and used them to simulate a penis. (*Id.*, Ex. 2 at 20:18-21:4 (Camacho used a balloon and asked coworker if he wanted to "dick sword fight"); Ex. 2 at 28:21-29:15 (Camacho used rolled up tissue paper to simulate a penis); Ex. 2 at 30:6-13 and Perez Dep. at 57:20-58:5 (Camacho stuck a mannequin hand down her pants to scratch her private area); Ex. 4 at 62:8-22 (Camacho placed rolled up paper towels in her

1　pants and Mr. Suzuki, the front desk manager, was present).) Camacho also physically

2　assaulted Holbrook, Villanueva, and Taimanglo on different occasions. In early June

3　2004, Camacho approached Villanueva and "all of a sudden, she put her right hand on

4　[Ms. Villanueva's] stomach and her left to [Ms. Villanueva's back] and started to hump

5　[her] and grind [her]." (*Id.*, Ex. 2 at 22:4-14.) Camacho grabbed Jennifer Holbrook's

6　hand and tried to place it on Camacho's breast and asked whether her breasts were more

7　like watermelons or melons. (*Id.*, Ex. 3 at 25:8-16; Ex. 4 at 71:13-23, 24-16.) Camacho

8　also tried to place Taimanglo's hand on her breast at least four times. (*Id.*, Ex. 4 at 72:9-

9　18.) In late June or early July, Camacho tried to stick her hand up Ms. Holbrook's skirt

10　and told Ms. Holbrook that she wanted to feel if she was wet. (*Id.*, Ex. 3 at 36:22-38:3.)

11　　　In July, Camacho slapped Taimanglo on the buttocks as she was either getting into

12　or out of the shuttle van. (*Id.* at 80:19-81:4.) Camacho also slapped Ms. Holbrook on the

13　buttocks in July and told Ms. Holbrook that she was sorry but that she couldn't help

14　herself. (*Id.*, Ex. 3 at 42:12-14, 43:5-7, 48:5-49:7.) On August 10, 2004, Camacho

15　slapped Taimanglo on the buttocks again. (*Id.*, Ex. 4 at 85:5-14; Ex. 2 at 35:17.)

16　　　Ms. Villanueva and Ms. Taimanglo informed Leo Palace managers and other

17　supervisors about Camacho's sexually harassing behavior as early as June 2004. Ms.

18　Villanueva told several supervisors about Camacho's physical attack on her in June. (*Id.*,

19　Ex. 2 at 23:17-25:6; Ex. 4 at 59:12-60:7.) Instead of correcting Camacho's behavior or

20　reporting the behavior to human resources or management, some of the supervisors and

21　managers laughed or acted like Ms. Villanueva was joking. (*Id.*, Ex. 2 at 24:11-12,

22　24:15-3.) Ms. Taimanglo and Ms. Villanueva both informed the front desk night

23　supervisor, Greg Perez, that Camacho had physically assaulted Ms. Villanueva. (*Id.*, Ex.

24　5 at 44:12-18.)

25　　　Greg Perez also informed Leo Palace management about Christina Camacho's

26　inappropriate behavior towards Viviene Villanueva in June 2004. (*Id.*, Ex. 6 at 99:7-22;

27　Ex. 4 at 55:23-25, 76:4-23; Ex. 5 at 50:18-51:24. ) He spoke with Mr. Suzuki about

28　Camacho harassing the women behind the front desk and asked if he could speak with

May Paulino, the human resources manager, about it. (*Id.*, Ex. 5 at 50:18-51:9; Ex. 7 at 33:20-34:4.) Mr. Perez spoke with Ms. Paulino and then told Mr. Suzuki he had spoken with Ms. Paulino. (*Id.*, Ex. 5 at 51:19-52:1.) On or about the third week of June 2004, Mr. Perez placed a report about the Villanueva incident in the inter-office mail to Human Resources. (*Id.*, Ex. 5 at 83:22-24 96:5-9; Ex. 4 at 56:10-22, 66:10-11; *see also* Ex. 6 at 44:18-19.) But after finding out that Camacho still was harassing the Plaintiff-Intervenors, Mr. Perez felt that he could not go back to Ms. Paulino again because "she [would] make[] life hard for [him]." (*Id.*, Ex. 5 at 52:6-53:7.)

