# Exhibit 2

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) CASE NO. 1:06-CV-00028 |

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,           ) CASE NO. 1:06-CV-00028
                                  )
                                  )
                    Plaintiff,    )
                                  )
          vs.                     )
                                  )
LEO PALACE RESORT,                )
                                  )
                    Defendant.    )
_____  )
JENNIFER HOLBROOK,                )
VIVIENE VILLANUEVA and            )
ROSEMARIE TAIMANGLO,              )
                                  )
          Plaintiff-Intervenors,  )
                                  )
          vs.                     )
                                  )
MDI GUAM CORPORATION dba LEO      )
PALACE RESORT MANENGGON HILLS     )
and DOES 1 through 10,            )
                                  )
          Defendants.             )
_____  )

### *DEPOSITION OF VIVIENE VILLANUEVA*

*Taken on Behalf of the Defendant*


BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of

Viviene Villanueva was taken before Veronica F. Reilly,

Certified Shorthand Reporter, on Wednesday, the 21st day of

March 2007, at 1:30 p.m. in the Law Offices of Dooley Roberts

& Fowler, 865 South Marine Corps Drive, Suite 201, Orlean

Pacific Plaza, Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

APPEARANCES


Appearing on behalf of the plaintiff:

        TEKER TORRES & TEKER
        Suite 2A
        130 Aspinall Avenue
        Hagatna, Guam 96910
        By:  Mr. Philip Torres, Esq.
        Phone:  671.477.9891


Appearing on behalf of the defendant:

        DOOLEY ROBERTS & FOWLER
        Suite 201, Orlean Pacific Plaza
        865 S. Marine Drive
        Tamuning, Guam 96913
        By:  Mr. Tim Roberts, Esq.
        Phone:  671.646.1222


Appearing on behalf of the EEOC:

        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
        333 S. Las Vegas Boulevard
        Suite 300
        Las Vegas, Nevada 89101
        By:  Ms. Angela D. Morrison, Esq.
        Phone:  702.388.5072

                ALSO PRESENT


Rosemarie Taimanglo, Plaintiff

May Paulino, Leo Palace

Nichiro Niikura, Leo Palace

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

1   who those names were?

2            MS. MORRISON:  Objection; calls for speculation.

3   BY MR. ROBERTS: (Continuing)

4       Q.    That's a terrible question.  I'll withdraw the

5   question.  Your answer should be, probably not.  I'll look at

6   it later.  What did she say, she'd like to make a sandwich

7   out of you?

8       A.    Yes.

9       Q.    Did you say anything to her?

10      A.    No.

11      Q.    What did you think she meant by that?

12      A.    Well, I thought that she was just hungry and then I

13  didn't think of anything else.

14      Q.    Did you interpret it as sexual harassment as a

15  remark as being sexual at the time or did you think it was

16  just an odd comment?

17      A.    At the time, I thought she just had made a mistake,

18  like when they say I'm so hungry, I could eat a horse.  You

19  know, the idiomatic phrase?  You know, I'm so hungry, I could

20  make a sandwich.  I thought that she had made a mistake of

21  saying a horse to a sandwich.

22      Q.    Okay.  Do you remember approximately how many days

23  -- how long between the time Christina first started working

24  and this comment approximately went by?

25      A.    From the time she started working?

1    Q.   Yeah.

2    A.   I'm not sure.  It was somewhere around May 2004.

3    Q.   And she started working on May 10 of 2004.  We all

4  know that, right?

5    A.   Yes.

6    Q.   Do you remember how many days or weeks later this

7  comment was made?

8    A.   (Witness shook head.)

9    Q.   After this comment, what was the next incident that

10  occurred that you saw with your own eyes that you would

11  consider sexual harassment?

12    A.   She and I, Christina and I, were working at the

13  hotel front desk and we had a lady guest passing by the lobby

14  area and she was wearing very short shorts and --

15    Q.   I'm sorry to interrupt, but how many days or weeks

16  after this sandwich comment did this incident you're

17  describing occur?

18    A.   I don't remember.

19    Q.   Okay.  Tell me what happened.

20    A.   This lady, she passed by, she was, you know, a

21  guest.  She passed by the lobby area and she was wearing

22  shorts that were -- and like tank top that was really tight

23  and as she passed by, Christina had commented, she goes,"Ooh,

24  nice boobs, nice ass."

25    Q.   What was that word?  Boobs?

1    A.    Boobs, yes.

2    Q.    Did the guest hear it?

3    A.    No.

4    Q.    Was this at the front desk?

5    A.    Yes, it was at the front desk.

6    Q.    Who else was behind the front desk at the time?

7    A.    Just the two of us.

8    Q.    Did you say anything to her when she made this

9  remark to you?

10    A.    Yes, I did.

11    Q.    What did you say?

12    A.    I told her to stop, you know, she can't say that,

13  the guest might have heard her.

14    Q.    Did she respond to you?

15    A.    She laughed.

16    Q.    After this incident, what's the next incident that

17  occurred that you would consider to be sexual harassment?

18    A.    We had a balloon in the shape of a sword in the

19  counter and then she took it, she waved it around, like

20  started to fence, and then she put the balloon to her private

21  area and she started saying to one of our male co-worker, I

22  believe his name was Sang or Song, he's Korean, and he said

23  do you want to like dick fight, sword fight.

24    Q.    Sword fight?

25    A.    Yes.

1    Q.   Were those the words she said?

2    A.   Dick sword fight.

3    Q.   Okay.  She said the word dick?

4    A.   Yes.

5    Q.   What did Song say?

6    A.   He didn't say anything.  He just looked at her.

7    Q.   He didn't laugh?

8    A.   No.

9    Q.   Did you laugh?

10   A.   No, sir.  He, Song, looked at her like he was kind

11   of disgusted.

12   Q.   Who was your supervisor at the time?

13   A.   There was no supervisor at the time.

14   Q.   Wasn't Rose your supervisor?

15   A.   Yes, but she wasn't there.

16   Q.   Did you report any of these incidents to Rose?

17   A.   No.

18   Q.   Why not?

19   A.   It didn't cross my mind.

20   Q.   Okay.  So after the balloon incident, what's the

21   next thing that you saw with your own eyes that you consider

22   sexual harassment from Christine Camacho?

23   A.   She started to hump me.

24   Q.   How long after she had started work at Leo Palace on

25   May 10 of 2004 did this humping incident occur?

1       A.   May incident, June, so two weeks, less than three

2   weeks.

3       Q.   Do you remember when in June?

4       A.   I don't remember the date but it was somewhere

5   around the first week, sir.

6       Q.   Tell me what happened.

7       A.   I was -- I took off the front desk.  I was in the

8   computer, computer No. 3.  We had four computers.  Computer 1

9   being the Ving card to make keys, 2 for, you know -- 3 and 4,

10  and I was in the middle and I noticed that she -- you know,

11  from my view, side view, that she had entered from the door

12  and then she was approaching me and then all of a sudden, she

13  put her right hand to my stomach and her left to my back and

14  started to hump me and grind me.

15      Q.   And what did you do?

16      A.   I was shocked.  I told her, stop it, Christina,

17  you're scaring me.  And all she said was, you know, "Sorry, I

18  couldn't help myself," but she was laughing anyways.

19      Q.   Did you push her away?

20      A.   I went like this.  I didn't push her away.

21      Q.   That looked like a side step?

22      A.   Yes.  Then --

23      Q.   Was anybody else behind the front desk when this

24  happened?

25      A.   My supervisor, Rose, was there but she didn't see

1   it.

2       Q.    Rose didn't see it?

3       A.    Yes.  Because she was kneeling down getting

4   something from the storage cabinet.

5       Q.    Did you tell Rose what had happened?

6       A.    Yes, I did.

7       Q.    What did Rose say?

8       A.    She said that she's crazy, she's going to get

9   herself in trouble.

10      Q.    By this time, June of 2004, you had known May

11  Paulino for about a year, right?

12      A.    Yes.

13      Q.    Did you ever think of reporting Christina's conduct

14  to May Paulino?

15      A.    No.  It didn't cross my mind, you know, at the time.

16  It didn't cross my mind.

17      Q.    Did you tell anybody else about this humping

18  incident?

19      A.    Yes, I did.

20      Q.    Who?

21      A.    Other than Rose?

22      Q.    Yeah.

23      A.    I told other supervisors, Jun Layug, which at the

24  time, he was Reception Center Front Desk Supervisor for B

25  Shift.

1    Q.    What's Jun's last name?

2    A.    Layug L-A-Y-U-G.

3    Q.    Layug.  And why did you tell Jun Layug?

4    A.    Because I felt uneasy.

5    Q.    What was Jun Layug's position?  Front Desk?

6    A.    I'm sorry.  Reception Center Supervisor for B shift.

7    Q.    For B shift?

8    A.    For swing shift.

9    Q.    Swing shift?

10   A.    Or I think that was C, C shift.

11   Q.    Did Jun say anything to you?

12   A.    He laughed.  He thought I was joking.

13   Q.    Who else did you tell about this humping incident

14   other than Jun?

15   A.    I told Concierge Supervisor, Ray Ocasamora.  I

16   believe he was the supervisor for the concierge back then and

17   he works swing shift as well.

18   Q.    What did he say?

19   A.    Nothing.  He laughed.

20   Q.    Anybody else other than Jun, Ray and Rose?

21   A.    Yes.

22   Q.    Who?

23   A.    Han Jang Min.  He was the Assistant Night Manager

24   for graveyard.

25   Q.    Can you spell that for the court reporter?

1      A.    H-A-N space J-A-N-G space M-I-N.

2      Q.    Did he say anything?

3      A.    No.  He laughed as well.

4      Q.    Who else did you tell?

5      A.    Greg Perez and he's the Night Manager, Graveyard

6   Night Manager.

7      Q.    So were you pretty angry as a result of this humping

8   incident?

9      A.    I wasn't angry but I was -- like I didn't understand

10  why they took it like a joke.

11     Q.    You're telling a lot of people.  You're telling

12  Rose, you're telling Jun, you're telling Ray, Han, Greg.  Why

13  were you telling all these people?

14     A.    Because to me, at that time, I felt like if I told

15  somebody, then they'd know that it really happened.

16     Q.    Why did you think it was important for somebody to

17  know that it really happened?

18     A.    Because at that time, they might think that it's a

19  joke.  So I figured if I told someone else, they might

20  believe.

