# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>      Plaintiff,<br><br>        vs.<br><br>LEO PALACE RESORT,<br><br>      Defendant. | ) CASE NO. 1:06-CV-00028<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA, and ROSEMARIE TAIMANGLO,<br><br>      Plaintiff-Intervenors,<br><br>        vs.<br><br>LEO PALACE RESORT,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION TRANSCRIPT

OF

# YUTAKA MARUYAMA

March 16, 2007

PREPARED BY:      GEORGE B. CASTRO
                  **DEPO RESOURCES**
                  #49 Anacoco Lane
                  Nimitz Hill Estates
                  Piti, Guam 96915
                  Tel:(671)688-**DEPO** * Fax:(671)472-3094

UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) CASE NO. 1:06-CV-00028 ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| LEO PALACE RESORT, | ) ) |
| Defendant. | ) ) |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA, and ROSEMARIE TAIMANGLO, | ) ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| vs. | ) ) |
| LEO PALACE RESORT, | ) ) |
| Defendant. | ) ) |

Deposition of **Yutaka Maruyama**, taken on Friday, March 16, 2007, at the hour of 9:03 a.m., at the U.S. Attorney's Office, District of Guam, Sirena Plaza, 108 Hernan Cortez Avenue, Hagatna, Guam before George B. Castro, pursuant to Notice. That at said time and place there transpired the following:

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel:(671)688-**DEPO** (3376) * Fax:(671)472-3094

**APPEARANCES**

For the Plaintiff                    U.S. EQUAL OPPORTUNITY
                                     COMMISSION
                                     By:  **Gregory L. McClinton, Esq.**

For the Plaintiff-Intervenors        TEKER, TORRES & TEKER, P.C.
                                     By:  **Phillip Torres, Esq.**

For the Defendant                    DOOLEY, ROBERTS & FOWLER, LLP
                                     By:  **Tim Roberts, Esq.**

Also present                         Michiro Niikura
                                     Viviene Villanueva
                                     Jennifer Holbrook (9:43)
                                     Angela Morrison (9:43)

1     Q   Okay.  And why is it that you remember

2  it was August 11th?

3     A   Or maybe 12th, I don't know -- well,

4  there was a note but I personally I don't

5  exactly remember the date, that was the day

6  12th, the weekend.

7     Q   Okay.    Now you said you had a

8  conversation with Jennifer Holbrook.

9     A   Yes.

10    Q   Okay.  And that was around that August

11  timeframe?

12    A   Yes.

13    Q   And did she come to you or did you

14  confront her?

15    A   I think she called me.

16    Q   Called you on the telephone?

17    A   Yes.

18    Q   And what did she tell you?

19    A   She told me that there was Christine,

20  on premises and she feel scared.  So I went to

21  contact --

22    Q   Okay.

23    A   -- and then I told her we will send the

24  security to escort Christine out and they feel

25  uncomfortable working on the shift on the day.

Case 1:06-cv-00028   Document 69-5   Filed 09/24/2007   Page 5 of 38

1  And I remember I said they can leave when they
2  can finish the shift and we will send the
3  security to escort them out, make sure they're
4  safe.

5      Q   Now, that was after Ms. Camacho had
6  been fired though, isn't that correct?

7      A   After Ms. Camacho was fired, yes.

8      Q   Okay.  And did security actually escort
9  Ms. Camacho off the premises?

10     A   I don't -- I'm not sure.  But they went
11 to the condominium.

12     Q   Security did?

13     A   Security did, I think.

14     Q   Did they find Ms. Camacho?

15     A   I'm not sure.

16     Q   Okay.   And was there any report
17 prepared regarding this incident by security?

18     A   Yes, I think I read the incident
19 report.

20     Q   Okay.  And was that incident report one
21 of the documents that you reviewed?  Actually,
22 there's two reports.  Did you review any of
23 those incident reports prior -- or in
24 preparation for today's deposition?

25     A   Yes, I think there was a part of the

1  Mr. Roberts' report.

2     Q   Okay.   Let   me   ask   you   a   different

3  question.   When   was   the   first   time   that   you

4  discovered,   as   General   Manager,   that   Christine

5  Camacho   was   sexually   harassing   Jennifer,

6  Viviene and Rose?

7        MR.   ROBERTS:   Objection,   asked   and

8  answered.

