Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223



FILED
DISTRICT COURT OF GUAM
OCT - 1 2007
JEANNE G. QUINATA
Clerk of Court

Attorneys for Defendant LeoPalace Resort

## IN THE DISTRICT COURT

## OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br>vs.<br><br>LEO PALACE RESORT,<br><br>Defendant. | CASE NO. 1:06-CV-00028<br><br><br><br><br><br><br><br><br>**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO,<br><br>Plaintiff-Intervenors,<br>vs.<br><br>MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10,<br><br>Defendants. | |

## I. INTRODUCTION

In the customary manner of a party opposing summary judgment, in its opposition memorandum the EEOC tries to blur the issues by blending events occurring before Christine Camacho was terminated with events occurring after she was terminated. The EEOC goes so far as to argue that Leopalace's motion based on post-August 16, 2004 events should be denied because of pre-

August 16, 2004 events. But this makes no sense. Leopalace's motion for partial summary judgment has nothing to do with things that happened before the attorney for Plaintiff-Intervenors threatened to sue Leopalace in a letter dated August 16, 2004 and delivered on August 17, 2004. The EEOC's allegations about what happened before August 16, 2004 revolve around negligence, i.e., Leopalace's alleged delay in responding to reports of employee Christine Camacho's inappropriate workplace conduct. The EEOC's allegations about post-August 13, 2004 events, after Ms. Camacho was terminated, revolve around Leopalace's alleged retaliation against Plaintiff-Intervenors after they threatened to sue Leopalace, Leopalace's alleged creation of a hostile working environment, and Leopalace's alleged constructive termination of Plaintiff-Intervenors. Leopalace asserts in its motion that Plaintiff-Intervenors possess insufficient facts to state a cause of action for retaliation, hostility, or constructive termination based on post-August 16, 2004 events. The pending motion is that simple, and nothing the EEOC says about prior events can change that.

Because Leopalace's motion for partial summary judgment does not concern pre-August 16, 2004 conduct, the Court can safely ignore large chunks of the EEOC's brief. They add nothing except prejudice to the issues actually raised by the pending motion for partial summary judgment. The portions of the EEOC's brief the Court can ignore include pages 1 through 5 and the first 8 lines of page 6. Only then, at page 5, line 9, does the EEOC get around to discussing the facts made the subject of Leopalace's motion. Interestingly, the facts raised by the EEOC in opposition to the motion for summary judgment are the same facts raised by Leopalace in its opening brief. Those facts amount to nothing more than "cold shoulder" treatment for which no relief is provided for under Title VII or state law. Notably, Leopalace used the words "cold shoulder" in its opening brief, before Plaintiff-Intervenors turned over their psychotherapy records. As it turns out, these are the identical words used by Plaintiff-Intervenor Rose Taimanglo to describe Leopalace management's post-August 16, 2004 conduct. Ms. Taimanglo told Dr. Perez-Iyechad that because of management's "cold shoulder", she

and the other Plaintiff-Intervenors that were feeling "alienated". See, Supplemental Declaration of Tim Roberts ("Roberts Supp. Dec."), Exhibit A1.[1]

