Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant LeoPalace Resort



FILED
DISTRICT COURT OF GUAM

NOV - 5 2007

JEANNE G. QUINATA
Clerk of Court

IN THE DISTRICT COURT

OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br>vs.<br><br>LEO PALACE RESORT,<br><br>Defendant. | CASE NO. 1:06-CV-00028<br><br><br><br><br><br><br><br><br>**DEFENDANT LEOPALACE RESORT'S TRIAL BRIEF** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO,<br><br>Plaintiff-Intervenors,<br>vs.<br><br>MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10,<br><br>Defendants. | |

This case does not involve a supervisor sexually harassing an employee. It is a co-employee harassment case, in which a single co-employee allegedly used vulgar language and behaved inappropriately around three (3) of her co-employees. There are six hundred (600) Leopalace

**ORIGINAL**

employees. Only three (3) of them have complained. The issue for the jury is the promptness of Leopalace's decision to terminate the alleged harasser. Plaintiff EEOC and Plaintiff-Intervenors claim that Leopalace acted too deliberately in doing so and that it was therefore negligent.

In June of 2004, Leopalace's then-night manager Greg Perez told Human Resources Director May Paulino about an incident in which new front desk hire Christina Camacho had jokingly "humped" her Leopalace co-employee, Viviene Villanueva. Ms. Paulino instructed Greg Perez to speak with Ms. Camacho to warn her that sexual harassment was not tolerated at Leopalace, and that her conduct was not to be repeated. For all Ms. Paulino knew, the warning worked, because she heard nothing more about Ms. Camacho until August 10, 2004. On that date, Plaintiff-Intervenor Rose Taimanglo told Ms. Paulino about a series of incidents involving Ms. Camacho that happened before and after the incident reported by Mr. Perez. Leopalace investigated and promptly terminated Ms. Camacho.

A.    **Sexual Harassment in the Workplace.**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." The 1964 Civil rights Act is statutorily codified in Title 42 of the United States Code, at 42 U.S.C. § 2000e-2(a)(1). Sexual harassment claims, and a negligence action against an employer for failing to address them, can only be maintained if the alleged harassment "alters, either expressly or constructively, the terms or conditions of an individual's employment." See, e.g., Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67-68, 106 S. Ct. 2399 (1986). To be actionable, the alleged harassment must be shown to be sufficiently "severe or pervasive." Burlington Indus., Inc. v. Ellerth, supra; Oncale v. Sundowner

2

Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 1002-03, (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367 (1993); Curry v. District of Columbia, 338 U.S. App. D.C. 439 (D.C. Cir. 1999).[1]

### B. Employer Liability For Co-Worker Harassment.

An employee can be harassed either by a supervisor or by a co-worker. The test for the employer's potential liability is different in each area. Here, we deal only with alleged co-worker harassment. In co-worker harassment cases, a negligence standard governs employer liability. Every federal circuit that has addressed co-worker harassment since 1998 has applied a simple negligence standard to co-worker harassment cases.[2] An employee harassed by a co-employee bears the burden of proof to establish by a preponderance of the evidence two separate things: (1) that the employer knew or should have known of the harassment; and (2) that the employer responded unreasonably to the situation.

---

[1] Until 1998, most courts held that same-sex co-worker harassment was not prohibited by the federal civil rights laws, namely 42 U.S.C. § 2000e-2(a)(1). In 1998, however, in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998 (1998), the United States Supreme Court held that "(w)e see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 79. Thus, given that this case only involves same-sex co-worker harassment, Leopalace could not even have been sued only six (6) years before the events giving rise to this lawsuit.

[2] "The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker." Rhodes v. Ill. DOT, 359 F.3d 498, 505-506 (7th Cir. 2004), citing Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S. Ct. 2275 (1998). "Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action ... Conversely, an employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has 'been negligent either in discovering or remedying the harassment.'" Burlington Indus. v. Ellerth, 524 U.S. 742, 760 (1998); Richardson v. New York State Dep't of Correctional Servs., 180 F.3d 426, 441 (2d Cir. 1999); Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999) (no vicarious liability for co-worker harassment); Wilson v. Tulsa Junior College, 164 F.3d 534, 541 n.4 (10th Cir. 1998) (noting distinction between vicarious liability and negligence standard).

