# ORIGINAL

Anna Y. Park, Regional Attorney
Derek Li, Supervisory Trial Attorney
Gregory McClinton Senior Trial Attorney
Angela D. Morrison, Trial Attorney
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone: (213) 894-1068
Facsimile: (213) 894-1301
E-Mail: lado.legal@eeoc.gov

333 S. Las Vegas Blvd., Suite 8112
Las Vegas, NV 89101
Telephone: (702)894-5072
Facsimile: (702)894-5094
E-mail: angela.morrison@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

**FILED**
DISTRICT COURT OF GUAM

NOV. – 5 2007

JEANNE G. QUINATA
Clerk of Court

## UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>　　　　Plaintiff,<br>　　v.<br><br>LEO PALACE RESORT,<br>　　　　Defendant.<br><br>JENNIFER HOLBROOK; VIVIENE VILLANUEVA; and ROSEMARIE TAIMANGLO,<br>　　　　Plaintiff-Intervenors,<br>　　v.<br><br>MDI GUAM CORPORATION d/b/a LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10,<br>　　　　Defendants. | Case No.: 2:06-CV-00028<br><br>**PLAINTIFF EEOC'S TRIAL BRIEF**<br><br>Trial Date: December 4, 2007 |

# TABLE OF CONTENTS

## TRIAL BRIEF

A.     FACTUAL CONTENTIONS     1

Camacho Made Vulgar Sexual Remarks to and Sexually Touched Plaintiff

    Intervenors     2

Camacho Sexually Touched Plaintiff-Intervenors     2

Camacho Engaged in other Sexually Suggestive Behavior Around Plaintiff;

    Intervenors     3

Leo Palace Management Knew About the Harassment in or about Early June     3

Leo Palace Management did not Take Adequate Steps to Address the

    Harassment     4

The Hostile Work Environment caused by Camacho Continued after

    She was Terminated     6

Leo Palace Retaliated Against Ms. Holbrook and Ms. Taimanglo     6

Plaintiff-Intervenors Suffered Emotional Distress as a result of the Sexual

    Harassment and Retaliation

B.     LEGAL BRIEF

    i     Issues of Law     8

       a.     Sexual Harassment     8

       b.     Retaliation     10

       c.     Compensatory Damages, Back Pay & Front Pay     13

       d.     Punitive Damages     13

       e.     Injunctive Relief     14

    ii.     Evidentiary Problems

C.     ATTORNEYS FEES     15

D.     ABANDONMENT OF ISSUES     17

TABLE OF AUTHORITIES

<u>C</u>ASES

*Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572 (9th Cir. 2000)...............16

*Burlington N. & Santa Fe Ry. Co. v. White*,
   -- U.S. ----, 126 S. Ct. 2405 (2006) .........................................................................10, 11

*Casa Marie Hogar v. Geriatrico, Inc,. et al.*, 38 F.3d 615 (1994) .....................................16

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ..........................................16

*Draper v. Couer Rochester, Inc.*, 147 F.3d 1104 (1998)..................................................12

*EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539 (9th Cir. 1987) ......................14, 15

*Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995) ....................................................9

*Gen. Tel. of the N.W., Inc. v. EEOC*, 446 U.S. 318 (1980)...............................................14

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) .......................................................8, 9

*Kolstad v. Am. Dental Association*, 527 U.S. 526 (1999).............................................13, 14

*McGinest v. GTE Serv. Co.*, 360 F.3d 1103 (9th Cir. 2004)...........................................9, 10

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).........................................................9

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ............................................9

*Nichols v. Azteca Rest. Enters.*, 256 F.3d 864 (9th Cir. 2001) ...........................................9

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).......................................11

*Passantino v. Johnson & Johnson Consumer Products*,
   212 F.3d 493 (9th Cir. 2000)........................................................................................13

*Porter v. Cal. Dept. of Corr.*, 419 F.3d 885 (9th Cir. 2005)...............................................11

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000)............................................................11

*Rene v. MGM Grand Hotel*, 305 F.3d 1061 (2002) (en banc)...........................................10

*Stanley v. Univ. of S. Cal.*,
   178 F.3d 1069 (9th Cir. 1999), *cert denied*, 528 U.S. 1022 (1999) ...............................16

*Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir.1994) ....................................12

*Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007)..............................................12

STATUTES

42 U.S.C. § 1981a(b)(1)................................................................................13

42 U.S.C. § 1988............................................................................................16

42 U.S.C. § 1988(b..........................................................................................16

42 U.S.C.A. § 2000d et seq...........................................................................16

RULES

Federal Rule of Civil Procedure 54(d)(1) .....................................................15

The United States Equal Employment Opportunity Commission hereby files its Trial Brief pursuant to LR 16.7(b).

