Anna Y. Park, Regional Attorney
Derek Li, Supervisory Trial Attorney
Gregory McClinton Senior Trial Attorney
Angela D. Morrison, Trial Attorney
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone: (213) 894-1068
Facsimile: (213) 894-1301
E-Mail: lado.legal@eeoc.gov

333 S. Las Vegas Blvd., Suite 8112
Las Vegas, NV 89101
Telephone: (702)894-5072
Facsimile: (702)894-5094
E-mail: angela.morrison@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

FILED
DISTRICT COURT OF GUAM

NOV - 7 2007

JEANNE G. QUINATA
Clerk of Court

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> LEO PALACE RESORT, <br><br> Defendant. <br><br> JENNIFER HOLBROOK; VIVIENE VILLANUEVA; and ROSEMARIE TAIMANGLO, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> MDI GUAM CORPORATION d/b/a LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, <br><br> Defendants. | Case No.: 2:06-CV-00028 <br><br> DECLARATION OF ANGELA MORRISON IN SUPPORT OF PLAINTIFF EEOC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS EMOTIONAL DISTRESS CLAIMS OF PLAINTIFF-INTERVENOR HOLBROOK |

-1-

I, Angela D. Morrison, declare and state:

1.      I am a Trial Attorney employed at the Las Vegas Local Office, Los Angeles District Office of the United States Equal Employment Opportunity Commission. I have personal knowledge of the facts stated herein, and if called as a witness to testify as to the matters stated herein, I could and would competently do so.

2.      On October 22, 2007, I telephonically attended the reconvened deposition of Tom Babauta, MSW.

3.      One of the first questions counsel for LeoPalace asked Mr. Babauta was whether Mr. Babauta's handwritten notes were included in his office's production of Plaintiff-Intervenor's records dated September 20, 2007.

4.      Counsel for LeoPalace did not ask Mr. Babauta any substantive questions about his treatment of Jennifer Holbrook. Counsel for LeoPalace did not ask Mr. Babauta to verify whether he had included his notes concerning his treatment of Viviene Villanueva. Counsel for LeoPalace only questioned Mr. Babauta whether the Holbrook notes were included and why they were not included, and how many times he had treated Jennifer Holbrook. After approximately ten minutes of such questions, counsel for LeoPalace sought to terminate the deposition. However, Plaintiff-Intervenor's counsel asserted his right to cross-examine the witness.

5.      At the October 22, 2007 deposition, Mr. Babauta testified he did not begin treating Jennifer Holbrook until April 2006.

6.      During the October 22, 2007 deposition, Mr. Babauta testified that he was not working with Jennifer Holbrook regarding this case and only talked about LeoPalace in one session.

7.      During the October 22, 2007 deposition, Mr. Babauta testified that nobody contacted him regarding his missing handwritten notes about Jennifer Holbrook.

8.      During the October 22, 2007 deposition, Mr. Babauta testified he gave all his handwritten notes to his office's secretary, Sabrina LNU, to copy for production to Defendant. Mr. Babauta testified that he believed that there was a mix-up because, at one

1  point, the office thought that they were to produce only those records relevant to the
2  instant case. Because Mr. Babauta did not treat Jennifer Holbrook regarding this case, he
3  testified that his office may have believed those records were not covered by the Court
4  Order and so Dr. Lilli Perez-Iyechad, another therapist in his office, instructed the
5  secretary not to copy Mr. Babauta's handwritten notes regarding Jennifer Holbrook.

6      9.      During the October 22, 2007 deposition, Mr. Babauta offered to have his
7  office produce the missing notes and said that he could call his office's secretary to have
8  her bring the notes to LeoPalace's counsel's office where the deposition was taking place.

9      10.     EEOC was not informed that Defendant LeoPalace believed Ms.
10  Holbrook's records were missing prior to the deposition.

11      11.     Counsel for Defendant LeoPalace did not inform EEOC about the Motion
12  to Dismiss prior to filing the motion on October 22, 2007.

13      12.     Attached as Exhibit 1 is a true and correct copy of the Declaration of Phil
14  Torres in Support of EEOC's Opposition to Defendant's Motion to Dismiss Emotional
15  Distress Claims of Plaintiff-Intervenor Holbrook, previously filed in this case as Court
16  Docket #95.

17      13.     Attached as Exhibit 2 is a true and correct copy of the Court's Order dated
18  September14, 2007 (Court Doc. # 66).

19      14.     Attached as Exhibit 3 is a true and correct copy of excerpts from the
20  deposition transcript of Tom Babauta, MSW, dated July 30, 2007.

21      15.     Attached as Exhibit 4 is a true and correct copy of excerpts from the
22  deposition transcript of Jennifer Holbrook.

23      16.     Attached as Exhibit 5 is a true and correct copy of Dr. Lilli Perez-Iyechad's
24  treatment summary of Jennifer Holbrook.

25      17.     Attached as Exhibit 6 is a true and correct copy of the cover letter to the
26  records produced by Dr. Perez-Iyechad and Mr. Babauta to Defendant Leo Palace.

27      18.     Attached as Exhibit 7 are true and correct copies of subpoenas served on
28  Tom Babauta, MSW and Dr. Lilli Perez-Iyechad, dated July 17, 2007.

19.     Attached as Exhibit 8 is a true and correct copy of the Court's Order Modifying Scheduling Order, dated September 27, 2007 (Court Doc. #73).

20.     On October 22, 2007, I telephonically attended the deposition of Dr. Lilli Perez-Iyechad.  The deposition was continued and I attended telephonically the continued deposition of Dr. Lilli Perez-Iyechad on November 3, 2007.

21.     During Dr. Perez-Iyechad's continued deposition on November 3, 2007, she testified that she did not instruct her office's secretary to not copy Mr. Babauta's therapy records concerning Ms. Holbrook.  Dr. Perez-Iyechad testified that prior to receiving the Court's September 14, 2007 Order, she and Mr. Babauta had a conversation in which they discussed whether Mr. Babauta would be required to produce his therapy records concerning Ms. Holbrook because they were not relevant to this case.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of November, 2007, at Las Vegas, Nevada.