Ms. Taimanglo informed other managers about the Villanueva incident and Camacho's other sexually harassing behavior in June and July 2004. Ms. Taimanglo first told Mr. Suzuki about Camacho's sexually inappropriate behavior in June 2004. (*Id.*, Ex. 4 at 62:2-22; 73:6-74:11, 94:3-14; Ex. 7 at 41:20-23, 68:3-13.) Ms. Taimanglo told Mr. Iijima about Camacho's comments to the guest regarding the vibrator. (*Id.*, Ex. 4 at 78:24-13.) Ms. Taimanglo told Greg Perez that "[Camacho's] behavior with the customers were of a sexual nature, especially one incident, and that the other girls were complaining about [Camacho], about her [sexual] aggressiveness toward them." (*Id.*, Ex. 5 at 44:12-18.) Ms. Taimanglo told May Paulino about the harassing behavior on July 1, 2004. (*Id.*, Ex. 4 at 55:15-25, 77:4-21.) During July 2004, Ms. Taimanglo repeatedly asked management what they were going to do about Christina Camacho's sexually harassing behavior but was told by Mr. Suzuki and Ms. Paulino that Leo Palace would not be terminating Christina Camacho. (*Id.*, Ex. 6 at 84:11-18, 92:13-93:8; Ex. 4 at 85:17-95:6.)

Although Ms. Taimanglo verbally counseled Camacho about her behavior, Camacho continued to engage in sexually inappropriate behavior. (*Id.*, Ex. 4 at 53:11-54:6, 100:13-23; Ex. 5 at 45:2-16.) However, Taimanglo did not have the authority to suspend employees or send them home, and had to get approval from Mr. Suzuki before writing an employee up or before going to Human Resources. (*Id.*, Ex. 4 at 45:20-23, 129:7-18.)

1    Further, although Leo Palace managers knew about the harassing behavior as early
2    as the third week of June, they allowed Camacho's behavior to continue through August.
3    Mr. Suzuki told May Paulino that, even though he was aware of the complaints about
4    Christina Camacho's, he could not terminate Christina Camacho when he found out
5    about it. *(Id.,* Ex. 6 at 78:24-80:1.) Mr. Suzuki also told May Paulino that he had not
6    counseled Christina Camacho about her behavior despite knowing that Camacho had
7    behaved inappropriately to Viviene Villanueva and Jennifer Holbrook. *(Id.* at 80:2-5,
8    81:3-6, 81:18-21.) In addition, he knew about Ms. Taimanglo's allegations against Ms.
9    Camacho but he could not terminate Christina Camacho because he was "too busy" and
10   short-staffed. *(Id.,* Ex. 1 at LPR 00004; Ex. 7 at 36:1-24; Ex. 6 at 82:17-83:7, 84:22-11;
11   Ex. 4 at 95:2-6; 69:14-20; *see also* Ex. 8 at 69:13-19.)

12   Mr. Iijima, another manager at Leo Palace, also knew about the harassing behavior
13   and did nothing to correct it. He told May Paulino that he knew about the allegations of
14   all three women, Taimanglo, Villanueva, and Holbrook, but he did not discipline Ms.
15   Camacho for her behavior. *(Id.,* Ex. 6 at 86:10-22.) Similarly, Mr. Iijima told Mr.
16   Maruyama, Leo Palace's general manager, and Mr. Suzuki that he knew Camacho was
17   sexually harassing the Plaintiff-Intervenors. *(Id.,* Ex. 8 at 81:12-16; *Id.,* Ex. 7 at 49:7-10,
18   49:22-50:2.) Ms. Holbrook also observed an incident where Camacho waived a tampon
19   in front of Mr. Iijima and he told her to put it way. *(Id.,* Ex. 3 at 63:10-5.)

20   There was no investigation regarding Camacho's behavior until August 2004.
21   *(Id.,* Ex. 8 at 81:20-21.) Finally, after allowing Plaintiff-Intervenors to be subjected to
22   Camacho's sexually harassing behavior for two months, Leo Palace investigated
23   Plaintiff-Intervenors complaints and terminated Camacho on August 13, 2004. *(Id.,* Ex. 1
24   at LPR 0006.) At no time did Mr. Maruyama discipline Ms. Paulino, Mr. Suzuki, or Mr.
25   Iijima for their delay in responding to and investigating the complaints about Camacho's
26   sexual harassment. *(Id.,* Ex. 8 at 122:12-18, 132:3-20.)

27   In 2004, employees who had sexually harassed other employees were allowed
28   back on Leo Palace property. *(Id.,* Ex. 6 at 122:17-24.) Thus, after Camacho was

terminated, she "was staying at the condo, in the condominiums [at Leo Palace]. And she was making phone calls to the girls (Villaneuva, Taimanglo, and Holbrook) and that was – at that time I guess they were afraid, so the general manager was aware about that and they called the security." (*Id.*, Ex. 6 at 118:13-19; *see also* Ex. 1 at LPR 0002-03; Ex. 2 at 73:2-23; Ex. 8 at 66:7-67:7.) However, it took at least two hours for security to remedy the situation. (*Id.*, Ex. 2 at 74:10-25.) Moreover, Mr. Iijima became angry with Ms. Holbrook about Camacho being on the property because "he didn't know what to do, he wasn't informed . . ." (*Id.* at 74:5-7.)