21     Q.    Did you think it was important that somebody believe

22  you?

23     A.    Yes.

24     Q.    Why?

25     A.    Because I was violated.

1    about the humping incident sometime in the first week of

2    June, Rose, Jun, Ray, Han and Greg, did you tell anybody

3    else?

4        A.    There were some staff that somehow like heard about

5    my incident and asked if it were true, but I could not recall

6    who.

7        Q.    Were these two Filipino guys?

8        A.    Filipino guys?

9        Q.    Yeah.

10       A.    (No response.)

11       Q.    You don't remember?

12       A.    (Witness shook head.)

13       Q.    Some staff heard about it and they asked you?

14       A.    If it were true and they thought that we're kidding,

15   so they wanted to confirm if it were true.

16       Q.    And what did you tell them?

17       A.    I told them that it's true.

18       Q.    After this humping incident, what's the next

19   incident of what you would consider sexual harassment that

20   you saw or witnessed with your own eyes?

21       A.    Christina -- we had a box of tissue at the front

22   desk and she took like a lot of it and stuffed it.  She

23   unzipped and she put it to the private area.

24       Q.    How many days or weeks after the humping incident

25   did this occur?

1    A.   I'm not sure but it was sometime in June.

2    Q.   So Christina stuffed tissue down her pants, right?

3    A.   Yes.

4    Q.   What else did she do on this tissue incident?

5    A.   She just said that "Oh, I have a dick."

6    Q.   Was there anything sticking out of her pants?

7    A.   No.  She just make it, you know, like make it look

8  like it's bulky.

9    Q.   Like it's bulky?

10    A.   Yes.

11    Q.   So she stuffed tissue down her pants and made it

12  look like she had a lump in her pants where a male penis

13  would be?

14    A.   Yes, and she was walking around, saying "Look, I

15  have a penis."

16    Q.   Okay.  Who else was there when this happened?

17    A.   I'm not sure who.

18    Q.   Did you tell her anything at all?

19    A.   To Christina?

20    Q.   Did you say anything to Christine?

21    A.   No.

22    Q.   Did you report this incident to anybody?

23    A.   No.

24    Q.   Did you go to May Paulino?

25    A.   No.

1    Q.    You didn't tell anybody about this incident?

2    A.    (Witness shook head.)

3    Q.    Okay.  After this tissue-stuffing incident, what's

4    the next thing that happened that you would consider being

5    sexual harassment that you saw?

6    A.    She -- we had a mannequin in the back office and she

7    did that hand of the mannequin and I saw her put the hand on

8    the pants, like touching like this. (Witness gestured.)

9    Q.    You got to kind of explain because the court

10   reporter can't really write gesturing, so try and explain

11   exactly what Christine did.

12   A.    We -- she wanted the hand of the mannequin to

13   scratch it, scratch her private area.

14   Q.    Was anybody else around who witnessed this?

15   A.    Yes.

16   Q.    Who?

17   A.    Rose.

18   Q.    I'm sorry?

19   A.    Rose Taimanglo.

20   Q.    Anyone other than Rose?

21   A.    There was more but I cannot recall who else.

22   Q.    Did you see anybody tell Christina to stop or take

23   the mannequin from her?

24   A.    Yes.

25   Q.    Who?

1      A.    Rose.  She told her to like stop, take it out,

2   that's not good.

3      Q.    What were Rose's exact words?

4      A.    Like stop, don't do that.

5      Q.    Did Christina stop?

6      A.    She eventually stopped but she laughed anyways.

7      Q.    And how long after the tissue incident did the

8   mannequin incident occur?  Are we in July yet?

9      A.    Maybe June, July.  I'm not sure.

10     Q.    Okay.  What's the next thing that happened after

11  this that you considered sexual harassment?

12     A.    (No response.)

13     Q.    Before you answer that, the mannequin incident, did

14  you think it was funny?

15     A.    No.

16     Q.    Was it your impression that Christina was trying to

17  maybe make a joke?

18     A.    No, she -- I guess she wanted us to see like it's --

19  the hand was scratching it.

20     Q.    You don't think that she was trying to be funny?

21     A.    No.

22     Q.    Was Christina -- did she joke around a lot?

23     A.    Joke in a clean joke or --

24     Q.    Any kind of joke?

25     A.    Yes.

1    Q.    Was she usually a nice person?

2    A.    Usually like in general?

3    Q.    Yeah, in general.

4    A.    She would -- she's a nice person, but in a way,

5  there's like a meaning to it; like she would say sexually --

6  sexual jokes.  I guess, you know, she would have been like --

7  continued on being nice if she stopped bothering people with

8  her sexual jokes.

9    Q.    Did you ever laugh at any of her jokes, even the

10 clean ones?

11   A.    Clean ones, yes.

12   Q.    Can you recall some clean jokes that she told or

13 jokes she made?

14   A.    No.

15   Q.    Did you consider Christina generally a happy person?

16   A.    Well --

17   Q.    Let me withdraw.  A better question is, was she

18 smiling a lot on the job?

19   A.    Sometimes.

20   Q.    After the mannequin incident, what's the next thing

21 that you saw happen that you would consider to be sexual

22 harassment?

23   A.    She would tell us about her sexual life, that she

24 had a girlfriend who worked at the Housekeeping Department

25 and she would describe how they have sex.

Q.   This comment by Rose, was this after the first time that Christine described having sex with her girlfriend?  Let me withdraw that question.  When did this conversation with Rose happen where Rose said management can't release her yet?

A.   Sometime in June -- July.

Q.   What's the next thing that happened that you would consider to be sexual harassment?

A.   She would tell us that she used dildos with her girlfriend.

Q.   I'm sorry?

A.   Dildos.

Q.   She would describe that she had used dildos on her girlfriend?

A.   Yes, when they have sex.  And she would brag about that her girlfriend's husband like knows and that the girlfriend likes having sex with her than the husband.

Q.   Was anybody else around when she told you this?

A.   I don't remember.

Q.   Did you tell her to shut up because you're not interested?

A.   No, I just moved away.

Q.   Moving ahead.  When --

A.   I'm sorry?

Q.   About when did this comment happen about Christine describing how she liked to use a dildo with her girlfriend?

1    A.    I can't recall.

2    Q.    But it was sometime in July?

3    A.    I'm sorry, I don't remember.

4    Q.    The last two incidents of sexual harassment that you

5    described were both verbal, right?

6    A.    Yes.

7    Q.    Did anything happen of a physical nature that you

8    saw with your own eyes after these two verbal comments until

9    Christine was fired?

10   A.    Before she was fired?

11   Q.    Yeah, at any time between these two oral comments

12   that you consider sexual harassment, did anything happen

13   after those but before Christine was fired of a physical

14   nature?

15   A.    Yes.

16   Q.    What?

17   A.    August 10, Rose was slapped in the butt.

18   Q.    And you saw that?

19   A.    Yes.

20   Q.    Was it behind the front desk?

21   A.    Yes, it was.

22   Q.    Tell me what happened.

23   A.    I was on the left side and her and Rose and

24   Christina went on the opposite side and Rose was near the

25   door, like facing towards the door and Christine was, like

1    she was following her and then all of a sudden, she slapped

2    her really hard and her hand stayed there and Rose just got

3    mad.

4        Q.    What did Rose do?

5        A.    She just got mad and told her, you know, "I warned

6    you so many times but you still do it."

7        Q.    What did Christina say?

8        A.    She just said, "I'm sorry.  I couldn't help myself,"

9    but she laughed, like she was laughing like she was happy.

10       Q.    Did you report this incident to anybody above Rose?

11       A.    No.

12       Q.    Why not?

13       A.    Because I don't want to make it my problem.  She's

14   not my responsibility.

15       Q.    After August 10, did you say it was August 10 was

16   the date you said?

17       A.    Yes, with Rose's butt slapping.

18       Q.    Things started to happen pretty fast then, right?

19       A.    Yes.

20       Q.    What happened next?

21       A.    On the next day, when she was told to go home --

22       Q.    Okay.  I think you got ahead of me there, but it was

23   my fault because I said what happened.  Rose got slapped on

24   the butt on August 10.  Shortly after that, did you get word

25   that May Paulino wanted to see you?

1    Q.    Were you on good terms with them?

2    A.    Good terms like staff-manager relation?

3    Q.    Yeah.

4    A.    Good terms but I was not close to them.

5    Q.    Were they ever mean to you or unfair to you before

6    August 11?

7    A.    No, they were nice.

8    Q.    When you spoke with them, did you speak with them in

9    English?

10   A.    English, yes.

11   Q.    They both spoke English?

12   A.    They did but Mr. Suzuki tried because he knows

13   little bit English.

14   Q.    Who's better, Ijima or Suzuki, at speaking English?

15   A.    I would say Mr. Ijima.

16   Q.    Were you working when Christina got fired?

17   A.    Yes, I was.

18   Q.    Do you remember what day that was?

19   A.    On the 13th, August 2004.

20   Q.    How did you find out that Christina had been fired?

21   A.    I found out the next day that she was completely

22   fired, but on the 13, Christina had told me twice; she was

23   harassing me, asking me what she had done to me.

24   Q.    So you were at work on the 13th, right?

25   A.    Right.

1        Q.    And I think Christina was calling you from somewhere

2    other than work, right?

3        A.    Yes, outside.

4        Q.    Did she call you on the Leo Palace telephone number

5    or on a cell number?

6        A.    I'm not sure.

7        Q.    Tell me about the first call from Christina.

8        A.    The first call was actually received or answered by

9    Rita Villagomez, because there's two phones and I was on the

10   other one and I kept answering phone calls.  And during those

11   times, I'll notice that Rita was whispering and I had a

12   feeling that it was Christina on the other line because she

13   was whispering and she was like -- Rita was kind of like

14   looking at me and like trying to cover.

15       Q.    Was Christina supposed to be working that day?

16       A.    I think she was like suspended.

17       Q.    Do you think she was supposed to be scheduled to

18   work that day?

19       A.    I don't know.

20       Q.    Did anyone tell you that she had been sent home and

21   told to stay home?

22       A.    On the 11?

23       Q.    At any time?

24       A.    On the 11, I heard that she was supposed to go home.

25       Q.    After your interview with May?

1    A.   That day she was supposed to go home in the morning.

2 When she came in the morning --

3    Q.   Of the 12th?

4    A.   Of the 11, and I heard that she was asked to go home

5 and not work, so she was supposed to go home but she didn't.