9  BY MR. McCLINTON:

10    Q   And Rose?

11    A   I   think   at   around   10th,   11th,   12th   of

12 August.

13    Q   Okay.

14    A   For these days.

15    Q   And   that   was   before   Ms.   Camacho   was

16 fired?

17    A   At   around   she   was   warned   or   she   was

18 terminated.   I   think   --   I   don't   remember   the

19 exact date personally --

20    Q   I understand.

21    A   -- however, we had a discussion of this

22 case   with   May   Paulino   and   Suzuki-San,   and

23 Iijima-San.

24    Q   Okay.   And   so,   what   I'm   asking   you   is

25 that   when   you   had   this   conversation   with   Mr.

1    Iijima, Mr. Suzuki, Ms. Paulino, that was

2    before Ms. Camacho had been fired, isn't that

3    correct?

4        A    Yes.

5        Q    Okay.   And did you have a personal

6    conversation with Mr. Suzuki?

7        A    Yes.

8        Q    Okay.  Was anyone else present when you

9    had the conversation with Mr. Suzuki?

10       A    No.

11       Q    So it was just you and Mr. Suzuki?

12       A    Yes.

13       Q    Okay.   And isn't it true that Mr.

14   Suzuki told you that he knew about Ms. Camacho

15   had been harassing these women before?

16       A    He explained to me that way.

17       Q    Okay.   And what exactly did he tell

18   you?

19       A    He told me that there was a complaint

20   in July and he hesitate to -- he delayed to

21   take the action and he was saw report.

22       Q    Okay.  Now did he tell you that he had

23   reported it to Personnel?   HR?

24       A    I don't remember.

25       Q    Did he tell you he had instructed Rose

1    EEOC charges or was that after you received the

2    letter from Mr. Torres?

3        A    Both, yes.

4        Q    Okay.  And were you upset that Rose had

5    contacted Mr. Torres?

6        A    I was disappointed.

7        Q    Okay.  And why were you disappointed?

8        A    Because  I  tried  to  take  care  of  the

9    three days with my best effort and within two,

10   three  days,  Jennifer  told  me  that  they  filed

11   against  the  company.   And  then  that  was  a  big

12   surprise for me.

13       Q    And -- but isn't it also true that Ms.

14   Camacho,  the  majority  of  her  conduct  started

15   before you came on as General Manager?

16       A    Would you repeat the question again?

17       Q    Sure.    Ms.   Camacho,   she   had   been

18   sexually  harassing  these  women  before  you  were

19   hired as general manager, isn't that true?

20       A    Yes.

21       Q    Okay.  And after you came on as general

22   manager,  you  came  on  in  July,  Ms.  Camacho,  she

23   was terminated, what, a month later?

24       A    Correct.

25       Q    Okay.   And  prior  to  you  coming  on  in

1  July, the company had taken no disciplinary

2  action against Ms. Camacho, isn't that true?

3      A    Correct.

4      Q    She had never been reprimanded for

5  sexually harassing these women?

6          MR. ROBERTS:  I object.  You're asking

7  about before he came on board, whether he knows

8  -- what had happened before he came on board?

9          MR. McCLINTON:  Okay.  You're not

10  representing him counsel, okay?  So, you've

11  made your objection for the record.

12          MR. ROBERTS:  I have.

13          MR. McCLINTON:  Okay.

14          MR. ROBERTS:  That's why I objected to

15  the form of the question.

16          MR. McCLINTON:  Okay.  I understand.

17  Okay.

18  BY MR. McCLINTON:

19      Q    Do you understand the question?

20      A    I do not understand the question.

21      Q    Okay.  Prior to you coming -- prior to

22  you becoming general manager --

23      A    Right, right.

24      Q    --  these women were being sexually

25  harassed by Ms. Camacho, isn't that true?

1    A   Yes.

2        MR. ROBERTS: Objection. No personal

3  knowledge.

4  BY MR. McCLINTON:

5    Q   May told you that, isn't that correct?

6    A   Yes, correct.

7    Q   Okay. And Mr. Suzuki told you when you

8  talked to him that he knew that Ms. Camacho was

9  sexually harassing these women, isn't that

10  true?

11    A   Correct.

12    Q   And you testified that Mr. Iijima also

13  told you that he knew that Ms. Camacho had been

14  sexually harassing these women, isn't that

15  true?

16    A   Yes.

17    Q   And so prior to you coming on board,

18  had Ms. Camacho been given any verbal warnings?