## II. UNDISPUTED FACTS

Other than that complaining about management's "cold shoulder", all Ms. Taimanglo really talked about in her single meeting with Dr. Lilli Perez-Iyechad in 2004 was how she had been treated by Christine Camacho before Ms. Camacho was terminated, not how Leopalace management treated her afterwards. Supp. Roberts Dec., Ex. A1. She never went back to Dr. Perez-Iyechad in 2004. *Id.*, Exs. A2, A3.[2] As for Jennifer Holbrook, the EEOC places a great deal of weight on an alleged "confrontation" she had with Mr. Maruyama. Her therapy records, however, suggest the incident had no effect on Ms. Holbrook whatsoever. Her first meeting with Dr. Perez-Iyechad was on August 19, 2004, only two (2) days after the supposed "confrontation" with Mr. Maruyama on August 17, 2004. Roberts Supp. Dec., Exhibit B1. Significantly, at that first meeting with Dr. Perez-Iyechad, Ms. Holbrook did not even mention Mr. Maruyama, or any confrontation, or any post-August 16, 2004 events at all. She only complained about what Ms. Camacho allegedly did prior to being terminated. She was also "worried about whether she can (graduate from UOG) this year, and that she was having "personal issues w/ current bf (boyfriend)". *Id.* at B1. *Id.* At her second appointment with Dr. Perez-Iyechad, on August 24, 2004, Ms. Holbrook did mention Mr. Maruyama -- she said that he was "compassionate" or "concerned" when "prompted by circumstances." *Id.*, at B2. Other than that, she

---

[1] The Court's Order requiring the Plaintiff-Intervenors to produce their psychotherapy records did not place any limitations on Leopalace's use of those records. Nonetheless, in an abundance of caution, Leopalace has not filed the actual psychotherapy records with the Court, although copies have been given to the other attorneys in this case. Leopalace requests the court's instructions with respect to the filing of these documents.

[2] Leopalace would also like to note that prior to this lawsuit Ms. Taimanglo filed a claim with the EEOC charging "retaliation" and "constructive discharge". She also claimed that she was subjected to "national origin discrimination" because she is a Filipina. The EEOC investigated her claims, but it was "unable to conclude" that Ms. Taimanglo was subjected to "retaliation" or "constructive discharge". The EEOC dismissed her claim for "national origin discrimination" as well. Exhibit 1, September 10, 2007 Declaration of Tim Roberts. In its Opposition Memorandum, the EEOC now claims, contrary to the results of its own pre-lawsuit investigation, that that Ms. Taimanglo did suffer from "retaliation" and "constructive discharge". Ms. Taimanglo's claims should be viewed with suspicion, at the very least.

did not talk about Leopalace. Ms. Holbrook's primary complaint during this second meeting with Dr. Perez-Iyechad was a "lack" of "appreciation" and "affection" from her ex-boyfriend, who she broke up with May of 2004. *Id.,* at B2. May of 2004, incidentally, is just prior to Ms. Holbrook's troubles with Christine Camacho at Leopalace. Id at B3. Ms. Holbrook also complained about her new boyfriend, as well. *Id.,* at B2. At Ms. Holbrook's third appointment with Dr. Perez-Iyechad, on September 23, 2004, she once again did not talk about her troubles Leopalace, either. *Id.,* at B3. Instead, she was encountering "stress" due at UOG, and she was was still having problems with her current and ex-boyfriend. *Id.,* at B3. Also, she was "agitated" because she had just been involved in a hit and run automobile accident. Dr. Perez also wrote, somewhat ambiguously, that Ms. Holbrook "otherwise stated she quit wk. at Leopalace - ↑ time on school wk." *Id.,* at B3. At her fourth visit with Dr. Perez-Iyechad, on December 9, 2004, Ms. Holbrook was complaining about a custody dispute with her ex-boyfriend and "venting" about stress at UOG. *Id.,* at B4. This was Ms. Holbrook's last session with Dr. Perez-Iyechad in 2004. On March 30, 2005, Dr. Perez-Iyechad terminated Ms. Holbrook's treatment. *Id.,* at B6.

So much for Ms. Holbrook's traumatic "confrontation" with Mr. Maruyama. She failed to even mention the incident at no less than four (4) counseling sessions between August 19, 2004 and the end of that year. After describing how awful that confrontation must have been in its brief, the EEOC goes on to argue that Plaintiff-Intervenors thereafter experienced "other negative changes in their working environment". These "negative changes in their working environment" turn out to be little more than management not being as nice to Plaintiff-Intervenors as it was before they threatened a lawsuit. The upshot, according to the EEOC, is that Ms. Holbrook "wasn't happy going to work knowing that [she] didn't have a good relationship anymore with Mr. Maruyama". EEOC Brief, p. 9:18-19. At the risk of sounding unsympathetic, being "happy" at work and having a "good relationship" with one's boss are

not federally protected rights. Similarly, going to work for eight (8) days thinking "something might happen" (EEOC Brief, p. 9:21) is simply not actionable.