3

### C. Severity or Pervasiveness of the Alleged Harassment.

Sexual harassment is actionable under Title VII only if it is so "severe or pervasive" that it "alters the conditions of the victim's employment" and creates "a hostile working environment". The courts do not measure conduct in the workplace in isolation; instead, "whether an environment is sufficiently hostile or abusive" must be judged by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, supra, 510 U.S. at 23. That is, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id.

To qualify as "hostile", the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." McPherson v. City of Waukegan, 2004 U.S. App. LEXIS 16513 (7th Cir. 2004). Sexual assaults, physical contact for which there is no express or implied consent, repealed uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures will usually qualify as harassment. But, "occasional vulgar banter, tinged with sexual innuendo, or coarse or boorish workers" will not usually qualify as harassment. McPherson, supra.

### D. Evidentiary Conflicts.

Leopalace night front desk manager, Greg Perez, reported Ms. Camacho's inappropriate behavior towards Viviene Villanueva to Ms. Paulino. Ms. Paulino told Mr. Perez to warn Ms. Camacho that sexual harassment is not tolerated at Leopalace, and to cease her conduct. Mr. Perez denied this at his deposition. Further incidents apparently continued to occur between July 7, 2004

4

and August 10, 2004, which was the day before Ms. Paulino suspended Ms. Camacho just before firing her on August 13, 2004.

Here, the jury will have to determine whether Leopalace acted unreasonably. This may come down to whether the jury believes Ms. Paulino or believes Mr. Perez. If it believes Ms. Paulino, the jury will then have to decide if she acted unreasonably in ordering Mr. Perez to counsel Ms. Camacho, and in believing that Mr. Perez's warning to Ms. Camacho had fixed the problem.

The prompt response to co-employee harassment required by the courts does <u>not</u> mean that an employer is <u>required</u> to terminate an employee the first time it receives a report that the employee has harassed another co-employee. Instead, a warning may be appropriate. <u>Ellison v. Brady</u>, 924 F.2d 872. 882 (9th Cir. 1991); <u>Star v. West</u>, 237 F.3d 1036, 1038-1039 (9th Cir. 2001).

### E. Compensatory Damages for Negligence.

Assuming the jury determines that a Title VII claim has been made out, it will then have to determine appropriate damages. Each of the three Plaintiff-Intervenors described a different set of experiences with Ms. Camacho.

1. <u>Viviene Villanueva</u>. Ms. Villanueva had been working for Leopalace since June of 2003, about a year before Christina Camacho was hired. On one occasion, Ms. Camacho commented "nice boobs, nice ass" about a passing hotel guest in Ms. Villanueva's presence. On a second occasion, Ms. Camacho placed a balloon in the shape of a sword to her private area, then asked a male Korean co-worker if he wanted to "dick sword fight". On third occasion, Ms. Camacho stuffed tissues into her pants, exclaiming "look, I have a penis". On a fourth occasion, Ms. Camacho used the arm of a mannequin from the back office to scratch her pants near her private parts. At various times, Ms. Camacho described to Ms. Villanueva how she would have sex

with her girl friend, and that she would use dildos with her girlfriend. Finally, in the first week of June, 2004, Ms. Camacho jokingly pantomimed "humping" Ms. Villanueva, laughingly commenting "sorry, I couldn't help myself". After that, Ms. Villanueva told Ms. Camacho to stop bothering her. Ms. Camacho never physically touched Ms. Villanueva again, and she never directed any offensive comments to her again. On August 11, 2004, Ms. Villanueva told Ms. Paulino that she had been comfortable working with Ms. Camacho ever since she told her to stop bothering her during the first week in June, 2004, a period of over two months.