## TRIAL BRIEF

### A. FACTUAL CONTENTIONS

Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964. The EEOC represents the public interest in securing an employment environment free of discrimination, and seeks relief on behalf of the three Plaintiff-Intervenors in this suit, Jennifer Holbrook, Viviene Villanueva, and Rosemarie Taimanglo (collectively "Plaintiff-Intervenors").

EEOC alleges Defendant Leo Palace Resort ("Leo Palace" or "Defendant") subjected Plaintiff-Intervenors to a hostile work environment on the basis of sex. Beginning in or about May 2004, a female co-worker, Christine Camacho, began sexually harassing Plaintiff-Intervenors (at first Ms. Taimanglo and Ms. Villanueva, then in June, Ms. Holbrook) by making sexually lewd and graphic remarks to or in the presence of Plaintiff-Intervenors, sexually touching Plaintiff-Intervenors, and engaging in other sexually suggestive behavior. Leo Palace's managers and supervisors knew or should have known about the harassment on or about the second week of June but did nothing to remedy or correct the situation until two months later in August 2004. Moreover, Defendant did not take adequate or reasonable steps to prevent such harassment from occurring. Finally, EEOC alleges that after Ms. Holbrook and Ms. Taimanglo asserted their rights under Title VII, LeoPalace retaliated against them by subjecting them to hostility and intimidation from managers, increased scrutiny, docking their hours, and causing their constructive discharge.

Rosemarie Taimanglo worked as a front desk supervisor at Leo Palace in 2004, a position which she had held since July 1, 2003. Jennifer Holbrook began working as a front desk clerk at Leo Palace on June 7, 2004. Viviene Villanueva started working as a

1

front desk clerk at Leo Palace on June 2, 2003. On May 10, 2004, Christine Camacho began work as a front desk clerk at Leo Palace. Ms. Camacho is a lesbian.

### Camacho Made Vulgar Sexual Remarks to and Sexually Touched Plaintiff Intervenors

Christina Camacho began engaging in sexually inappropriate behavior towards Plaintiff-Intervenors shortly after she began her employment with Leo Palace. Beginning in May 2004, Camacho made almost daily sexual comments to or in the presence of Plaintiff-Intervenors. For example, in May 2004, Camacho said that she would make a sandwich out of her coworkers and eat them, using "eat" in its sexually suggestive sense. In the first week of June, Camacho told Taimanglo that "eating [Taimanglo] tonight would taste better than the lunch she just had." Camacho would talk about her sexual relations with her girlfriend in front of Villanueva, Taimanglo, and Holbrook on an almost daily basis. Camacho told Villanueva that she used dildos with her girlfriend. Camacho also told Holbrook that Camacho would enjoy having oral sex when a female is menstruating. Camacho admitted to making sexual jokes, using sexually explicit language, talking about her sexual relations with her girlfriend, and to making a comment about having oral sex while her girlfriend was menstruating.

In addition, Camacho made sexually suggestive remarks about or to guests. During May or June 2004, Camacho made comments to the effect of "nice boob, nice ass" about a female guest. Taimanglo also heard Camacho tell hotel guests that a box from the bridal department contained a vibrator. Camacho recalls making the latter comment.

### Camacho Sexually Touched Plaintiff-Intervenors

In early June 2004, Camacho approached Villanueva and "all of a sudden, she put her right hand on [Ms. Villanueva's] stomach and her left to [Ms. Villanueva's back] and started to hump [her] and grind [her]." Camacho grabbed Jennifer Holbrook's hand and tried to place it on Camacho's breast and asked whether her breasts were more like watermelons or melons. Camacho also tried to place Taimanglo's hand on Camacho's

2

breast at least four times. In late June or early July, Camacho tried to stick her hand up Ms. Holbrook's skirt and told Ms. Holbrook that she wanted to feel if she was wet.