*Angela D. Morrison*
Angela D. Morrison

# Exhibit 1

Anna Y. Park, Regional Attorney
Derek Li, Supervisory Trial Attorney
Gregory McClinton Senior Trial Attorney
Angela D. Morrison, Trial Attorney
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone: (213) 894-1068
Facsimile: (213) 894-1301
E-Mail: lado.legal@eeoc.gov

333 S. Las Vegas Blvd., Suite 8112
Las Vegas, NV 89101
Telephone: (702)894-5072
Facsimile: (702)894-5094
E-mail: angela.morrison@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Case No.: 2:06-CV-00028 |
| Plaintiff, | DECLARATION OF PHILLIP TORRES IN SUPPORT OF PLAINTIFF EEOC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS EMOTIONAL DISTRESS CLAIMS OF PLAINTIFF-INTERVENOR HOLBROOK |
| v. | |
| LEO PALACE RESORT, | |
| Defendant. | |
| JENNIFER HOLBROOK; VIVIENE VILLANUEVA; and ROSEMARIE TAIMANGLO, | |
| Plaintiff-Intervenors, | |
| v. | |
| MDI GUAM CORPORATION d/b/a LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | |
| Defendants. | |

US Attorney's Office
Districts of Guam & NMI

Time 21⁷
OCT 29 2007
Receiving name _Emanuel_
Date keyed in Dbase _____
Entered into Dbase by: _____

-1-

I, Phillip Torres, declare and state:

1.     I am an attorney representing Plaintiff-Intervenors in the current matter. I have personal knowledge of the facts stated herein, and if called as a witness to testify as to the matters stated herein, I could and would competently do so.

2.     On October 22, 2007, I attended the reconvened deposition of Tom Babauta, MSW.

3.     At no time prior to the October 22, 2007 deposition of Mr. Babauta was my office informed that Defendant LeoPalace believed Mr. Babauta's handwritten notes and therapy records regarding his sessions with Ms. Holbrook were not included with Mr. Babauta's response to the Court's Order to Produce.

4.     At no time prior to the October 22, 2007 deposition of Mr. Babauta was my office informed by Mr. Babauta that his handwritten notes and therapy records regarding his sessions with Ms. Holbrook were not included with Mr. Babauta's response to the Court's Order to Produce.

5.     Counsel for Defendant LeoPalace did not inform my office about the Motion to Dismiss prior to filing the motion on October 22, 2007.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of October, 2007, at Hagatna, Guam.

_____
PHILLIP TORRES

-2-

# Exhibit 2

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant LeoPalace Resort

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | CIVIL CASE NO. 06-00028 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| LEO PALACE RESORT, | ) | |
| | ) | |
| Defendant. | ) | **ORDER re:** |
| | ) | |
| | ) | **(1) MOTION TO COMPEL TESTIMONY AND PRODUCTION OF DOCUMENTS, OR IN THE ALTERNATIVE, TO DISMISS EMOTIONAL DISTRESS CLAIMS;** |
| JENNIFER HOLBROOK, VIVIENE VILLANUEVA and ROSEMARIE TAIMANGLO, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | **(2) MOTION TO EXTEND DISCOVERY COMPLETION DEADLINE;** |
| vs. | ) | |
| MDI GUAM CORPORATION dba LEO PALACE RESORT MANENGGON HILLS and DOES 1 through 10, | ) | **(3) MOTION FOR INDEPENDENT MEDICAL EXAMINATION.** |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter came before the court on August 29, 2007, at the hour of 1:30 pm on several motions filed by Defendant Leopalace Resort ("Leopalace"). Good cause being shown, IT IS HEREBY ORDERED:

1. Leopalace's motion to compel is granted. Plaintiff-Intervenors through their therapists are ordered to produce, not later than 4:00 p.m. on the third (3rd) day after their receipt of this Order, all medical records in their possession, including without limitation handwritten notes, related to any of the Plaintiff-Intervenors in this case. Leopalace may re-depose these therapists in connection with these medical records within a reasonable time, but may not re-depose Plaintiff-Intervenors.

2. Leopalace's alternative motion to preclude emotional distress claims is premature and is therefore denied without prejudice.

3. Leopalace's motion for an extension of the current discovery deadline is granted. The parties shall complete all remaining discovery within thirty (30) days of the date of this Order. Leopalace shall have thirty (30) days from the date of this Order within which to retain a medical expert and deliver an expert medical report to the other parties. Plaintiff EEOC and Plaintiff-Intervenors shall thereafter have two (2) weeks within which to take the deposition of Leopalace's medical expert.

4. Leopalace's motion for an independent medical examination is denied.

IT IS SO ORDERED.



/s/ Joaquin V.E. Manibusan, Jr.
**U.S. Magistrate Judge**
**Dated: Sep 14, 2007**

2

# Exhibit 3

APPEARANCES


Appearing on behalf of the Plaintiff-Intervenors:

        TEKER TORRES & TEKER
        Suite 2A
        130 Aspinall Avenue
        Hagatna, Guam 96910
        By:  Mr. Philip Torres, Esq.
        Phone:  671.477.9891


Appearing on behalf of the Defendant:

        DOOLEY ROBERTS & FOWLER
        Suite 201, Orlean Pacific Plaza
        865 S. Marine Drive
        Tamuning, Guam 96913
        By:  Mr. Tim Roberts, Esq.
        Phone:  671.646.1222


Appearing on behalf of the Plaintiff:

        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
        333 S. Las Vegas Boulevard
        Suite 300
        Las Vegas, Nevada 89101
        By:  Ms. Angela D. Morrison, Esq.
        Phone:  702.388.5072

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

Case 1:06-cv-00028    Document 117    Filed 11/07/2007    Page 12 of 50

1  down.  If I ask a bad question, tell me.  I'll ask it a

2  different way.