On August 16, 2004, Plaintiff-Intervenors' attorney Phil Torres sent a letter to Leo Palace in which he informed Leo Palace that his clients might take the claim to court and that he had spoken with the EEOC. (*Id.*, Ex. 1 at LPR 00182-187.) On the date that Mr. Maruyama received Mr. Torres' letter, Mr. Maruyama asked Jennifer Holbrook "why [were] they doing this?" (*Id.*, Ex. 3 at 82:24-83:2.) Ms Holbrook responded:

> "I am not doing this to you." [Mr. Maruyama] said, "But I am the
> Company. I am Leo Palace." And I responded to him, "I am not doing this
> because HR didn't do anything about it." And he said, "I can't trust you
> anymore." He kept on staring at me, I can feel the anger coming off of his
> voice. I started to tremble inside and I started feeling scared. And then he
> stormed out of the front desk.

(*Id.* at 83:8-16.) Mr. Maruyama's voice carried enough, that Ms. Taimanglo thought he was yelling. (*Id.*, Ex. 4 at 103:20-22.) Mr. Maruyama's actions made Taimanglo nervous. (*Id.* at 104:11-16.)

After the incident, Mr. Maruyama continued to pace back and forth in the lobby area. (*Id.*, Ex. 3 at 84:16-20; Ex. 4 at 105:24-106:1.) Mr. Maruyama was "disappointed" that Ms. Holbrook had contacted an attorney. (*Id.*, Ex. 8 at 79:4-12; 101:2-13.) He also testified that he was "worried that the [Plaintiff-Intervenors would take [his] expression against [him], or something like that, so honestly [he] was afraid to talk to them." (*Id.* at 130:2-5.) He also testified that there were "a lot of reasons" for treating the Plaintiff-

1    Intervenors differently after Leo Palace received Mr. Torres' letter, "because they're
2    suing the company and still working for the company, so I think employees, you know,
3    around them will see the difference before they sued the company and after they sued the
4    company." (*Id.* at 135:3-17.)

5          After Mr. Torres informed Leo Palace that the Plaintiff-Intervenors were
6    considering filing an EEOC charge, Plaintiff-Intervenors experienced other negative
7    changes in their working environment. May Paulino avoided talking to Plaintiff-
8    Intervenors because "they were already filing." (*Id.*, Ex. 6 at 161:5-10.) After Camacho
9    was terminated the rest of management also did not talk to the Plaintiff-Intervenors as
10   they did prior to the termination. (*Id.*, Ex. 3 at 129:12-130:3.) Prior to their complaint,
11   Mr. Maruyama and Mr. Suzuki greeted Ms. Taimanglo, Ms. Villanueva, and Ms.
12   Holbrook each morning. (*Id.*, Ex. 4 at 108:2-5; 110:15-111:5; Ex. 3 at 51:13-15.) Mr.
13   Suzuki no longer talked to Villanueva like he did prior to Camacho being terminated.
14   (*Id.*, Ex. 2 at 59:10-12.) Mr. Maruyama ignored Villanueva. (*Id.*, Ex. 2 at 58:11-24.)

15         Mr. Suzuki and Mr. Maruyama stopped greeting Ms. Taimanglo in the mornings
16   after she complained. (*Id.*, Ex. 4 at 108:1-8; 114:18-20.) After Ms. Taimanglo returned
17   from a two-week leave recommended by her therapist due to the harassment at Leo
18   Palace, Mr. Maruyama approached Ms. Taimanglo and asked her sarcastically whether
19   there had been any sexual harassment reports. (*Id.* at 108:9-13.) Mr. Iijima approached
20   Rose Taimanglo and told her "that out of the three girls, the ladies, [she] was the biggest
21   voice." (*Id.* at 109:21-23.) The conversation upset Ms. Taimanglo and she went into
22   another room and cried. (*Id.* at 110:4-6.) Mr. Maruyama commented on the fact that Ms.
23   Taimanglo had been crying and said "I didn't know local girls cry." (*Id.* at 109:12-14.)
24   Later, Mr. Iijima spoke with Ms. Taimanglo and apologized for upsetting her and told her
25   that Mr. Maruyama had told him that the Plaintiff-Intervenors were "dangerous." (*Id.* at
26   112:2-5.) At one point, Mr. Iijima also changed Ms. Taimanglo's shift from a swing
27   shift to a morning shift, but Ms. Taimanglo did not complain because she was "scared
28   [she] might get fired for complaining." (*Id.* at 125:14-20.)