6 She rode in with the shuttle van drivers.

7    Q.   On the 11th?

8    A.   On the 11th.

9    Q.   Who told you that May was supposed to go home?

10    A.   Christina?

11    Q.   Or Christina was supposed to go home?

12    A.   I'm not sure who it was, I just heard.

13    Q.   Did you also hear she was riding around with the

14 shuttle drivers?

15    A.   I heard and when I rode to one of that shuttle --

16 the van, the driver had picked her up because she was on the

17 road.

18    Q.   So did you ride in the van with Christina?

19    A.   No, I was there first.

20    Q.   So Christina got on the van?

21    A.   Yes.

22    Q.   And that's on the 11th?

23    A.   On the 11th.

24    Q.   And this is after Christina had been told to go

25 home?

1    A.    Yes.

2    Q.    Did you and Christina talk?

3    A.    Yes.

4    Q.    What did you talk about?

5    A.    She asked -- Well, she was telling me what happened

6 and she said --

7    Q.    What did she say happened?

8    A.    She said that they're sending me home because of

9 complaints from us - me, Rose and Jen - you know, regarding

10 her wrongdoings.  And she, at that moment, she admitted doing

11 those stuff with Jen and Rose, but she was like, "but I don't

12 remember doing anything to you, like what did I do."  And at

13 first, I didn't want to answer and then she kept asking and

14 then I told her, don't you remember you humped me sometime in

15 June?  And she didn't actually get a chance to answer it

16 because I had to get down to bring the laundry to the laundry

17 room.

18    Q.    Did she threaten you in any way?

19    A.    I felt threatened because on the 13th, she kept

20 calling.

21    Q.    No, but on the 11th when you were riding around in

22 the van with her and talking with her?

23    A.    I got conscious and I was kind of scared that she

24 was asked to go home and she's still here.

25    Q.    Did she raise her voice or yell at you in any way?

*March 21, 2007: Viviene Villanueva*

1          A.    I assume, yes.

2          Q.    Did you ever speak with Christine on that day,

3    Friday the 13th?

4          A.    She called -- the second call came in and I was the

5    one that picked up because I was by myself and I had already

6    recognized her voice when she said, you know, "Viviene" and

7    then she kept asking, "What did I do?  What did I do?  I

8    don't remember doing anything to you."

9          Q.    Can you describe the tone of her voice?

10         A.    Like she was frustrated but she wasn't angry but she

11   kept asking "What, what did I do?  What did I do?"  And at

12   first, I didn't want to answer because it's supposed to be

13   confidential that she was not supposed to be talking to us or

14   be near us but then she kept like harassing me, "What did I

15   do?  What did I do?"

16              And then I just wanted to end the call and I told

17   her, you humped me, remember, sometime June 2004.  She said,

18   "No, I don't remember."  And I asked her, did management talk

19   to you anything about it, like were you given a report or

20   anything and she said, "No, management did not talk to me

21   about it."  And then she said, "Okay, I'll just talk to you

22   later because I have a 3 o'clock meeting with May."

23              And at that moment, when I hang up the phone, all I

24   could remember was her stuff, like Christina bragging that

25   she had beaten up her girlfriend, her ex-girlfriend, for that

Case 1:06-cv-00028    Document 69-2    Filed 09/24/2007    Page 24 of 80

```
1   matter and she was reported to police but was never arrested
2   because she was related to a policeman.
3           So I got scared and I called HR and I spoke to Rose
4   and told her that I wanted to talk to May because I have
5   something to tell her and she said, "No, May's on the other
6   line" and she goes, "Do you want to leave her any message?"
7   And I told her exactly what happened and she goes, "Okay,
8   I'll let her know."  At that time, I was really scared for my
9   life because, you know, I just remembered all this stuff.  I
10  just went home.
11      Q.   Were you there when security came to escort
12  Christina off the premises at any time during this time
13  period?
14      A.   I don't know.
15      Q.   So you went home right after you made the call to
16  Boots at HR?
17      A.   I went home like 1:45.
18      Q.   Do you blame Leo Palace for Christine Camacho
19  calling you on the 13th?
20      A.   Well, at that moment, no, I just got scared.
21      Q.   I mean, Leo Palace had fired Christine, right?
22      A.   Yes, but their actions were delayed.
23      Q.   Their actions were what?
24      A.   Delayed.
25      Q.   I understand you believe they fired her late, but
```

1      Q.    Was there any difference between working for Leo
2   Palace and before your sexual harassment complaint letter
3   from Phil Torres to Leo Palace?
4      A.    Before the letter?
5      Q.    Let me slow that down.   Did anything change in your
6   job at Leo Palace after your sexual harassment complaint?
7      A.    Yes.
8      Q.    What changed?
9      A.    Managers treated us differently.
10     Q.    How differently?
11     A.    Like Mr. Mariyama, before the incident, Christine
12  was fired, he always comes to the front desk to pick up the
13  letter or messages that he has and he would say good morning
14  and he would smile and he would greet all of us and he'll
15  look at us in a happy way.   But after Christine was fired, he
16  would selectively greet staff and sometimes when I greeted
17  him, he would just like look at me and just look away.
18     Q.    Look away?
19     A.    Yes, like continue walking.   And when there's was
20  two of us, me and Rita Villagomez, I was the one that greeted
21  him like good morning and he looked at me and then looked at
22  Rita and said good morning, you know, instead of me.   He
23  looked at me and then looked at Rita and said good morning to
24  her.
25     Q.    Were you surprised that Mr. Mariyama appeared to be

1   upset over the fact that you three had hired an attorney and

2   threatened to sue Leo Palace for sexual harassment?

3        A.   I was surprised.

4        Q.   Do you blame him for being upset?

5        A.   No.

6        Q.   Was any other manager different towards you after

7   your sexual harassment complaint?

8        A.   Mr. Suzuki.

9        Q.   Huh?

10       A.   Mr. Suzuki.

11       Q.   .How was Mr. Suzuki different?

12       A.   He wouldn't talk to us anymore like before.

13       Q.   Mr. Mariyama testified at his deposition -- were you

14   there at his deposition?

15       A.   Yes, I was.

16       Q.   Do you remember him testifying that he was afraid of

17   you after your sexual harassment was filed or that he was

18   afraid to talk to you?

19       A.   I think so.

20       Q.   Do you have any reason to believe that he was being

21   untruthful when he said that in his deposition?

22       A.   I'm sorry?

23       Q.   Do you have any reason to believe that Mr. Mariyama

24   was not telling the truth when he said he was just afraid to

25   talk to you after your sexual harassment complaint?

1    A.   After she told me that she was going to quit, I felt

2    like I wanted to quit, too, because I didn't want to carry

3    the burden of what Rose and Jennifer had gone through.

4    Q.   Why did you quit your job at Leo Palace?

5    A.   Why I did quit my job?

6    Q.   (Nodded head.)

7    A.   Because I didn't want management to be -- to turn --

8    because I've seen what Rose and Jen had gone through with

9    Mr. Mariyama and the stuff that he said.  When Rose said she

10   was going to quit, I just didn't want to carry that burden.

11   Q.   What burden?

12   A.   That they had gone through, that they were stressed.

13   And, you know, even though I didn't want to leave Leo Palace,

14   it was a hard decision.

15   Q.   It was a hard decision to leave Leo Palace?

16   A.   Yes.

17   Q.   Did anyone at Leo Palace force you to quit your job?

18   A.   No.

19   Q.   Did you feel forced to quit your job or was it just

20   a hard decision?

21   A.   I didn't want to quit, but at that point, I felt

22   like it.

23   Q.   You decided to quit?

24   A.   I decided to quit.

25   Q.   And that's because Rose had quit?

1   choice?

2       A.   Well, I thought -- I mean, I had a choice and I

3   didn't want but it was like making a hard decision.

4       Q.   And you chose to quit?

5       A.   I chose to quit.

6       Q.   And was that a voluntary decision?

7       A.   Yes.

8       Q.   You thought about it and you made a voluntary

9   decision to resign your job at Leo Palace; is that correct?

10      A.   Yes.

11      Q.   What were the reasons you decided to go see a

12  counselor?

13      A.   Right after Christina was harassing -- at least on

14  the 11th and specially on the day that she was fired, I felt

15  that some day that she was going to retaliate because of us.

16  And so everyday that I go to work and which is mostly morning

17  shift, and me, I'm the person that would go to work even like

18  more than thirty minutes even though it's closed.  And

19  everyday, when I'll drive, I will be like looking around, is

20  she there, is she anywhere near me, is she around or is

21  anyone in particular, like because she had friends, you know,

22  someone that I don't know, so I have to be watchful.

23      Q.   Do you think Leo Palace should have -- Let me ask it

24  this way:  What do you think Leo Palace should have done, if

25  anything, after it fired Christine Camacho?

1     A.    (No response.)

2     Q.    That's a bad question.  I'll withdraw it.  After

3   Christine was fired and after she came and rode around in the

4   shuttle, did you ever see her back on Leo Palace premises?

5     A.    Yes.

6     Q.    When?

7     A.    August 15th she was checked into the condominiums.

8   We noticed -- we just -- for me, in particular, I noticed her

9   voice coming from that room, you know, over the phone and it

10  was not her room -- not registered under her name.  It was

11  under an active employee, Rita Villagomez, and she was not

12  even listed as a guest.

13    Q.    So what did you do about that, if anything?

14    A.    I'm sorry?

15    Q.    Did you tell anybody, hey, Christine is on the

16  premises?

17    A.    Yes.

18    Q.    Who?

19    A.    I told Rose that I think that was Christina, that

20  was her voice.  And then, you know, we called several times

21  to check and it was her.  So Jen called up Mr. Mariyama on

22  the phone and said that Christina was checked into one of the

23  condos and I believe Jen said that Mr. Mariyama was busy at

24  that time and she had asked him to, you know, to go to front

25  desk when he's not busy.

1    And then that day, Mr. Ijima pointed to Jen like you

2  go to the storage room and they were going to talk and we

3  didn't actually hear, but -- it wasn't clear but we could

4  hear it was loud voices. And then when Jen came out, she

5  said, Mr. Ijima is getting mad that he's not -- he doesn't

6  know what to do, he wasn't informed and then -- like she was

7  getting mad at her. And then me and Rose were like, why

8  would he get mad at us, we're not the bad guys, we're the

9  victims, we just need security.