19  By HR. If you know.

20    A   Well, I don't know but there was no

21  investigation or warning before August.

22    Q   Okay. And before you fired -- as

23  general manager, before you fire an employee

24  you're going to look at the personnel file,

25  aren't you?

1  conversation?

2      A    And then she said, yes.  I said "why"

3  and they said -- I think she said, because

4  there was a sexual harassment.  And then I

5  remember I said suing company means suing

6  management and that includes me.

7      Q    But she never sued you though, isn't

8  that correct?  You're not being sued, isn't

9  that right?

10      A    Well, but I felt the responsibility and

11  I tried to take care of them.  And then couple

12  later I found out they sue the company, so that

13  was a big surprise and disappointment to me.

14      Q    But isn't it true that these women,

15  they were upset.  It wasn't the fact that you

16  handled it in the end.  But isn't it true that

17  this harassment occurred before you were hired

18  as general manager?

19      A    Correct.

20      Q    And a lot of this stuff that was going

21  on, you were not even there, isn't that true?

22      A    True.

23      Q    And once you found out about it in

24  August, you tried to take care of it, isn't

25  that correct?

1  Mr. Roberts with that investigation report.  I
2  mean the memo of what happened.

3      Q    Okay.  Did you have to give that memo
4  and report this to Mr. Abe?

5      A    No.

6      Q    Does Mr. Abe know about this?

7      A    Yes.

8      Q    Did you inform him or did he receive
9  knowledge based on the lawsuit?

10      A    I informed him.

11      Q    You testified that you did job
12  performances for the employees.  Does that
13  include May Paulino?

14      A    Yes.

15      Q    Did you discipline May Paulino in any
16  way for failure to investigate the sexual
17  harassment case between July and August?

18      A    No.

19      Q    Why not?  Not a big deal?

20      A    Because this case was the first time on
21  Leo Palace, for me.

22      Q    But you know -- you have a No-Sexual --
23  No-Tolerance policy when it comes to sexual
24  harassment.

25      A    Right.

1 company and I feel that the general manager, I
2 am a part -- I'm part of the responsibility, I
3 was afraid to talk with them because they might
4 take my expression against me or something like
5 that, so honestly I was afraid to talk to them.
6     Q   In your sexual harassment training,
7 while you were at the Westin or your other
8 jobs, did you ever go through a seminar which
9 discuss retaliation? Or retaliation is?
10     A   I don't know. Would you explain?
11     Q   If for example, the work hours of
12 Jennifer were reduced, do you understand --
13     A   Oh, retaliation.
14     Q   -- what that means?
15     A   Yes, I understand.
16     Q   Okay. For example, if the job duties
17 are different or expanded or reduced, do you
18 understand that to be retaliation?
19     A   Yes.
20     Q   Did you have any discussions with any
21 of your managers that they were not to engage
22 in any sort of retaliation against these three
23 plaintiffs?
24     A   I didn't know, or -- well, I didn't
25 know that there was the fact that there was

Case 1:06-cv-00028    Document 69-5    Filed 09/24/2007    Page 14 of 38

1  retaliation against them.

2  Q  No, but I asked whether you had any

3  discussion with any of them --

4  A  No.

5  Q  -- about how they were to continue to

6  treat them as employees.

7  A  Retaliation. Well, I remember that I

8  instructed them that to make sure there's no

9  any problems, you know, happening for them.

10  Not only sexual harassment but, you know, any

11  kind of a problem, you know, in the work

12  environment. So, I did say make sure, you

13  know, there is no problems, you know, be

14  careful about the situation.

15  Q  You said that you were disappointed in

16  Jennifer, did Mr. Suzuki know that you were

17  disappointed in Jennifer?

18  A  I don't know.

19  Q  What sort of discussion did you have

20  with Mr. Suzuki after you learned of my letter

21  to Human Resources?

22  A  Mainly confirming the fact what

23  happened, when, who, where, that kind of thing.

24  Q  Okay. Were you upset with him,

25  disappointed in him?

1    A    Yes.

2    Q    And did you let him know that?

3    A    Well, not only Suzuki but all the
4    manager were informed that these kind of things
5    never happen again. And then be ready to
6    handle with these cases in the future.

7    Q    Did you discipline Mr. Suzuki in any
8    way by deducting his pay, reducing his hours,
9    putting something in his personnel file?