The EEOC admits, EEOC Brief, p. 11:21-23, that a "hostile work environment" must be judged from the perspective of a "reasonable person in the plaintiff's position". Reasonable people in Plaintiff-Intervenors' position would assume that management might not be friendly to them anymore after they threatened a $330,000.00 lawsuit. Most jobs aren't fun. Most bosses are not nice. But people don't have a right to a fun job or a nice boss. Reasonable people know this. Leopalace did nothing after August 13, 2004 to "alter the terms or conditions" of Plaintiff-Intervenors' employment. They still came to work. They still did their jobs. They still got paid. Legally speaking, that is all they were entitled to. A "cold shoulder" from management is not actionable under Title VII or local law.

## III. LAW AND ARGUMENT

The EEOC complains that some of the cases cited by Leopalace (1) were decided after Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405 (2006), (2) were decided outside the 9th Circuit, and (3) involve ADEA and ADA discrimination claims rather than Title VII retaliation claims. As noted in Leopalace's opening brief, there is a dearth of authority addressing claims based on the trivial post-August 16, 2004 conduct at issue in this motion, although Leopalace did in fact discuss Burlington Northern for its general holding that Title VII does not create a code of civility for the workplace, a holding based on the EEOC's own manual. Burlington Northern, *supra*, 126 S. Ct. at 2415. Nonetheless, in searching for decisions on point, Leopalace had to take precedents when and where it could find them. The EEOC has further confirmed this dearth of authority by relying solely upon cases involving conduct remarkably more egregious than "cold shoulder" treatment or an isolated and minimal reduction in working hours. Also, notwithstanding the EEOC's complaints about Leopalace's authority, as noted below the EEOC has cited numerous cases decided before Burlington Northern, cases from courts outside the Ninth Circuit, and a case involving USERRA rather than Title VII. In the event the pending motion comes down to the

question of whose cases are more on point, this reply brief will focus on the facts of the cases the EEOC has relied upon.

A.  Hostile Work Environment.

In its discussion of the hostile work environment claims, the EEOC cites to several cases involving employer misconduct horrifically worse than a few days of cold shoulder treatment. Significantly, all of the EEOC's cases involve a manager or supervisor making managerial or supervisory sexual comments and engaging in sexual conduct, which are inherently hostile in and of themselves. Nothing like that happened here. None of Leopalace's conduct after August 13, 2004 involved crude or sexual comments or conduct that was inherently hostile in and of itself. Leopalace did nothing that would cause a reasonable person to feel that she had no choice but to resign. To put this in perspective, if a supervisor is rude to an employee for, say, making a bad cup of coffee, there is nothing inherently hostile about that. No reasonable employee would conclude that she had no choice but to quit if her boss became angry with her for making a bad cup of coffee, and then stopped speaking with her as much as before. Those facts are no different from the facts in this case. A manager's motivation in not talking to an employee is irrelevant. It is only the "not talking" part that is relevant. Whether a manager stops talking to an employee because she made a bad cup of coffee, or because she threatened to sue the company, the end result is the same: a mere managerial "cold shoulder", which is not actionable under federal or local law.

The EEOC's cases begin with Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986), decided two decades before Burlington Northern. In Meritor, the plaintiff was forced to sleep with her supervisor 40 or 50 times out of fear of losing her job. Meritor, *supra*, 477 U.S. at 60. The EEOC simply refuses to acknowledge the difference between such egregious supervisor conduct and a supervisor's mere failure to smile at an employee.