        2.    <u>Jennifer Holbrook.</u> Ms. Holbrook was hired on June 7, 2004. Around the third week of June of 2004, about two (2) weeks into the job, Ms. Camacho grabbed Ms. Holbrook's hand and asked her "do you think my breasts are either watermelons or melons?" She then tried to pull Ms. Holbrook's hand to her breast. Ms. Holbrook never told anybody she didn't want to work with Ms. Camacho anymore. Ms. Holbrook never told anyone about this incident or otherwise reported it to management. Although she explained at her deposition that she said she didn't know who to report it to, she later admitted that she knew she was supposed to report sexual harassment to her supervisor, Mr. Suzuki. Still later, she said she knew she was supposed to report sexual harassment to management, but she felt that reporting the harassment "compromise" her job. On a second occasion, a week or two after the first incident, two or three weeks into the job, or somewhere around June 28 through July 5, 2004, Ms. Holbrook was walking to the Leopalace Cafeteria to go to lunch with Ms. Taimanglo, Ms. Villanueva, and Ms. Camacho. In any event, as they were walking, Ms. Camacho tried to place her hand under Ms. Holbrook's skirt because she wanted to know whether Ms. Holbrook was "wet". Ms. Holbrook pushed her hand away and told her to "stop". Ms. Holbrook then proceeded to have lunch with Ms. Camacho, although she said she was "uncomfortable" doing so. She never reported this incident to anyone and she never told

6

anyone that she did not want to work with Ms. Camacho anymore. On a third occasion, on July 7, 2004, Ms. Camacho slapped Ms. Holbrook on the buttocks. Ms. Holbrook shouted at her "what are you doing?" and Ms. Camacho giggled and said "I'm sorry, I can't help myself." Ms. Holbrook responded, "No, that wasn't nice at all" and that "don't you ever do that again to anybody. And if I find out that you do that to anybody else, I will report you".

At some point, Ms. Camacho held up a kotex in its wrapper and waved it in front of Mr. Iijima and Ms. Holbrook at the front desk, saying "Look", Mr. Iijima told her to put it away. She then went to the restroom. At about the same time as the melon incident, Ms. Camacho told Ms. Holbrook she enjoyed having oral sex with a female when the other female is menstruating. On other occasions, Ms. Camacho would describe what she did with her sex partner during working hours. Whenever she started to do this, Ms. Holbrook just walked away.

Ms. Holbrook admits she was given an Employee Handbook when she took the Leopalace job, and admits that the Handbook contained a sexual harassment policy. The Handbook will be an exhibit at trial, and it clearly states that harassment is to be reported to Human Resources immediately. Ms. Holbrook also remembers telling Ms. Paulino that Ms. Camacho should have known about Leopalace's sexual harassment policy because it's in the Leopalace Handbook.

Ms. Holbrook reported the buttocks-slapping incident to her immediate supervisor Rose Taimanglo on August 9 or August 10, 2004, after which Ms. Camacho was terminated on August 13, 2004.

Ms. Camacho used swear words as normal part of her conversation. She did that with everybody. Asked if she felt that Ms. Camacho's words were directed at Ms. Holbrook personally, Ms. Holbrook said "I felt that it wasn't necessary to use those types of words in the working environment". That is, Ms. Holbrook said that Ms. Camacho was not necessarily directing her

7

vulgar comments to Ms. Holbrook directly. Although Ms. Holbrook considered this to be sexual harassment, she says swear words were in Ms. Camacho's "general vocabulary." At her interview with Ms. Paulino on August 11, 2004, Ms. Holbrook admitted to Ms. Paulino that she and the other girls sometimes laughed at Ms. Camacho's jokes. Ms. Holbrook prepared a handwritten statement before being interviewed by Ms. Paulino on August 11, 2004, two days before Ms. Camacho was terminated. Ms. Holbrook never mentioned the melon incident, or the skirt incident, or the kotex waiving incident.

Ms. Holbrook was hired on June 7th, 2004. The melon incident happened around June 21, 2004, the skirt incident happened a week or two later, around the week of June 28th through July 5th, and the buttocks-slapping incident occurred on July 7th, 2004. Three physical incidents over the course of less than three weeks, after which Ms. Camacho did not physically bother Ms. Holbrook for the next thirty-seven days until she was fired on August 13, 2004.

        3.     Rose Taimanglo. Ms. Taimanglo was the Front Desk Supervisor when Ms. Camacho was hired. She had the power to warn employees orally and in writing.

In the first week of June, 2004, Ms. Camacho returned from lunch and remarked to Ms. Taimanglo and that "eating (her) tonight would taste better then the lunch she just had". On four or more occasions in June of 2004, Ms. Camacho tried to make Ms. Taimanglo to put her hand on her breasts.