In July, Camacho slapped Taimanglo on the buttocks as she was either getting into or out of the shuttle van. Camacho also slapped Ms. Holbrook on the buttocks in July and told Ms. Holbrook that she was sorry but that she couldn't help herself. On August 10, 2004, Camacho slapped Taimanglo on the buttocks again. Ms. Camacho admits slapping Ms. Villanueva and Ms. Holbrook on the buttocks.

### Camacho Engaged in other Sexually Suggestive Behavior Around Plaintiff-Intervenors

On several occasions, Camacho placed objects like balloons or rolled up towels near her crotch and used them to simulate a penis. On one occasion, Ms. Villanueva witnessed that Camacho placed a balloon at her crotch and asked a coworker if he wanted to "dick sword fight." Camacho used rolled up tissue paper to simulate a penis on yet another occasion. She also placed rolled up paper towels in her pants and Mr. Suzuki, the front desk manager, was also present. Villanueva also observed Camacho stick a mannequin hand down her pants to scratch her private area. Ms Camacho admitted that she rolled up towels or a wash cloth to simulate a penis.

### Leo Palace Management Knew About the Harassment in or about Early June

Ms. Villanueva and Ms. Taimanglo informed Leo Palace managers and other supervisors about Camacho's sexually harassing behavior as early as June 2004. Ms. Villanueva told several supervisors about Camacho's physical attack on her around the second week of June. Ms. Taimanglo and Ms. Villanueva both informed the front desk night supervisor, Greg Perez, that Camacho had physically assaulted Ms. Villanueva.

Supervisor Greg Perez also informed Leo Palace management about Christina Camacho's inappropriate behavior towards Viviene Villanueva in June 2004. He spoke with Satoshi Suzuki, the front desk manager, about Camacho harassing the women behind the front desk and asked if he could speak with May Paulino, the human resources manager, about it. Mr. Perez spoke with Ms. Paulino and then told Mr. Suzuki he had

spoken with Ms. Paulino. On or about the third week of June 2004, Mr. Perez placed a report about the Villanueva incident in the inter-office mail to Human Resources.

Ms. Taimanglo informed other managers about the Villanueva incident and Camacho's other sexually harassing behavior in June and July 2004. Ms. Taimanglo first told Mr. Suzuki, the front desk manager, about Camacho's sexually inappropriate behavior in June 2004. Ms. Taimanglo told Hideo Iijima, another Leo Palace manager, about Camacho's comments to the guest regarding the vibrator. Mr. Iijima admitted to Ms. Paulino, Mr. Suzuki, and Yutaka Maruyama, the general manager, that he knew Camacho was sexually harassing Plaintiff-Intervenors. Ms. Taimanglo told Greg Perez that Camacho was engaging in sexually inappropriate behavior in front of customers and that the other women at the front desk were complaining about Camacho's sexual aggressiveness toward them. Ms. Taimanglo told May Paulino about the harassing behavior on July 1, 2004. During July 2004, Ms. Taimanglo repeatedly asked Mr. Suzuki what he was going to do about Camacho's sexually harassing behavior.

### Leo Palace Management did not Take Adequate Steps to Address the Harassment

As an initial matter, Leo Palace's policies regarding sexual harassment were inadequate. Leo Palace's stated sexual harassment policy did not conform to standard practices. Additionally, Defendant did not put up required EEOC posters, did not train non-supervisory employees regarding sexual harassment, and failed to distribute its sexual harassment policy to employees. Likewise, many of the managers had not attended sexual harassment training.

Leo Palace's response to Plaintiff-Intervenors' complaints was also inadequate. When Ms. Villanueva told her supervisors or managers about the humping incident, instead of correcting Camacho's behavior or reporting the behavior to human resources or management, some of the supervisors and managers laughed or acted like Ms. Villanueva were joking. Though Mr. Perez knew that Camacho was still harassing

1  Plaintiff-Intervenors, he felt that he could not go back to Ms. Paulino again because "she

2  [would] make[] life hard for [him]."