3      A.  Okay.

4      Q.  Having said all that, I'm going to announce that I'm

5  doing the deposition somewhat under protest.  I don't have

6  medical records that I believe I'm entitled to and the main

7  purpose of this deposition is to find out what I can about

8  why I don't have those medical records and I'm going to

9  reserve my right to at least attempt to reschedule your

10 deposition in the future if after filing a motion with the

11 court, I obtain the relief that I'll be looking for.  But I'm

12 saying that for the record.  You don't have to respond to it

13 one way or the other.

14     A.  Sure.

15     Q.  You know Rose Taimanglo and Viviene Villanueva and

16 Jennifer Holbrook?

17     A.  I know Viviene Villanueva and Jennifer Holbrook.

18     Q.  How many times have you counseled Viviene?

19     A.  I met with her on two occasions, two sessions.

20     Q.  And Jennifer more, right?

21     A.  Jennifer, I believe it was sixteen.

22     Q.  When was the first time, if you recall, that you saw

23 Jennifer?

24     A.  I met with Jennifer for the first time on April 8,

25 2006.

1    A.    Uh-huh.

2    Q.    You see what the first one is, any and all medical

3    and/or dental records including any and all reports and

4    handwritten notes.  Did you see that when you got this HIPPA

5    form?

6    A.    No.

7    Q.    Did you read it?

8    A.    No.  Like I said, even when the clients ask me for

9    copies of their own personal records, I didn't make that

10   available to them because of the misinterpretation that may

11   occur.  So it's not standard practice for me to just give

12   records, just because it may be misunderstood or

13   misrepresented.  So I typically would come up with a

14   treatment summary, just standard.

15   Q.    Well, I can understand a patient might misunderstand

16   notations.  Do you have the same concern with legal

17   professionals, such as me, that I would misinterpret or

18   misuse private information?

19   A.    I think anybody, I mean, not just attorneys.  Even

20   if it was another therapist that was reviewing the

21   information, because they're not really understanding what's

22   going on at the moment and what I'm thinking and what I'm

23   processing, so that's kind of my concern.

24        So even before I got the subpoena from you, even

25   when I guess Jennifer had requested for her information, that

1    she wanted to review her notes, I explained to her that I

2    would just need to sit with you if that's something you want

3    and it's not standard for me to give it out.  So I did

4    prepare a treatment summary.

5        Q.   All right.  Let me show you what we'll mark as

6    Exhibit 3 and this is the same as Exhibit 3 used in the

7    earlier deposition except it's addressed to Tom Babauta.  Do

8    you remember getting this subpoena?

9        A.   Yes, sir, I do.

10       Q.   And what day did this subpoena require you to do

11   something?

12       A.   July 10 at 2 o'clock.

13       Q.   The subpoena asked you to produce certain documents

14   on July 10 at 2 o'clock at my office, right?

15       A.   Yes.

16       Q.   And that deposition didn't go forward, right?

17       A.   No, sir.

18       Q.   And do you know why?

19       A.   Because I didn't attend.  I didn't show up.

20       Q.   Did you speak with anybody about your decision not

21   to show up?

22       A.   Dr. Lilli was going off island and she shared with

23   me she was going to be doing some research and review and

24   then I consulted with Dr. Bellis and he advised me at this

25   point, maybe we should just hold off because we did provide

1      A.    It all depends on the situation.  Sometimes it

2   contains quotes, sometimes it's formulations.

3      Q.    Your mental impression?

4      A.    My mental impression.

5      Q.    And is it sometimes the case that you have a

6   relatively immediate working hypothesis of what this person's

7   problem might be?

8      A.    By the end of the first section, I definitely have a

9   better understanding, unless it was like a personality

10  disorder, then it would take a few sessions to a few years.

11  But typically, I would get a working diagnosis.  It's

12  required actually if we're going to be billing the

13  insurances, that we have some kind of information to go on,

14  something to bill them about.

15     Q.    Let me ask you this, it might speed things up a

16  little bit:  It was Dr. Perez that diagnosed Jennifer as

17  having post traumatic stress disorder?

18     A.    Yes.

19     Q.    Was that your diagnosis or Dr. Perez?

20     A.    It was Dr. Perez's and that's why in my treatment

21  summary, I have her diagnosis is PTSD by history.

22     Q.    So when she came to see you -- I'll get there in a

23  minute.  When she came to see you, what did she present with,

24  as you guys like to say?

25     A.    That was -- she came in, she was having some

 1  treatment and diagnosis of PTSD.

 2      Q.   When you were treating Jennifer, did you ever notice

 3  that she had recurrent intrusive distressing recollections of

 4  an event including images, thoughts of protection?

 5      A.   (No response.)

 6      Q.   Did she display, while you were meeting with her,

 7  each and every required diagnostic criteria for a diagnosis

 8  of post traumatic stress disorder?

 9      A.   I'm just taking a minute here because there's quite

10  a few things on the diagnostic criteria.

11      Q.   Let's do it this way, Tom.  I withdraw that.  There

12  are quite a bit.

13      A.   Right.

14      Q.   And I wouldn't expect you to spit them out or

15  remember like that.  Did she display efforts to avoid

16  thoughts, feelings or conversations associated with the

17  events at Leo Palace?

18      A.   Yes.

19      Q.   And would your notes reflect that?

20      A.   They may but I will say that about 90% of what I

21  worked on with her was more after-effects of what happened

22  and not specifically about -- the discussion wasn't each and

23  every time about what happened at Leo Palace.  It was more

24  about kind of like spill off of what happened, more about how

25  it kind of translated into day-to-day difficulties that she

1  was -- things that were happening currently in her life,

2  right?

3      A.    Right.

4      Q.    Did you ever make any effort to clinically determine

5  whether she was still suffering from post traumatic stress

6  disorder during the time you were treating her?

7      A.    No, it wasn't something that -- there were other

8  things that popped up.  But it wasn't something where I said

9  let me reevaluate what exactly -- if your initial diagnosis

10 was still current.  So I operated off of that.

11     Q.    So you yourself didn't make any independent effort

12 to clinically diagnose PTSD while you were treating her?