1    Prior to her attorney's letter, Ms. Holbrook had a good working relationship with
2  Mr. Maruyama. (Holbrook Dep. 129:18-19.) They spoke Japanese together and Ms.
3  Holbrook was being considered as his executive assistant. (*Id.*, Ex. 3 at 135:11-136:16.)
4  After Mr. Maruyama received Mr. Torres' letter, "[Mr. Maruyama] no longer said
5  'hello,' he no longer smiled. He just walked by and stared at [Plaintiff-Intervenors] at the
6  front desk, and it wasn't a nice stare. [Plaintiff-Intervenors'] supervisors didn't talk to
7  [them] . . . . [Ms. Holbrook] felt like they were given the silent treatment." (*Id.*, Ex. 3 at
8  87:7-12; *see also id.* at 125:14-21.) There was no further discussion about Ms. Holbrook
9  becoming Mr. Maruyama's executive assistant. (*Id.* at 136:17-19.)

10    The front desk continued to be short-staffed after Leo Palace terminated Camacho.
11  (*Id.*, Ex. 7 at 66:8-14.) Despite the short-staff situation, Ms. Holbrook's schedule was
12  changed from two days off to three days off. (*Id.*, Ex. 3 at 90:7-8; 103:3-17.) Ms.
13  Holbrook was also given a shift with an hour and forty-five minutes less time. (*Id.* at
14  104:11-16.) When Ms. Holbrook asked Mr. Suzuki why he was cutting her hours, he
15  said he did not know. (*Id.* at 110:13-24.) After a shift supervisor asked Mr. Suzuki why
16  he was cutting Ms. Holbrook's hours, Mr. Suzuki responded to Ms. Holbrook that "It's
17  up to you if you want to stay or leave." (*Id.* at 111:1-7.)

18    As a result of Camacho's harassing behavior and management's initial inaction
19  and subsequent behavior, Plaintiff-Intervenors suffered increased, stress, anxiety and
20  fear. Dr. Lilli Perez Iyechad (Ms. Taimanglo and Ms. Holbrook's therapist) wrote,
21  "[Taimanglo's] presenting problem stemmed from a former coworker who was sexually
22  inappropriate verbally and physically to her. This created much anxiety for Ms.
23  Taimanglo, a feeling that was exacerbated because the behavior was allowed to continue
24  before management intervened and she quit her job." (*Id.*, Ex. 9.) Dr. Perez Iyechad
25  wrote something similar in Jennifer Holbrook's Treatment Summary:

26      [Holbrook's] presenting problem stemmed from a coworker who was
27      sexually inappropriate verbally and physically towards her. This created
28      much anxiety for Ms. Holbrook, a feeling that was exacerbated because the

behavior was allowed to continue before management intervened.

Consequently, Ms. Holbrook quit her job as a Front Desk Clerk and sought
employment elsewhere. . . . the situation has created a major disruption in
her life beyond the workplace.

(*Id.*, Ex. 10.) Mr. Babauta (Ms. Villanueva's and Ms. Holbrook's therapist) noted:

Ms. Holbrook didn't feel protected when the management of Leo Palace
failed to Intervene. She felt like she was re-victimized when she believed
the management of Leo Palace retaliated and harassed her. She states her
boss yelled at her. Ms. Holbrook was so frustrated and disgusted that she
quit. She felt that the company didn't protect her and then exacerbated
things by harassing her. She experienced overwhelming stress prior to her
resigning.

(*Id.*, Ex. 11.) Regarding Ms. Villanueva, Mr. Babauta wrote, "Ms. Villanueva did
not feel safe at Leo Palace. She stated that she was under an extreme amount of
stress and was overwhelmed." (*Id.*, Ex. 12.)

Ms. Holbrook had believed that the situation at Leo Palace would get better after
Leo Palace terminated Camacho, however, she testified her situation did not improve.
(*Id.*, Ex. 3 at 138:18-139:5.) She "wasn't happy going to work knowing that [she] didn't
have a good relationship anymore with Mr. Maruyama." (*Id.* at 140:24-141:1.) Ms.
Holbrook was afraid every day that she worked after Camacho was terminated that
"something might happen." (*Id.* at 152:20-25.) Accordingly, Ms. Holbrook left the
employ of Leo Palace on August 28, 2004 because "management does not appropriately
take care of their staff. (*Id.*, Ex. 1 at LPR 00028.) In her letter of resignation, she wrote
that part of the reason she was leaving was to take care of her mother. However, she
testified that she wrote it "because [she] just wanted to get out of there, and she didn't
want to be hassled anymore or give two-week notice." (*Id.*, Ex. 3 at 92:12-15.) She
continued to suffer anxiety and depression even into April 2006. (*Id.* at 18:3-14.)