10   Q.   Well, what happened with respect to Christina being

11  out at the condo? Was Palacios Security called?

12   A.   Not at that time. He was called later.

13   Q.   Later that day?

14   A.   No.  Mr. Palacios responded like two hours, after

15  two hours.

16   Q.   And what did Palacios do?

17   A.   He watched the front desk and then when we had our

18  lunch.  He escorted us and then went back up and then when we

19  got home, I'm not sure if he rode in a different car or if he

20  was with us, but he made sure that we got to our cars.

21   Q.   Was it your understanding that management had called

22  Palacios to make sure these things happened?

23   A.   Yes, but it was delayed.

24   Q.   Like two hours?

25   A.   Yes.

1  answering my questions.

2                    CROSS-EXAMINATION

3  BY MS. MORRISON:

4      Q.   I have a few questions.  Earlier when you were

5  testifying about the orientation you received, you said it

6  was very quick?

7      A.   Yes.

8      Q.   What do you mean by or how long do you consider very

9  quick?  How long did that orientation session take?

10     A.    The orientation?  Between time frame of about five

11 to ten minutes.

12     Q.   Earlier you were also testifying about a comment

13 that Christina made about a sandwich that you thought, that

14 looking back now you think was sexually harassing.  At the

15 time, was that everything that Christina had said at the time

16 just that you were a sandwich?

17     A.   No.

18     Q.   What else did she say?

19     A.   She made a second statement, a follow-up statement

20 saying that she was going to make a sandwich out of us and

21 eat us.  She said literally eat you guys.

22     Q.   And at the time when you heard her say she's going

23 to eat you, at that time, did you think that that was

24 sexually harassing?  That part of the statement?

25     A.   Yes.

# REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Viviene Villanueva personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 87, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 25th day of April 2007.

_____/S/_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# Exhibit 3

1      IN THE DISTRICT COURT OF GUAM

2

3   U.S. EQUAL EMPLOYMENT          )   CASE NO. 1:06-CV-00028
    OPPORTUNITY COMMISSION,        )

4                                  )
              Plaintiff,           )

5                                  )
         vs.                       )

6                                  )      DEPOSITION OF
    LEO PALACE RESORT,             )   JENNIFER HOLBROOK
                                   )       SATURDAY,

7                                  )   MARCH 17, 2007
              Defendant.           )

8   _____)
    JENNIFER HOLBROOK,             )

9   VIVIENE VILLANUEVA and         )
    ROSEMARIE TAIMANGLO,           )

10                                 )
              Plaintiff-Intervenors, )

11                                 )
         vs.                       )

12                                 )
    MDI GUAM CORPORATION dba LEO   )

13  PALACE RESORT MANENGGON HILLS  )
    and DOES 1 through 10,         )

14                                 )
              Defendants.          )

15  _____)

16
        The deposition of Jennifer Holbrook, called by
17  the Defendants, pursuant to Notice and pursuant to the
    Guam Rules of Civil Procedure, taken at the offices of
18  Dooley Roberts & Fowler, LLP, Suite 201, Orlean Pacific
    Plaza, 865 South Marine Corps Drive, Tamuning, Guam
19  96913, on Saturday, March 17, 2007, at the hour of 7
    o'clock a.m.

20
        That at said time and place, there transpired the
21  following:

22

23
                Cecilia F. Flores
24        Freelance Stenotype Reporter
                Tel: (671) 632-0727
25              Fax: (671) 632-5353
        Email: chilangflores@hotmail.com

COPY

1                          A P P E A R A N C E S:

2

3    For Plaintiff          Angela D. Morrison
                            U.S. EQUAL EMPLOYMENT OPPORTUNITY
4                           COMMISSION
                            333 S. Las Vegas Boulevard, Suite 300
5                           Las Vegas, Nevada 89101

6

7    For Plaintiff-
       Intervenors          Phillip Torres, Esq.
                            TEKER TORRES & TEKER, P.C.
8                           130 Aspinall Avenue, Suite 2A
                            Hagatna, Guam 96910

9

10   For Defendant
       LeoPalace            Tim Roberts, Esq.
11                          DOOLEY ROBERTS & FOWLER, LLP
                            Suite 201, Orlean Pacific Plaza
12                          865 South Marine Corps Drive
                            Tamuning, Guam 96913

13

14   Also Present:         Michiro Niikura, Director, LeoPalace
                                       Administration
15                          May Paulino, HR Manager, LeoPalace
                            Viviene Villanueva, Plaintiff-Intervenor

16

17

18

19

20

21

22

23

24

25

1    anything of that nature?

2       *A.*     No.

3       *Q.*     Okay.  When was the first incident of what you

4    would consider sexual harassment that you saw with your

5    own eyes or experienced yourself at LeoPalace Resort?

6       *A.*     From Christina?  Or in general?

7       *Q.*     In general, that you saw with your own eyes.

8       *A.*     The first incident that I could recall would

9    probably be with me when Christina grabbed my hand and

10   she -- before she grabbed my hand, she asked me, "Do you

11   think my breasts are either watermelons or melons?"

12      *Q.*     And about how many days or weeks after you

13   started working did Christina ask you that?

14      *A.*     Maybe two weeks into the job.

15      *Q.*     So you think about the third week in June?

16      *A.*     Yes.

17      *Q.*     And so she said, "Do you think my breasts are

18   watermelons or melons" -- what did she say?

19      *A.*     She asked me if I thought that her breasts were

20   watermelons or melons.

21      *Q.*     And did you answer her?

22      *A.*     I didn't answer her.  I was like I don't think

23   -- I believe what I said is "I don't know."

24      *Q.*     And then what did she do?

25      *A.*     She grabbed my hand forcefully and tried to

1    pull it to her breast.

2        Q.    And how did you react to that?

3        A.    I pulled -- I jerked my hand away and I said,

4    "No."

5        Q.    Did anybody else see this?

6        A.    I don't remember.

7        Q.    Was there anybody else at the front desk?

8        A.    I don't remember that.

9        Q.    Where did it happen?

10       A.    At the front desk.

11       Q.    Were there any guests around?

12       A.    I don't think so.

13       Q.    And you don't remember if there were any other

14   co-employees around?

15       A.    Correct, I don't remember.

16       Q.    And what did Christina say or do when you

17   jerked your hand away, or when you pulled your hand

18   away?

19       A.    I don't remember after that.

20       Q.    How did this make you feel?

21       A.    It made me feel uncomfortable.

22       Q.    So what did you do about it?

23       A.    I kept my distance from her.

24       Q.    Did you tell any supervisor?

25       A.    No.

1    *Q.*    Other than those particular words -- well, what

2  other words did you hear her say on the job?  That's a

3  terrible question that I withdraw; what other words did

4  you hear her say on the job.  Here's a different

5  question.  What's the next incident that you can

6  specifically recall after this melon incident that

7  involved touching?

8    *A.*    We were all walking to lunch --

9    *Q.*    When though, when did this happen?

10   *A.*    Maybe a week later or a week -- a week or two

11  weeks later.

12   *Q.*    So this is either three weeks or four weeks

13  into the job?

14   *A.*    Yes.

15   *Q.*    The first incident happened, was it two weeks

16  into the job approximately?

17   *A.*    I believe so.

18   *Q.*    Okay.  And so the second incident that we're

19  going to talk about right now involving touching was

20  either --

21   *A.*    The third or --

22   *Q.*    -- approximately three or four weeks into the

23  job?

24   *A.*    Yes.

25   *Q.*    And what happened?

1      A.      I was wearing a black skirt that day and we

2   were walking to lunch from the front desk --

3      Q.      Who's we?

4      A.      We would be Rose, Viviene, Christina and I, and

5   I believe --

6      Q.      You were walking to lunch?

7      A.      Yes, to the cafeteria.

8      Q.      So the four of you were going to have lunch

9   that day?

10      A.      We were scheduled to have lunch.

11      Q.      Well, you were walking together?

12      A.      Yes.

13      Q.      And you were going to the cafeteria?

14      A.      Yes.

15      Q.      Where you were going to have lunch with each

16   other?

17      A.      Yes.

18      Q.      Okay. So what happened?

19      A.      As we were walking, she tried to stick her hand

20   under my skirt because she wanted to know if I was wet.

21      Q.      Did she say those words?

22      A.      She said, "I want to feel if you're wet."

23      Q.      And when you say she tried to put her hand

24   under your skirt -- I know there's a lot of people here,

25   I know this is embarrassing for you, I'm sorry, we have

Jennifer Holbrook: Saturday, March 17, 2007

1    to do it.  Tell me exactly what she did.

2        A.    She tried to go under my skirt to see if I was

3    wet, she tried to reach for me in my genital area.

4        Q.    Okay.  Did she actually touch your genital

5    area?

6        A.    No.

7        Q.    Why not?

8        A.    Because I pushed her down with my hand and I

9    said, "Stop!"

10       Q.    Did Viviene see this?

11       A.    I believe so.

12       Q.    Did Rose see this?

13       A.    I believe so.

14       Q.    So what did Christine do when you pushed her

15   hand away and said stop?

16       A.    Christina laughed at it and I ran ahead of the

17   group.

18       Q.    Ran?

19       A.    Well, I went further ahead of the group.

20       Q.    You walked a little faster, right?

21       A.    Yes.

22       Q.    And so did you have lunch with Christina and

23   Rose and Viviene that day?

24       A.    Yes.

25       Q.    Anything unusual happen during the lunch that

1   report it to?

2      *A.*      Correct.

3      *Q.*      All right.  Now we're three to four weeks into

4   the job and now there's been two incidents of sexual

5   harassment involving touching, right?

6      *A.*      Yes.

7      *Q.*      After this second incident with the dress,

8   what's the next incident involving touching that you

9   experienced or saw with your own eyes?

10     *A.*      Touching.

11     *Q.*      Physical contact.

12     *A.*      For myself, what I can remember what Christina

13  did to me, the third incident was when she slapped me on

14  my ass.

15     *Q.*      Okay.  Now when was this, the second incident

16  -- well let me back up.  Did you tell anybody about this

17  second incident?

18     *A.*      Which second incident?

19     *Q.*      The feeling up of the dress incident.

20     *A.*      No.

21     *Q.*      You didn't tell your boyfriend?