10    A    No.

11    Q    How about Mr. Iijima, did you
12    discipline him in any way?

13    A    No.

14    Q    Did you let him know that you were
15    disappointed?

16    A    No.

17    Q    You had the ability to discipline him
18    though, to discipline the other management
19    personnel, correct?

20    A    Yes.

21    Q    You said that you advised the managers
22    to be careful about talking to the women after
23    you had discovered or after you were informed
24    about my letter.

25    A    No.

1    MR.    ROBERTS:    Objection,
2 mischaracterizes the testimony.

3    A    I told them be careful to have any kind
4 of a problems in the work environment. But I
5 didn't tell them to be careful with them for
6 conversation or what you're asking.

7 BY MR. TORRES:

8    Q    Okay. Besides the managers that worked
9 with them, Iijima and Suzuki, did you have this
10 "be careful" conversation with May Paulino?

11    A    No.

12    Q    Did you have it with anybody else?

13    A    Well, I told them that, you know, make
14 sure that any kind of problem won't happen
15 again but I didn't tell them be careful for the
16 conversation or something like that.

17    Q    Okay. But at that point you had
18 already terminated Christina Camacho.

19    A    Yes.

20    Q    So that eliminated the problem, right?

21    A    Well, this problem. But in the future,
22 any kind of problem may happen. So I -- the
23 problems what I meant is the problems in the
24 future.

25    Q    Okay. But you said that be careful in

1  talking to these three women --

2      MR. ROBERTS:  Objection --

3      A   I didn't say that.

4  BY MR. TORRES:

5      Q   I thought you said that you had

6  informed the managers be careful while talking

7  to the women --

8      A   No.

9      Q   -- and just to observe them.

10     A   No, I didn't say that.

11     Q   Well, could you clarify what you said?

12     A   I told them that -- well, sexual

13 harassment happened in the Front Office and my

14 employees who were -- who received the

15 harassment is still watching there.  And I told

16 them any kind of problems including sexual

17 harassment will not take place at the Front

18 Office or any other department.

19         So, I told them that be careful in

20 order to prohibit these kind of problems

21 happening in our working place.  That was my

22 instruction.  Not only with Iijima and Suzuki

23 but all the department head.

24     Q   Okay.  But you never instructed anybody

25 to be careful about their conversations with

1  Rose, and Viviene, and Jennifer?

2     A    I didn't instruct.

3     Q    So there would be no reason for anybody

4  to treat them differently or converse with them

5  in different manners or even avoid them?

6     A    I think there are reasons, a lot of

7  reasons.

8     Q    Did you think there's a reason through

9  that?

10    A    Yeah.

11    Q    What reasons?

12    A    Because they're suing the company and

13 still working for the company, so I think

14 employees, you know, around them will see the

15 difference before they sued the company and

16 after they sued the company. So I think

17 there's a difference.

18    Q    What's the difference?

19    A    Suing the company or not.

20    Q    Okay. But you never told your managers

21 then not to talk to them differently?

22         MR. ROBERTS:  Objection --

23 BY MR. TORRES:

24    Q    Not to interact with them differently?

25         MR. ROBERTS:    Objection, asked and

# Exhibit 9



**Family Pacific**
Licensed Individual
Marriage & Family Therapists
Play Therapists

**CONFIDENTIAL**

March 21, 2007

Lilli Perez Iyechad
PhD, RPT-S

Law Offices
Teker Torres & Teker, P.C.
Suite 2A, 130 Aspinall Avenue
Hagatna, Guam 96910-5018

LisaLinda Natividad
LCSW, QCSW

Attn: Phillip Torres, Esquire

Tom V.C. Babauta
MSW, QCSW

Subject:   Treatment Summary for Rosemarie B. Taimanglo [DOB:11/26/69]
           Re: District Court of Guam Civil Case No. 06-00028

*Hafa Adai* Attorney Torres,

Tricia A. Lizama
MSW, QCSW

I am in receipt Ms. Taimanglo's authorization for the release of records dated March 2, 2007, whereby she allows for disclosure of her health related documents that may be used for the purpose of litigation discovery. The authorization was attached to your letter requesting for the information in order to best represent her in the matter of the U.S. Equal Employment Opportunity Commission vs. Leo Palace Resort.