Next the EEOC cites to another pre-Burlington Northern case, Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993). In Harris, a supervisor subjected the plaintiff to unwanted sexual innuendo, asked her to

get coins from his pants pocket, and threw objects on the ground and asked her to bend over and pick them up. *Id.* at 19. Again, this is a lot more hostile than failing to cheerfully greet an employee.

The EEOC then cites another pre-<u>Burlington Northern</u> case, <u>Nichols v. Azteca Rest. Enter.</u>, 256 F. 3d 864 (9th Cir. 2001). In this case, male co-workers and a supervisor subjected an employee to "a relentless campaign of insults, name-calling and vulgarities", calling him such things as "faggot" and "f***king female whore". *Id.* at 870 (asterisks inserted). What did Leopalace management call Plaintiff-Intervenors? It called them to come to work. And then it paid them. Which is all it was required to do.

The EEOC's cite to <u>Nichols</u> is followed by a cite to a pre-<u>Burlington Northern</u>, out-of-circuit case of <u>Burns v. McGregor Elec. Indus., Inc.</u>,955 F. 2d 559 (8th Cir. 1992). There, a manager-trainee often made sexual comments to plaintiff Burns when Burns left the restroom, made daily comments to other workers about Burns' intimate hygiene habits and relationships, and showed nude photos of Burns to co-workers. The owner of the company showed Burns advertisements for pornographic films, talked about sex, asked her to watch such pornographic films with him, made lewd gestures, asked her for dates at least once a week, suggested that she would perform her work better if she engaged in oral sex with him, and asked her to pose nude in return for overtime pay. A supervisor tried to get Burns to sit on the owner's lap, go out with him, or go up to his apartment. *Id.* at 560-61. Now, *that* is a hostile working environment. It is surprising and significant that the EEOC would mention the <u>Burns</u> case in the same breath as this case.

The final case cited by the EEOC on the hostile work environment issue is another pre-<u>Burlington Northern</u> decision, <u>Draper v. Coeur Rochester, Inc.</u>, 147 F. 3d 1104 (9th Cir. 1998). There, a supervisor subjected the plaintiff to sexual remarks for two years. He told her about his sexual fantasies, which included a ménage à trois with his wife and the plaintiff. He gave her unfavorable work assignments and forced her to eat lunch with him in his office. *Id.* at 1105-07. <u>Draper</u> is of no help to the EEOC.

In short, the EEOC's hostile working environment cases establish this: If Leopalace subjected Plaintiff-Intervenors to sustained and repeated sexual harassment starting on August 16, 2004, then its

motion for partial summary judgment should be denied. But surely, instead, the court can see that Leopalace's motion should be granted under trivial facts of this case, involving little more than "cold shoulder" treatment and a single minimal reduction in hours. Courts should not let these kinds of cases get to a jury. Partial summary judgment should be granted on Plaintiff-Intervenors' "hostile work environment" claims.

B. Retaliation.

Turning to retaliation, the EEOC leads off with Burlington Northern. In Burlington Northern, the plaintiff had been reassigned and then suspended without pay for 37 days in retaliation for gender discrimination complaints, although she was eventually reinstated with back pay. Burlington Northern, *supra*, 126 S. Ct. at 2409. A one-time reduction of 1.25 hours is not in the same ballpark as a 37 day suspension. Courts have characterized such reductions as "trivial" and declared it "absurd" to think they could support a retaliation claim.

In Ray v. Henderson, 217 F. 3d 1234, 1237 (9th Cir. 2000), the next case cited by the EEOC, management retaliated for the plaintiff's complaints by eliminating employee meetings, eliminating its flexible starting time policy, instituting a "lockdown" of the workplace, and cutting the plaintiff's salary. All of this substantively different than failing to chat with an employee.

The EEOC's next precedent is the pre-Burlington Northern case of Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998). In Oncale, the plaintiff was physically assaulted in a sexual manner and threatened with rape. When he complained to supervisory personnel, the company took no remedial action and the Safety Compliance Clerk "called him [plaintiff] a name suggesting homosexuality." *Id.* at 77.