On or about July 1, 2004, Ms. Taimanglo told her supervisor Mr. Suzuki that Ms. Camacho was harassing co-employees and guests. She asked Mr. Suzuki if it was okay for her to tell Ms. Paulino about it, and he said of course. Ms. Taimanglo told Ms. Paulino that Ms. Camacho had tried to "hump" Vivienne Villanueva. Ms. Taimanglo also told Ms. Paulino about other incidents, as well, such as the melon incident, the candle incident, and others. Ms. Paulino had not heard

8

about any of these other incidents. But, Ms. Paulino had previously instructed Mr. Perez to counsel Ms. Camacho to correct here behavior, so she believed the situation would be taken care of.

Later in July, Ms. Camacho slapped Ms. Taimanglo on the buttocks inside the hotel shuttle van. Ms. Taimanglo did not tell Ms. Paulino about this incident. Then, on August 10, 2004, Ms. Camacho slapped Ms. Taimanglo on the buttocks again while they were standing behind the front desk. Ms. Taimanglo was very angry about this second incident. Ms. Taimanglo told Ms. Holbrook what had happened. Ms. Holbrook told Ms. Taimanglo that Ms. Camacho did the same thing to her. Ms. Taimanglo finally went to Ms. Paulino on August 10, 2004. Ms. Taimanglo realized that Greg Perez's counseling hadn't worked, so she investigated and terminated Ms. Camacho on August 13, 2004. During her interviews with Ms. Holbrook, Ms. Taimanglo, and Ms. Villanueva on August 10 and 11, 2004, they admitted to Ms. Paulino that they had laughed at Ms. Camacho's jokes and behavior.

### F. Hostile Working Environment, Retaliatory and Constructive Discharge.

1. <u>Facts.</u> As mentioned above, Leopalace investigated and then terminated Ms. Camacho on August 13, 2007. Those facts serve as the basis for the negligence allegations in this case. The EEOC and the Plaintiff-Intervenors allege that they suffered damages as a result of this negligence in July and the first ten (10) days of August, 2004. But both the EEOC and Plaintiff-Intervenors also complain about what happened after Leopalace terminated Ms. Camacho, and after Leopalace received a letter from Plaintiff-Intervenors' attorney demanding $330,000.00 in damages on August 17, 2004. Plaintiff-Intervenors say that Leopalace "retaliated" against them for complaining about the previous harassment. They say they were forced to endure a "hostile work environment". They say they were "constructively discharged". They seek compensatory and punitive damages based on these allegations. However, under the

9

relevant case law, Leopalace's conduct after it terminated Ms. Camacho is not actionable as a matter of law.

On the morning of Tuesday, August 17, 2004, four (4) days after terminating Ms. Camacho, Leopalace management received a letter dated August 16, 2006 from the law firm of Teker, Torres and Teker, PC, representing the Plaintiff-Intervenors in this case. The letter accused Leopalace of allowing Plaintiff-Intervenors to be sexually harassed in the workplace by Ms. Camacho. The letter demanded that Leopalace pay a collective $330,000.00 in damages to the Plaintiff-Intervenors. In the letter, Plaintiff-Intervenors' attorney stated that he had discussed the case with the Equal Employment Opportunity Commission ("EEOC"), but that he "had not filed a formal complaint, as yet."

After August 17, 2004, Ms. Taimanglo continued to work at Leopalace for over two months, through October 23, 2004, giving her two week notice on October 11, 2004. Ms. Villanueva also continued to work at Leopalace for over two months, through October 29, 2004, giving her two week notice on October 15, 2004, four days after Ms. Taimanglo gave her notice. Ms. Holbrook resigned on August 28, 2004. She had made her mind up to quit as of August 19, 2004.

The Plaintiff-Intervenors generally claim that they were "treated differently" by Leopalace management and co-workers after their attorney's August 16, 2007 demand letter was sent.[3] Leopalace's general manager at the time, Yutaka Maruyama, testified at his deposition that he was simply afraid to talk to the claimants after receiving their attorney's demand letter, ("knowing that they're suing the company and I feel that the general manager ... I'm part of the

---

[3] Any such alleged "different" treatment by co-workers, is, of course, irrelevant to this case, since management can only act through high level managers, not co-workers.

responsibility, I was afraid to talk to them because they might take my expression against me or something like that, so honestly I was afraid to talk to them"). There will be no evidence to dispute Mr. Maruyama's testimony, which certainly has the "ring of truth" in any event.