3      Although Ms. Taimanglo verbally counseled Camacho about her behavior,

4  Camacho continued to engage in sexually inappropriate behavior. However, Ms.

5  Taimanglo did not have the authority to suspend employees or send them home, and had

6  to get approval from Mr. Suzuki before writing an employee up or before going to

7  Human Resources. In response to Taimanglo's July inquiries about what LeoPalace was

8  going to do about Camacho, Ms. Taimanglo was told by Mr. Suzuki and Ms. Paulino that

9  Leo Palace would not be terminating Camacho.

10     Further, although Leo Palace managers knew about the harassing behavior as early

11 as the second week of June, they allowed Camacho's behavior to continue through

12 August. Mr. Suzuki told Ms. Paulino that, even though he was aware of the complaints

13 about Camacho, he could not terminate her when he found out about it. Mr. Suzuki also

14 told Ms. Paulino that he had not counseled Camacho about her behavior despite knowing

15 that Camacho had behaved inappropriately to Ms. Villanueva and Ms. Holbrook. In

16 addition, he knew about Ms. Taimanglo's allegations against Camacho but he could not

17 terminate Camacho because he was "too busy" and short-staffed.

18     There was no investigation regarding Camacho's behavior until August 11, 2004.

19 Finally, after allowing Plaintiff-Intervenors to be subjected to Camacho's sexually

20 harassing behavior for two months, Leo Palace investigated Plaintiff-Intervenors'

21 complaints and terminated Camacho on August 13, 2004. At no time did Mr. Maruyama,

22 the hotel general manager, discipline Ms. Paulino, Mr. Suzuki, or Mr. Iijima for their

23 delay in responding to and investigating the complaints about Camacho's sexual

24 harassment.

25 ///

26 ///

27

28

## The Hostile Work Environment caused by Camacho Continued after she was Terminated

Ms. Villanueva felt afraid that Camacho was going to retaliate against her. She had to ride the shuttle van with Camacho after Leo Palace suspended Camacho on August 11, 2004. After Leo Palace terminated Camacho, she called Ms. Villanueva at work, resulting in Ms. Villanueva feeling further harassed.

In 2004, employees who had sexually harassed other employees were allowed back on Leo Palace property. Thus, after Camacho was terminated, she stayed at one of the condominiums at Leo Palace and called Plaintiff-Intervenors. Plaintiff-Intervenors informed management about Camacho's presence on the property. However, it took at least two hours for security to remedy the situation. Moreover, Mr. Iijima became angry with Ms. Holbrook about Camacho being on the property.

## Leo Palace Retaliated Against Ms. Holbrook and Ms. Taimanglo

On August 16, 2004, Plaintiff-Intervenors' attorney Phil Torres sent a letter to Leo Palace in which he informed Leo Palace that his clients might take the claim to court and that he had spoken with the EEOC. On the date that Mr. Maruyama received Mr. Torres' letter, Mr. Maruyama confronted Ms. Holbrook about the letter in Ms. Taimanglo's presence. After the incident, Mr. Maruyama continued to pace back and forth in the lobby area. He testified that he was "worried that the [Plaintiff-Intervenors would take [his] expression against [him], or something like that, so honestly [he] was afraid to talk to them." He also testified that there were "a lot of reasons" for treating the Plaintiff-Intervenors differently after Leo Palace received Mr. Torres' letter, "because they're suing the company and still working for the company, so I think employees, you know, around them will see the difference before they sued the company and after they sued the company."

After Mr. Torres informed Leo Palace that the Plaintiff-Intervenors were considering filing an EEOC charge, Ms. Taimanglo and Ms. Holbrook experienced other negative changes in their working environment. Ms. Paulino avoided talking to Plaintiff-

1  Intervenors because "they were already filing." After Camacho was terminated the rest
2  of management also did not talk to Ms. Holbrook and Ms. Taimanglo as they did prior to
3  the termination.

4         When Ms. Taimanglo returned from a two-week leave recommended by her
5  therapist due to the harassment at Leo Palace, Mr. Maruyama approached Ms. Taimanglo
6  and asked her sarcastically whether there had been any sexual harassment reports.  Mr.
7  Iijima approached Ms. Taimanglo and told her "that out of the three girls, the ladies, [she]
8  was the biggest voice."  The conversation upset Ms. Taimanglo and she went into another
9  room and cried.  Mr. Maruyama commented on the fact that Ms. Taimanglo had been
10  crying and said "I didn't know local girls cry."  Later, Mr. Iijima spoke with Ms.
11  Taimanglo and apologized for upsetting her and told her that Mr. Maruyama had told him
12  that the Plaintiff-Intervenors were "dangerous."  At one point, Mr. Iijima also changed
13  Ms. Taimanglo's shift from a swing shift to a morning shift, but Ms. Taimanglo did not
14  complain because she was "scared [she] might get fired for complaining."