13     A.    No.

14              MR. ROBERTS:  I have no further questions.

15                          [Whereupon the deposition was

16                           concluded at 4:12 p.m.]

17

18

19

20

21

22

23

24

25

## REPORTER'S CERTIFICATE

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that TOM BABAUTA personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 30, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 31st day of July 2007.

_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# Exhibit 4

1              IN THE DISTRICT COURT OF GUAM

2
U.S. EQUAL EMPLOYMENT           )  CASE NO. 1:06-CV-00028
3 OPPORTUNITY COMMISSION,        )
                                )
4           Plaintiff,           )
                                )
5      vs.                       )
                                )        DEPOSITION OF
6 LEO PALACE RESORT,             )     JENNIFER HOLBROOK
                                )        SATURDAY,
7                                )      MARCH 17, 2007
           Defendant.           )
8 _____)
  JENNIFER HOLBROOK,             )
9 VIVIENE VILLANUEVA and         )
  ROSEMARIE TAIMANGLO,           )
10                               )
           Plaintiff-Intervenors, )
11                               )
       vs.                       )
12                               )
  MDI GUAM CORPORATION dba LEO   )
13 PALACE RESORT MANENGGON HILLS )
   and DOES 1 through 10,        )
14                               )
           Defendants.           )
15 _____)

16
       The deposition of **Jennifer Holbrook**, called by
17 the Defendants, pursuant to Notice and pursuant to the
   Guam Rules of Civil Procedure, taken at the offices of
18 Dooley Roberts & Fowler, LLP, Suite 201, Orlean Pacific
   Plaza, 865 South Marine Corps Drive, Tamuning, Guam
19 96913, on Saturday, March 17, 2007, at the hour of 7
   o'clock a.m.
20
       That at said time and place, there transpired the
21 following:

22

23
                    Cecilia F. Flores
24           Freelance Stenotype Reporter
                  Tel: (671) 632-0727
25                Fax: (671) 632-5353
            Email: chilangflores@hotmail.com

COPY

1               A P P E A R A N C E S :

2

3   For Plaintiff        Angela D. Morrison
                         U.S. EQUAL EMPLOYMENT OPPORTUNITY
4                        COMMISSION
                         333 S. Las Vegas Boulevard, Suite 300
5                        Las Vegas, Nevada 89101

6

7   For Plaintiff-
     Intervenors         Phillip Torres, Esq.
                         TEKER TORRES & TEKER, P.C.
8                        130 Aspinall Avenue, Suite 2A
                         Hagatna, Guam 96910

9

10  For Defendant
     LeoPalace           Tim Roberts, Esq.
11                       DOOLEY ROBERTS & FOWLER, LLP
                         Suite 201, Orlean Pacific Plaza
12                       865 South Marine Corps Drive
                         Tamuning, Guam 96913

13

14  Also Present:        Michiro Niikura, Director, LeoPalace
                              Administration
15                       May Paulino, HR Manager, LeoPalace
                         Viviene Villanueva, Plaintiff-Intervenor

16

17

18

19

20

21

22

23

24

25

1    you started at LeoPalace, right?

2        A.    (No response.)

3        Q.    Let me ask it a different way.  In May or June

4    of 2003, you left the Junior Golf League?

5        A.    Well, it ended.

6        Q.    It ended?

7        A.    Yes.

8        Q.    And then did you take a job?

9        A.    Yes.

10       Q.    Where?

11       A.    LeoPalace.

12       Q.    Were you hired in 2003 or 2004 at LeoPalace?

13       A.    2004.

14       Q.    On June 5th of 2004; does that sound familiar?

15       A.    I believe so.

16       Q.    Maybe June 7th sounds a little more familiar.

17   Let me show you what we'll mark as Exhibit 3, this is a

18   new employee work sheet that we've been talking about

19   most of the week.

20                              (Exhibit 3 marked: New.

21                              Employee Orientation.)

22       Q.    (By Mr. Roberts)  When you were interviewed by

23   May Paulino back in 2001 for the job with LeoPalace,

24   were you given an employee handbook?

25       A.    I don't remember.

1 anything of that nature?

2     *A.*    No.

3     *Q.*    Okay. When was the first incident of what you

4 would consider sexual harassment that you saw with your

5 own eyes or experienced yourself at LeoPalace Resort?

6     *A.*    From Christina? Or in general?

7     *Q.*    In general, that you saw with your own eyes.

8     *A.*    The first incident that I could recall would

9 probably be with me when Christina grabbed my hand and

10 she -- before she grabbed my hand, she asked me, "Do you

11 think my breasts are either watermelons or melons?"

12     *Q.*    And about how many days or weeks after you

13 started working did Christina ask you that?

14     *A.*    Maybe two weeks into the job.

15     *Q.*    So you think about the third week in June?

16     *A.*    Yes.

17     *Q.*    And so she said, "Do you think my breasts are

18 watermelons or melons" -- what did she say?

19     *A.*    She asked me if I thought that her breasts were

20 watermelons or melons.

21     *Q.*    And did you answer her?

22     *A.*    I didn't answer her. I was like I don't think

23 -- I believe what I said is "I don't know."

24     *Q.*    And then what did she do?

25     *A.*    She grabbed my hand forcefully and tried to

1    Q.    Other than those particular words -- well, what

2    other words did you hear her say on the job?  That's a

3    terrible question that I withdraw; what other words did

4    you hear her say on the job.  Here's a different

5    question.  What's the next incident that you can

6    specifically recall after this melon incident that

7    involved touching?

8    A.    We were all walking to lunch --

9    Q.    When though, when did this happen?

10   A.    Maybe a week later or a week -- a week or two

11   weeks later.

12   Q.    So this is either three weeks or four weeks

13   into the job?

14   A.    Yes.

15   Q.    The first incident happened, was it two weeks

16   into the job approximately?

17   A.    I believe so.

18   Q.    Okay.  And so the second incident that we're

19   going to talk about right now involving touching was

20   either --

21   A.    The third or --

22   Q.    -- approximately three or four weeks into the

23   job?