1  Villanueva felt afraid that Camacho was going to "retaliate because of [them].
2  And so everyday that [she went] to work . . . [she would] be like looking around..." (*Id.*,
3  Ex. 2 at 72:13-19.) Ms. Villanueva had to ride the shuttle van with Camacho after Leo
4  Palace suspended Camacho on August 11, 2004. (*Id.* at 44:13-45:17.) After Leo Palace
5  terminated Camacho, Camacho called Ms. Villanueva at work, resulting in Villanueva
6  feeling further harassed. (*Id.* at 42:21-43:14.) Both incidents made Villanueva feel
7  scared and threatened. (*Id.* at 45:19-24; 48:9-10.) Indeed, on August 13, 2004, Ms.
8  Villanueva felt so scared that she went home. (*Id.* at 49:8-10.) Ms Villanueva finally
9  resigned her position on October 15, 2004 "[b]ecause [she] didn't want management to
10  be – to turn – because [she saw] what Rose and Jen had gone through with Mr. Mariyama
11  and the stuff that he said. When Rose said she was going to quit, [Villanueva] didn't
12  want to carry that burden." (*Id.*, Ex. 2 at 68:5-10; *see also id.*, Ex. 1 at LPR 00134.)

13  Ms. Taimanglo went to see a therapist because she was "always crying at work."
14  (*Id.*, Ex. 4 at 118:25-119:1; *see also* Ex. 7 at 74:9-18.) Dr. Perez Iyechad had Ms.
15  Taimanglo's doctor prescribe her Xanax. (*Id.*, Ex. 4 at 121:13-20.) Ms. Taimanglo did
16  not stop taking the drug everyday until after she left Leo Palace. (*Id.* at 123:3-5.) On
17  October 11, 2004, Ms. Taimanglo resigned her job at Leo Palace because, "management .
18  . . made [her] feel that if [she] cried for help . . . they won't correct the problem and made
19  [her] feel that [she] shouldn't have said anything." (*Id.*, Ex. 1 at LPR 00058.) Moreover,
20  Ms. Taimanglo left the job she obtained after leaving Leo Palace because she "fell into a
21  depression because of what happened to me at Leo Palace Resort." (*Id.* at 18:19-22; *see*
22  *also id.* at 19:8-20.) Even discussing the event almost three years later at her deposition,
23  Ms. Taimanglo cried. (*Id.* at 18:23.)

## III.  LEGAL STANDARD

25  Summary judgment is appropriate only if the evidence demonstrates "there is no
26  genuine issue as to any material fact and . . . the moving party is entitled to a judgment as
27  a matter of law." Fed. R. Civ. P. 56(c). In essence, the inquiry for the Court is "whether
28  the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Anderson*, 477 U.S. at 248. A fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* Further, "the requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment level is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

## IV. ARGUMENT

**A.     A Genuine Issue of Material Fact Exists that Plaintiff-Intervenors Continued to Suffer from a Hostile Work Environment After Camacho was Terminated**

A hostile environment is actionable if the harassing conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal brackets and quotation marks removed). Some of the factors relevant to determining whether there is an objectively hostile work environment include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). This "should be judged from the perspective of a reasonable person in the plaintiff's position[.]" *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001). The victim of the hostile work environment must also subjectively perceive the environment to be abusive. *Id.* at 873.

The hostile work environment is evaluated based on the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. at 372. "Under the totality of the circumstances analysis, the district court should not carve the work environment into a

series of discrete incidents." *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564
(8th Cir. 1992). Rather, "each successive episode has its predecessors, that the impact of
the separate incidents may accumulate, and that the work environment created may
exceed the sum of the overall scenario." *Id.* Moreover, "[d]iscriminatory behavior
comes in all shapes and sizes, and what might be an innocuous occurrence in some
circumstances may, in the context of a pattern of discriminatory harassment, take on an
altogether different character, causing a worker to feel demeaned, humiliated, or
intimidated on account of her gender." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104,
1109 (9th Cir. 1998) (citing *Meritor Sav. Bank*, 477 U.S. at 65 (noting that employees
have the "right to work in an environment free from discriminatory intimidation, ridicule,
and insult")).