22     *A.*      I don't remember.

23     *Q.*      All right.  Did you ever talk with Viviene

24  about it, that particular incident?

25     *A.*      I don't remember.

Jennifer Holbrook: Saturday, March 17, 2007

1    *Q.*    All right.  So when did this -- and now you're

2    going to talk about an incident wherein Christina

3    slapped your butt, right?

4    *A.*    Um-hmm.

5    *Q.*    How many days or weeks after the dress

6    incident, this butt-slapping incident occur?

7    *A.*    I believe it was on July 7th.

8    *Q.*    July 7th would be 31 days or right around 30

9    days after you first started the job.

10   *A.*    Okay.

11   *Q.*    So the second incident was three to four weeks

12   into the job; that puts it at either 30 days into the

13   job or about 23 days into the job.  Does that help you

14   remember when this third incident might have happened,

15   how many days after the dress incident?

16   *A.*    No.

17   *Q.*    Was it within a day, or two days, or three

18   days, or four days, a week?

19   *A.*    I remember July 7th.

20   *Q.*    Okay.  What happened on July 7th?

21   *A.*    It was Christina and I working at the front

22   desk for the morning shift.

23   *Q.*    And she had previously tried to, before this

24   incident, before this day, tried to put her hand on your

25   -- or put your hand on her breast, right?

1    *A.*    Yes, there's two doors at the front.

2    *Q.*    One on each side?

3    *A.*    Yes.

4    *Q.*    So what happened?

5    *A.*    I was working on the computer and all I

6    remember -- what I remember is working on the computer,

7    doing some work so I guess getting ready for check-out

8    time, all I get is this big slap, bam!  right on me.

9                    MR. ROBERTS:  The record should indicate

10   the witness has clapped her hands.

11   *A.*    And I yelled.

12   *Q.*    What did you say?

13   *A.*    I reacted by screaming.  My face was red, I

14   could feel my -- the anger, my ears were tipped red

15   also.

16   *Q.*    You had this reaction before you knew who did

17   that to you?

18   *A.*    I knew who -- I knew Christina slapped me

19   because I was --

20   *Q.*    How?  I mean, did you see her coming?

21   *A.*    No, I didn't see her coming.

22   *Q.*    Okay.

23   *A.*    She was behind me, she slapped me on my butt, I

24   turned around really quickly, I felt red, I felt angry.

25   I told her -- I screamed really loud and I said, "What

1   *A.*  I remember we were told of his coming on July

2 1st.

3   *Q.*  And did you meet Mr. Maruyama when he came

4 onboard?

5   *A.*  Yes.

6   *Q.*  And he's Japanese?

7   *A.*  Yes.

8   *Q.*  And you speak Japanese?

9   *A.*  Yes.

10   *Q.*  Did you converse with Maruyama in Japanese or

11 in English or both?

12   *A.*  Both.

13   *Q.*  Did he come by the front desk every morning and

14 say "hi"?

15   *A.*  Yes.

16   *Q.*  And between July 1 and July 7, did you ever say

17 anything to Mr. Maruyama about Christine Camacho?

18   *A.*  No.

19   *Q.*  Why not?

20   *A.*  Again, I really didn't know who to report it

21 to.

22   *Q.*  Well, you had just threatened Christine that if

23 she ever did that to anyone, you would report her.

24   *A.*  Yes.

25   *Q.*  And who were you talking about, that you would

1    A.    Yeah.

2    Q.    The Kotex was in its wrapper, I take it?.

3    A.    Yes.

4    Q.    And what did Mr. Iijima do?

5    A.    I think he told her to put it away.

6    Q.    Iijima-san spoke English, right?

7    A.    Yes.

8    Q.    Pretty good English?

9    A.    Pretty well.

10   Q.    And when Mr. Iijima told her to put it away,

11   did she do it?

12   A.    I believe she went to the rest room right after

13   that

14   Q.    Were there any other incidents other than the

15   melon, discussing her breast as being a melon, or

16   reaching under your skirt, or slapping your butt, or the

17   waving of the Kotex, that you remember that you would

18   consider sexual harassment, that you saw with your own

19   eyes?  Or heard with your own ears.

20   A.    Yeah, I felt her jokes were unnecessary, her

21   sexual jokes, you know, her vulgar language, the way she

22   talked.  It made me feel uncomfortable and it made me

23   keep myself away from her.

24   Q.    But you don't remember any specific jokes,

25   right?

Jennifer Holbrook: Saturday, March 17, 2007

1    *A.*      She -- she said she would enjoy having oral sex

2    when a female is on her menstruation.

3    *Q.*      And when did she say that?

4    *A.*      About the same time she asked me to feel her

5    melons.

6    *Q.*      That would have been back on, like the first

7    incident, right?

8    *A.*      Yes.

9    *Q.*      The same time?

10   *A.*      The same time?

11   *Q.*      I mean, was it a part of the same incident or

12   is it around the same time?

13   *A.*      Around the same time.

14   *Q.*      And what did you tell her when she said that?

15   *A.*      I said, "That's sick," and I walked away from

16   her.

17   *Q.*      Okay.  So now we've got the three incidents

18   involving touching, physical contact between you and

19   Christine, and then we've got the waving of the Kotex

20   and the comment about having sex with a woman during

21   menstruation.  Anything else of an oral nature that you

22   would consider sexual harassment?

23   *A.*      There were days she would describe what she did

24   with her partner during the working hours.

25   *Q.*      Her sexual partner, her girlfriend?

1      *A.*      Her girlfriend at LeoPalace.

2      *Q.*      And so what did she do, describe --

3      *A.*      Having sex with her.

4      *Q.*      And did you tell Christine, "Stop that, I'm not

5   interested in your sex life"?

6      *A.*      I didn't respond to her, I just walked away.

7      *Q.*      Did you report her conduct to management, or a

8   supervisor?

9      *A.*      No.

10     *Q.*      Have you ever heard about this memorandum that

11  was supposedly drafted by night manager Greg Perez

12  detailing an incident involving Viviene?

13     *A.*      I heard about it.

14     *Q.*      And what did you hear?

15     *A.*      Viviene told me that Christina grabbed her from

16  the back and tried to hump her.

17     *Q.*      And when did Viviene tell you this?

18     *A.*      Maybe the second or third week I started

19  working.

20     *Q.*      Did you report that to management or

21  supervisor?

22     *A.*      She told me that Greg and Ralph were there and

23  she --

24     *Q.*      Who's Ralph?

25     *A.*      A co-worker that worked the shift with Viviene.

1    *A.*    Yes.

2    *Q.*    Why?

3    *A.*    Because they knew --

4    *Q.*    No, no, no; listen to my question.  Do you

5  fault LeoPalace for anything that Christine may have

6  done before LeoPalace Resort was aware that she was

7  acting inappropriately at the workplace?

8    *A.*    No.

9    *Q.*    We've talked about certain incidents and

10 certain comments that Christine made.  Were these -- and

11 she slapped your butt on, you remember, July 7, right?

12   *A.*    Yes.

13   *Q.*    Was there anything else that happened in July

14 that you could specifically remember?

15   *A.*    About Christina's behavior?

16   *Q.*    Yeah; that you saw with your own eyes or

17 experienced for yourself in July.

18   *A.*    I just continued to hear again -- she continued

19 to create a hostile environment for me, uncomfortable

20 feeling at --

21   *Q.*    Because of her language and the words she said?

22   *A.*    Yeah.  I was afraid of what she's going to --

23 what -- I was afraid of what she was going to do to me

24 next, you know, three incidences, and she slapped me on

25 my butt.  I told her to stop, but she continued to use

1  vulgar language.  I felt uncomfortable being at the

2  front desk with her.

3      *Q.*     Let me show you what we'll mark as Exhibit 5,

4  and this is a form we've all seen.  It's what May

5  Paulino testified is a transcript of her interview with

6  you on August 11 of 2004, I think you saw it yesterday

7  at the deposition but I could be wrong about that.

8      *A.*     No, I didn't see this yesterday.

9                              (Exhibit 5 marked: August

10                              11, 2004 interview

11                              transcript.)

12     *Q.*     What I'd like you to do, and I'll tell you, May

13  Paulino testified that she typed this up after her

14  interview with you on August 11th, and that it was an

15  accurate summary of what you talked about.

16     *A.*     Okay.

17     *Q.*     Read this to yourself and I'll ask you some

18  questions; okay?

19                              (Witness complied.)

20                              (Off the record.)

21                              (Back on the record.)

22     *A.*     Okay.

23     *Q.*     (By Mr. Roberts)  Okay, we're back on the

24  record.  You're looking at Exhibit 5 which has been

25  previously identified by May Paulino as a transcript of

1  her interview with you on August 11th.  Do you see how

2  May has transcribed what she said and then transcribed

3  what you said, at least according to May, right?

4      *A.*     Okay.

5      *Q.*     Do you see that?

6      *A.*     Um-hmm.

7      *Q.*     Is there anything inaccurate about what May

8  said that she said to you?

9      *A.*     I don't remember May saying sexual harassment

10 is a very sensitive matter, and it has to be corrected

11 immediately.

12     *Q.*     Okay; you don't remember that.  Do you remember

13 you and her talked about sexual harassment though during

14 the meeting, right?

15     *A.*     Yes.

16     *Q.*     Do you remember in particular what May might

17 have said about sexual harassment in the workplace?

18     *A.*     I remember telling her that Christina should

19 have known about sexual harassment because it's in our

20 handbook.  I remember, I remember saying that.

21     *Q.*     Do you see anything else that May said that she

22 said that you don't think she said?

23     *A.*     I don't see it in here that she told me what

24 Mr. Suzuki said about letting go -- we can't let go of

25 Christina because we're short of staff.

Jennifer Holbrook: Saturday, March 17, 2007

1              MS. MORRISON:  Objection; asked and

2   answered.

3              MR. ROBERTS:  It was.

4       Q.    (By Mr. Roberts)  What happened?

5       A.    A letter was dropped off in an envelope to the

6   front desk for Mr. Maruyama, we put that letter -- I put

7   that letter --

8       Q.    That letter is Mr. Torres' letter?

9       A.    The same letter, yes, in an envelope addressed

10  to Mr. Maruyama.  This was a fax --

11      Q.    Right.

12      A.    -- right?  So the letter, I put it into his

13  mail stack because he comes in every morning to get his

14  mail, every morning.