Please note that it is not standard practice for behavioral health clinicians to provide photocopied pages outlining the therapeutic intervention as our documentation is for the purpose of treatment provision and is considered protected health care information. As I had indicated to Ms. Taimanglo, I would gladly provide a treatment summary.

Ms. Taimanglo was a self-referral who requested services after hearing from then coworker, Ms. Holbrook, of her efforts to cope with the work situation. Ms. Taimanglo's initial appointment was on August 19th to which she was prompt, guarded, dysthymic and appeared distressed. The diagnostic impression on Axis I was Occupational Problem (V62.2) and Post Traumatic Stress Disorder, Acute (309.81). Her presenting problem stemmed from a former coworker who was sexually inappropriate verbally and physically towards her. This created much anxiety for Ms. Taimanglo, a feeling that was exacerbated because the behavior was allowed to continue before management intervened and she quit her job. Ms. Taimanglo was employed as a Front Desk Supervisor. She, along with Ms. Holbrook and Ms. Villanueva, were exposed to the sexually inappropriate behavior.

**Address:**
Reflection Center, Suite 102
222 Chalan Santo Papa,
Hagåtña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714
**Email:** fampac@ite.net
**Website:** www.familypacific.org

Ms. Taimanglo attended the August 19, 2004 session. She did not engage in efforts to continue therapy until recently. She has since come into two sessions this month indicating that the litigation has triggered her anxieties associated with the case and that she was having difficulty coping. She further stated that she has had two jobs since her employment with Leo Palace Resort and that she continues to experience overwhelming anxiety associated with confrontation at the workplace. This remains her concern to date and as a result, she is reengaged in therapy to address the problem.

I trust that this treatment summary will suffice in providing documentation on the psychological impact Ms. Taimanglo sustained as a result of the sexual harassment she experienced.

*Sinceru yan magahet,*

Lilli Perez Iyechad, PhD

Attachment – Authorization to Disclose Confidential Information

Cc:     file copy

# Exhibit 10





# Family Pacific
Licensed Individual
Marriage & Family Therapists
Play Therapists

March 21, 2007

Lilli Perez Iyechad
PhD, RPT-S

Law Offices
Teker Torres & Teker, P.C.
Suite 2A, 130 Aspinall Avenue
Hagatna, Guam 96910-5018

LisaLinda Natividad
LCSW, QCSW

Attn:   Phillip Torres, Esquire

Subject:        Treatment Summary for Jennifer T. Holbrook [DOB:02/22/79]
                Re: District Court of Guam Civil Case No. 06-00028

Tom V.C. Babauta
MSW, QCSW

*Hafa Adai* Attorney Torres,

Tricia A. Lizama
MSW, QCSW

I am in receipt Ms. Holbrook's authorization for the release of records dated
March 1, 2007, whereby she allows for disclosure of her health related documents
that may be used for the purpose of litigation discovery. The authorization was
attached to your letter requesting for the information in order to best represent her
in the matter of the U.S. Equal Employment Opportunity Commission vs. Leo
Palace Resort.

Please note that it is not standard practice for behavioral health clinicians to
provide photocopied pages outlining the therapeutic intervention as our
documentation is for the purpose of treatment provision and is considered
protected health care information. As I had indicated to Ms. Holbrook, I would
gladly provide a treatment summary.

Ms. Holbrook was a self-referral who requested services on August 14, 2004. Her
initial appointment was on August 19th to which she was prompt, distraught, labile
and appeared overwhelmed. The diagnostic impression on Axis I was
Occupational Problem (V62.2) and Post Traumatic Stress Disorder, Acute
(309.81). Her presenting problem stemmed from a former coworker who was
sexually inappropriate verbally and physically towards her. This created much
anxiety for Ms. Holbrook, a feeling that was exacerbated because the behavior was
allowed to continue before management intervened. Consequently, Ms. Holbrook
quit her job as a Front Desk Clerk and sought employment elsewhere.

Apparently, the situation had created major disruption in her life beyond the
workplace. In addition to assisting Ms. Holbrook with the trauma experienced in
**Address:**
Reflection Center, Suite 202 the sexual harassment, I also as provided support for her adjustment in other life
222 Chalan Santo Papa, areas. Specifically, Ms. Holbrook was anxious had difficulty concentrating and
Hagåtña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714
**Email:** fampac@ite.net
**Website:** www.familypacific.org

making decisions that consequently affected her academic performance while in her senior year at the University of Guam. Ms. Holbrook also experienced prolonged mood swings, including depression, hat consequently affected her relationship with her partner. It is my opinion that her symptoms displayed were results of her heightened anxiety, or Post-Traumatic Stress Disorder.