The EEOC's final retaliation case is Porter v. Cal Dep't of Corr., 419 F. 3d 8885 (9th Cir. 2005). In this case, the employee's supervisor told her boyfriend that she was a "whore", vetoed her holiday and vacation requests, and cancelled or denied her transfers. After she made a formal complaint followed by a

civil action, management instructed her enter and exit the premises to limit her contact with other staff. The other staff yelled obscenities and insults at her. *Id.* at 889-90.

To conclude the retaliation discussion, it is hard to understand how the EEOC can seriously equate conduct such as month-long suspensions without pay, sexual preference and promiscuity insults, long suspensions without pay, or punitive policy changes affecting all employees with the mild cold shoulder treatment at issue here. The EEOC's cited case law and its legal brief would be (and no doubt have been) relevant and convincing against the backdrop of any number of different and far more outrageous factual circumstances. But in this case, the EEOC's case law and its brief are neither relevant nor convincing. Leopalace suggests a reason for this: The facts of this case do not support a lawsuit. There has been no violation of federal or local law in this case. Partial summary judgment should be granted on Plaintiff-Intervenors' retaliation claims.

C.    Constructive Discharge.

In addition to the previously-discussed Draper decision, the EEOC cites to three other decisions in the constructive discharge section of its brief, two of which are pre-Burlington Northern. The first of the three cases is Steiner v. Showboat Operating Co., 25 F. 3d 1459 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995). In Steiner, the plaintiff's supervisor called her offensive names based on her gender, and on one occasion loudly and repeatedly demanded, in front of customers and other employees, that she perform oral sex on two customers. *Id.* at 1462. Leopalace agrees that the reasonable person would feel that she had no choice but to resign if this happened to her. But what if her supervisor didn't do any of that? What if he just didn't talk to her very much?

The EEOC next cites to Wallace v. City of San Diego, 479 F. 3d 616 (9th Cir. 2007). This is a URESSA case, where there was evidence of years of discriminatory conduct against the plaintiff because of his Naval Reserve duties. *See id.* at 629.

The final case cited by the EEOC is Watson v. Nationwide Insurance Co., 823 F. 2d 360 (9th Cir. 1987). In this case, the employer conspired to create trumped-up charges of inadequate job performance

while the plaintiff was on her honeymoon. When she returned, she was subjected to abusive treatment and harassment for several days. "[A] personnel manager told her that she was considered a bitch and that she could either resign or be demoted to a position in which she would be supervised by her subordinate trainees." *Id.* at 362. Again, Leopalace agrees that the reasonable person would feel she had no choice but to resign under these circumstances. But these are not the circumstances of this case. Management's disinclination to talk to an employee after she threatens to sue him for $330,000.00 is completely different than loudly and publicly telling her to get down on her knees and perform oral sex on a customer, or telling her that unless she resigned she would be demoted. The first example is horrific and shocking to the conscience; the second is the quintessential and classic constructive discharge case. This case is neither of those things. Plaintiff-Intervenors were not constructively discharged. They simply found better jobs and quit. Partial summary judgment should be granted on Plaintiff-Intervenors' "constructive discharge" claims.

## IV. CONCLUSION

The issue in this case is whether Leopalace acted promptly enough when informed of Ms. Camacho's conduct in late June or early July of 2004. This is a <u>negligence</u> issue. If the EEOC wins, the issue is what amount of damages will fairly compensate the Plaintiff-Intervenors. This case is not about whether Leopalace should be punished with an award of punitive damages for intentional misconduct after Christine Camacho was terminated. Partial summary judgment should be granted.

Dated this 1st day of October, 2007.

DOOLEY ROBERTS & FOWLER LLP

By _____
**TIM ROBERTS**
Attorneys for Defendant