Plaintiff-Intervenors were not "constructively discharged" from their employment. Instead, they just quit, in order to obtain higher paying jobs. Moreover, nothing that Leopalace did or failed to do after August 17, 2004 constituted "retaliation" or a "hostile work environment" under the relevant case law. Each Plaintiff-Intervenors' claim for post-August 16, 2004 damages will be discussed separately.

      a.    <u>Vivienne Villanueva</u>. Ms. Villanueva never thought about quitting her job at Leopalace until <u>after</u> Rose Taimanglo told her that she was quitting. When Ms. Taimanglo told Ms. Villanueva that she was quitting, Ms. Villanueva "felt like quitting" too. And even though it was hard for me to quit, it was something that I had to decide." Ms. Villanueva did not want to carry the "burden" of working at Leopalace with Ms. Taimanglo gone while the lawsuit was pending. Ms. Villanueva admits that no one at Leopalace forced her to quit.

Ms. Villanueva will not say that any Leopalace manager was mean to her after her lawyer sent his August 16, 2004 letter. All she will say is that managers treated her differently and that they "gave us the silent treatment." But she admits that she still spoke with Mr. Suzuki and Mr. Iijima about "work related" matters. As for Mr. Maruyama, the resort's GM who had just been hired on July 1, 2004, he did not say "good morning" anymore or greet the front desk clerks in the same "happy way." Ms. Villanueva admits that she does not blame Mr. Maruyama for being "upset" about her sexual harassment claim. That being said, Ms. Villanueva admits that she and Mr. Maruyama were never really "on friendly terms" and that she was "never close to him."

11

As for Mr. Suzuki, before the threat of a lawsuit began looming over everyone's heads, he would sometimes join the front desk staff for "pot luck" breakfasts in the morning. After her attorney's demand letter, however, he didn't participate in the pot lucks any more. Ms. Villanueva mentioned May Paulino, the Human Resources Manager, describing an incident where Ms. Paulino said something like, "Madam, the duplex can now use the hotel swimming pool." This resulted in a conversation wherein Ms. Villanueva asked Ms. Paulino how or where she was supposed to obtain the proper forms for the duplex gusts, to which Ms. Paulino responded "I will give it to them." Ms. Villanueva things that Ms. Paulino's comments were made in a "sarcastic" way.

Asked directly whether Leopalace "retaliated" against Ms. Villanueva in any "financial way" after her attorney's demand letter, Ms. Villanueva explained that on August 11, 2004, after being interviewed by May Paulino and reporting Christina Camacho's sexual harassment, she decided to go home early at 1:45 p.m. and that she didn't get paid for the hours of work she missed that day. In Ms. Villanueva's estimation, this was the only time that Leopalace retaliated against her financially for complaining about sexual harassment.

Ms. Villanueva's resignation letter is dated October 15, 2004, and made effective October 29, 2004. She started her new job at the Guam Marriott almost immediately, on November 7, 2004. The Marriot job paid more money.

      b.    <u>Jennifer Holbrook</u>. Ms. Holbrook was attending UOG while she worked at Leopalace. After quitting her job at Leopalace on August 28, 2004 she graduated in December of 2004 with a degree in Consumer Family Science Nutrition. Ms. Holbrook then applied for and received employment with the Guam Public School System ("GPSS") as a "Program Coordinator for the Food and Nutrition Services" at a much higher rate of pay. (Ms.

12

Holbrook never considered being a front desk clerk for a hotel at $8.50 an hour to be her career goal). Apparently, it was Ms. Holbrook who delivered Plaintiff-Intervenors' attorney's August 16, 2007 demand letter to Leopalace. According to her, on the morning of Tuesday, August 17, 2004 Ms. Holbrook bundled her attorney's letter together with Mr. Maruyama's other mail, which he picked up every morning from the front desk. Thereafter, according to Ms. Holbrook, Mr. Maruyama came up to her and asked "Why are you doing this?" Remember, this was only four (4) days <u>after</u> Mr. Maruyama had first learned of the harassment complaints and had terminated the alleged harasser. He left her and pushed the door hard and walked back to his office, then across the lobby, then out the front door. He did not shout at her. He only raised his voice. Ms. Holbrook was not surprised that Mr. Maruyama was upset that she had filed a sexual harassment complaint against him. It was understandable to her.