15         Prior to her attorney's letter, Ms. Holbrook had a good working relationship with
16  Mr. Maruyama.  After Mr. Maruyama received Mr. Torres' letter, he would glare at Ms.
17  Holbrook and give her the silent treatment.  There was no further discussion about Ms.
18  Holbrook becoming Mr. Maruyama's executive assistant.  Despite a short-staff situation,
19  Ms. Holbrook's schedule was changed from two days off to three days off.  Ms.
20  Holbrook was also given a shift with an hour and forty-five minutes less time.  When Ms.
21  Holbrook asked Mr. Suzuki why he was cutting her hours, he said he did not know.  After
22  a shift supervisor asked Mr. Suzuki why he was cutting Ms. Holbrook's hours, Mr.
23  Suzuki responded to Ms. Holbrook that "It's up to you if you want to stay or leave."

24         Because of their treatment, Ms. Holbrook and Ms. Taimanglo felt that they had no
25  choice but to resign.  Ms. Holbrook left LeoPalace on August 28, 2007.  On October 11,
26  2004, Ms. Taimanglo resigned her job at Leo Palace because, "management . . . made
27  [her] feel that if [she] cried for help . . . they won't correct the problem and made [her]
28  feel that [she] shouldn't have said anything."

7

**Plaintiff-Intervenors Suffered Emotional Distress as a result of the Sexual Harassment and Retaliation**

As a result of Camacho's harassing behavior and management's initial inaction and subsequent behavior, Plaintiff-Intervenors suffered increased, stress, anxiety and fear. Ms. Taimanglo and Ms. Holbrook sought therapy from Dr. Lilli Perez-Iyechad. Ms. Villanueva received treatment from Tom Babauta, MSW. Dr. Lilli Perez-Iyechad diagnosed Ms. Villanueva and Ms. Holbrook with post traumatic stress disorder and occupational problems. Regarding Ms. Villanueva, Mr. Babauta wrote, "Ms. Villanueva did not feel safe at Leo Palace. She stated that she was under an extreme amount of stress and was overwhelmed."

Ms. Holbrook felt depressed and anxious. Ms. Villanueva felt worried and scared. She also suffered from sleeplessness and headaches. Ms. Taimanglo went to see a therapist because she was "always crying at work." Dr. Perez Iyechad had Ms. Taimanglo's doctor prescribe her Xanax. Ms. Taimanglo did not stop taking the drug everyday until after she left Leo Palace. Moreover, Ms. Taimanglo left the job she obtained after leaving Leo Palace because she "fell into a depression because of what happened to me at Leo Palace Resort."

**B.     LEGAL BRIEF**

    i.     Issues of Law

        a.     *Sexual Harassment*

Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). To establish a claim of hostile environment, the complained-of conduct must be unwelcome. The conduct must be undertaken because of the claimant's sex and must be severe or pervasive so that it affected the terms, conditions and

8

privileges of employment and created an abusive work environment. *Id.* at 21 (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)).

Some of the factors relevant to determining whether the conduct was severe or pervasive include:

> the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Systems, Inc.*, 510 U.S. at 23.

The hostile work environment is evaluated based on the totality of the circumstances. *Id.* Moreover, the Defendant cannot present a piecemeal defense by disaggregating the hostile acts that each claimant experienced, witnessed, or learned of. As the Supreme Court explained, "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). "The statute does not separate individual acts that are part of the hostile environment claim from the whole for purposes of timely filing and liability." *Id.* at 118.

For an employer to be liable for harassment by a coworker, the plaintiff must demonstrate that "the employer knew or should have known of the harassment but did not take adequate steps to address it." *McGinest v. GTE Serv. Co.*, 360 F.3d 1103, 1119 (9th Cir. 2004) (quotation omitted). Once an employer knows or should have known that harassment is occurring, "a remedial obligation kicks in." *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 876 (9th Cir. 2001) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir. 1995)). Remedies must "be reasonably calculated to end the harassment." *Id.* (quotation omitted). In addition, remedies are reasonable if they "(1) 'stop harassment by the person who engaged in the harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *McGinest*, 360 F.3d at 1120 (quotation omitted)). Additionally, "[t]o be adequate, an employer must intervene promptly." *Id.* (quotation omitted). Finally, an employer's remedial measures "must

9

1  include some form of disciplinary action, . . . which must be 'proportionate[] to the
2  seriousness of the offense.'" *Id.* (quotation omitted).