24   A.    Yes.

25   Q.    And what happened?

1      *A.*      I was wearing a black skirt that day and we
2   were walking to lunch from the front desk --
3      *Q.*      Who's we?
4      *A.*      We would be Rose, Viviene, Christina and I, and
5   I believe --
6      *Q.*      You were walking to lunch?
7      *A.*      Yes, to the cafeteria.
8      *Q.*      So the four of you were going to have lunch
9   that day?
10     *A.*      We were scheduled to have lunch.
11     *Q.*      Well, you were walking together?
12     *A.*      Yes.
13     *Q.*      And you were going to the cafeteria?
14     *A.*      Yes.
15     *Q.*      Where you were going to have lunch with each
16  other?
17     *A.*      Yes.
18     *Q.*      Okay.  So what happened?
19     *A.*      As we were walking, she tried to stick her hand
20  under my skirt because she wanted to know if I was wet.
21     *Q.*      Did she say those words?
22     *A.*      She said, "I want to feel if you're wet."
23     *Q.*      And when you say she tried to put her hand
24  under your skirt -- I know there's a lot of people here,
25  I know this is embarrassing for you, I'm sorry, we have

1    to do it.  Tell me exactly what she did.

2        A.     She tried to go under my skirt to see if I was

3    wet, she tried to reach for me in my genital area.

4        Q.     Okay.  Did she actually touch your genital

5    area?

6        A.     No.

7        Q.     Why not?

8        A.     Because I pushed her down with my hand and I

9    said, "Stop!"

10       Q.     Did Viviene see this?

11       A.     I believe so.

12       Q.     Did Rose see this?

13       A.     I believe so.

14       Q.     So what did Christine do when you pushed her

15   hand away and said stop?

16       A.     Christina laughed at it and I ran ahead of the

17   group.

18       Q.     Ran?

19       A.     Well, I went further ahead of the group.

20       Q.     You walked a little faster, right?

21       A.     Yes.

22       Q.     And so did you have lunch with Christina and

23   Rose and Viviene that day?

24       A.     Yes.

25       Q.     Anything unusual happen during the lunch that

1    report it to?

2        A.    Correct.

3        Q.    All right.  Now we're three to four weeks into

4    the job and now there's been two incidents of sexual

5    harassment involving touching, right?

6        A.    Yes.

7        Q.    After this second incident with the dress,

8    what's the next incident involving touching that you

9    experienced or saw with your own eyes?

10       A.    Touching.

11       Q.    Physical contact.

12       A.    For myself, what I can remember what Christina

13   did to me, the third incident was when she slapped me on

14   my ass.

15       Q.    Okay.  Now when was this, the second incident

16   -- well let me back up.  Did you tell anybody about this

17   second incident?

18       A.    Which second incident?

19       Q.    The feeling up of the dress incident.

20       A.    No.

21       Q.    You didn't tell your boyfriend?

22       A.    I don't remember.

23       Q.    All right.  Did you ever talk with Viviene

24   about it, that particular incident?

25       A.    I don't remember.

1    *Q.*    All right.  So when did this -- and now you're

2    *going to talk about an incident wherein Christina*

3    *slapped your butt, right?*

4    *A.*    Um-hmm.

5    *Q.*    How many days or weeks after the dress

6    incident, this butt-slapping incident occur?

7    *A.*    I believe it was on July 7th.

8    *Q.*    July 7th would be 31 days or right around 30

9    days after you first started the job.

10   *A.*    Okay.

11   *Q.*    So the second incident was three to four weeks

12   into the job; that puts it at either 30 days into the

13   job or about 23 days into the job.  Does that help you

14   remember when this third incident might have happened,

15   how many days after the dress incident?

16   *A.*    No.

17   *Q.*    Was it within a day, or two days, or three

18   days, or four days, a week?

19   *A.*    I remember July 7th.

20   *Q.*    Okay.  What happened on July 7th?

21   *A.*    It was Christina and I working at the front

22   desk for the morning shift.

23   *Q.*    And she had previously tried to, before this

24   incident, before this day, tried to put her hand on your

25   -- or put your hand on her breast, right?

1    *A.*    Yes, there's two doors at the front.

2    *Q.*    One on each side?

3    *A.*    Yes.

4    *Q.*    So what happened?

5    *A.*    I was working on the computer and all I

6    remember -- what I remember is working on the computer,

7    doing some work so I guess getting ready for check-out

8    time, all I get is this big slap, bam!  right on me.

9              MR. ROBERTS:  The record should indicate

10   the witness has clapped her hands.

11   *A.*    And I yelled.

12   *Q.*    What did you say?

13   *A.*    I reacted by screaming.  My face was red, I

14   could feel my -- the anger, my ears were tipped red

15   also.

16   *Q.*    You had this reaction before you knew who did

17   that to you?

18   *A.*    I knew who -- I knew Christina slapped me

19   because I was --

20   *Q.*    How?  I mean, did you see her coming?

21   *A.*    No, I didn't see her coming.

22   *Q.*    Okay.

23   *A.*    She was behind me, she slapped me on my butt, I

24   turned around really quickly, I felt red, I felt angry.

25   I told her -- I screamed really loud and I said, "What

1   are you" -- I don't remember, I believe I said, "What

2   are you doing?" And she giggled and she said, "I'm

3   sorry.  I can't help myself." I said, "No, that wasn't

4   nice at all." And I told her, I said, "Don't you ever

5   do that again to anybody.  And if I find out that you do

6   that to anybody else, I will report you in."  And Hong

7   came out also.

8       *Q.*    But he came out after -- did he come out while

9   you were screaming?

10      *A.*    Right after I was done getting mad with

11  Christina, and I told her.

12      *Q.*    After you had got done telling off Christina?

13      *A.*    Yes.

14      *Q.*    So Mr. Hong didn't see what had happened?

15      *A.*    He asked me what happened.

16      *Q.*    What did you tell him?