Viewing the totality of the circumstances, Jennifer Holbrook, Rosemarie
Taimanglo, and Viviene Villanueva were subjected to a hostile work environment
beginning in at least June 2004 and continued to be subjected to a hostile work
environment even after Leo Palace terminated Christina Camacho. Camacho's behavior
towards Plaintiff-Intervenors was frequent, severe, and physically threatening. (*Supra*
pp. 2-6.) As discussed above, Camacho used obscene and sexually vulgar language on
almost a daily basis towards or in the presence of Plaintiff-Intervenors. (*Id.* p. 2.)
Similarly, she physically assaulted each of the Plaintiff-Intervenors throughout June,
July, and August 2004. (*Id.* pp. 2-3.) Despite Leo Palace's knowledge that Camacho had
engaged in sexually abusive behavior since at least the middle of June, Leo Palace's
managers and human resources manager allowed Camacho to continue working at Leo
Palace until August 13, 2007. (*Id.* pp. 3-6.) Further, the front desk manager's reason for
failing to remedy the situation earlier was because they were short-staffed. (*Id.* p. 5.) As
a result, Plaintiff-Intervenors felt unprotected and scared. (*Id.* pp. 8-9.)

Even after Camacho was terminated, Plaintiff-Intervenors continued to feel
unprotected by management. (*Id.* pp. 8-10.) The day Camacho was terminated, she
repeatedly called Ms. Villanueva. (*Id.* p.10.) Leo Palace management failed to prevent

1   Camacho from returning to the property after she was terminated and, as a result,

2   Plaintiff-Intervenors were further intimidated once they found out Camacho had been

3   staying in a Leo Palace condominium. (*Id.* pp. 5-6, 10.)Further, once Plaintiff-

4   Intervenors notified Leo Palace management that Camacho was on the property, it took

5   around two hours for security to respond. (*Id.* p. 6.) Additionally, when Mr. Iijima

6   discovered that Camacho was on the property, he became angry with Ms. Holbrook. (*Id.*)

7       Upon receipt of Mr. Torres' August 16, 2004 letter, management at Leo Palace

8   subjected Plaintiff-Intervenors to further intimidation. Mr. Maruyama confronted Ms.

9   Holbrook and demanded to know why she was suing the company. (*Id.* pp. 6-7.) Both

10  Ms. Taimanglo and Ms. Holbrook testified that Mr. Maruyama's actions scared them. (*Id.*

11  pp. 6-7.) All of the Plaintiff-Intervenors testified that Mr. Suzuki, Mr. Maruyama, and

12  Ms. Taimanglo no longer spoke with them as they did prior to receiving Mr. Torres'

13  letter. (*Id.* pp. 7-10.) Mr. Maruyama and Ms. Taimanglo's testimony corroborate this, as

14  both admitted that they avoided talking to them because they were going to file with

15  EEOC. (*Id.* pp. 6-7.) Mr. Maruyama expressed the opinion to Mr. Iijima that the women

16  were "dangerous." (*Id.* p. 7.) Moreover, both Ms. Holbrook and Ms. Taimanglo

17  experienced a change in shifts or a reduction in hours after Leo Palace received Mr.

18  Torres' letter. (*Id.*) As set forth above, this resulted in Plaintiff-Intervenors feeling

19  unprotected, scared, intimidated, and anxious. (*Id.* pp. 8-10.) Accordingly, Plaintiff-

20  Intervenors continued to suffer a hostile work environment even after Camacho was

21  terminated.

22      Reasonable people in Plaintiff-Intervenors' situation would have similarly

23  believed Leo Palace's management's actions to be hostile and intimidating. For example,

24  Greg Perez felt that he could not further complain to May Paulino because she would

25  make things difficult for him. (*Id.* p. 4.) Mr. Babauta also testified that once people have

26  been victimized, it is a reasonable reaction for them to be hypersensitive to things in their

27  environment and their surroundings. (Morrison Decl., Ex. 13 at 24:15-19, 27:6-11.)

28  Similarly, Management's failure to timely respond to Plaintiff-Intervenors complaints of

sexual harassment and reasons for doing so, would demean and humiliate a reasonable worker. Such behavior coupled with management glaring at, yelling at, and no longer speaking with the employee, would create an atmosphere of intimidation for a reasonable employee. Moreover, when Leo Palace management reduced Ms. Holbrook's hours and changed Ms. Taimanglo's shift, it added to the atmosphere of intimidation. All of these events combined to alter the terms and conditions of Plaintiff-Intervenor's employment, as further evidenced by the fact that each Plaintiff-Intervenor felt compelled to quit.

Defendant's argument that the Court should dismiss EEOC's claims for hostile work environment that occurred after Camacho was terminated or that the Court should treat each event in isolation would require the Court to carve the work environment into a series of discrete acts. Instead, EEOC's claims for hostile work environment should be evaluated based on the totality of the circumstances and that includes the conduct that occurred both before and after Camacho was terminated. As a result, there can be no doubt but that the cumulative impact of Camacho's sexually harassing and intimidating behavior, management's allowing such behavior to continue for a period of two months, and management's intimidating actions after Camacho was terminated, created an abusive work environment. Therefore, EEOC requests that the Court deny Defendant's motion with respect to the hostile work environment claims.