15      Q.    Did you work on August 16th?

16      A.    I don't remember.

17      Q.    Okay.

18      A.    And that was on a Tuesday, August 17th, when he

19  got that letter in the morning.

20      Q.    And you were at work on that day?

21      A.    Yes, Tuesday morning.  He came, gave him the

22  letter -- gave him his mail.  I guess he opened it and

23  Rose and I were working that morning, he walked by and

24  stormed right straight towards me in the front desk, and

25  he said, "Why are you doing this?"  He had his voice

1  raised and he was up in my face asking me why am I suing

2  him.

3     *Q.*     Was he behind the front desk?

4     *A.*     Behind the front desk.

5     *Q.*     Where you were?

6     *A.*     Yes.

7     *Q.*     And he said, "Why are you doing this"?

8     *A.*     And I said, "I am not doing this to you."  He

9  said, "But I am the company.  I am LeoPalace."  And I

10 responded to him, "I'm doing this because HR didn't do

11 anything about it."  And he said, "I can't trust you

12 anymore."  He kept on staring at me, I can feel anger

13 coming off of his voice.  I started to tremble inside, I

14 felt butterflies inside and I started feeling scared.

15 And then he stormed out of the front desk, Rose got off

16 the phone and she was freaking out too.

17    *Q.*     Rose was on the phone while this conversation

18 was taking place?

19    *A.*     Yes.

20    *Q.*     Where was Rose?

21    *A.*     At the front desk.

22    *Q.*     I know, but there's several computers, right?

23    *A.*     Rose was right -- okay, this is the counter --

24    *Q.*     All right.

25    *A.*     -- i was probably here on the back -- there's a

1    back counter that we store stuff in, so I was standing

2    there, Rose was on the phone probably between the far

3    left and the middle computer.

4        *Q.*    Was she on the phone for the entire incident?

5        *A.*    I don't remember.

6        *Q.*    Okay.

7        *A.*    But I glanced at her and she was looking over

8    at me while she was on the phone.

9        *Q.*    Okay.

10       *A.*    So --

11       *Q.*    When you say Mr. Maruyama stormed away, what do

12   you mean stormed?

13       *A.*    He pushed the door open hard and then he pushed

14   the other door open, and he walked this way back to his

15   office and in a few minutes he walked back the other

16   way, across the lobby, walked out the front door, and he

17   just kept on pacing back and forth that day and just not

18   talking to us, and just pushing -- I remember, the

19   reason why I'm saying storm is because I remember him

20   pushing the door really hard to get out of it.

21       *Q.*    Okay.  When you say he raised his -- did you

22   say he raised -- he didn't shout -- did he raise his

23   voice or shout?

24       *A.*    He raised his voice.

25       *Q.*    He wasn't shouting, right?

1      A.      No, he raised his voice.

2      Q.      And would you describe Mr. Maruyama as

3   generally a calm kind of individual?

4      A.      Calm, happy, greeted me every morning.

5      Q.      So every morning that you were working, he

6   would come in and say, "Hi, how are you doing," right?

7                MS. MORRISON:    Objection; vague as to

8   time?

9      Q.      (By Mr. Roberts)   What time did Mr Maruyama

10  generally get to the office?

11     A.      About 8 o'clock.

12     Q.      And were you usually at work at that time?

13     A.      If I worked A shift.

14     Q.      If you worked A shift.   And did Mr. Maruyama

15  always say "Hello, good morning, how are you doing,"

16  words to that effect?

17     A.      Yes, he greeted the front desk staff.

18     Q.      Would you describe Mr. Maruyama as generally a

19  friendly person?

20     A.      Yes.

21     Q.      Did you get along with him prior to this

22  incident?

23     A.      Yes.

24     Q.      Was he your friend prior to this incident?

25     A.      Define friend.

1    *Q.*    Were you on friendly terms with him?

2    *A.*    He was my GM and I showed him the respect of a

3  GM.

4    *Q.*    How long did this incident take from the time

5  he first came to talk to you and the time he left your

6  area?

7    *A.*    You have to repeat the question, please.

8    *Q.*    I will.  I'll just ask a different question.

9  Other than what you've already said, did Mr. Maruyama

10  say anything else to you during this incident?

11    *A.*    That morning?

12    *Q.*    Yes.

13    *A.*    No, he didn't talk to me ever after that.

14    *Q.*    And did you say anything to Mr. Maruyama during

15  this incident that you haven't already described?

16    *A.*    No.

17    *Q.*    In your own words, as if you had any other

18  words, describe how working at LeoPalace after the

19  sexual harassment Complaint was filed was different than

20  working at LeoPalace before the sexual harassment

21  Complaint was filed?

22    *A.*    It was not comfortable anymore.

23    *Q.*    Why?

24    *A.*    Because of all the stress I had to deal with.

25    *Q.*    Like what?

Jennifer Holbrook: Saturday, March 17, 2007

1    A.    The stress, knowing that Christina harassed me,
2  knowing I got yelled at by the GM.
3    Q.    But you said he didn't yell.
4    A.    Okay; I'm sorry.  Who raised his voice at me
5  and made me feel intimidated every day.
6    Q.    How?
7    A.    He no longer said "hello," he no longer smiled.
8  He just walked by and stared at me or stared at us at
9  the front desk, and it wasn't a nice stare.  Our
10  supervisors didn't talk to us -- you know, we were -- I
11  felt like I was given the silent treatment, you know.  I
12  was questioned if I was wearing my uniform or not from a
13  telephone conversation I had with May.  I mean, it just
14  wasn't the same anymore.  A memo was put out saying that
15  we no longer can use our cell phones on the premises.
16    Q.    And you think that was related to your sexual
17  harassment complaint?
18    A.    Yes.
19    Q.    Why?
20    A.    It never -- it never had occurred -- it never
21  bothered HR office that we were using our cell phones
22  during our break or anything, but it came out right
23  after the fact that we filed this.
24    Q.    How do you know that you guys using your cell
25  phones at work didn't bother management?

1    *A.*    I don't think they took $10.00 out -- I don't

2  think it was about a dollar amount that they were taking

3  out, but the fact that they cut my hours, I was given 80

4  hours every two weeks and now I wasn't even getting

5  that.

6    *Q.*    (By Mr. Roberts)  An hour and 15 minutes less?

7    *A.*    I had -- there were days that I had three days

8  off for that week, and I wasn't making 40 hours anymore.

9    *Q.*    How much longer after August 17th did you work

10 for LeoPalace?

11   *A.*    I believe a week.

12   *Q.*    Is that why you quit, because your hours were

13 reduced?

14   *A.*    I quit because I was tired of dealing with all

15 the stress I was getting from LeoPalace.  I was tired of

16 not being spoken to by Mr. Maruyama, I was tired of

17 feeling uncomfortable.

18   *Q.*    It was only a week.  I mean -- let me ask you

19 this.  Was it understandable to you that Mr. Maruyama,

20 being new on the job and getting a sexual harassment

21 complaint against him, would have been upset?

22   *A.*    Repeat your question.

23   *Q.*    Were you surprised that Mr. Maruyama was upset

24 that a sexual harassment complaint had been filed

25 against the company he was general manager of?

Jennifer Holbrook: Saturday, March 17, 2007

1    *A.*     Was I surprised that he was upset?

2    *Q.*     Yes.

3    *A.*     No.

4    *Q.*     So was it understandable to you that he would

5    be upset about having a sexual harassment complaint

6    filed against the company he was GM of?

7    *A.*     Yes.

8                                    (Exhibit 11 marked:

9                                    Letter of Resignation.)

10   *Q.*     This is Exhibit 11, and I think you've all seen

11   this before.  I believe this is your letter of

12   recommendation.

13   *A.*     Resignation.

14   *Q.*     What did I say?

15   *A.*     Recommendation.

16   *Q.*     Yeah, that's not a letter of recommendation,

17   that's a letter of resignation.  You quit on August

18   28th?

19   *A.*     Yes.

20   *Q.*     And what did you handwrite on this letter of

21   resignation?

22             MS. MORRISON:  Objection; document

23   speaks for itself.

24   *Q.*     (By Mr. Roberts)  You can answer the question.

25   *A.*     "To also find out about an immediate family

1  member, my mother having cancer (uterus) which needs

2  immediate attention."

3      *Q.*      Did your mother have uterine cancer at the time

4  you wrote this letter?

5      *A.*      She was diagnosed with pre-cancer cells.

6      *Q.*      Was that one of the reasons you quit LeoPalace,

7  to take care of your mother?

8      *A.*      Not the main reason why I quit.

9      *Q.*      Was it one of the reasons?

10     *A.*      No.

11     *Q.*      Then why did you put it in the letter?

12     *A.*      I wrote this letter because I just wanted to

13 get out of there, and I didn't want to be hassled

14 anymore or give a two-week notice.  And, you know, with

15 all the stress I had to deal with at LeoPalace, I just

16 wanted to get out of there, and I also indicated here

17 that I really felt management didn't take appropriate

18 care of their staff in many manners.

19     *Q.*      I know that, I'm not asking about that.  You

20 put -- do you agree with me that one of the reasons that

21 you said in your letter of resignation that you were

22 quitting was to also take care of your mother who was

23 diagnosed with cancer of the uterus?  You wrote that;

24 didn't you?

25     *A.*      I did.

Jennifer Holbrook: Saturday, March 17, 2007

1   when had this work schedule come out, and I guess been

2   posted

3        *A.*     Mr. Suzuki always does our work schedule and

4   posts it at least by the Thursday or Friday.  So what

5   I'm trying to say is I believe this work schedule went

6   up on either the 19th or the 20th, and when I reviewed

7   it when I got back to work, that's when I noticed my

8   hours were getting cut to three days off.

9        *Q.*     Okay.  So this work schedule had been posted

10  either the 19th or the 20th, and it posted the schedule

11  for what dates?

12       *A.*     From August 22 to September 4th.

13       *Q.*     So it's the 9/22 through 9/4 time period that

14  you believe your hours were cut?

15       *A.*     Yes.

16       *Q.*     And why do you think your hours were cut?

17       *A.*     Retaliation.

18       *Q.*     Because you had three days off during the week

19  of Sunday -- or, excuse me, the second week of this work

20  shift you had three days off rather than your usual two?

21       *A.*     Yes.

22       *Q.*     And you think --

23       *A.*     And I was given a B shift.