She was seen for five sessions between the months of August 2004 and April 2005. During the course of treatment, she was able to complete her studies at the University of Guam and managed to secure employment elsewhere. While Ms. Holbrook has survived the initial negative impact of the sexual harassment, she continued to have the 'victim' mentality as evidenced in her expressed concerns associated with furthering her education in a system that discriminates. Note that Ms. Holbrook returned to therapy at a later date with a colleague in the same practice, Mr. Tom Babauta.

I trust that this treatment summary will suffice in providing documentation on the psychological impact Ms. Holbrook sustained as a result of the sexual harassment she experienced.

*Sinceru yan magahet,*

Lilli Perez Iyechad, PhD

Attachment – Authorization to Disclose Confidential Information

Cc:     file copy

# Exhibit 11



Family
Pacific
Licensed Individual
Marriage & Family Therapists
Play Therapists

March 19, 2007

Treatment Summary

Lilli Perez Iyechad
PhD, RPT-S

Re: Holbrook, Jennifer T.

LisaLinda Natividad
LCSW, QCSW

Ms. Holbrook initiated treatment with this provider on April 8, 2006. She attended a total of fifteen sessions. Treatment was terminated on January 26, 2007.

Tom V.C. Babauta
MSW, QCSW

Ms. Holbrook had a diagnosis of Post Traumatic Stress Disorder (PTSD) by history. She was under the care of Dr. Lilli Perez Iyechad prior to seeking treatment with this provider.

Tricia A. Lizama
MSW, QCSW

The primary focus of treatment was on relationship issues. An additional diagnosis of relationship problems not otherwise specified was added to her previous diagnosis of PTSD. Ms. Holbrook was extremely indecisive and lacked direction both personally and professionally. She expressed dissatisfaction with her situation. She was motivated to understand the root of her unhappiness. Ms. Holbrook sought guidance to clarify the confusion that she was experiencing. She felt stuck. She was feeling frustrated, unappreciated and misunderstood. She perceived her life as being unstable.

Ms. Holbrook was able to set goals for herself personally and professionally. She worked hard at looking at the past patterns in her life and learning from those patterns. She attempted to overcome her stressors.

Ms. Holbrook experienced trauma in her previous work setting at the Leo Palace in 2004. One of her co-workers Christina Camacho had informed Ms. Holbrook "I'm lesbian just to let you know." Ms. Camacho made lewd comments and attempted to touch Ms. Holbrook reaching under her skirt. Ms. Holbrook attempted to be assertive and told Ms. Camacho "If you touch me I'm going to hurt you." There was an incident in which Ms. Holbrook kicked Ms. Camacho after Ms. Camacho attempted to touch Ms. Holbrook. Ms. Camacho responded by slapping Ms. Holbrook on the butt and Ms. Holbrook screamed. A manager appeared from a back room and Ms. Camacho commented "I can't help it."

**Address:**
Reflection Center, Suite 102
222 Chalan Santo Papa,
Hagåtña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714
**Email:** fampac@ite.net
**Website:** www.familypacific.org

Ms. Holbrook didn't feel protected when the management of Leo Palace failed to intervene. She felt like she was re-victimized when she believed the management of Leo Palace retaliated and harassed her. She states that her boss yelled at her. Ms. Holbrook was so frustrated and disgusted that she quit. She felt that the company didn't protect her and then exacerbated things by harassing her. She experienced overwhelming stress prior to her resigning.

Due to Mr. Holbrook's traumatic experiences, she has had difficulty with decision-making and struggled with stability in her life. She has been dissatisfied with her life personally and professionally. Ms. Holbrook's personality has been altered as a result of her traumatic experiences and she has developed a negative/pessimistic world view. This negative outlook has resulted in numerous problems personally and professionally. She has lacked stability and tends to be confused.

Tom Babauta, MSW, QCSW
Licensed IMFT - 0054

# Exhibit 12



**Family Pacific**
Licensed Individual
Marriage & Family Therapists
Play Therapists

February 27, 2007

Treatment Summary

Lilli Perez Iyechad
PhD, RPT-S

Re: Viviene Villanueva

LisaLinda Natividad
LCSW, QCSW

This treatment summary was prepared at the request of Viviene Villanueva.