After this, Ms. Holbrook was "not comfortable" working at Leopalace any more. It should be noted that Ms. Holbrook worked a grand total of eight (8) days after her attorney's litigation threat before resigning on August 28, 2004. On August 19, 2007, a Thursday, she told her therapist, Dr. Lilli-Perez-Iyechad, that she intended to quit the following Saturday, two days later.

Ms. Holbrook also complains that her "hours got cut" by Leopalace in retaliation for her attorney's letter. Ms. Holbrook testified at her deposition that "I went into work one Saturday morning and found that my hours had been cut and instead of being off at 2:45 p.m., I was to be off at 1:30 p.m. - - I quickly realized that management reducing my work hours was retaliatory against me." This was probably Saturday, August 21, 2004. She was making $8.50 an hour at the time. She agreed that an hour and 15 minutes of time at $8.50 per hour is about $10.00

13

(although it is, in fact, $10.62). She insists that Leopalace retaliated against her by reducing her pay by $10.00.

At her deposition, Ms. Holbrook testified that she quit because she was tired of dealing with "stress", tired of "not being spoken to by Mr. Maruyama", and tired of feeling "uncomfortable". But remember, on August 19, 2004, a mere two (2) days after her discussion with Mr. Maruyama, she told her therapist she intended to quit only two (2) days later. Ms. Holbrook admits that one of the reasons she quit was to take care of her mother who had been diagnosed with cancer. Significantly, no matter how she was treated, Ms. Holbrook "continued doing my job." Nothing that Leopalace did or did not do changed the "terms or conditions" of her employment.

Ms. Holbrook's therapy records suggest her discussion with Mr. Maruyama had no effect on her whatsoever. Her first meeting with Dr. Perez-Iyechad was on August 19, 2004, only two (2) days after Mr. Maruyama had raised his voice with her on August 17, 2004. At that first therapy session, Ms. Holbrook did not even mention Mr. Maruyama, or any confrontation, or any post-August 16, 2004 events at all. She only complained about what Ms. Camacho allegedly did prior to being terminated. Over the course of the next four sessions with her therapist, Ms. Holbrook complained about school problems, ex-boyfriend problems, current boyfriend problems, child custody issues, and a hit and run automobile accident – but not about Leopalace. At her second appointment with Dr. Perez-Iyechad, on August 24, 2004, Ms. Holbrook <u>did</u> mention Mr. Maruyama -- she said that he was a "compassionate" or "concerned" person.

Ms. Holbrook was earning $8.50 per hour at Leopalace. In May of 2005, Ms. Holbrook accepted her Program Coordinator job with the Guam Public School System at an hourly rate of $12.75 an hour. That job is what she went to UOG to train for.

14

c. <u>Rose Taimanglo</u>. Christina Camacho was terminated by Leopalace on August 13, 2004. Two months later, on October 11, 2004, Rose Taimanglo submitted her letter of resignation.

Ms. Taimanglo was given several opportunities at her deposition to testify about just how bad it was working for Leopalace after August 16, 2007, which is when her attorney sent his letter threatening to sue Leopalace for $330,000.00. Asked an open-ended question, Ms. Taimanglo practically fell all over herself talking about how much she loved working at Leopalace -- even during Leopalace's alleged "hostility" and "retaliation" between August 17, 2004 and October 23, 2004:

> I love my job at Leo Palace ... I always loved working at Leo Palace, even till the last day ... Even the day, my last day to work there. I still love - - I loved working there.

Even after Ms. Taimanglo resigned from Leopalace, and after she filed her claims with the EEOC, and after she sued Leopalace, she still wanted her old job back.

Ms. Taimanglo admits that after she complained about sexual harassment, and after her attorney's demand letter, Leopalace did not reduce her hours or pay in any way, shape or form. Instead, she says management merely treated her "differently". Mr. Maruyama was "mean" to her one time, though. This involved an incident wherein Mr. Maruyama had come by the front desk to pick up his messages from Ms. Taimanglo. As Ms. Taimanglo handed Mr. Maruyama his messages, Mr. Maruyama asked, "is there any sexual harassment report in the messages?" Ms. Taimanglo thought he was being "sarcastic" when he said this. On the other hand, Ms. Taimanglo does not blame Mr. Maruyama for being "upset" that she filed a sexual harassment claim. Ms. Taimanglo thinks Mr. Maruyama is "a good guy".

15

Other than the Maruyama incident described above, Ms. Taimanglo could not say that management was "mean" to her at any time after she threatened to sue Leopalace. All management did was treat her "differently". That is, Mr. Maruyama did not "greet me like he used to" when he came in to pick up his messages. Sometimes he wouldn't "look" at Ms. Taimanglo like he did before. On another occasion, Ms. Taimanglo had a conversation with Mr. Iijima, another manager, after which she went to another room and cried – but not because Mr. Iijima was mean to her. The next day, Mr. Maruyama visited Ms. Taimanglo to find out why she was crying. Although Mr. Maruyama commented that he "didn't know local girls cried", Ms. Taimanglo did not know whether he intended that as a mean remark.

As for Mr. Iijima, after Ms. Taimanglo's attorney threatened suit, she met with Mr. Iijima because he wanted to talk with her privately. During their conversation, Mr. Iijima was nice to her and apologized for their previous conversation in which resulted in Ms. Taimanglo's crying. In fact, Mr. Iijima told Ms. Taimanglo that she ought to report the previous harassment to the police for her own protection from the alleged harasser, Christina Camacho. Neither Mr. Iijima nor Mr. Suzuki was never mean to Ms. Taimanglo after she filed her harassment complaint.

Other than that complaining about management's "cold shoulder", all Ms. Taimanglo really talked about in her single meeting with therapist Dr. Lilli Perez-Iyechad in 2004 was how she had been treated by Christine Camacho before Ms. Camacho was terminated, not how Leopalace management treated her afterwards. She never went back to Dr. Perez-Iyechad in 2004. She only went back to therapy in 2007 after the lawsuit started heating up.

Ms. Taimanglo's last day on the job was October 23, 2004. Before giving notice, Ms. Taimanglo already had a job lined up with Wells Fargo Bank at a higher rate of pay.

2. <u>Hostile Work Environment</u>. What Plaintiff-Intervenors complain of is not enough to establish a hostile work environment at any time after August 16, 2004. "In order for a plaintiff to have an actionable hostile work environment claim under title VII, the work environment must be both objectively and subjectively hostile." West v. Maxon Corp., 2001 U.S. Dist. LEXIS 22228, *13-*14 (S.D. Ind. 2001). The question is whether the allegedly improper conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). To establish an objectively hostile work environment, a plaintiff must establish that the alleged harassment was serious and tangible enough to alter the plaintiff's compensation, terms, conditions or privileges of employment. Grady v. Cracker Barrel Old Country Store, 2007 U.S. Dist. LEXIS 47673, *20 (M.D. Penn.)

"Cold shoulder" treatment does not support a hostile work environment claim, nor does mere snubbing by supervisors. West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *24-*25; Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876, 2004 U.S. App. LEXIS 4711 (3rd Cir.). A single reduction in an employee's time of 1.25 hours does not constitute a "hostile work environment". See generally, Baucom v. Holiday Cos., 428 F. 3d 764, 765 (8th Cir. 2005). Isolated instances of non-severe misconduct will not support a claim of a hostile work environment. *See* West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *15. As noted below, a one-time reduction of an employee's overtime of 1.5 hours has been described as "relatively trivial", and the contention that such a reduction might support a retaliation claim has been described as "absurd". Valenti v. City of Chicago, 2004 U.S. Dist. LEXIS 2779, *23 (N.D. Ill.).

3. <u>Constructive Discharge</u>. Two Plaintiff-Intervenors voluntarily resigned from Leopalace more than two months after Ms. Camacho was terminated, and one Plaintiff-Intervenor

17

quit her job two weeks after Ms. Camacho was terminated. Therefore, Plaintiff-Intervenors cannot claim constructive discharge based on Ms. Camacho's conduct. Instead, both Plaintiff-Intervenors and Plaintiff EEOC must attempt to base a claim for constructive discharge on the actions of the Leopalace management after Ms. Camacho's termination. The record in this case reveals no grounds for such a claim.

The constructive discharge inquiry is "objective": "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004). "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." Brooks v. City of San Mateo, 229 F. 3d 917, 930 (9th Cir. 2000). "[A] plaintiff who claims constructive discharge must, to survive summary judgment, show more than 'ordinary' discrimination. Absent 'extraordinary conditions', an employee is expected to remain employed while seeking redress." Roeder v. Hendricks Community Hospital, 2001 U.S. Dist. LEXIS 24619, *29 (S.D. Ind.). Given this high standard, it is not surprising that claims of "cold shoulder" treatment similar to those advanced by the plaintiffs here are completely inadequate to sustain a claim of constructive discharge. *See* Huskey v. City of San Jose, 204 F. 3d 893, 901 (9th Cir. 2000); Roeder, *supra*, 2001 U.S. Dist. LEXIS 24619 at *33. Having one's hours cut a single time by an hour-and-a-quarter will not sustain a retaliation claim. It takes something much more serious. Rabinovitz v. Pena, 89 F. 3d 482, 488-899 (7th Cir. 1996); Harrison v. Chicago Tribune Co., 992 F. 2d 697, 705 (7th Cir. 1993).

    4.    Retaliation. Plaintiff-Intervenors' claims for retaliation rest on the allegations that, after Leopalace received a letter from Plaintiff-Intervenors' counsel threatening to

18

Case 1:06-cv-00028   Document 103   Filed 11/05/2007   Page 18 of 20

report Leopalace to the EEOC unless it paid them $330,000.00, Leopalace management gave them the "cold shoulder" and did not talk to them as much. In addition, Ms. Holbrook contends that Mr. Maruyama raised his voice to her one time, and that her work schedule was cut back by 1.25 hours. This is simply not sufficient to sustain a claim for retaliation. In order to establish retaliation, the Plaintiff-Intervenors must demonstrate some adverse employment action. Valenti, *supra*, 2004 U.S. Dist. LEXIS 2779 at *21. "An adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Id.* Not everything that makes an employee unhappy is an actionable adverse action. *Id.* "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2414 (2006). The challenged action must be "materially adverse", as "it is important to separate significant from trivial harms." *Id.* at 2415.

The alleged "cold shoulder" that Plaintiff-Intervenors received after threatening to sue their employer is not the sort of significant harm that constitutes actionable retaliation. Title VII does not set forth a general code of civility for the American workplace. Burlington Northern, *supra*, 126 S. Ct. at 2415. "And normal petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* (citing to EEOC Manual). A "cold shoulder" from management is not an adverse employment action because it is not a materially adverse change in the terms and conditions of employment. West, *supra*, 2001 U.S. Dist. LEXIS 2228 at *22.

Similarly, the allegation that Leopalace reduced Ms. Holbrook's hours by 1.25 hours is not an adverse action sufficient to establish retaliation. In Valenti, the court unequivocally stated, "It is absurd to think that a plainly trivial reduction in overtime of 1.5 hours can support a claim for retaliation." Valenti, *supra*, 2004 U.S. Dist. LEXIS at *23. And see, Baucom v. Holiday Cos., 428 F. 3d 764, 765 (8th Cir. 2005).

19

Case 1:06-cv-00028    Document 103    Filed 11/05/2007    Page 19 of 20

### G. Affirmative Defenses.

The facts of this case also show that Plaintiff-Intervenors' claims may be barred based on Leopalace's affirmative defenses of contributory negligence, consent, encouragement, and mutual engagement and participation. Loftin-Boggs v. City of Meridian, 633 F. Supp. 1323, 1327 (S.D. Miss. 1986) *aff'd*, 824 F. 2d 971 (5th Cir. 1987), *cert. denied*, 484 U.S. 1063 (1988); and Gan v. Kerpo Circuit Systems, Inc., 1982 U.S. Dist. LEXIS 10842 (E.D. Mo.). Christine Camacho will testify that all of the Plaintiff-Intervenors engaged in sexual banter at the workplace along with her. May Paulino will testified that each of the Plaintiff-Intervenors admitted that they engaged in sexual banter at the workplace along with Ms. Camacho. The facts also tend to support all of Leopalace's other affirmative defenses, including without limitation Leopalace's tenth, thirteenth, sixteenth, nineteenth, twentieth, and twenty-third affirmative defenses.

DOOLEY ROBERTS & FOWLER LLP

Date: November 5, 2007      By _____
**TIM ROBERTS**
Attorneys for Defendant