3       EEOC will be able to demonstrate that harassment was unwanted. Plaintiff-
4  Intervenors complained to management, went to an attorney, and filed a charge with the
5  EEOC. Similarly, EEOC will be able to demonstrate that the behavior was because of
6  sex. Camacho as a lesbian creates an inference that she harassed the three women
7  because of their sex, female. In addition, the comments Camacho made were sexual in
8  nature. Moreover, her physical harassment of Plaintiff-Intervenors involved areas of the
9  body "linked to sexuality." *See Rene v. MGM Grand Hotel*, 305 F.3d 1061, 1066
10 ("[S]uch harassment – grabbing, poking, rubbing or mouthing areas of the body linked to
11 sexuality – is inescapably 'because of … sex.'") (quotation omitted). Additionally,
12 EEOC will be able to demonstrate the harassment was severe or pervasive. As discussed
13 above, Camacho made sexual comments on an almost daily basis for two months.
14 Moreover, she physically assaulted each Plaintiff-Intervenor at least once.

15      Finally, EEOC will be able to demonstrate that Leo Palace knew or should have
16 known about the harassment but did not take adequate steps to address it. Evidence
17 exists that Leo Palace's management knew about the Villanueva incident as early as the
18 second week of June. Moreover, Ms. Paulino and Mr. Suzuki's testimony will
19 demonstrate that they knew about the harassment by at least the end of June. Despite
20 management's knowledge of the harassment, they did nothing to address it until the
21 second week of August. The harassment did not stop but rather continued during that
22 entire period. Likewise, because Leo Palace had inadequate sexual harassment policies,
23 it did not take adequate steps to prevent the harassment from occurring or to persuade
24 potential harassers from unlawful conduct in the first place.

25                     *b.      Retaliation*

26      Unlike the substantive provisions of Title VII, the anti-retaliation provision "is not
27 limited to discriminatory acts that affect the terms and conditions of employment."
28 *Burlington N. & Santa Fe Ry. Co. v. White*, -- U.S. ----, 126 S. Ct. 2405, 2412-13 (2006).

10

The EEOC must present evidence that Ms. Holbrook and Ms. Taimanglo engaged in a protected activity, that the Defendant took an adverse employment action against them, and that there is a causal connection between the protected activity and the adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If the Defendant can establish a legitimate reason for the adverse employment action, the Plaintiff can also rebut by proving pretext. *Id.*

A plaintiff shows that an employment action is materially adverse if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415 (quotation and internal quotation marks omitted). Whether an action is "materially adverse depends on the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* at 2417 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). In *Burlington*, the Court noted that, in context, changes to an employees' schedule could be retaliatory. *Id.* at 2415. The Ninth Circuit Court of Appeals has found that "circumstantial evidence of a 'pattern of antagonism' following protected conduct can also give rise to inference" of retaliation. *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) (quotation omitted).

EEOC will demonstrate that Leo Palace retaliated against Ms. Taimanglo and Ms. Holbrook. Both women engaged in a protected activity by complaining to human resources and asserting their rights under Title VII. LeoPalace also took an adverse employment action against them. Ms. Holbrook and Ms. Taimanglo were subjected to hostility and intimidation from management employees. Their hours were reduced.

Moreover, Ms. Taimanglo and Ms. Holbrook were subjected to an adverse action when they were constructively discharged. "A constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." *Draper v. Couer Rochester, Inc.*,

11

147 F.3d 1104, 1110 (1998) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994)). This requires a plaintiff to "show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (quotation omitted). Further, a jury may take into account "[t]he frequency and freshness of the instances of harassment" into the determination of whether an individual was constructively discharged. *Draper*, 147 F.3d at 1110 n.2.

EEOC will be able to demonstrate that Ms. Taimanglo and Ms. Holbrook were constructively discharged. Camacho's conduct should be considered part of the circumstances because it was Leo Palace's delayed action regarding Camacho's conduct that led, in part, to Ms. Holbrook's and Ms. Taimanglo's intolerable working conditions and constitutes a continuing pattern of discrimination. Subsequent to Camacho's termination, Ms. Holbrook's and Ms. Taimanglo's therapists noted that management's inaction had exacerbated their anxiety. Further, the hostile conduct towards Ms. Holbrook continued because Mr. Maruyama intimidated her, Mr. Suzuki cut her hours, she was no longer being considered for the executive assistant position, and management was no longer talking to her. Likewise, Ms. Taimanglo was subjected to further hostile conduct, such as having her shift changed, being subjected to the general manager's belittling comments, being ignored, and being singled out as "the loudest voice." The freshness and frequency of Camacho's harassment, the events right after Camacho's termination, and the retaliation against Ms. Holbrook and Ms. Taimanglo by Leo Palace management, would cause a reasonable person to feel the conditions of employment were intolerable.

Finally, EEOC also will be able to demonstrate a causal connection between the protected activity and the adverse employment action. The proximity in time creates an inference of causation. In addition, both Mr. Maruyama and Ms. Paulino acknowledged that they behaved differently around Ms. Taimanglo and Ms. Holbrook after the women retained an attorney.

12

|   |   |
|---|---|
| 1 |                    *c.*     *Compensatory Damages, Back Pay& Front Pay* |

      Title VII provides for compensatory and punitive damages for intentional violations of the Act. Section 1981a(b)(3)(C) establishes a statutory cap of $300,000 per plaintiff where the defendant employer has more than 500 employees in each of twenty or more calendar weeks in either the year prior to or the year in which the discriminatory conduct occurred. Defendant employed in excess of 500 employees during the relevant time period. Accordingly, Defendant's liability for punitive and compensatory damages under Title VII is limited to $300,000 per Plaintiff-Intervenor. Because Plaintiff-Intervenors suffered emotional distress as a result of the harassment and retaliation, they will be entitled to compensatory damages.

      EEOC seeks backpay, plus pre-judgment interest to be determined at date of judgment, in the amounts of $500.00 for Ms. Villanueva, $11,432.00 for Ms. Taimanglo, and $9,000.00 for Ms. Holbrook. EEOC also seeks frontpay in the amounts of $4620.00 for Ms. Taimanglo and $9,000.00 for Ms. Holbrook. EEOC additionally seeks lost benefits in the amounts of $500.00 for Ms. Holbrook and Ms. Villanueva, and $4620.00 for Ms. Taimanglo.

                  *d.*     *Punitive Damages*

      Under the terms of the Civil Rights Act of 1991, punitive damages are available in claims of disparate treatment under Title VII, where the employer has engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

      The Supreme Court explained that "egregious misconduct" while relevant evidence of the requisite mental state, is not itself required to justify an award of punitive damages under Section 1981a. *Kolstad v. Am. Dental Association*, 527 U.S. 526 (1999). The correct standard is whether the employer had "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Id.* at 2121. In general, intentional discrimination is enough to establish punitive damages liability. *Passantino v. Johnson & Johnson Consumer Products*, 212 F.3d 493, 515 (9th Cir. 2000).

1    The Ninth Circuit has further explained:

2         Although the purpose of Title VII is served by rewarding employers

3         who adopt anti-discrimination policies, *see id.* [citing *Kolstad*] it would be

4         undermined if those policies were not implemented, and were allowed

5         instead to serve only as a device to allow employers to escape punitive

6         damages for the discriminatory activities of their managerial employees.

7    *Passantino*, 212 F.3d at 517.

8         EEOC will be able to demonstrate that punitive damages are warranted. Sexual

9    harassment and retaliation are intentional forms of discrimination under Title VII.

10   Defendant also was aware of federal hostile work environment law; yet subjected

11   Plaintiff-Intervenors to a sexually harassing work environment for almost two months

12   because Defendant was short-staffed. Moreover, the first incident of which Leo Palace

13   was aware involved a physical assault and Camacho subsequently physically assaulted

14   both Ms. Holbrook and Ms. Taimanglo. In addition, as discussed above, LeoPalace

15   utterly failed to put into place effective and appropriate policies. Finally, not only did Leo

16   Palace force Plaintiff-Intervenors to endure further sexual harassment, it retaliated against

17   Ms. Holbrook and Ms. Taimanglo when they complained. Accordingly, punitive

18   damages are warranted.

19                    *e.    Injunctive Relief*

20        EEOC also seeks injunctive relief under Title VII. EEOC will request the Court to

21   grant a permanent injunction barring Defendant from engaging in any employment

22   practice which discriminates on the basis of sex, and order Defendant to institute and

23   carry out policies, practices and programs, including training programs, posting notice of

24   the outcome of the suit, and hiring an outside monitor, which eradicate the effects of its

25   past unlawful employment practices. The EEOC can seek broad injunctive relief when

26   filing suit as a Plaintiff. *Gen. Tel. of the N.W., Inc. v. EEOC*, 446 U.S. 318, 325 (1980);

27   *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1543-45 (9th Cir. 1987). Also,

28   proving employment discrimination entitles the plaintiff to an injunction against

14

1  discrimination, unless the employer proves that it is unlikely to repeat the practices. *See*
2  *Goodyear Aerospace Corp.*, 813 F.2d at 1544. An employer which takes curative actions
3  only after legal action has been taken fails to provide sufficient assurances that it will not
4  repeat the violation to justify denying an injunction. *Id.*

5           ii.    *Evidentiary Problems*

6                  a.    EEOC anticipates moving *in limine* to preclude the testimony
7  of Joseph Ishesaki as irrelevant under Federal Rules of Evidence 401, 402, 403 and 404;
8  and for lack of personal knowledge under Federal Rule of Evidence 602.

9                  b.    EEOC anticipates moving *in limine* to exclude evidence or
10 testimony regarding advice that Plaintiff-Intervenors' counsel may have given them
11 concerning seeking therapy as precluded by attorney/client privilege; and/or irrelevant.

12                 c.    EEOC anticipates moving *in limine* to preclude evidence or
13 testimony regarding Plaintiff-Intervenors' past sexual behavior or marital status pursuant
14 to Federal Rules of Evidence 401, 402, 403, 404, and 412.

15                 d.    EEOC anticipates moving *in limine* to preclude argument
16 referring to or characterizing EEOC's Title VII intentional discrimination claims as
17 claims for negligence.

18                 e.    In addition, Defendants' Motion for Partial Summary
19 Judgment -- currently under submission, Plaintiff's Motion for Partial Summary
20 Judgment -- currently being briefed, and Defendant's Motion to Dismiss the Emotional
21 Distress Claims of Jennifer Holbrook -- currently being briefed, will possibly affect the
22 admissibility of certain evidence.

23 **C.    ATTORNEY'S FEES**

24         Should EEOC prevail, EEOC will seek its costs, which will include travel costs,
25 witness fees, and expert costs. EEOC estimates that its total trial costs will be at least
26 $55,000. Federal Rule of Civil Procedure 54(d)(1) provides "[u]nless a federal statute,
27 these rules, or a court order provides otherwise, costs – other than attorney's fees –
28 should be allowed the prevailing party." Nonetheless, the court has the discretion to limit

15

1  or to refuse costs against a civil rights Plaintiff in "important, close, but ultimately
2  unsuccessful civil rights cases that may have the regrettable effect of discouraging
3  potential plaintiffs from bringing such cases at all." *See Ass'n of Mexican-Am. Educators*
4  *v. California*, 231 F.3d 572, 593 (9th Cir. 2000), *Casa Marie Hogar v. Geriatrico, Inc,. et*
5  *al.*, 38 F.3d 615, 618 (1994); *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1079-80 (9th Cir.
6  1999), *cert denied*, 528 U.S. 1022 (1999) (district court abused its discretion in denying a
7  losing civil rights plaintiff's motion to re-tax costs without first considering (1) the
8  plaintiff's financial resources and (2) the chilling effect of imposing such costs on future
9  civil rights litigants).
10       Pursuant to 42 U.S.C. § 1988(b), the Court may award attorney's fees to the
11  prevailing party, however, U.S. EEOC is not entitled to attorney's fees:
12       (b) Attorney's fees
13       In any action or proceeding to enforce a provision of . . . title VI of the
14       Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] . . . the court, in its
15       discretion, may allow the prevailing party, other than the United States, a
16       reasonable attorney's fee as part of the costs. . . .
17  Under 42 U.S.C. § 1988, a court should not assess attorney's fees against Plaintiff "unless
18  a court finds that his claim was frivolous, unreasonable, or groundless, or that the
19  plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v.*
20  *EEOC*, 434 U.S. 412, 422 (1978).
21  ///
22  ///
23
24
25
26
27
28

## D.  ABANDONMENT OF ISSUES

EEOC does not abandon any issues in its Complaint.

Respectfully Submitted,

Date: November 5, 2007

United States Equal Employment
Opportunity Commission

By: _____

Angela Morrison
Derek Li
Attorneys for Plaintiff