17      *A.*    I told him, "Christina just came up to me and

18  hit me on my butt really hard, and she laughed about

19  it."

20      *Q.*    Who's Mr. Hong?

21      *A.*    Mr. Hong, I believe, was the sales supervisor.

22      *Q.*    Sales supervisor?

23      *A.*    I believe so.

24      *Q.*    And the sales supervisor was in charge of

25  coordinating J Pax from Japan?

1    A.    Yeah.

2    Q.    The Kotex was in its wrapper, I take it?

3    A.    Yes.

4    Q.    And what did Mr. Iijima do?

5    A.    I think he told her to put it away.

6    Q.    Iijima-san spoke English, right?

7    A.    Yes.

8    Q.    Pretty good English?

9    A.    Pretty well.

10    Q.    And when Mr. Iijima told her to put it away,

11   did she do it?

12    A.    I believe she went to the rest room right after

13   that

14    Q.    Were there any other incidents other than the

15   melon, discussing her breast as being a melon, or

16   reaching under your skirt, or slapping your butt, or the

17   waving of the Kotex, that you remember that you would

18   consider sexual harassment, that you saw with your own

19   eyes?  Or heard with your own ears.

20    A.    Yeah, I felt her jokes were unnecessary, her

21   sexual jokes, you know, her vulgar language, the way she

22   talked.  It made me feel uncomfortable and it made me

23   keep myself away from her.

24    Q.    But you don't remember any specific jokes,

25   right?

1    A.    Yes.

2    Q.    Why?

3    A.    Because they knew --

4    Q.    No, no, no; listen to my question.  Do you

5    fault LeoPalace for anything that Christine may have

6    done before LeoPalace Resort was aware that she was

7    acting inappropriately at the workplace?

8    A.    No.

9    Q.    We've talked about certain incidents and

10   certain comments that Christine made.  Were these -- and

11   she slapped your butt on, you remember, July 7, right?

12   A.    Yes.

13   Q.    Was there anything else that happened in July

14   that you could specifically remember?

15   A.    About Christina's behavior?

16   Q.    Yeah; that you saw with your own eyes or

17   experienced for yourself in July.

18   A.    I just continued to hear again -- she continued

19   to create a hostile environment for me, uncomfortable

20   feeling at --

21   Q.    Because of her language and the words she said?

22   A.    Yeah.  I was afraid of what she's going to --

23   what -- I was afraid of what she was going to do to me

24   next, you know, three incidences, and she slapped me on

25   my butt.  I told her to stop, but she continued to use

1    *A.*    Yes.

2    *Q.*    Why is that offensive then if Christine Camacho

3    is using those words?

4    *A.*    Because it's in a work environment.  I don't

5    use it in a work environment, and I don't feel it's

6    appropriate to be used in a work environment.

7    *Q.*    So there's a distinction?

8    *A.*    Yes.

9    *Q.*    Mr. Roberts told you that prior to receiving

10   the letter from me, that they had already terminated

11   Christine Camacho.

12   *A.*    Yes.

13   *Q.*    When did you find out she had been terminated;

14   do you remember?

15   *A.*    On Friday morning.

16   *Q.*    The 13th?

17   *A.*    Yes.

18   *Q.*    And did you think that things were going to get

19   better after she was terminated?

20   *A.*    Yes.

21   *Q.*    Did they get better after she was terminated?

22   *A.*    No.

23   *Q.*    How so?

24   *A.*    Management wasn't treating us fairly anymore,

25   you know.  Mr. Maruyama approached me and made me -- the

1    *A.*    Yes.

2    *Q.*    Why did you go back there?  You had the same

3    job at CCP, according to your earlier testimony.

4    *A.*    It was -- I liked working at LeoPalace, I liked

5    working with Mr. Suzuki and the staff, it was a friendly

6    environment, and I felt I was capable of doing a good

7    job working there.

8    *Q.*    And so that relationship that you had with

9    management early on wasn't the same?  Are you testifying

10   that it's not the same then after this?

11   *A.*    Correct, it's not the same anymore.

12   *Q.*    Mr. Roberts said you only worked there eight

13   days afterwards, after the complaint became

14   knowledgeable to management.

15   *A.*    I'm sorry; repeat your question.

16   *Q.*    Okay.  Mr. Roberts said that Mr. Maruyama found

17   out on August 17th about your complaint and that

18   subsequent to that you only worked for eight days.

19   *A.*    Okay.

20   *Q.*    And you said you quit because you were

21   stressed, but eight days, it was only eight days.

22   *A.*    It was eight days that I had to work, I really

23   felt like I had to go to work, you know, make the most

24   of it.  I wasn't happy working -- I wasn't happy going

25   to work knowing that I didn't have a good relationship

1    *Q.*    Right?

2    *A.*    Right.

3    *Q.*    So you saw a job opening for a job as a

4    personal assistant with Yutaka Maruyama in early August?

5    *A.*    I believe so.

6    *Q.*    And around the same time, May Paulino had

7    recommended you for that job?

8    *A.*    Yes.

9    *Q.*    To Mr. Maruyama?

10   *A.*    Yes.

11   *Q.*    And were you interested in that job?

12   *A.*    Yes.

13   *Q.*    And on August 11th you were still considering

14   whether you wanted that job or not?

15   *A.*    Yes.

16   *Q.*    So this would have been a job that you would

17   have taken if -- would you have taken this job if it had

18   become available?

19   *A.*    Yes.

20   *Q.*    You said that you were afraid every day, at

21   least eight days that you say you worked --

22   *A.*    Okay.

23   *Q.*    -- after your sexual harassment complaint, you

24   were afraid every day that Maruyama would yell at you.

25   *A.*    I was afraid something might happen.

1                    REPORTER'S CERTIFICATE

2

3          I, **Cecilia F. Flores**, Freelance Stenotype

4    Reporter, hereby certify the foregoing 154 pages to be a

5    true and correct transcript of the stenographic

6    shorthand notes and audio recording taken by me in the

7    within-entitled and numbered case at the time and place

8    as set forth herein.

9          Dated at Hagatna, Guam, this 14th day of April,

10   2007.

11                    _____
                            Cecilia F. Flores

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 5



Family Pacific

Licensed Individual
Marriage & Family Therapists
Play Therapists

March 21, 2007

Lilli Perez Iyechad
PhD, RPT-S

LisaLinda Natividad
LCSW, QCSW

Tom V.C. Babauta
MSW, QCSW

Tricia A. Lizama
MSW, QCSW

Law Offices
Teker Torres & Teker, P.C.
Suite 2A, 130 Aspinall Avenue
Hagatna, Guam 96910-5018

Attn:    Phillip Torres, Esquire

Subject:    Treatment Summary for Jennifer T. Holbrook [DOB:02/22/79]
            Re:  District Court of Guam Civil Case No. 06-00028

*Hafa Adai* Attorney Torres,

I am in receipt Ms. Holbrook's authorization for the release of records dated March 1, 2007, whereby she allows for disclosure of her health related documents that may be used for the purpose of litigation discovery. The authorization was attached to your letter requesting for the information in order to best represent her in the matter of the U.S. Equal Employment Opportunity Commission vs. Leo Palace Resort.

Please note that it is not standard practice for behavioral health clinicians to provide photocopied pages outlining the therapeutic intervention as our documentation is for the purpose of treatment provision and is considered protected health care information. As I had indicated to Ms. Holbrook, I would gladly provide a treatment summary.

Ms. Holbrook was a self-referral who requested services on August 14, 2004. Her initial appointment was on August 19th to which she was prompt, distraught, labile and appeared overwhelmed. The diagnostic impression on Axis I was Occupational Problem (V62.2) and Post Traumatic Stress Disorder, Acute (309.81). Her presenting problem stemmed from a former coworker who was sexually inappropriate verbally and physically towards her. This created much anxiety for Ms. Holbrook, a feeling that was exacerbated because the behavior was allowed to continue before management intervened. Consequently, Ms. Holbrook quit her job as a Front Desk Clerk and sought employment elsewhere.

Apparently, the situation had created major disruption in her life beyond the workplace. In addition to assisting Ms. Holbrook with the trauma experienced in the sexual harassment, I also as provided support for her adjustment in other life areas. Specifically, Ms. Holbrook was anxious had difficulty concentrating and

**Address:**
Reflection Center, Suite 202
222 Chalan Santo Papa
Hagatña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714

making decisions that consequently affected her academic performance while in her senior year at the University of Guam. Ms. Holbrook also experienced prolonged mood swings, including depression, hat consequently affected her relationship with her partner. It is my opinion that her symptoms displayed were results of her heightened anxiety, or Post-Traumatic Stress Disorder.

She was seen for five sessions between the months of August 2004 and April 2005. During the course of treatment, she was able to complete her studies at the University of Guam and managed to secure employment elsewhere. While Ms. Holbrook has survived the initial negative impact of the sexual harassment, she continued to have the 'victim' mentality as evidenced in her expressed concerns associated with furthering her education in a system that discriminates. Note that Ms. Holbrook returned to therapy at a later date with a colleague in the same practice, Mr. Tom Babauta.

I trust that this treatment summary will suffice in providing documentation on the psychological impact Ms. Holbrook sustained as a result of the sexual harassment she experienced.

*Sinceru yan magahet,*

Lilli Perez Iyechad, PhD

Attachment – Authorization to Disclose Confidential Information

Cc:     file copy

# Exhibit 6



**Family Pacific** August 31, 2007

Licensed Individual
Marriage & Family Therapists
Plag Therapists Dooley Roberts & Fowler LLP
       Suit 201, Orlean Pacific Plaza
       865 South Marine corps Drive
       Tamuning, Guam 96913

Lilli Perez Iyechad
PhD, RPT-S

       Attn: Tim Roberts, Esq.

RECEIVED
SEP 20 2007
9:50
DOOLEY ROBERTS & FOWLER LLP

LisaLinda Natividad
LCSW, QCSW

    Subject:    Acknowledgement of Receipt of Records
                  Holbrook, Jennifer
                  Taimanglo, Rosemarie
                  Villanueva, Viviene

Tom V.C. Babauta
MSW, QCSW

                Request for Disposal of Confidential Records
                District Court of Guam Case No. 1:06-CV-00028

Tricia A. Lizama
MSW, QCSW

       Greetings Attorney Roberts,

       The accompanying records are provided to you in response to the order to
produce documents relative to emotional distress. Please note that I had
conversed with Attorney Phil Torres on the matter of the records and he
assured me that you and he would facilitate the proper disposal of the records.
Such copies should be shredded to ensure confidentiality.

       Attorney Torres further noted that copies of the records would be made in the
event that an 'expert' will review the records for a secondary analysis. I
remind you that the records were written for us, as therapists the content of
which should not be taken out of context.

       I wish to reiterate that the females involved feel that the personal information
contained in these files goes beyond the interest of this case. I trust that you
will honor the belief of confidentiality in the therapeutic relationship as it
parallels in part, the confidential nature of the relationship between an
attorney and his clientele.

       Sincerely,

Lilli Perez Iyechad, PhD           Tom VC Babauta, MSW

**Address:**
Reflection Center, Suite 102
222 Chalan Santo Papa,
Hagåtña, Guam 96910
**Phone:** (671) 477-5715
**Fax:** (671) 477-5714
**Email:** fampac@ite.net
**Website:** www.familypacific.org

# Exhibit 7

**DEPOSITION EXHIBIT**

_4_

**Issued by the**

# DISTRICT COURT OF GUAM



**FILED**

DISTRICT COURT OF GUAM

JUL 1 8 2007

MARY L.M. MORAN
CLERK OF COURT

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
V.

**SUBPOENA IN A CIVIL CASE**

LEO PALACE RESORT,

*sc* //N 07/17/07 12:25pm

TO:   Lilli Perez-Iyechad, PhD
      Family Pacific

Case Number:[1]   1:06-CV-00028

Suite 102, Reflection Center
222 Chalan Santo Papa, Hagåtña, Guam
Tel: (671) 477-5715

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

✔ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Dooley Roberts & Fowler, LLP, Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913 | July 30, 2007 at 1:30 p.m. |

✔ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

All medical and other records <u>whatsoever</u> related to Jennifer Holbrook and/or Rose Taimanglo and/or Vivienne Villanueva.

| PLACE | DATE AND TIME |
|---|---|
| Dooley Roberts & Fowler LLP, Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913 | **RECEIVED** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  | JUL 18 2007 By: PE Time: 4:17pm |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| TSM | July 13, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Tim Roberts, Esq., Dooley Roberts & Fowler LLP
Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913; (671) 646-1222

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | Suite 102, Reflection Center<br>222 Chalan Santo Papa, Hagåtña, Guam<br>Tel: (671) 477-5715 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Lilli Perez-Iyechad | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Thomas J. Sablan | Process Server SP0058-06 |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    07/17/07
                DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

118 Tun Gregorio Tugon St., Yigo, Guam 96929

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

☐AO88 (Rev. 1/07 Guam) Subpoena in a Civil Case



**DEPOSITION EXHIBIT**       **Issued by the**

**4**

# DISTRICT COURT OF GUAM

**FILED**
DISTRICT COURT OF GUAM

JUL 18 2007

MARY L.M. MORAN
~~CLERK~~ OF COURT

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
    V.

**SUBPOENA IN A CIVIL CASE**

LEO PALACE RESORT, *07/17/07 4:03pm*

Case Number:[1]    1:06-CV-00028

TO:    Tom Babauta, MSW, ACSW
       Family Pacific

Suite 102, Reflection Center
222 Chalan Santo Papa, Hagåtña, Guam
Tel: (671) 477-5715

☐    YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Dooley Roberts & Fowler LLP, Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913 | July 30, 2007 at 3:30 pm |

☑    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**All medical and other records <u>whatsoever</u> related to Jennifer Holbrook and/or Rose Taimanglo and/or Vivienne Villanueva.**

| PLACE | DATE AND TIME |
|---|---|
| Dooley Roberts & Fowler LLP, Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913 | July 24, 2007 at 10:00 a.m. |

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

**RECEIVED**

JUL 18 2007

Tokar Torres & Tokar, P.C.

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* | July 13, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Tim Roberts, Esq., Dooley Roberts & Fowler LLP
Suite 201, 865 S. Marine Corps Drive, Tamuning, Guam 96913; (671) 646-1222

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than *district of issuance*, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | Suite 102, Reflection Center<br>222 Chalan Santo Papa, Hagåtña, Guam<br>Tel: (671) 477-5715 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Tom Babauta | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Thomas J. Sablan | Process Server; SP0058-06 |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on     07/17/07
                DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

118 Tun Gregorio Tugon Street, Yigo, Guam 96929

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

# Exhibit 8

1  **TEKER TORRES & TEKER, P.C.**
   130 Aspinall Avenue-Suite 2A
2  Hagåtña, Guam 96910
   Telephone: 671.477.9891
3  Facsimile: 671.472.2601

4  Attorneys for Plaintiff-Intervenors,
   *Jennifer Holbrook, Rosemarie*
5  *Taimanglo and Viviene Villanueva*

6

7

8                **UNITED STATES DISTRICT COURT**

9                    **DISTRICT OF GUAM**

10
   U.S. EQUAL EMPLOYMENT                    CIVIL CASE NO. 06-00028
11 OPPORTUNITY COMMISSION,

12                          Plaintiff,

13          vs.

14 LEO PALACE RESORT,

15                          Defendant.
                                            **ORDER MODIFYING**
16 ───────────────────────────             **SCHEDULING ORDER**

17 JENNIFER HOLBROOK, VIVIENE
   VILLANUEVA and ROSEMARIE
18 TAIMANGLO,

19                  Plaintiff-Intervenors,

20          vs.

21 MDI GUAM CORPORATION dba LEO
   PALACE RESORT MANENGGON HILLS
22 and DOES 1 through 10,

23                          Defendant.

24                 ----------

25 ///

ORDER MODIFYING SCHEDULING ORDER                        **PAGE** 1 of 2

1    Plaintiff-Intervenors, having moved the Court for an order extending deadline dates for future

2   discovery, motions and a new trial date, and it appearing to the Court that good cause exists for

3   granting Plaintiff-Intervenors' unopposed Motion,

4    **IT IS HEREBY ORDERED** that,

5    1.    The August 6, 2007 *discovery cut-off date* (defined as the last day to file responses to

6   discovery) is extended to **October 12, 2007.**

7    2.    Discovery and dispositive motion cut-off dates (the last day to file motions):

8    a)   The *discovery motion cut-off date* is extended from July 6, 2007, to **October 12,**

9   **2007.**

10    b)   The *dispositive motion cut-off date* is extended from September 10, 2007, to

11   **October 22, 2007.**

12    3.    Each party shall file a trial brief no later than November 5, 2007.

13    4.    The October 9, 2007 *Preliminary Pretrial Conference* is continued to **November 13,**

14   **2007, at 11:00 a.m.**

15    5.    The parties' exhibit binders, exhibit lists, witness lists, discovery material designations,

16   and proposed pretrial order shall be filed or lodged no later than November 20, 2007.

17    6.    The October 23, 2007 *Final Pretrial Conference* is continued to **November 27, 2007,**

18   **at 9:00 a.m.**

19    5.    That the October 30, 2007 *Jury Trial*, is continued to **December 4, 2007, at 9:00 a.m.**

20    IT IS SO ORDERED.

21     /s/ Joaquin V.E. Manibusan, Jr.

22         **U.S. Magistrate Judge**
          **Dated: Sep 27, 2007**

23

24
*U.S. Equal Employment Opportunity Commission vs. Leo Palace Resort*
**District Court of Guam Civil Case No. 06-00028**
25

ORDER MODIFYING SCHEDULING ORDER                    **PAGE** 2 of 2