**B.    A Genuine Issue of Material Fact Exists that Leo Palace Retaliated Against Jennifer Holbrook and Rosemarie Taimanglo**

Unlike the substantive provisions of Title VII, the anti-retaliation provision "is not limited to discriminatory acts that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, -- U.S. ----, 126 S. Ct. 2405, 2412-13 (2006).[1]

---

[1] Accordingly, *Burlington* rejects the definition of adverse employment action quoted by Defendant. The cases cited by Defendant, *Valenti v. City of Chicago*, 2004 Dist. LEXIS 2779 at *21 (N.D. Ill.) and *West v. Maxon Corp.*, 2001 U.S. Dist. LEXIS 22228 at *22 (S.D. Ind.), are out of circuit, were decided prior to *Burlington*, and apply the wrong

To establish a triable issue of fact on retaliation, the EEOC must present evidence that Holbrook engaged in a protected activity, that the Defendant took an adverse employment action against her, and that there is a causal connection between the protected activity and the adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If the Defendant can establish a legitimate reason for the adverse employment action, the Plaintiff can also rebut by proving pretext. *Id.*

A plaintiff shows that an employment action is materially adverse if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415 (quotation and internal quotation marks omitted). Whether an action is "materially adverse depends on the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* at 2417 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). In *Burlington*, the Court noted that, in context, changes to an employees' schedule could be retaliatory. *Id.* at 2415. The Ninth Circuit Court of Appeals has found that "circumstantial evidence of a 'pattern of antagonism' following protected conduct can also give rise to inference" of retaliation. *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) (quotation omitted).

Jennifer Holbrook engaged in a protected activity by asserting her right to file with the EEOC. Leo Palace engaged in an adverse employment action against Ms. Holbrook by subjecting her to intimidation, cutting her hours, and no longer considering her for the position of Mr. Maruyama's executive assistant. (*Supra* pp. 6-10.) As discussed above,

standard. Another case cited by Defendant in support of its position, *Baucom v. Holiday Cos.*, 428 F.3d 764, 765 (8th Cir. 2005), is out of circuit and was decided prior to *Burlington*. Moreover, the plaintiff in *Baucom* was asserting ADEA and ADA discrimination claims not Title VII retaliation claims.

1   Mr. Maruyama raised his voice to Jennifer Holbrook and asked her why she was suing
2   him and/or the company and Ms. Holbrook felt intimidated by his actions. (*Id.* pp. 6-7.)
3   Subsequently, Mr. Suzuki cut Ms. Holbrook's hours by giving her three days off instead
4   of two and changing her shift schedule. (*Id.* p. 8.) In addition, Leo Palace managers no
5   longer spoke to her. (*Id.* pp. 8-9.)

6          These actions would have dissuaded a reasonable employee from making a
7   complaint. Ms. Holbrook's schedule was reduced even though Leo Palace was short-
8   staffed. Furthermore, Ms. Holbrook had no way of knowing whether the reduction in
9   hours would continue because when she approached Mr. Suzuki about the schedule he
10  merely said he did not know why her hours were cut. (*Id.* p. 8.) If the reduction in hours
11  would have continued, Ms. Holbrook would have stood to lose hundreds of dollars over
12  the course of a year. Such fear of economic retaliation could dissuade a reasonable
13  person from making a complaint. *See Burlington*, 126 S. Ct. at 2418. A reasonable
14  person could also infer from Mr. Suzuki's statement to Ms. Holbrook that it was up to her
15  whether she stayed or left that Mr. Suzuki meant that she could either not pursue her
16  claim or work. (*Supra* p. 8.) Additionally, given that Ms. Holbrook's supervisors were
17  no longer talking to her and that there was no further discussion of Ms. Holbrook
18  receiving the executive assistant position, the totality of the circumstances were such that
19  a reasonable person would be dissuaded from making a complaint of discrimination.

20         Ms. Taimanglo also engaged in a protected activity by asserting her right to file an
21  EEOC charge and was subjected to an adverse employment action as a result. Ms.
22  Taimanglo witnessed Mr. Maruyama's confrontation with Jennifer Holbrook and it
23  scared her. (*Id.* pp.6-7.) She, too, was subjected to a pattern of antagonism by
24  management, including management no longer speaking to her as they did prior to her
25  complaint, and Mr. Maruyama making belittling comments to her about whether there
26  was any more sexual harassment and about her crying. (*Id.* pp. 7-8, 10.) Ms. Taimanglo
27  also experienced fear of economic retaliation when her shift was changed. (*Id.* p. 7.)
28  These actions would dissuade a reasonable person from making a complaint.

1  Evidence exists concerning causation for the adverse employment actions taken
2  against both Ms. Holbrook and Ms. Taimanglo. Mr. Maruyama testified that he was
3  scared to speak with the women because of the lawsuit and that there were a lot of
4  reasons to treat the women differently, including that they were suing the company. (*Id.*
5  pp. 6-7.) Evidence exists that he also called the women "dangerous." (*Id.* p. 7.) Ms.
6  Paulino stated that she avoided speaking to the women because they were filing. (*Id.*)
7  Finally, the temporal proximity between the adverse employment actions creates an
8  inference of causation. *See Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000).
9  Therefore, EEOC requests the Court to deny Defendant's motion as to Ms. Holbrook's
10  and Ms. Taimanglo's retaliation claim.

11  **C.    A Genuine Issue of Material Fact Exists that Jennifer Holbrook and**
12  **Rosemarie Taimanglo were Constructively Discharged**

13      "A constructive discharge occurs when a person quits his job under circumstances
14  in which a reasonable person would feel that the conditions of employment have become
15  intolerable." *Draper*, 147 F.3d at 1110 (citing *Steiner v. Showboat Operating Co.*, 25
16  F.3d 1459, 1465 (9th Cir.1994)).   This is "normally a factual question for the jury."
17  *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (quotation omitted).
18  This requires a plaintiff to "show some aggravating factors, such as a continuous pattern
19  of discriminatory treatment." *Id.* at 626 (citation omitted).   Further, a jury may take into
20  account "[t]he frequency and freshness of the instances of harassment" into the
21  determination of whether an individual was constructively discharged. *Draper*, 147 F.3d
22  at 1110 n.2.  For example, the Ninth Circuit Court of Appeals found that whether a
23  plaintiff was constructively discharged was a jury question where plaintiff had presented
24  evidence that she quit after only four incidents over a two-month period. *Watson v.*
25  *Nationwide Ins. Inc.*, 823 F.2d 360, 361-62 (9th Cir. 1987).

26      Here, a reasonable person in the same circumstances as Jennifer Holbrook and
27  Rosemarie Taimanglo would have felt that the conditions of employment were
28  intolerable.  Camacho's conduct should be considered part of the circumstances because

it was Leo Palace's delayed action regarding Camacho's conduct that led, in part, to Ms. Holbrook's and Ms. Taimanglo's intolerable working conditions and constitutes a continuing pattern of discrimination. Subsequent to Camacho's termination, Ms. Holbrook's and Ms. Taimanglo's therapists noted that management's inaction had exacerbated their anxiety. (*Id.* pp. 8-9.) Further, the hostile conduct towards Ms. Holbrook continued because Mr. Maruyama intimidated her, Mr. Suzuki cut her hours, she was no longer being considered for the executive assistant position, and management was no longer talking to her. (*Id.* pp. 6-9.) Likewise, Ms. Taimanglo was subjected to further hostile conduct, such as having her shift changed, being subjected to the general manager's belittling comments, being ignored, and being singled out as "the loudest voice." (*Id.* p. 6-8, 10.)

The freshness and frequency of Camacho's harassment, the events right after Camacho's termination, and the continuing pattern of discrimination by Leo Palace management, would cause a reasonable person to feel the conditions of employment were intolerable. Indeed, Ms. Holbrook's testimony that she "just wanted to get out of there, and she didn't want to get hassled anymore or give two-weeks notice," (*id.* p. 9), mirrors the description of constructive discharge enunciated by the Ninth Circuit in *Wallace* as "the individual has simply had enough; she can't take it anymore." 823 F.2d at 626 (quotation omitted). Ms. Taimanglo's emotional state while at Leo Palace and the effects she continues to suffer over the hostile environment at Leo Palace also demonstrate that Ms.Taimanglo had enough and could not take it anymore. (*Id.* pp. 6-8, 10.) Finally, the number of incidents far exceeds the four incidents deemed sufficient to support constructive discharge in *Watson*. Accordingly, a genuine issue of material fact exists as to whether Ms. Holbrook and Ms. Holbrook were constructively discharged and EEOC requests the Court to deny Defendant's motion with respect to Ms. Holbrook's and Ms. Taimanglo's constructive discharge claim.

///

///

# V. CONCLUSION

For the foregoing reasons, Plaintiff requests the Court to deny Defendant's Motion for Partial Summary Judgment.

Date: September 24, 2007

United States Equal Employment
Opportunity Commission

By: ANGELA MORRISON
Attorneys for Plaintiff