24       *Q.*     Do you consider that a retaliation?

25       *A.*     Yes.

Jennifer Holbrook: Saturday, March 17, 2007

1    *Q.*    Why?

2    *A.*    We had five people gone from the front desk.

3    *Q.*    What's a B shift?

4    *A.*    B shift was from 6:15 to 1:00.

5    *Q.*    In the morning?

6    *A.*    6:15 a.m. to 1:00 p.m.

7    *Q.*    That's still 8 hours though, right?

8    *A.*    No.

9    *Q.*    I mean, is the B shift less hours than the A

10   shift or the C shift?

11   *A.*    A shift is from 6:15 to 2:45.

12   *Q.*    What's the B shift?

13   *A.*    6:15 to 1:00.

14   *Q.*    So that's an hour and 45 minutes difference,

15   right?

16   *A.*    Yes.

17   *Q.*    And you think that you were given a B shift by

18   Leo -- your testimony is you were given a B shift by

19   LeoPalace, which is an hour and 45 minutes less than an

20   A shift or a C shift, in retaliation for your sexual

21   harassment complaint?

22   *A.*    Yes.

23   *Q.*    Had you ever worked a B shift before this in

24   the two months you worked at LeoPalace?

25   *A.*    Never.

Jennifer Holbrook: Saturday, March 17, 2007

1      *Q.*     (By Mr. Roberts)  Why do you think, if

2   LeoPalace wanted to retaliate against you for making a

3   sexual harassment complaint, it only cut one day off

4   your schedule?

5      *A.*     I think they were upset with us for filing a

6   complaint against them.

7      *Q.*     Why not, why not a week off?

8      *A.*     I don't know.

9      *Q.*     When you found out, according to you, that your

10  hours had been cut, did you talk to anybody about that?

11     *A.*     Yes.

12     *Q.*     Who?

13     *A.*     Mr. Suzuki.

14     *Q.*     What did you say?

15     *A.*     I asked him why was he cutting my hours, why am

16  I being short of time.

17     *Q.*     And approximately when did this conversation

18  take place?

19     *A.*     I believe it was this week.

20     *Q.*     What week?

21     *A.*     The week of August 21st -- the 15th through the

22  21st, that week.

23     *Q.*     What did Mr. Suzuki tell you?

24     *A.*     He said, "I don't know."  And then I spoke to

25  Mr. Sekine on the Saturday, 28th, August 28th.

1      Q.      And what did Mr. Sekine say?

2      A.      He was asking me why I was leaving at 1

3   o'clock, and I said, "Ask Mr. Suzuki, he cut my hours."

4   And so he called Mr. Suzuki on the phone and he asked Mr

5   Suzuki about it and then the response I got from Mr.

6   Sekine is, "It's up to you if you want to stay or

7   leave."

8      Q.      Is that when you decided to write your letter

9   of resignation and quit?

10     A.      That day I had it, I was done with all this

11  retaliation and being treated unfairly.

12     Q.      It was a yes or no question.

13     A.      Yes.

14     Q.      Okay.  So did you write your letter of

15  resignation immediately after that telephone call with

16  Mr. Sekine, or that conversation with Mr. Sekine?

17     A.      No.

18     Q.      When did you write it?

19     A.      Prior to that.

20     Q.      Well, you just said -- never mind.  Didn't you

21  just say you decided to write your letter of resignation

22  after this conversation?

23              MS. MORRISON:  Objection;

24  mischaracterizes her testimony.

25     A.      I decided then after the conversation that I

Case 1:06-cv-00028    Document 69-2    Filed 09/24/2007    Page 64 of 80

1   *Q.*     Did somebody else type this document for you?

2   *A.*     I believe so.

3   *Q.*     And did somebody else type this for you -- who

4   typed this for you?

5   *A.*     I don't know.

6   *Q.*     All right.  Did your lawyer help you prepare

7   this?

8   *A.*     Yes.

9   *Q.*     That's about as far as I can go with that

10  question.  No, keep it.  Look at the, look at paragraph

11  3 on the last three lines, I want you to read those to

12  yourself.

13  *A.*     Okay.

14  *Q.*     You say that after you made your complaint when

15  you'd make eye contact with managers, they would either

16  quickly turn away or stare at you in a hostile manner;

17  do you see that?

18  *A.*     Yes.

19  *Q.*     Who are you talking about?

20  *A.*     Mr. Iijima, the other Japanese staff across the

21  way.

22  *Q.*     Japanese staff across the way; who are they?

23  *A.*     Man, i don't remember.

24  *Q.*     The guys on the other side of the lobby?

25  *A.*     Where they take care of the tour groups.

1    *Q.*    Yeah.    Those aren't managers though, are they?

2    *A.*    No, I believe that they are just employees.

3  Mr. Saito, he was the manager in the back also.

4    *Q.*    So would he have to come out from the back to

5  stare at you in a hostile manner?

6    *A.*    He would walk by with a stare.

7    *Q.*    Can you describe what a -- describe a hostile

8  manner; what do you mean?

9    *A.*    Just staring at you without saying a word, you

10  know, without -- giving you direct eye contact, making

11  you feel uncomfortable with that stare and not being

12  able to -- really feeling intimidated with the stare.

13  Sometimes they would stand; for example, I remember them

14  standing at the front door of the main lobby and we

15  could just feel that they -- we saw -- I saw that they

16  were watching us, and just staring at us without saying

17  anything.

18    *Q.*    Their job was to watch the front desk, right?

19    *A.*    I don't think that's their job, to stand at the

20  front desk and watch us.

21    *Q.*    They're front desk supervisors though, aren't

22  they?

23    *A.*    Mr. Suzuki was my front desk supervisor.

24    *Q.*    And what was Iijima's job?

25    *A.*    I don't -- a supervisor, manager.

Jennifer Holbrook: Saturday, March 17, 2007

1    *Q.*    Of what?

2    *A.*    I don't know.

3    *Q.*    And what was -- did Suzuki ever stare at you in

4    a hostile manner?

5    *A.*    Not that I recall.

6    *Q.*    You recall Iijima?

7    *A.*    Yes.

8    *Q.*    On how many occasions?

9    *A.*    I don't know.

10    *Q.*    Did you ever speak with Mr. Iijima about that?

11    *A.*    About his stare?

12    *Q.*    Yes.

13    *A.*    No.  Mr. Iijima doesn't speak to us much either

14    anymore.

15    *Q.*    After your sexual harassment complaint?

16    *A.*    Yes.

17    *Q.*    For the next 10 days until you quit.

18            MS. MORRISON:  Is that a question?

19            MR. ROBERTS:  Yeah.

20    *Q.*    (By Mr. Roberts)  So the period of time in

21    which you feel that Mr. Iijima was mean to you was 10

22    days?

23    *A.*    Yeah, 10 long days.

24    *Q.*    And how many of those days did you actually

25    work?

1      *A.*     Did you get a count?

2      *Q.*     No.

3      *A.*     About nine days, 9 days, 8 hours.

4      *Q.*     And you're counting those two, you're counting

5      those two days that somebody's written in sick leave,

6      right

7      *A.*     Yes.

8      *Q.*     You worked between August -- counting August

9      18th through August 28th --

10     *A.*     Yes.

11     *Q.*     -- you claim you worked nine of those days?

12     *A.*     Yes.

13     *Q.*     And that's an 11-day period.

14     *A.*     Repeat your comment.

15     *Q.*     You said you worked 9 days --

16     *A.*     Yes.

17     *Q.*     -- from and including August 18th until -- and

18     including August 28?

19     *A.*     From the 18th?

20     *Q.*     Actually --

21     *A.*     Let's start from the 17th.

22     *Q.*     -- let's start from the 17th.  Thank you.  From

23     the 17th --

24     *A.*     Okay.

25     *Q.*     -- through and including the 28th --

Jennifer Holbrook: Saturday, March 17, 2007

1    *A.*     Okay.

2    *Q.*     -- and that's an 11-day period?

3    *A.*     That's a total of 12.

4    *Q.*     Yeah.  Of those 12 days, from and including

5    August 17th through and including August 28th, a 12-day

6    period, how many days did you work?

7    *A.*     Eight.

8    *Q.*     Eight of the 12 days?

9    *A.*     Yes.

10   *Q.*     Look at paragraph 7 of Exhibit 13, please.

11   *A.*     Okay.

12   *Q.*     Do you say in that paragraph that sometimes

13   management would just not acknowledge your presence on

14   these eight days after you filed your sexual harassment

15   complaint?

16   *A.*     Yes.

17   *Q.*     What do you mean by that?

18   *A.*     They wouldn't talk to us anymore.  I mentioned

19   to you I had a good relationship with Mr. Maruyama, Mr.

20   Suzuki was our front desk manager, Mr. Iijima was also

21   part -- his office was behind us.  They didn't talk to

22   us anymore, nobody talked to us.  I remember one day

23   also when May walked by and she didn't talk to us, you

24   know.  A lot of the Japanese staff that were behind us

25   or across the way, nobody talked to us.  It was an

1  unfriendly environment.  It's like we couldn't talk to

2  anybody anymore.  It wasn't the same anymore, it was

3  just so unhappy being there from my perspective.

4      Q.    Can I have that exhibit back, please?  Well,

5  you were still able to talk with Mr. Suzuki, right?

6      A.    I did, I spoke to him.  I continued doing my

7  job.  If I had to communicate with my supervisor, he was

8  the one I communicated with.

9      Q.    Yeah, you went to him and said, "Hey, what's up

10  with these hours," right?

11      A.    I asked him about my hours.

12      Q.    And he wasn't rude to you, was he?

13      A.    No, I don't think so.

14      Q.    Can you look at Exhibit 16, I believe -- no,

15  15.  You haven't seen this document, but this was given

16  to me by the EEOC and there's an EEOC Bates stamp that's

17  partially cut off, it's marked as Exhibit 15.  Mr.

18  Griffin reported -- this is a report by Mr. Griffin

19  after his conversation with you on or about April 5th of

20  2005.  Mr. Griffin wrote after Christine Camacho was

21  discharged, you told him that you retained legal counsel

22  and were advised to go see a therapist because of their

23  ordeal with sexual harassment.  Did you tell Mr. Griffin

24  that?

25      A.    I don't remember.

1    you told of any decision?

2        *A.*    On Friday, we were told --

3        *Q.*    I'm sorry; on that day.

4        *A.*    No.

5        *Q.*    So for all you know as of that day, nothing had

6    been resolved by management?

7        *A.*    Correct.

8        *Q.*    You stated in reviewing the exhibit of the

9    transcript from that day written by May that there were

10   some things, that's Exhibit 5, that there were some

11   things that were inaccurate.  Did you have a

12   conversation with her about your relationship with Mr.

13   Maruyama?

14                  MR. ROBERTS:  Object; leading.

15       *A.*    Yes.  At the end of our conversation, she asked

16   me if I was still interested or if I decided in taking

17   the position to be Mr. Maruyama's executive assistant, I

18   believe.

19       *Q.*    Okay.

20       *A.*    And I told her I was still thinking about it.

21       *Q.*    (By Mr. Torres)  There's nothing in here to

22   reflect that, in Exhibit 5?

23       *A.*    No.

24       *Q.*    Thinking about what position as executive --

25   what is that, executive assistant?

1    A.    Mr. Maruyama needed, I believe like a secretary

2  in his office to help him with his daily -- day-to-day

3  events.

4    Q.    When you would converse with Mr. Maruyama,

5  would you do that in both English language and Japanese

6  language?

7    A.    Yes.

8    Q.    .When were you told about this opportunity to be

9  an executive assistant, initially?

10    A.    A week -- about a week before we went to May,

11  so that would be the week before like August 11th

12  probably.

13    Q.    Okay.  And who approached you about that?

14    A.    I believe I saw the job opening and I kind of

15  inquired about it.  Mrs. Paulino made a recommendation

16  to Mr. Maruyama about me applying for the position.

17    Q.    And then after the August 11th complaint to Ms.

18  Paulino, was that -- was there any other further

19  discussion about that opportunity?

20    A.    No.

21    Q.    Also in here it talks about jokes and you say

22  that you would laugh.  Do you see that where it says,

23  "Yes, at times we laughed about it"?

24    A.    Yes.

25    Q.    Okay.  And it says, "You folks entertained her

Case 1:06-cv-00028    Document 69-2    Filed 09/24/2007    Page 72 of 80

1  sexual jokes." Did you entertain her sexual jokes?

2  *A.*    No.

3  *Q.*    Did you entertain her jokes?

4  *A.*    Her clean jokes, yes.

5  *Q.*    So that's an inaccuracy within that?

6  *A.*    Yes.

7  *Q.*    You were asked to review your time sheet and

8  state how many different hours you worked and there was

9  a chrono's that was put into exhibit, that's Exhibit

10  Number 10.  On the last page, which goes from the time

11  frame of August the 8th to August the 21st, you were

12  asked how many hours you worked and your response was

13  65.

14  *A.*    Yes.

15  *Q.*    Do you remember that?

16  *A.*    Yes.

17  *Q.*    But why does this document actually says you

18  worked 65.75 regular hours and 9,25 overtime hours?  So

19  you actually worked 75 hours that week?

20  *A.*    Yes.

21  *Q.*    You testified that you make use of the words

22  "fuck" and "shit" occasionally -- or just make use of

23  those words, right?

24  *A.*    Yes.

25  *Q.*    They come out of your mouth too?

1    A.     Yes.

2    Q.     Why is that offensive then if Christine Camacho

3    is using those words?

4    A.     Because it's in a work environment.  I don't

5    use it in a work environment, and I don't feel it's

6    appropriate to be used in a work environment.

7    Q.     So there's a distinction?

8    A.     Yes.

9    Q.     Mr. Roberts told you that prior to receiving

10   the letter from me, that they had already terminated

11   Christine Camacho.

12   A.     Yes.

13   Q.     When did you find out she had been terminated;

14   do you remember?

15   A.     On Friday morning.

16   Q.     The 13th?

17   A.     Yes.

18   Q.     And did you think that things were going to get

19   better after she was terminated?

20   A.     Yes.

21   Q.     Did they get better after she was terminated?

22   A.     No.

23   Q.     How so?

24   A.     Management wasn't treating us fairly anymore,

25   you know.  Mr. Maruyama approached me and made me -- the

1   day he approached me on the 17th, he made me feel scared

2   every day after that even when he walks by because I

3   never know if he's going to storm in through the front

4   desk and yell at me for something else, or raise his

5   voice.

6         I didn't appreciate the fact that I was wearing

7   a jacket to work because it was so cold at the front

8   desk and I get a call from May asking me if I'm wearing

9   my uniform.  I had to turn around, unzip the front and

10  show her through the cameras that I was, and she

11  acknowledged it.  And like the fact that -- you know, I

12  was treated like I was the bad guy now. Nobody wanted to

13  talk to us; it wasn't the same happy environment that I

14  was working at anymore.

15       *Q.*     Okay.  But before you called this a happy

16  environment.  Were you happy in those times from June,

17  July, August 2004?

18              MR. ROBERTS:  Objection; leading.

19       *Q.*     (By Mr. Torres)  Can you explain -- you use the

20  word happy; can you explain it to me?  Let me strike

21  that.  You said you worked for LeoPalace in 2001?

22       *A.*     Yes.

23       *Q.*     And did you like your job then?

24       *A.*     Yes.

25       *Q.*     You worked for LeoPalace in 2004?

1    *A.*    Yes.

2    *Q.*    Why did you go back there?  You had the same

3    job at CCP, according to your earlier testimony.

4    *A.*    It was -- I liked working at LeoPalace, I liked

5    working with Mr. Suzuki and the staff, it was a friendly

6    environment, and I felt I was capable of doing a good

7    job working there.

8    *Q.*    And so that relationship that you had with

9    management early on wasn't the same?  Are you testifying

10   that it's not the same then after this?

11   *A.*    Correct, it's not the same anymore.

12   *Q.*    Mr. Roberts said you only worked there eight

13   days afterwards, after the complaint became

14   knowledgeable to management.

15   *A.*    I'm sorry; repeat your question.

16   *Q.*    Okay.  Mr. Roberts said that Mr. Maruyama found

17   out on August 17th about your complaint and that

18   subsequent to that you only worked for eight days.

19   *A.*    Okay.

20   *Q.*    And you said you quit because you were

21   stressed, but eight days, it was only eight days.

22   *A.*    It was eight days that I had to work, I really

23   felt like I had to go to work, you know, make the most

24   of it.  I wasn't happy working -- I wasn't happy going

25   to work knowing that I didn't have a good relationship

 1  anymore with Mr.Maruyama.  Or that Mr. Suzuki and

 2  everybody felt like we were the bad guys and they

 3  weren't talking to us anymore.

 4          MR. ROBERTS:  Objection; the witness is

 5  speculating as to what other people's feelings were.

 6  *A.*    Okay; sorry.

 7          MR. ROBERTS:  You don't have to say

 8  you're sorry.  You can answer the question now that I've

 9  objected to it.

10  *A.*    You know, I -- they didn't -- why?  I felt I

11  was doing my job and I continued going to work during

12  those times even though we were short of staff.  I --

13  yeah, I really believed that everything was going to be

14  better.  I did my job, I provided excellent customer

15  service and yet I got treated a lot differently, like no

16  -- basically, it wasn't the same anymore.

17  *Q.*    (By Mr. Torres)  When you went to see the

18  psychiatrist, you testified that you went on my

19  recommendation.

20  *A.*    Yes.

21  *Q.*    How long have I known you?

22  *A.*    A few years.

23  *Q.*    And you came to see me as an attorney?

24  *A.*    Friend attorney; yes.

25  *Q.*    So we have both kinds of relationships?

Jennifer Holbrook: Saturday, March 17, 2007

1    *Q.*    Right?

2    *A.*    Right.

3    *Q.*    So you saw a job opening for a job as a

4    personal assistant with Yutaka Maruyama in early August?

5    *A.*    I believe so.

6    *Q.*    And around the same time, May Paulino had

7    recommended you for that job?

8    *A.*    Yes.

9    *Q.*    To Mr. Maruyama?

10   *A.*    Yes.

11   *Q.*    And were you interested in that job?

12   *A.*    Yes.

13   *Q.*    And on August 11th you were still considering

14   whether you wanted that job or not?

15   *A.*    Yes.

16   *Q.*    So this would have been a job that you would

17   have taken if -- would you have taken this job if it had

18   become available?

19   *A.*    Yes.

20   *Q.*    You said that you were afraid every day, at

21   least eight days that you say you worked --

22   *A.*    Okay.

23   *Q.*    -- after your sexual harassment complaint, you

24   were afraid every day that Maruyama would yell at you.

25   *A.*    I was afraid something might happen.

1                    REPORTER'S CERTIFICATE

2

3        I, Cecilia F. Flores, Freelance Stenotype

4   Reporter, hereby certify the foregoing 154 pages to be a

5   true and correct transcript of the stenographic

6   shorthand notes and audio recording taken by me in the

7   within-entitled and numbered case at the time and place

8   as set forth herein.

9        Dated at Hagatna, Guam, this 14th day of April,

10  2007.

11        _____
                    Cecilia F. Flores

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jennifer Holbrook: Saturday, March 17, 2007

1                    CLERK'S CERTIFICATE

2    Superior Court Of Guam:

3        I, Cecilia F. Flores, Special Deputy Clerk,

4    Superior Court of Guam, do hereby certify that on

5    Saturday, the 17th day of March, 2007 at the hour of 7

6    o'clock a.m. there appeared before me **Jennifer Holbrook**

7    at the law offices of Dooley Roberts & Fowler, LLP,

8    Suite 201, Orlean Pacific Plaza, 865 South Marine Corps

9    Drive, Tamuning, Guam 96913, the deponent herein,

10   produced pursuant to Notice to give her deposition in

11   the within-entitled and numbered CIVIL CASE NO.

12   1:06-CV-00028; that prior to the examination the

13   deponent was by me duly sworn upon her oath; that

14   thereafter the deposition transcript was prepared by me,

15   and the Certified Original Transcript was presented to

16   Mr. Torres' office for the deponent's review,

17   corrections, if any, and execution.

18       I further certify that I am not a relative,

19   employee, attorney or counsel of any of the parties, nor

20   a relative or employee of such attorney or counsel, and

21   that I am not directly or indirectly interested in the

22   matters in controversy.

23       In testimony whereof, I have hereunto set my hand

24   and seal of Court this 14th day of April, 2007.

25   _____

Jennifer Holbrook: Saturday, March 17, 2007