Tom V.C. Babauta
MSW, QCSW

Viviene Villanueva received treatment at Family Pacific with this provider in 2004. She attended an initial evaluation on August 19, 2004. She had a follow up appointment scheduled for September 30, 2004, but was unable to attend due to transportation problems. She had a session on October 5, 2004. Her treatment consisted of an initial evaluation and a follow up appointment.

Tricia A. Lizama
MSW, QCSW

Ms. Villanueva sought treatment after experiencing a hostile workplace environment. Ms. Villanueva was a victim of sexual harassment. As a result of a female co-worker "Christina" sexually harassing her, she experienced numerous symptoms. She was adversely affected by the sexual abuse. She complained of extreme levels of anxiety, headaches, fear, and difficulty falling asleep and staying asleep. She was not getting enough sleep. She developed hypersensitivity and was easily distracted.

Ms. Villanueva stated that a co-worker sexually abused her in June 2004. The co-worker was physically humping Ms. Villanueva. Ms. Villanueva stated that this incident was caught on a surveillance camera. She reported it to the night manager/ assistant night manager. She stated that nothing was done until another manager named Greg Perez returned from his leave of absence. Human Resources was informed at that time.

Ms. Villanueva stated that she felt uneasy at the worksite as a result of her co-worker verbally sexually abusing her after the physical sexual harassment incident. Her co-worker would make nasty inappropriate comments. Ms. Villanueva stated that her co-worker would say things like "both of you make me wet" and "my girlfriend has her menstruation and I tasted it, it tastes good".

**Address:**
Reflection Center, Suite 102
222 Chalan Santo Papa,
Hagåtña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714
**Email:** fampac@ite.net
**Website:** www.familypacific.org

Ms. Villanueva reported that her co-worker "Christina" was terminated.

In addition to the anxiety, fear and sleeplessness due to the sexual harassment, Ms. Villanueva became hypersensitive and she experienced headaches due to stress. She became extremely concerned over her safety and was unsure if her former co-worker "Christina" would retaliate. She also didn't trust the company to protect her. She was worried that her former co-worker would get violent. She did state that she was never threatened. Ms. Villanueva stated that she did not feel safe at Leo Palace. She stated that she was under an extreme amount of stress and was overwhelmed.

Ms. Villanueva did not experience nightmares, mood swings, or crying spells. She reported that her main problem was sleeplessness and anxiety.

Ms. Villanueva needed some time off from work. This allowed time to recover from the incidents of sexual harassment. I provided a work excuse to Ms. Villanueva recommending that she be granted a two week leave of absence from August 19, 2004 through September 2, 2004.

I hope that the information above will assist you in understanding Ms. Villanueva's state of mind as a result of her traumatic experiences.

Tom Babauta
Licensed Individual,
Marriage and Family
Therapist
IMF-054

# Exhibit 13

IN THE DISTRICT COURT OF GUAM

U.S. EQUAL EMPLOYMENT           ) CASE NO. 1:06-CV-00028
OPPORTUNITY COMMISSION,        )
                               )
                Plaintiff,     )
                               )
     vs.                       )      📄 **COPY**
                               )
LEO PALACE RESORT,             )
                               )
_____Defendant.___  )
JENNIFER HOLBROOK,             )
VIVIENE VILLANUEVA and         )
ROSEMARIE TAIMANGLO,           )
                               )
     Plaintiff-Intervenors,)
                               )
     vs.                       )
                               )
MDI GUAM CORPORATION dba LEO   )
PALACE RESORT MANENGGON HILLS  )
and DOES 1 through 10,         )
                               )
_____Defendants._____    )

### *DEPOSITION OF TOM BABAUTA*

*Taken on Behalf of the Defendant*

BE IT REMEMBERED That, pursuant to
the Guam Rules of Civil Procedure, the deposition of
Tom Babauta was taken before Veronica F. Reilly, Certified
Shorthand Reporter, on Monday, the 30th day of July 2007, at
3:30 p.m. in the Law Offices of Dooley Roberts & Fowler, 865
South Marine Corps Drive, Suite 201, Orlean Pacific Plaza,
Tamuning, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

APPEARANCES


Appearing on behalf of the Plaintiff-Intervenors:

                    TEKER TORRES & TEKER
                    Suite 2A
                    130 Aspinall Avenue
                    Hagatna, Guam 96910
                    By:  Mr. Philip Torres, Esq.
                    Phone:  671.477.9891


Appearing on behalf of the Defendant:

                    DOOLEY ROBERTS & FOWLER
                    Suite 201, Orlean Pacific Plaza
                    865 S. Marine Drive
                    Tamuning, Guam 96913
                    By:  Mr. Tim Roberts, Esq.
                    Phone:  671.646.1222


Appearing on behalf of the Plaintiff:

                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                    333 S. Las Vegas Boulevard
                    Suite 300
                    Las Vegas, Nevada 89101
                    By:  Ms. Angela D. Morrison, Esq.
                    Phone:  702.388.5072

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

Case 1:06-cv-00028    Document 69-5    Filed 09/24/2007    Page 34 of 38

1  other symptoms that she presented with when she first came to

2  see you in April of 2006?

3      A.   Well, she felt like after the incident up at Leo

4  Palace and after everything kind of crumbling around her,

5  that that was the starting point. So again, I didn't start

6  working with her until April 2006. But that's her

7  perception, that at that point, things just started to kind

8  of deteriorate in different areas of her life and she was

9  just having trouble with anxiety and depression and second

10  guessing her decisions. So many times she would make a

11  decision and then -- on a major life event and then feel like

12  no, I made the wrong choice. So she was flip-flopping back

13  and forth and that was the reason she decided to come in and

14  see me.

15      Q.   Was she having relationship problems?

16      A.   Yes, sir.

17      Q.   With whom?

18      A.   With --

                REDACTED

19                                                                             s

20

21      Q.   She mentioned his name in her deposition. It's

REDACTED      And do you remember what her problem was with

23                  when you were seeing her?

24      A.   Basically -- Let me just make sure that's in the

25  scope here, because -- (Witness read document.)

*July 30, 2007: Tom Babauta*

1  treatment.  She wanted -- Jennifer wanted a fresh start, just
2  the fresh perspective and not to be tainted with any
3  information from Dr. Lilli.  So she just kind of wanted,
4  again, in line with her trying to move forward because she
5  felt really stuck in her life, she was trying to step
6  forward.
7      Q.    So you've never discussed this particular
8  information with Dr. Perez?
9      A.    No.
10     Q.    Or with Ms. Holbrook?
11     A.    No.  I could speculate if you want, but she said no.
12     Q.    If you call it speculation, no, I don't want you to
13 speculate, but what were you going to say?
14     A.    Is that okay?  (Witness looked at Ms. Morrison)
15 Just when people are victimized, they tend to have
16 hypersensitivity to things in their environment and their
17 surroundings.  So something that may be -- not even be
18 thought twice by somebody else who hadn't been victimized,
19 because of the hypersensitivity, it's heightened.
20         And so now, like as an example, if you and I are
21 joking around and playing and we're teasing each other,
22 somebody who's been traumatized, the teasing may invoke what
23 we call a tune-in kind of a behavior or a thought where it's
24 almost like reliving or almost like initiates a flashback of
25 another time when they were having a traumatic event

 1  the work setting, then it could be considered occupational

 2  problem.

 3       Q.   You also said that someone can have a

 4  hypersensitivity based on being a victim?

 5       A.   (Witness nodded head.)

 6       Q.   And their reaction might not be the reaction that

 7  any of us in this room would have but it's very much a real

 8  reaction for them?

 9       A.   Right.

10       Q.   And is it also a reasonable reaction for them?

11       A.   For somebody who's been traumatized, yes.

12       Q.   So while we have what's called a reasonable man

13  standard, so somebody who's a victim and acting out in what

14  might otherwise be perceived as hypersensitive would actually

15  be a reasonable reaction for their situation.  Do you agree?

16       A.   Sure.

17            MR. TORRES:  I have nothing further.

18            MR. ROBERTS:  Well, since it wasn't Tom that

19  actually made the diagnosis of PTSD, I wasn't going to ask

20  him about it, but he did, so now I have a few questions.

21                   REDIRECT EXAMINATION

22  BY MR. ROBERTS:

23       Q.   Do you have any particular expertise in diagnosing

24  post traumatic stress disorder?

25       A.   I have training from the Veterans Administration on

## REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that TOM BABAUTA personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 30, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 31st day of July 2007.

_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter